UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WENDY GAUTHIER,

    *Plaintiff,*

*v.*

SUNHEALTH SPECIALTY SERVICES, INC. and SUNBRIDGE HEALTHCARE CORPORATION,

    *Defendants.*

Civil Action No.: 4:05-cv-40119

### DEFENDANTS' CONCISE STATEMENT of MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Local Rule 56.1, Defendants SunHealth Specialty Services, Inc., and SunBridge Healthcare Corporation file this statement of facts as to which there is no genuine issue to be tried.

**1.** The Plaintiff, Wendy Gauthier, was employed by SunBridge from December 22, 2003 through May 25, 2004 as a Certified Nursing Assistant. **Exhibit B** – Depo. of Gauthier (Day 1), 16:18-17:2; **Exhibit H** – Personnel Action Form.

**2.** The Plaintiff was hired to work the 11:00 PM to 7:00 AM shift. **Exhibit B** – Depo. of Gauthier (Day 1), 16:18-17:2.

**3.** During the six months she was employed by SunBridge, the Plaintiff was paid $12.00 per hour. **Exhibit I** – Plaintiff's Responses to the Defendants' Requests for Admissions to the Plaintiff.

**4.** SunBridge was aware that the Plaintiff was pregnant at the time she was hired. "Q. What was said in that interview? A. She asked me work history. What I was able to do. I

told her that I was pregnant. I told her I was looking for full-time work on 11:00 to 7:00 shift."

**Exhibit B** – Depo. of Gauthier (Day 1), 11:16-11:20.

    5.      The Plaintiff's intention was to take 90 days of maternity leave from SunBridge following the birth of her child.

> Q. You told her that you were pregnant because you didn't want it to become an issue?
>
> A. Yeah, you know, just to tell her up front that I was pregnant. You know, that I was going to be leaving within, I don't know, eight months or nine months, whatever it is because you can leave and I was going to come back. You have 90 days.

**Exhibit B** – Depo. of Gauthier (Day 1), 12:16 -12:23.

    6.      Under the Family Medical Leave Act, Massachusetts Maternity Leave Act and SunBridge policy, that maternity leave would have been unpaid. 28 U.S.C. §2612(c) ("leave granted under [the Family Medical Leave Act] may consist of unpaid leave"); M.G.L. c. 149, §105D ("Said maternity leave may be with or without pay at the discretion of the employer"); **Exhibit G** – SunBridge Employee Handbook, p.7 ("You are eligible for family or medical leave if you have been employed for at least 12 months").

    7.      The only "handicap" the Plaintiff complains of in this matter relates to "complications" from her pregnancy.

> Q. (By Mr. Griggs) Do you have a handicap?
> A. Now or then?
> Q. Do you have a handicap now?
> A. No.
> Q. Have you ever had a handicap?
> A. Yes.
> Q. What was that handicap?

>   A.  When I was pregnant, being pregnant.  I had complications due to my pregnancy.
>
>   Q.  What was that handicap?
>
>   MR. SHEA:  Objection.  She said complications due to her pregnancy.
>
>   THE WITNESS:  I had swollen feet, my hands were swollen, I was sick, I had morning sickness every night through the whole night.
>
>   ***
>
>   Q.  (By Mr. Griggs) Did this prevent you from doing anything?
>
>   A.  I felt like, yeah, because they felt it prevented me from doing my job the way that I'm supposed to do my job, but I felt that I followed all the regulations and the rules and tried to do my job to the best of my ability at that time.

**Exhibit B –** Depo. of Gauthier (Day 1), 50:12-51:17.

    8.      The only complications from the Plaintiff's pregnancy were vomiting and swollen feet and hands.

>   Q.  . . . Did you have any symptoms that arose subsequent to your employment commencing at SunBridge?
>
>   A.  Yes.
>
>   Q.  What were those symptoms?
>
>   A.  I was vomiting, I had morning sickness all the time.  My feet were swollen and my hands were swollen.  It was rough.
>
>   MR. SHEA:  You are talking strictly related to the pregnancy.
>
>   MR. GRIGGS:  That's correct.
>
>   Q.  (By Mr. Griggs) You were talking about morning sickness, swollen feet?
>
>   A.  Yeah.
>
>   Q.  What else?
>
>   MR. SHEA:  Vomiting.
>
>   THE WITNESS:  Vomiting.

**Exhibit B –** Depo. of Gauthier (Day 1), 37:9-38:1.

    9.      The symptoms the Plaintiff felt in connection with her pregnancy were typical to a normal pregnancy.  "Q.  Did you ever receive medication for your morning sickness?  A.  No, I did not."  **Exhibit C –** Depo. of Gauthier (Day 2), 13:18-13:20.

> Q. Did you ever seek treatment for this morning sickness? I already asked if you took medication you said no; is that correct?
>
> A. Correct.
>
> Q. Did you ever seek any other type of treatment?
>
> A. No. I just went to the doctor's office and they just told me it's common and it happens, and it was something I'd have to deal with.

**Exhibit C** – Depo. of Gauthier (Day 2), 19:9-19:18.

> Q. (By Mr. Griggs) So in the records that you just reviewed, and in your own recollection, you never received any medication or treatment for your morning sickness; is that correct?
>
> MR. SHEA: Objection.
>
> THE WITNESS: Correct.
>
> Q. (By Mr. Griggs) And you had just said that you also asked your physician about swollen feet. Did you ask him about your swollen feet?
>
> A. Yes, he was aware of that.
>
> Q. And when you asked him about the swollen feet and the morning sickness, what did he say about that?
>
> A. He didn't really say too much about the morning sickness, because it happens with pregnancy. And the swollen feet he just asked me to keep my feet up.

**Exhibit C** – Depo. of Gauthier (Day 2), 21:5-21:23.

10. Attendance during a CNA's assigned shift is an essential function of the CNA's job.

11. Understaffing jeopardizes the health and safety of the residents of a skilled nursing facility.

12. Wendy Gauthier was terminated after the second no call/no show because patient care was being compromised.

> Q. You just said she got two verbal warnings, did she get two verbal warnings?
>
> A. I'm going to say yes, we did it twice. And I thought it was she called out two times and then we terminated as patient care was being compromised.
>
> Q. Which patient care was being compromised?
>
> A. On the shift that she was assigned to work.

4

**Exhibit D** – depo. of Stephen Copper, 34:7-34:16.

    13.    It is difficult for SunBridge to arrange coverage for absent CNAs, especially on the second or third shift.

> Q.  (By Mr. Griggs)  Did you find it a challenge to find CNAs to staff shifts at Sandalwood?
>
> MR. SHEA:  Objection.
>
> THE WITNESS:  Very much so.
>
> Q.  (By Mr. Griggs)  So you were saying it was hard to find CNAs?
>
> MR. SHEA:  Objection.
>
> THE WITNESS:  Yes.
>
> Q.  (By Mr. Griggs)  Did you find it also hard to find nurses as well?
>
> MR. SHEA:  Objection.
>
> THE WITNESS:  Yes, sir.

**Exhibit E** – Depo of Ann Kendall, 68:11-68:23.

> Q.  (By Mr. Griggs)  I have one last question about staffing a nursing home in general.  As an administrator of a nursing home, do you face challenges of finding competent staff for your nursing home?
>
> MR. SHEA:  Objection.
>
> THE WITNESS:  Yes.
>
> Q.  (By Mr. Griggs)  While you were the administrator at SunBridge of Sandalwood in Oxford, Massachusetts, did you find challenges with regard to staffing your facility?
>
> MR. SHEA:  Objection.
>
> THE WITNESS:  Yes.
>
> Q.  (By Mr. Griggs)  Did you have trouble finding competent CNAs?
>
> MR. SHEA:  Objection.
>
> THE WITNESS:  Yes.
>
> Q.  (By Mr. Griggs)  In your opinion, do you think that leniency with regard to attendance policies may have been driven by these challenges?
>
> MR. SHEA:  Objection.
>
> THE WITNESS:  Yes.

**Exhibit D** – depo. of Stephen Copper, 113:4-114:2.

     **14.**    The Plaintiff was unable to fulfill her obligation of being present for her work shift.

> Q. Well, the question that's posed, I'll repeat it again and I'll shorten it, if you will: Can you name or describe an instance where you were unable to perform your job functions at SunBridge as a CNA because of this morning sickness?
>
> A. Well, yeah. I had -- I had asked Lisa Franks to switch with me because I was sick at work --
>
> Q. And --
>
> A. -- and I had asked her to work the following night.

**Exhibit C** – Depo. of Gauthier (Day 2), 15:3-15:14.

> Q. (By Mr. Griggs) You just testified that in May of 2004, there was a time when you could not perform the essential job functions of your position, as a CNA, because of morning sickness, and that you described as a time when you had asked Lisa Franks to then take your next shift, because I'm presuming you felt bad; is that correct?
>
> A. Yes.
>
>     THE REPORTER: That she felt "bad"?
>
> Q. (By Mr. Griggs) Is that a fair summary?
>
>     THE WITNESS: Yes.
>
>     And, like I said, I was sick throughout my whole pregnancy. I was even sick in the labor room, if you want to know that.
>
> Q. (By Mr. Griggs) Now, in May, 2004, was that the first time that you felt you were unable to perform your job functions?
>
> A. No, it was in January. In the beginning of January. And, like I said, beginning of January throughout my pregnancy.
>
> Q. When was the first time that you can recall that you were prevented from performing the essential job functions as your position as a CNA because of morning sickness?
>
> A. I'd say January, 2004, because that's when it started.
>
> Q. In January, 2004, and you discovered that you -- that you were unable to perform the essential job functions of your position as a CNA because of morning sickness, who did you tell about that?
>
> A. Who did I tell about that? The day that I was unable to come to work, I called in. I told the 3-to-11 supervisor.

**Exhibit C** – Depo. of Gauthier (Day 2), 17:7-18:19.

6

15. The Plaintiff failed to fulfill her attendance obligations. She was absent at least 9 times during her six-month employment. "Q. Do you recall calling in sick a number of times while you were employed at SunBridge? A. Yes, I did. Q. Do you recall roughly how many times you called out sick? A. Maybe nine, 10." **Exhibit B** – Depo. of Gauthier (Day 1), 42:3-42:9.

16. The only accommodation requested by the Plaintiff as a result of her pregnancy was additional time off from work.

> The only accommodation that I had told Ann was that I might need to take some nights off because I had some early morning doctor's appointments and she told me I was unable to do that. Because it was too hard for me to stay up all night and stay up all day to go to my doctor's appointments. And I was denied those accommodations.

**Exhibit B** – Depo. of Gauthier (Day 1), 38:9-38:16.

17. On or about April 28, 2004, the Plaintiff reported an injury to her stomach.

**Exhibit J** – Incident/Accident Report.

18. The accommodation Gauthier sought following this injury to her stomach was to be excused from any heave lifting or bending.

> Q. Okay. So when you say, "My doctor said 'no heavy lifting,'" which doctor is that?
> A. Dr. Farricy.
> Q. And did Dr. Farricy ever put that in writing, to your knowledge?
> A. Yes, he did.
> Q. And is that Exhibit 3 or 4?
> A. I believe it's four. But, like I said, I'm not sure. And, I believe, there was another note with this one. It said, "no lifting and no bending," due to complications of my pregnancy.

**Exhibit C** – Depo. of Gauthier (Day 2), 47:20-47:9

7

    **19.**    Lifting and supporting the weight of facility residents is an essential function of the Certified Nursing Assistant position.

> Q. Why did she request that note?
>
> A. To ensure that Wendy was capable of doing her job.
>
> Q. Why?
>
> A. Because there was lifting.
>
> Q. There was lifting?
>
> A. Yes, she was responsible to lift patients on her shift.

**Exhibit D** – depo. of Stephen Copper, 44:3-44:10.

> Q. Do you know whether light duty was available for someone in her position?
>
> A. No.
>
> Q. You don't know?
>
> A. I do know. Not for a CNA due to the nature of the work lifting.

**Exhibit D** – depo. of Stephen Copper, 59:7-59:12.

> Q. If Wendy Gauthier was injured at work and she needed an accommodation such as light duty, who would she go to, you?
>
> A. If she were injured at work and on compensation and the physician from the compensation that she went to sent her back to work with an accommodation for light duty, the light duty is very specified.
>
> Q. Like lifting restriction?
>
> A. And/or bending or sitting or whatever, it's very specific. If I could accommodate it, I would do so. But it would have to be accommodated on like if Wendy was working 11:00 to 7:00, I can't accommodate that, we do not have light duty on 11:00 to 7:00.

**Exhibit E** – Depo. of Ann Kendall, 75:23-76:13.

> Q. You would have gone back to your regular job if you had light duty?
>
> A. I can never be a certified nursing assistant again.

**Exhibit F** – Depo of Kathleen Raymond, 17:16-17:19.

> Q. Earlier you said that you could never be a CNA again, what did you mean by that?
>
> A. I cannot do certified nursing assistant anymore. I cannot lift over 10 pounds with my hand. I can't do that. It's just something I can't do anymore.

> Q. Is that an essential element of the job of being a CNA?
> A. Yes.

**Exhibit F** – Depo of Kathleen Raymond, 35:7-35:15.

20. The Plaintiff never made a report of discrimination. "Q. While you were employed at SunBridge, did you ever complain to anybody that you thought you were being discriminated against? A. No." **Exhibit B** – Depo. of Gauthier (Day 1), 45:17-45:21.

21. The Plaintiff was never retaliated against for making a report of discrimination.

> Q. Were you ever retaliated against for saying that you were pregnant?
> A. Yes.
> Q. When?
> A. After I was injured on the job.
> Q. And by whom?
> A. Because I had -- I felt like they retaliated against me because I missed a lot of time from work due to my pregnancy, they wrote me up. They got me for a no call/no show which I never committed. I was sick all the time. I needed light duty, was refused it.

**Exhibit B** – Depo. of Gauthier (Day 1). 45:22-46:9.

> Q. Were there any other instances where anybody retaliated against you at SunBridge because you said you were pregnant?
> MR. SHEA: Other than what she's already testified to?
> MR. GRIGGS: Correct.
> THE WITNESS: No.

**Exhibit B** – Depo. of Gauthier (Day 1). 47:19-48:1.

22. The Plaintiff never raised the issue of a Workers' Compensation Act claim being filed on her behalf.

> Q. But, nonetheless, you did return to work; is that correct?
> A. That is correct.

9

> Q. And were you able to fulfill your essential job functions when you returned to work after you were injured on the job?
>
> A. Yes, I had to.
>
> Q. Did you ever file a workmen's compensation complaint?
>
>> MR. SHEA: Objection.
>>
>> You can answer that.
>>
>> THE WITNESS: Did I?
>
> Q. (By Mr. Griggs) Yes.
>
> A. At the time, no.
>
>> There was -- there was nothing brought up to me about workmen's compensation.
>
> Q. Did you ever ask anyone about workmen's compensation?
>
> A. No.
>
> Q. Did you ever speak to anyone at SunBridge about workmen's compensation?
>
> A. No, I did not.
>
> Q. In your complaint relating to this lawsuit, it was stated that you believe you were discriminated against, or retaliated against -- I'm paraphrasing -- for filing a workmen's compensation claim; is that correct?
>
> A. Correct.

**Exhibit C** – Depo. of Gauthier (Day 2), 47:21-48:24.

23. The Plaintiff was never retaliated against for filing a Workers Compensation Act claim. *Id.*

24. The Plaintiff was never retaliated against for request that a Workers Compensation Act claim be filed on her behalf. *Id.*

        Respectfully Submitted,

        **SunHealth Specialty Services, Inc., and SunBridge Healthcare Corporation**,

        by its attorney,

           /s/ Michael Williams
        K. Scott Griggs  (BBO# 555988)
        Michael Williams (BBO# 634062)
        Lawson & Weitzen, LLP
        88 Black Falcon Avenue, Suite 345
        Boston, MA 02210-1736
        Telephone: (617) 439-4990
        Facsimile:  (617) 439-3987
        MWilliams@Lawson-Weitzen.com

**CERTIFICATE OF SERVICE**

    I hereby certify that this Document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 2, 2007.

          /s/ Michael Williams