UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WENDY GAUTHIER,

     *Plaintiff,*

*v.*

SUNHEALTH SPECIALTY SERVICES,
INC. and SUNBRIDGE HEALTHCARE
CORPORATION,

     *Defendants.*

Civil Action No.: 4:05-cv-40119

## AFFIDAVIT of MICHAEL WILLIAMS in SUPPORT of DEFENDANTS' MOTION for SUMMARY JUDGMENT

I, Michael Williams, do depose and state:

1.    I am a member in good standing of the bar of the Commonwealth of Massachusetts and for the United States District Court for the District of Massachusetts. I am an associate at the law firm of Lawson & Weitzen, LLP. I represent the Defendants, SunHealth Specialty Services, Inc., and SunBridge Healthcare Corporation, in this matter. I have personal knowledge of the facts recited herein and that the same are true of my knowledge.

2.    Filed in support of the *Defendants' Motion for Summary Judgment* are true copies of the following:

    Exhibit A - Plaintiff's Amended Complaint (Docket Entry #17)

    Exhibit B - Excerpts from the Deposition of Plaintiff Wendy Gauthier (Day 1)

    Exhibit C - Excerpts from the Deposition of Plaintiff Wendy Gauthier (Day 2)

    Exhibit D - Excerpts from the Deposition of Stephen Copper

    Exhibit E - Excerpts from the Deposition of Ann Kendall

Exhibit F  -  Excerpts from the Deposition of Kathleen Raymond

Exhibit G  -  SunBridge Employee Handbook

Exhibit H  -  Personnel Action Form

Exhibit I  -  Plaintiff's Responses to the Defendants' Requests for Admissions to the Plaintiff

Exhibit J  -  Incident/Accident Report dated 4/28/04

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 2nd DAY OF APRIL, 2007.

_____/s/ Michael Williams_____

Michael Williams  (BBO# 634062)

Dated: April 2, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WENDY GAUTHIER,

Plaintiff

v.

SUNHEALTH SPECIALTY
SERVICES, INC. and SUNBRIDGE
HEALTHCARE CORPORATION,

Defendants

CIVIL ACTION NO.: 05cv40119-FDS

## PLAINTIFF'S AMENDED COMPLAINT AND JURY DEMAND

### Parties

1.   The Plaintiff, Wendy Gauthier, is a natural person currently residing at 7 Grafton Street,

Apartment 2, Millbury, Worcester County, Massachusetts.

2.   The Defendant, SunHealth Specialty Services, Inc. (hereinafter referred to as

"SunHealth" or collectively as "Defendants"), is a corporation with a principle address of

101 Sun Avenue, Albuquerque, New Mexico.

3.   The Defendant, SunBridge Healthcare Corporation (hereinafter referred to as

"SunBridge" or collectively as "Defendants"), is a corporation with a principle address of

101 Sun Avenue, Albuquerque, New Mexico.  SunBridge operates a facility known as

SunBridge Care and Rehabilitation for Sandalwood (hereinafter referred to as

"Sandalwood"), is located at 3 Pine Street, Oxford, Worcester County, Massachusetts.

## Facts

4.  The Plaintiff began her employment with the Defendants at the Sandalwood facility in or about December of 2003 as a full-time employee under the job title of Certified Nursing Assistant (CNA). Over the time of her employment, the Plaintiff always performed her job responsibilities well.

5.  The Plaintiff was injured during the course of her employment while moving a patient. As a result of this injury, the Plaintiff went to the hospital and was treated for a strained muscle.

6.  The Plaintiff believed that a worker's compensation claim should have been filed on her behalf.

7.  The Plaintiff had initially requested light duty and was denied, while other employees had been granted light duty in the past.

8.  The Defendants were aware that the Plaintiff was pregnant. The Plaintiff began experiencing complications with her pregnancy and informed management of the Defendants.

9.  The Plaintiff requested a reasonable accommodation from the Defendants for complications related to her pregnancy. The Plaintiff asked the Defendants for time off from work and light duty and was denied.

10. The Plaintiff provided medical documentation to the Defendants regarding her pregnancy complications and her injury while at work.

11. When the Plaintiff attempted to return to work after her injury with medical documentation, the Plaintiff felt retribution and retaliation for being injured on the job and for requesting reasonable accommodation for her pregnancy.

12.     Ultimately, the Plaintiff's employment was terminated on or about May 15, 2004 for allegedly committing a "no call–no show."

13.     In fact, the Plaintiff had informed the Defendants of her scheduled absence and notified the Defendants of her replacement.

14.     The Plaintiff believes that the reasons given by the Defendants for her termination are not credible and are a pretext.

## Count I
### (M.G.L. c. 151B - Handicap Discrimination and Harassment)

15.     The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

16.     The Plaintiff is a qualified handicap person, pursuant to M.G.L. c. 151B and otherwise. The Plaintiff was also regarded as handicapped by the Defendants.

17.     The Plaintiff's employment with the Defendants was terminated, and her employment with the Defendants was otherwise adversely affected, based upon the Plaintiff's handicap.

18.     The Plaintiff was treated adversely and differently than her co-workers and she suffered a pervasive and hostile work environment based upon her handicap and disability.

19.     The Plaintiff was severely and adversely affected by the Defendants' conduct and the failure of the Defendants to take reasonable steps to stop this conduct.

WHEREFORE, The Plaintiff, Wendy Gauthier, respectfully requests a judgment against the Defendants and for all damaged available pursuant to M.G.L. c. 151B.

## Count II
### (M.G.L. c. 151B–Sex/Gender/Pregnancy Discrimination)

20.     The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

21.     The discriminatory treatment of the Plaintiff, as described herein, violates the express

provisions of M.G.L. c. 151B with regard to sex, gender and pregnancy.

22.    There is direct and circumstantial evidence of bias on the part of the Defendants, including, but not limited to, the evidence set forth above.

23.    This environment and the conditions imposed upon the Plaintiff and the adverse action taken against the Plaintiff related to her sex and gender adversely affected the terms and conditions of her employment.

24.    The Plaintiff was severely and adversely affected by the Defendants' conduct and the failure of the Defendants to take reasonable steps to stop this conduct.

WHEREFORE, the Plaintiff, Wendy Gauthier, respectfully requests a judgment against the Defendants and for all damages available pursuant to M.G.L. c. 151B.

### Count III
### (M.G.L. c. 151B –Retaliation)

25.    The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

26.    The Plaintiff was treated differently as to the terms and conditions of her employment and based upon her reporting of handicap, sex and gender discrimination.

27.    The Plaintiff believes that she was terminated, at least in part, based upon her reporting of said discrimination.

28.    This environment and the conditions imposed upon the Plaintiff related to and adversely affected the terms and conditions of her employment.

29.    The Plaintiff was severely and adversely affected by the Defendants' conduct and the failure of the Defendants to take reasonable steps to ensure that this discriminatory conduct would not continue.

WHEREFORE, the Plaintiff, Wendy Gauthier, respectfully requests judgment against the Defendants and for all damages available pursuant to M.G.L. c. 151B.

### Count IV
### (M.G.L. c. 152, Section 75B –Retaliation)

25. The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

26. The Plaintiff was treated differently as to the terms and conditions of her employment and based upon her work-related injury.

27. The Plaintiff believes that she was terminated, at least in part, based upon her work-related injury.

28. This environment and the conditions imposed upon the Plaintiff related to and adversely affected the terms and conditions of her employment.

29. The Plaintiff was severely and adversely affected by the Defendants' conduct and the failure of the Defendants to take reasonable steps to ensure that this discriminatory conduct and retaliation would not continue.

WHEREFORE, the Plaintiff, Wendy Gauthier, respectfully requests judgment against the Defendants and for all damages available pursuant to M.G.L. c. 152, Section 75B.

**THE PLAINTIFF CLAIMS A JURY TRIAL WITH RESPECT TO ALL CLAIMS**

**SO TRIABLE, PURSUANT TO FED. R. CIV. P. RULE 38 AND OTHERWISE.**


The Plaintiff
WENDY GAUTHIER
By Her Attorney

Date: May 4, 2006

MICHAEL O. SHEA, ESQUIRE
BBO#555474
Law Office Of Michael O. Shea, P.C.
451 Main Street
Wilbraham, MA 01095
Telephone: (413) 596-8005
Facsimile: (413) 596-8095

5

1

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3

4

5    ******************************

6    WENDY GAUTHIER,              *

7              Plaintiff        *

8    vs.                    *No.: 05cv40119-FDS

9    SUNHEALTH SPECIALTY          *

10   SERVICES, INC. and SUNBRIDGE *

11   HEALTHCARE CORPORATION,      *

12             Defendants        *

13   ******************************

14

15        DEPOSITION OF:  WENDY GAUTHIER

16       CATUOGNO COURT REPORTING SERVICES

17            446 Main Street

18         Worcester, Massachusetts

19        February 8, 2007    3:21 p.m.

20

21

22

23           Elisabeth Zahariadis

24        Certified Shorthand Reporter

11

1          Q.      How did you find the job at

2     SunBridge Sandalwood?

3          A.      I found it in the Telegram and

4     Gazette.

5          Q.      Who did you contact at SunBridge?

6          A.      I believe it was Ann Kendall.  She

7     was the director of nursing.

8          Q.      Ann Kendall?

9          A.      Yes.

10         Q.      You went for an interview at

11    SunBridge Sandalwood?

12         A.      Yes, I did.

13         Q.      Who did you speak to during your

14    interview?

15         A.      I spoke to Ann.

16         Q.      What was said in that interview?

17         A.      She asked me work history.  What I

18    was able to do.  I told her that I was pregnant.

19    I told her I was looking for full-time work on

20    11:00 to 7:00 shift.

21         Q.      Why did you request 11:00 to 7:00?

22         A.      Because my boyfriend and I only

23    have one car so we worked opposite shifts.

24         Q.      Why did you tell Ann Kendall you

1     were pregnant?

2          A.     So it wouldn't become an issue if

3     something had happened or they would know up

4     front before I even started.

5          Q.     What do you mean by become an

6     issue?

7          A.     Anything had happened, I just

8     wanted her to know up front that I was pregnant.

9     I had a lot of complications due to my

10    pregnancy.

11         Q.     Did you tell her in this interview

12    when you first went for your interview that you

13    had complications?

14         A.     No, it didn't get the complications

15    until after, after I started working there.

16         Q.     You told her that you were pregnant

17    because you didn't want it to become an issue?

18         A.     Yeah, you know, just to tell her up

19    front that I was pregnant.  You know, that I was

20    going to be leaving within, I don't know, eight

21    months or nine months, whatever it is because

22    you can leave and I was going to come back.  You

23    have 90 days.

24         Q.     Just to complete my question and

16

1          it.  Do you want to read it back and get

2          her answer.

3                  MR. GRIGGS:  You are telling her

4          not to answer.

5                  MR. SHEA:  You asked and she

6          answered it.  Can we read back the last

7          question?  She said no.  I'm happy to go

8          back in the record.

9                  MR. GRIGGS:  Let's read back the

10         question and the answer.

11

12                  * (Question and answer read)

13

14         Q.    (By Mr. Griggs)  At the time of

15    your interview, did you request any

16    accommodation in any regard?

17         A.    No.

18         Q.    When was your first day of

19    employment?

20         A.    December 22, 2004, I believe.

21         Q.    You started working 11:00 to 7:00?

22         A.    Correct.

23                  MR SHEA:  Did you say three or

24         four?

17

1           THE WITNESS:  It was December I

2       started working, 2003.

3       Q.    (By Mr. Griggs)  When you were

4    hired, were you ever told you you were an

5    employee at will?

6       A.    No.

7       Q.    Did you ever sign a document

8    acknowledging that you were an employee at will?

9       A.    I don't understand what you mean by

10   that.

11      Q.    Did you ever sign a document where

12   by you acknowledged by your signature that you

13   were employee at will?

14           MR. SHEA:  If you know?

15           THE WITNESS:  I don't recall.

16      Q.    (By Mr. Griggs)  Do you know what

17   an employee at will means?

18           MR. SHEA:  Objection.  You can

19       answer if you know.

20           THE WITNESS:  I don't know, no.

21           MR. GRIGGS:  I'll mark this

22       document as Exhibit 1.

23

24           (Exhibit 1, Employee

```
 1        double negative.

 2        Q.    (By Mr. Griggs)  You were not

 3   denied light duty in January of 2004?

 4        A.    Correct.

 5        Q.    Thank you.

 6              When did you first have

 7   complications from your pregnancy -- strike

 8   that.

 9              Did you have any symptoms that

10   arose subsequent to your employment commencing

11   at SunBridge?

12        A.    Yes.

13        Q.    What were those symptoms?

14        A.    I was vomiting, I had morning

15   sickness all the time.  My feet were swollen and

16   my hands were swollen.  It was rough.

17              MR. SHEA:  You are talking strictly

18        related to the pregnancy.

19              MR. GRIGGS:  That's correct.

20        Q.    (By Mr. Griggs)  You were talking

21   about morning sickness, swollen feet?

22        A.    Yeah.

23        Q.    What else?

24              MR. SHEA:  Vomiting.
```

38

```
 1              THE WITNESS:  Vomiting.

 2       Q.    (By Mr. Griggs)  Did you ever

 3   request any change in your work duties or

 4   accommodations, if you will?

 5       A.    Yes, I have.

 6       Q.    With respect to the morning

 7   sickness symptoms like vomiting and swollen

 8   feet?

 9       A.    The only accommodation that I had

10   told Ann was that I might need to take some

11   nights off because I had some early morning

12   doctor's appointments and she told me I was

13   unable to do that.  Because it was too hard for

14   me to stay up all night and stay up all day to

15   go to my doctor's appointments.  And I was

16   denied those accommodations.

17       Q.    When you asked Ann Kendall for a

18   day off or a night off so that you could attend

19   a doctor's appointment?

20              MR. SHEA:  I think she said plural.

21       Q.    (By Mr. Griggs)  When was the first

22   time?

23              MR. SHEA:  If you don't remember

24       exactly.
```

GAUTHIER, WENDY (Day 1) 02/08/07

42

1        A.    I think it was Donna.  I'm not

2   sure.

3        Q.    Do you recall calling in sick a

4   number of times while you were employed at

5   SunBridge?

6        A.    Yes, I did.

7        Q.    Do you recall roughly how many

8   times you called out sick?

9        A.    Maybe nine, 10.

10       Q.    Did you ever receive a written

11  warning regarding your attendance?

12       A.    Yes.

13       Q.    Did you ever not show up for a

14  shift without calling?

15       A.    No.

16       Q.    On January 27th, did you not call

17  in and not show up for work?

18            MR. SHEA:  She just said she never

19       did that.

20            THE WITNESS:  No.

21            MR. GRIGGS:  I'll mark this

22       document entitled the 2004 Attendance

23       Controller as Exhibit 5.

24

1          A.     28th.

2          Q.     What does that note say?

3          A.     I was kicked in the abdomen by a

4     patient during care.

5          Q.     I'm sorry, I said January.

6          A.     It's actually April 28th I got

7     injured on the job.

8          Q.     You are referring to that day?

9          A.     Yes.

10               MR. SHEA:  Can we take a quick

11        break?

12               MR. GRIGGS:  Sure.

13

14               (A recess was taken)

15

16               MR. GRIGGS:  Back on the record.

17         Q.     (By Mr. Griggs)  While you were

18    employed at SunBridge, did you ever complain to

19    anybody that you thought you were being

20    discriminated against?

21         A.     No.

22         Q.     Were you ever retaliated against

23    for saying that you were pregnant?

24         A.     Yes.

46

1    Q.    When?

2    A.    After I was injured on the job.

3    Q.    And by whom?

4    A.    Because I had -- I felt like they

5    retaliated against me because I missed a lot of

6    time from work due to my pregnancy, they wrote

7    me up.  They got me for a no call/no show which

8    I never committed.  I was sick all the time.  I

9    needed light duty, was refused it.

10   Q.    Did you ever request light duty in

11   writing?

12   A.    Yes, my doctor provided a note.

13   Q.    Do you have a copy of that?

14   A.    No, I do not.

15   Q.    What doctor was that?

16   A.    Dr. Farricy.

17   Q.    What was the date that he wrote

18   that letter?

19          MR. SHEA:  You don't have to guess.

20          THE WITNESS:  I don't recall.

21          MR. SHEA:  We can get the medical

22      records and clear up these dates, but don't

23      speculate.

24   Q.    (By Mr. Griggs)  Did Dr. Farricy

47

1     write this letter after the incident that you

2     were injured?

3             A.      Yes.

4             Q.      Was it at your request?

5             A.      No, it was at his request.

6             Q.      Do you know who he sent this letter

7     to?

8             A.      He sent it to Ann.

9             Q.      Do you know what it said?

10            A.      It said that Wendy Gauthier needs

11    to be on light duty, no lifting, no rolling

12    heavy patients over.

13            Q.      Did you request to move to the day

14    shift?

15            A.      No, did I not.

16            Q.      Did you request to move to any

17    other shift?

18            A.      No.

19            Q.      Were there any other instances

20    where anybody retaliated against you at

21    SunBridge because you said you were pregnant?

22                    MR. SHEA:  Other than what she's

23       already testified to?

24                    MR. GRIGGS:  Correct.

48

1                THE WITNESS:  No.

2        Q.    (By Mr. Griggs)  Did you ever file

3    for unemployment benefits after you were

4    terminated from SunBridge?

5        A.    Yes, I tried, I was denied.

6        Q.    Why were you denied?

7        A.    I had called unemployment.

8                MR. SHEA:  Objection.  For the

9          record, it shouldn't even be introduced in

10         a civil procedure.

11       Q.    (By Mr. Griggs)  Why were you

12   denied?

13       A.    Because they told me in the state

14   of Massachusetts if a woman is pregnant then

15   they are unable to collect.  And I was

16   terminated, so I didn't even have a chance.

17   They told me I was unable to collect anything.

18       Q.    Do you recall filing a charge with

19   the Mass Commission Against Discrimination?

20       A.    I had called them and they told me

21   they felt that I didn't have a good enough case,

22   I'd have to pay for it.  I didn't go that route.

23                MR. SHEA:  Other than in this

24         case.

50

1          Q.     (By Mr. Griggs)  Charge of

2    discrimination, I'm just going to walk through a

3    few of these things here on page one.  I'll

4    represent to you --

5                  MR. SHEA:  Do you want to show her

6          the document?

7                  MR. GRIGGS:  Sure.

8          Q.     (By Mr. Griggs)  Have you ever seen

9    this document?

10                 MR. SHEA:  Take your time and look

11         through it.

12         Q.     (By Mr. Griggs)  Do you have a

13   handicap?

14         A.     Now or then?

15         Q.     Do you have a handicap now?

16         A.     No.

17         Q.     Have you ever had a handicap?

18         A.     Yes.

19         Q.     What was that handicap?

20         A.     When I was pregnant, being

21   pregnant.  I had complications due to my

22   pregnancy.

23         Q.     What was that handicap?

24                 MR. SHEA:  Objection.  She said

```
 1        complications due to her pregnancy.
 2             THE WITNESS:  I had swollen feet,
 3        my hands were swollen, I was sick, I had
 4        morning sickness every night through the
 5        whole night.
 6             MR. SHEA:  There's case law on
 7        that.  Go ahead.
 8             MR. GRIGGS:  There is, we can talk
 9        about that.
10        Q.    (By Mr. Griggs)  Did this prevent
11   you from doing anything?
12        A.    I felt like, yeah, because they
13   felt it prevented me from doing my job the way
14   that I'm supposed to do my job, but I felt that
15   I followed all the regulations and the rules and
16   tried to do my job to the best of my ability at
17   that time.
18             MR. SHEA:  You mean doing anything
19        at all or life activities, which one are
20        you talking about?  I think she's confused.
21        Q.    (By Mr. Griggs)  Either.  Let's
22   talk about life activities.  Does being pregnant
23   prevent you from --
24             MR. SHEA:  Does being pregnant or
```

1

1          UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3         CIVIL ACTION NO.:  05CV40119-FDS

4

5    *****************************

6    WENDY GAUTHIER,            *

7          Plaintiff,          *

8    Vs.                       *

9    SUNHEALTH SPECIALTY        *

10   SERVICES, INC., and        *

11   SUNBRIDGE HEALTHCARE       *

12   CORPORATION,              *

13          Defendants.        *

14   *****************************

15

16         DEPOSITION OF:  WENDY GAUTHIER

17

18          CATUOGNO COURT REPORTING

19         446 Main Street, 18th Floor

20          Worcester, Massachusetts

21        March 5, 2007        10:15 a.m.

22

23            Dawn L. Halcisak

24        Certified Shorthand Reporter

13

```
 1        A.    Yes.

 2        Q.    So, in short, you were able to

 3   fulfill your job functions as a certified

 4   nursing assistant; is that correct?

 5        A.    Yes, when I first started there in

 6   December.  I didn't start receiving

 7   complications until January.

 8        Q.    Well, let's talk about the

 9   complications of which you speak of.  What kind

10   of complications?

11        A.    I had morning sickness all the

12   time --

13        Q.    Now, when you say "all the time" --

14             MR. SHEA:  No, let her finish.  Let

15        her finish her answer.

16             THE WITNESS:  I had swollen feet.

17        I had to use the bathroom more frequently.

18        Q.    (By Mr. Griggs) Did you ever

19   receive medication for your morning sickness?

20        A.    No, I did not.

21        Q.    When you said you had morning

22   sickness all the time, what do you mean by "all

23   the time" exactly?

24        A.    It wasn't -- it was just -- it
```

15

1   time.  I -- it was throughout my whole

2   pregnancy.  I --

3           Q.    Well, the question that's posed,

4   I'll repeat it again and I'll shorten it, if you

5   will:  Can you name or describe an instance

6   where you were unable to perform your job

7   functions at SunBridge as a CNA because of this

8   morning sickness?

9           A.    Well, yeah.  I had -- I had asked

10  Lisa Franks to switch with me because I was sick

11  at work --

12          Q.    And --

13          A.     -- and I had asked her to work the

14  following night.

15          Q.    And when was that?

16          A.    I believe that was in May, 2004.

17          Q.    Was there any other times you were

18  unable to perform your job functions as a CNA

19  because of morning sickness?

20              MR. SHEA:  That she specifically

21         recalls?  She said, "throughout."  I'll

22         object, for the record, this has been

23         asked and answered.  She's said several

24         times "throughout."  You asked her about a

GAUTHIER, WENDY (Day 2)  3/5/07

17

1          MR. SHEA:  Me too.  Me too.

2      Q.    (By Mr. Griggs)  You just answered

3  that there was a time in May of 2004 when --

4      A.    Well, that's --

5          THE REPORTER:  Wait, let him finish

6      the question, okay?

7      Q.    (By Mr. Griggs)  You just testified

8  that in May of 2004, there was a time when you

9  could not perform the essential job functions of

10  your position, as a CNA, because of morning

11  sickness, and that you described as a time when

12  you had asked Lisa Franks to then take your next

13  shift, because I'm presuming you felt bad; is

14  that correct?

15      A.    Yes.

16          THE REPORTER:  That she felt "bad"?

17      Q.    (By Mr. Griggs)  Is that a fair

18  summary?

19          THE WITNESS:  Yes.

20          And, like I said, I was sick

21      throughout my whole pregnancy.  I was even

22      sick in the labor room, if you want to

23      know that.

24      Q.    (By Mr. Griggs)  Now, in May, 2004,

18

1    was that the first time that you felt you were

2    unable to perform your job functions?

3        A.    No, it was in January.  In the

4    beginning of January.  And, like I said,

5    beginning of January throughout my pregnancy.

6        Q.    When was the first time that you

7    can recall that you were prevented from

8    performing the essential job functions as your

9    position as a CNA because of morning sickness?

10       A.    I'd say January, 2004, because

11   that's when it started.

12       Q.    In January, 2004, and you

13   discovered that you -- that you were unable to

14   perform the essential job functions of your

15   position as a CNA because of morning sickness,

16   who did you tell about that?

17       A.    Who did I tell about that?  The day

18   that I was unable to come to work, I called in.

19   I told the 3-to-11 supervisor.

20       Q.    And who was that?

21       A.    I don't even remember.  They don't

22   really have supervisors.  They were using

23   agencies for supervisors, so they had anybody

24   come in and out.  It's hard to keep track of

19

1   everybody.

2       Q.    Now, this morning sickness, aside

3   from making you vomit frequently, did it stop

4   you from going shopping?

5       A.    Yes.  It stopped me from doing the

6   things I really enjoy doing.  I couldn't clean

7   at home.  I had to put my feet up, because my

8   feet were so swollen.

9       Q.    Did you ever seek treatment for

10  this morning sickness?  I already asked if you

11  took medication you said no; is that correct?

12      A.    Correct.

13      Q.    Did you ever seek any other type of

14  treatment?

15      A.    No.  I just went to the doctor's

16  office and they just told me it's common and it

17  happens, and it was something I'd have to deal

18  with.

19      Q.    Can you show me anywhere in this

20  set of records that references -- did you ever

21  complain to your doctor about your morning

22  sickness?  I believe you just said you did.

23          Did he ever give you any written

24  advice, or make any diagnosis about this morning

21

1

2                    THE WITNESS:  I don't see anything

3          in here about that.  I can't understand

4          his writing.

5          Q.    (By Mr. Griggs)  So in the records

6    that you just reviewed, and in your own

7    recollection, you never received any medication

8    or treatment for your morning sickness; is that

9    correct?

10                    MR. SHEA:  Objection.

11                    THE WITNESS:  Correct.

12          Q.    (By Mr. Griggs)  And you had just

13    said that you also asked your physician about

14    swollen feet.  Did you ask him about your

15    swollen feet?

16          A.    Yes, he was aware of that.

17          Q.    And when you asked him about the

18    swollen feet and the morning sickness, what did

19    he say about that?

20          A.    He didn't really say too much about

21    the morning sickness, because it happens with

22    pregnancy.  And the swollen feet he just asked

23    me to keep my feet up.

24          Q.    How often?

47

1    doctor said, "no heavy lifting"?

2        A.    Correct.

3        Q.    So, once again, was it a hospital

4    doctor from Women's and Children's Center in Med

5    City that wrote this note or was it your

6    doctor --

7        A.    This one -- this is from my doctor.

8    Dr. Farricy.

9        Q.    Okay.  So when you say, "My doctor

10   said 'no heavy lifting,'" which doctor is that?

11       A.    Dr. Farricy.

12       Q.    And did Dr. Farricy ever put that

13   in writing, to your knowledge?

14       A.    Yes, he did.

15       Q.    And is that Exhibit 3 or 4?

16       A.    I believe it's four.  But, like I

17   said, I'm not sure.  And, I believe, there was

18   another note with this one.  It said, "no

19   lifting and no bending," due to complications of

20   my pregnancy.

21       Q.    But, nonetheless, you did return to

22   work; is that correct?

23       A.    That is correct.

24       Q.    And were you able to fulfill your

48

1    essential job functions when you returned to

2    work after you were injured on the job?

3         A.    Yes, I had to.

4         Q.    Did you ever file a workmen's

5    compensation complaint?

6              MR. SHEA:  Objection.

7              You can answer that.

8              THE WITNESS:  Did I?

9         Q.    (By Mr. Griggs)  Yes.

10        A.    At the time, no.

11             There was -- there was nothing

12   brought up to me about workmen's compensation.

13        Q.    Did you ever ask anyone about

14   workmen's compensation?

15        A.    No.

16        Q.    Did you ever speak to anyone at

17   SunBridge about workmen's compensation?

18        A.    No, I did not.

19        Q.    In your complaint relating to this

20   lawsuit, it was stated that you believe you were

21   discriminated against, or retaliated against --

22   I'm paraphrasing -- for filing a workmen's

23   compensation claim; is that correct?

24        A.    Correct.

1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3

4

5   ******************************

6   WENDY GAUTHIER,                *

7            Plaintiff        *

8   vs.                        *No.: 05cv40119-FDS

9   SUNHEALTH SPECIALTY           *

10  SERVICES, INC. and SUNBRIDGE *

11  HEALTHCARE CORPORATION,       *

12           Defendants        *

13  ******************************

14

15

16      DEPOSITION OF:  STEPHEN G. COPPER

17      CATUOGNO COURT REPORTING SERVICES

18            446 Main Street

19          Worcester, Massachusetts

20        February 8, 2007    10:12 a.m.

21

22

23          Elisabeth Zahariadis

24       Certified Shorthand Reporter

34

1    call/no show.

2         Q.    You just said she got a verbal

3    warning after the second no call/no show, right?

4         A.    Right, and then we terminated.  So

5    it would be one verbal, the no call/no show, we

6    terminated.

7         Q.    You just said she got two verbal

8    warnings, did she get two verbal warnings?

9         A.    I'm going to say yes, we did it

10   twice.  And I thought it was she called out two

11   times and then we terminated as patient care was

12   being compromised.

13        Q.    Which patient care was being

14   compromised?

15        A.    On the shift that she was assigned

16   to work.

17        Q.    Do you know whether she had

18   coverage for the no call/no show incident,

19   whether she had arranged coverage for herself?

20        A.    No.

21        Q.    Was that a common thing to do?

22              MR. GRIGGS:  Form.

23        Q.    (By Mr. Shea)  To be able to

24   arrange coverage and move your schedule around?

44

1       Q.      Who requested that note and why?

2       A.      Ann Kendall.

3       Q.      Why did she request that note?

4       A.      To ensure that Wendy was capable of

5   doing her job.

6       Q.      Why?

7       A.      Because there was lifting.

8       Q.      There was lifting?

9       A.      Yes, she was responsible to lift

10  patients on her shift.

11      Q.      You mean this was in relation to

12  her pregnancy?

13      A.      Yes.

14      Q.      Does SunBridge require that of all

15  pregnant employees to get a note from a doctor

16  or was that with respect to Wendy Gauthier?

17      A.      I do not know that.

18      Q.      Is there some policy that was being

19  followed at SunBridge that Ann Kendall felt she

20  needed a note from Wendy Gauthier to clear her

21  from lifting patients?

22      A.      I do not know that either.

23      Q.      Do you know whether Wendy Gauthier

24  asked for any accommodations from Ann Kendall or

59

1      Q.    You don't know?

2      A.    I would assume, yes, good employee.

3      Q.    You don't know whether she was

4  given any kind of opportunity to perform light

5  duty?

6      A.    No.

7      Q.    Do you know whether light duty was

8  available for someone in her position?

9      A.    No.

10      Q.    You don't know?

11      A.    I do know.  Not for a CNA due to

12  the nature of the work lifting.

13      Q.    Do you know whether they put any

14  CNAs on light duty?

15      A.    No.

16      Q.    You don't know?  You know they

17  didn't or you don't know either way?

18      A.    Yes, we would put CNAs on light

19  duty if we could accommodate them.

20      Q.    Where would they go on light duty?

21      A.    On the day shift if there was a

22  position available.

23      Q.    What would they do on the day shift

24  that needed light duty?

113

1    that?

2              MR. SHEA:  Objection.

3              THE WITNESS:  Yes.

4        Q.    (By Mr. Griggs)  I have one last

5    question about staffing a nursing home in

6    general.  As an administrator of a nursing home,

7    do you face challenges of finding competent

8    staff for your nursing home?

9              MR. SHEA:  Objection.

10             THE WITNESS:  Yes.

11       Q.    (By Mr. Griggs)  While you were the

12   administrator at SunBridge of Sandalwood in

13   Oxford, Massachusetts, did you find challenges

14   with regard to staffing your facility?

15             MR. SHEA:  Objection.

16             THE WITNESS:  Yes.

17       Q.    (By Mr. Griggs)  Did you have

18   trouble finding competent CNAs?

19             MR. SHEA:  Objection.

20             THE WITNESS:  Yes.

21       Q.    (By Mr. Griggs)  In your opinion,

22   do you think that leniency with regard to

23   attendance policies may have been driven by

24   these challenges?

114

1          MR. SHEA:  Objection.

2          THE WITNESS:  Yes.

3          MR. GRIGGS:  No further questions.

4          MR. SHEA:  Nothing further.

5

6          (Deposition concluded at 12:49 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

COPPER, STEPHEN G. (30(b)(6))  02/08/07

1

1        UNITED STATES DISTRICT COURT

2         DISTRICT OF MASSACHUSETTS

3

4

5    ****************************

6    WENDY GAUTHIER,              *

7             Plaintiff        *

8    vs.                        *No.: 05cv40119-FDS

9    SUNHEALTH SPECIALTY          *

10   SERVICES, INC. and SUNBRIDGE *

11   HEALTHCARE CORPORATION,       *

12            Defendants        *

13   ****************************

14

15      DEPOSITION OF:  ANN MARIE KENDALL

16      CATUOGNO COURT REPORTING SERVICES

17            446 Main Street

18         Worcester, Massachusetts

19       February 8, 2007    1:08 p.m.

20

21

22         Elisabeth Zahariadis

23      Certified Shorthand Reporter

24   APPEARANCES:

68

```
 1                    THE WITNESS:  Variety of reasons.
 2           I believe some of it being it was difficult
 3           to get staffing sometimes, so sometimes you
 4           try to make exceptions and also in doing
 5           so, you would help try to educate the
 6           employee and try to work with them.
 7           Q.    (By Mr. Griggs)  So sometimes you
 8    had no choice but to keep somebody?
 9                    MR. SHEA:  Objection.
10                    THE WITNESS:  Yes.
11           Q.    (By Mr. Griggs)  Did you find it a
12    challenge to find CNAs to staff shifts at
13    Sandalwood?
14                    MR. SHEA:  Objection.
15                    THE WITNESS:  Very much so.
16           Q.    (By Mr. Griggs)  So you were saying
17    it was hard to find CNAs?
18                    MR. SHEA:  Objection.
19                    THE WITNESS:  Yes.
20           Q.    (By Mr. Griggs)  Did you find it
21    also hard to find nurses as well?
22                    MR. SHEA:  Objection.
23                    THE WITNESS:  Yes, sir.
24                    MR. GRIGGS:  No further questions.
```

1    have gone to, you?

2              MR. GRIGGS:  Objection.  Assumes

3         facts not in the record.

4         Q.    (By Mr. Shea)  You may answer?

5         A.    If she had complications with her

6    pregnancy, I hoped she would go to her

7    physician.

8         Q.    If she needed an accommodation for

9    a physical impairment, would she go to you on

10   that?

11             MR. GRIGGS:  Objection to the form.

12             THE WITNESS:  Am I supposed to

13        answer?

14        Q.    (By Mr. Shea)  Yes.

15             MR. GRIGGS:  Objection to the form

16        of the question.  Answer if you understand

17        it.

18             THE WITNESS:  I'm not, can you just

19        clarify that?  I just really want to answer

20        honestly and that I understand it.

21        Q.    (By Mr. Shea)  Sure.  I'll give you

22   two different scenarios.

23             If Wendy Gauthier was injured at

24   work and she needed an accommodation such as

76

1   light duty, who would she go to, you?

2       A.   If she were injured at work and on

3   compensation and the physician from the

4   compensation that she went to sent her back to

5   work with an accommodation for light duty, the

6   light duty is very specified.

7       Q.   Like lifting restriction?

8       A.   And/or bending or sitting or

9   whatever, it's very specific.  If I could

10   accommodate it, I would do so.  But it would

11   have to be accommodated on like if Wendy was

12   working 11:00 to 7:00, I can't accommodate that,

13   we do not have light duty on 11:00 to 7:00.

14       Q.   Do you know whether she asked for

15   light duty on another shift?

16       A.   I don't remember her asking for

17   light duty.

18       Q.   You don't remember either way?

19       A.   No, sir.

20       Q.   Meaning correct you don't remember

21   either way?

22           MR. GRIGGS:  Form of the question.

23           THE WITNESS:  I don't know what

24      you are asking.

1

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3

4    ******************************

5    WENDY GAUTHIER,                *

6              Plaintiff        *

7    vs.                        *No.: 05cv40119-FDS

8    SUNHEALTH SPECIALTY          *

9    SERVICES, INC. and SUNBRIDGE *

10   HEALTHCARE CORPORATION,        *

11             Defendants       *

12   ******************************

13

14

15      DEPOSITION OF:  KATHLEEN D. RAYMOND

16       CATUOGNO COURT REPORTING SERVICES

17            446 Main Street

18          Worcester, Massachusetts

19         January 24, 2007     9:46 a.m.

20

21

22

23          Elisabeth Zahariadis

24       Certified Shorthand Reporter

1          A.      No, not offhand.

2          Q.      If I give you a minute, is it

3    possible that you could think of?

4          A.      I know there was a Debbie Laranger.

5    That's one of them off the top of my head.

6          Q.      She was injured on the job?

7          A.      Yes.

8          Q.      How was she injured on the job?

9          A.      I think by lifting a patient.

10         Q.      How were you injured on the job?

11         A.      Patient grabbed my wrist and

12   twisted and that's how my injury occurred.  But

13   I continued to work for two months after that

14   until my hand got so bad, I couldn't, I had a

15   hard time functioning doing my regular work.

16         Q.      You would have gone back to your

17   regular job if you had light duty?

18         A.      I can never be a certified nursing

19   assistant again.

20         Q.      What about Debbie Laranger you

21   said?

22         A.      I don't know.

23         Q.      Is it Laranger?

24         A.      I believe that's how you say her

35

1    anything to do with the change in policy?

2        A.    I'm not sure.

3        Q.    I'm going to be going back over a

4    few of the points jumping around, if I confuse

5    you, just let me know.

6        A.    Okay.

7        Q.    Earlier you said that you could

8    never be a CNA again, what did you mean by that?

9        A.    I cannot do certified nursing

10   assistant anymore.  I cannot lift over 10 pounds

11   with my hand.  I can't do that.  It's just

12   something I can't do anymore.

13       Q.    Is that an essential element of the

14   job of being a CNA?

15       A.    Yes.

16       Q.    If you can't do the lifting, you

17   can't be a CNA?

18       A.    Right.

19           MR. SHEA:  Objection to the last

20      question.

21       Q.    (By Mr. Williams)  You talked about

22   how you had been on light duty, I think you said

23   for a year; is that correct?

24       A.    A year, maybe a little bit more.

Sun Healthcare Group

# Employee Handbook

OUR EMPLOYEES ARE THE COMPANY
QUALITY CARE IS OUR BOTTOM LINE

OWNERSHIP AND ACCOUNTABILITY
SURPASS ALL EXPECTATIONS
CORPORATE SERVES THE FIELD



E H B 0 0 0 0 0 1

 Sun Healthcare Group

SUN HEALTHCARE GROUP

## MISSION

Sun Healthcare Group, Inc., and its
affiliated family of companies
are committed to ethical care and
quality of life for our patients and residents.
To fulfill this pledge, and as employers
of choice in the communities we serve,
we provide quality, cost-effective
healthcare services with skill,
compassion and respect.

## CORE VALUES

1. Our employees are the company.
   Quality care is our bottom line.

2. Surpass all expectations.

3. Ownership and Accountability

4. Corporate serves the field.

E H B 0 0 0 0 0 2

# *Welcome to Sun*



**Chairman of the Board and Chief Executive Officer**

At Sun Healthcare Group Inc., we are committed to being a leading provider of quality healthcare services for our patients and residents.

As an employer of choice, we recognize that all our employees play a valuable role in contributing to the overall objectives of the company. Only with high caliber employees can we maintain our high standards of service. This employee handbook will serve as a guide in achieving and maintaining those high standards within the work environment.

Passion for our jobs begins with compassion for one another. Above all, we must have a high degree of integrity in everything that we do — from preparing billing statements and delivering medications to providing direct patient care and making decisions about the future of the company. Skill, compassion, respect and integrity must be at the center of all that we do on a daily basis.

Richard K. Matros
Chairman of the Board and
Chief Executive Officer

Richard K. Matros is chairman of the board and CEO of Sun Healthcare Group, Inc. With more than 25 years of experience in healthcare and related health services, Rick has extensive experience managing skilled care facilities. He holds an M.S. degree in gerontology from the University of Southern California and a B.S. degree in psychology from Alfred University.

# *Introduction*

This handbook is intended to be a valuable resource in understanding the company's standards, personnel policies and practices. Since it is only a summary created for your ease, it is not all-inclusive of our human resource policies and procedures. The details found in the *Human Resources Policy and Procedure Manual* take precedence over the information provided in this handbook. If you have questions regarding the policies found in the *HR Policy and Procedure Manual,* you may request to review the manual and any specific policy in more detail with your supervisor. Your hiring manager will also outline the topics unique to your work location.

As a Sun employee, it is your responsibility to read this handbook and become familiar with its policies. You are required to acknowledge receipt of this handbook by signing the statement included in this handbook and providing it to your supervisor or location manager.

Because circumstances and situations change, the company reserves the right to revise, amend, add and delete personnel policies and procedures. As policies are developed and updated to deal with new situations, conditions, or laws, the company will inform you of these changes.

*The policies in this handbook cannot be modified, varied or bypassed without the express written approval of the senior vice president of human resources.*

## CONTENTS

SECTION 1    P. 1

Our employees are the company. Quality care is our bottom line.

SECTION 2    P. 13

Surpass All Expectations

SECTION 3    P. 19

Ownership and Accountability

SECTION 4    P. 33

Corporate Serves the Field

INDEX    P. 35

# *Introduction*

## Company Overview

**Organization**

**Sun Healthcare Group, Inc.** and its affiliated entities, described below, are referred to in this handbook as "Sun" or "the company." The various Sun affiliates include:

- **CareerStaff Unlimited, Inc.**, which is a national healthcare staffing solutions provider.
- **SunAlliance Healthcare Services, Inc.**, which provides mobile radiology and laboratory services.
- **SunBridge Healthcare Corporation** which, together with other affiliated companies, operates long-term care, behavioral health and acute rehabilitation facilities across the United States.
  - **Americare Health Services Corporation**, which provides Medicare Part B supplies.
- **SunDance Rehabilitation Corporation**, which provides physical, occupational and speech therapy to residents in SunBridge and nonaffiliated nursing homes.
  - **HTA of New York, Inc.**, which provides rehabilitative, educational and social services to the pediatric and adult population in the New York metropolitan area.
- **SunPlus Home Health Services Inc.**, which provides quality healthcare services in patients' homes and delivers prescription medications, supplies and equipment directly to patients.

**Equal Opportunity Employer / Affirmative Action**

It is Sun's policy to be an Equal Opportunity Employer, and as a federal contractor to comply with all Affirmative Action regulations. To that end, it is our intent to ensure that all employment decisions are based on bonafide job qualifications and work records. Sun ensures that all conditions and privileges of employment, including recruitment, hiring, evaluation, transfer, promotion, discipline, determination of compensation and benefits, and termination of employment, for all job classifications, are based on qualifications and work record and as directed by state law.

E H B 0 0 0 0 0 5

# *Introduction*

**Discrimination**

Sun's policy is that all employees be able to enjoy a work environment that is free of unlawful discrimination. It is also the company's policy to prohibit discrimination of an employee by another employee, supervisor, manager, officer and third parties. All employees, managers, officers and business guests must avoid any action or conduct, physical or verbal, which could be viewed as discrimination, including, but not limited to, comments, slurs, epithets, threats, derogatory comments or unwelcome jokes which are made on the basis of race, color, age, religion, national origin, ancestry, sex, gender, gender identity, sexual orientation, disability, physical or mental disability or serious medical condition.

All incidents of alleged discrimination will be thoroughly and promptly investigated.

**At-will Employment**

Nothing in this handbook is intended to create a contract of employment either expressed or implied. Any employee who does not have a written contract of employment is an at-will employee. At-will employment means that either party can terminate the employment relationship at any time for any reason or no reason. This at-will employment policy cannot be modified by any statement in this handbook or other policy or by any statement, oral or written, by any management personnel.

# *Section 1*

**Our employees are the company.
Quality care is our bottom line.**

Quality service is Sun's top priority. The company is dependent upon you, the employee, to deliver that service and drive the business.

## CONTENTS

| | |
|---|---|
| Orientation | 2 |
| Employee Physicals | 2 |
| Introductory Period | 2 |
| Personnel Files | 3 |
| Meal and Break Periods | 3 |
| Overtime | 3 |
| Working Multiple Locations | 4 |
| Paydays | 4 |
| Categories of Employees | 4 |
| Performance Appraisals | 5 |
| Employee Benefits | 5 |
| Workers' Comp. | 6 |
| Paid Time Off, Vacation, Holiday and Sick Plans | 6 |
| Family and Medical Leave (FMLA) | 7 |
| General Leave | 10 |
| State-specific Leave | 10 |
| Bereavement Leave | 10 |
| Jury Duty | 11 |
| Witness Duty | 11 |
| Military Leave | 12 |
| Employee Feedback | 12 |



E H B 0 0 0 0 0 7

OUR EMPLOYEES ARE THE COMPANY.
QUALITY CARE IS OUR BOTTOM LINE.

# *Section 1*

**Orientation**

The company recognizes that your orientation is an integral part of ensuring that you feel welcomed and valued. As a new employee, the objective of your orientation is to help you gain a clear understanding of your role along with the company's standards, values and practices. In addition, you will be made aware of Sun's code of conduct, compliance process, policies and procedures and benefit programs.

**Employee Physicals**

Depending on the state in which you work, you may be required to receive a skin test or chest X-ray for tuberculosis prior to your first day of work. Your hiring manager or location representative will inform you whether you will need to receive a skin test or chest X-ray. You may also be asked to have a physical examination after a contingent offer of employment and annually thereafter. The company follows all requirements of the Americans with Disabilities Act and state disability laws with respect to employee physicals.

**Introductory Period**

All employees are hired on a 90-calendar-day introductory status during which time your performance and suitability for the job are carefully appraised by your supervisor. Introductory employees may be terminated at any time during this 90-day period with or without prior warning. Management is not required to apply progressive discipline to introductory employees but will make reasonable efforts to correct your unsatisfactory conduct or performance. If you fail to correct your conduct or performance in a satisfactory manner, you will be terminated during the 90-calendar-day introductory period.

The existence of an introductory period does not in any way alter the company's at-will employment policy. At-will employment allows the company or you to terminate your employment relationship at any time, with or without notice, and with or without cause, regardless of the completion of an introductory period.



E H B 0 0 0 0 0 8

OUR EMPLOYEES ARE THE COMPANY.
QUALITY CARE IS OUR BOTTOM LINE.

2

# Section 1

## Personnel Files

Employee personnel files are the property of the company and are maintained at the hiring location. It is very important that your personnel record be kept current. Please promptly report any change of name, address, telephone number, marital status, dependents, payroll deductions or emergency contact information to your location manager or payroll processor. Because your personnel file contains confidential information, the company ensures appropriate care and security in handling these records and will release them only to authorized individuals. You can review your personnel file during regular business hours in the presence of your supervisor or a human resources representative.

## Meal and Break Periods

The company provides meal and rest periods to eligible non-exempt employees as determined by the needs of the business and in compliance with state and federal law.

You must clock or sign out for your meal periods and clock or sign in when returning to work. Automatic deductions for meal periods are not authorized by the company. **It is your responsibility to notify your supervisor if you are unable to take a meal break.** Your supervisor will indicate on your time card "no meal period" so that you are paid for the time worked in accordance with applicable state and federal law. Your supervisor schedules all break periods, taking into consideration workloads, departmental staffing and business line needs.

## Overtime

The company complies with all state and federal rules and regulations governing the payment of overtime compensation to non-exempt employees. Overtime is paid in accordance with federal and state law. All overtime must be authorized in writing in advance by your supervisor. Exempt positions are not eligible for overtime pay.

Overtime hours are recorded on a time sheet or through a time clock. Overtime will be paid at one and one-half times your regular rate of pay or as otherwise required by state law. Overtime hours are calculated on actual hours worked to include orientation and most training. Vacation, holiday, sick time, paid time off and jury duty are examples of hours not included in the calculation of overtime.

The human resources representative will provide guidance in the exempt or non-exempt classification of positions in accordance with the Fair Labor Standards Act. Questions concerning overtime should be directed to your human resources representative.



E H B 0 0 0 0 0 9

# *Section 1*

**Working Multiple Locations**

You may be employed concurrently by more than one entity, department, division, region and/or business line. Report total hours worked in all areas to the home location (defined as the original hiring location or where the majority of hours are worked). The home location will prevail for purposes of computing paid time off and all other employment-related benefits. All other divisions, locations and departments will be considered secondary.

**Paydays**

You will be paid weekly, bi-weekly or semi-monthly, depending on your business location. Your paycheck will be distributed by your supervisor or payroll processor. However, you may receive a paycheck remittance via the mail if you choose to have your paycheck automatically deposited into your bank account. You will be provided the necessary forms for requesting automatic/direct deposit during orientation.

**Categories of Employees**

It is the company's policy that you be assigned to one of the following employee-status categories to determine eligibility for benefits and employment requirements.

**Full-time employees** are regularly scheduled (non-temporary) employees who work a minimum number of hours per week as defined per company business line, entity and/or collective bargaining unit. You are eligible for the company's benefit programs, subject to the actual terms, conditions and limitations of the company's programs, policies and provisions.

SunBridge, CareerStaff, SunDance,
   Corporate:                30 hours per week
SunPlus, SunAlliance:         32 hours per week

**Part-time employees** are regularly scheduled (non-temporary) employees who work less than the defined full-time number of hours per week as defined per company business line, entity and/or collective bargaining unit. Part-time employees receive all legally mandated benefits (such as social security and workers' compensation insurance); however, you are generally not eligible for company benefit programs, subject to the actual terms, conditions and limitations of the company's programs, policies and provisions.

SunBridge, CareerStaff, SunDance,
   Corporate:          Less than 30 hours per week
SunPlus, SunAlliance:    Less than 32 hours per week

E H B 0 0 0 0 1 0

# *Section 1*

**Categories of Employees** (continued)

**PRN/per diem employees** work on an "as needed" (PRN) basis or on a temporary basis with no regularly scheduled hours. While you receive all legally mandated benefits (such as social security and workers' compensation insurance), you are generally ineligible for all of the company's other benefit programs.

**Nonexempt employees** must be paid the applicable minimum wage and receive overtime pay at the rate of time and one-half for all hours over 40 worked in a workweek (exclusive of other hours paid but not worked, eg. vacation or holiday time, etc.) or, when required by applicable state law, you may receive overtime pay based on the number of hours worked in a day or pay period. Any position that does not qualify under a specific exemption (see below) is considered nonexempt.

**Exempt employees** are excluded from specific provisions of the Fair Labor Standards Act (FLSA) and/or state wage and hour laws, including payment of overtime. You must be paid on a salary or fee basis and satisfy the requirements of an exempt executive, professional or administrative employee or outside sales employee under applicable federal and state laws.

**Performance Appraisals and Merit Increases**

A performance appraisal provides you with a formal review of your performance during the previous year and includes opportunities for performance improvement and goals for professional growth and development. Your immediate supervisor will formally evaluate your performance at least once per year. Any adjustment to compensation as a result of your performance appraisal becomes effective after the evaluation. All such adjustments are considered merit increases.

**Employee Benefits**

The company offers a wide range of benefits to employees and their dependents. A full description of the following benefits is available from your hiring manager, human resources representative, benefits department or SunWeb (under the human resources link):
  • life insurance.
  • health, vision and dental coverage.
  • accidental death and dismemberment insurance.
  • short- and long-term disability insurance.
  • voluntary contribution to health and dependent care
    spending accounts.



# *Section 1*

**Employee Benefits**
**(continued)**

- 401(k) plan.
- direct deposit.

If you are classified as a full-time employee, you are eligible to participate in the company's employee benefit plans. Part-time, temporary and on-call employees may only be eligible to participate in some of these benefits. An employee benefit information packet will be mailed to each eligible employee's home address upon start of employment. New employees must apply for these benefits within 30 days of eligibility.

*Note:* The company reserves the right to revise, amend, add and delete benefit programs offered to employees.

**Workers' Compensation**

The company has a workers' compensation benefits program as required by each state. If you are injured on the job, you must immediately report the injury to your supervisor. Forms required by state law and the workers' compensation carrier should be completed as required. Your supervisor is responsible for ensuring that you are given assistance in obtaining immediate medical attention. The company reserves the right to select a provider of care in accordance with state requirements.

If you are unable to work due to a work-related illness or injury, your supervisor is responsible for maintaining contact with you and coordinating your return to work. Should you require time away from your responsibilities as indicated by the company's selected provider of care, you and your provider are also responsible for providing updated and current information on physician appointments, ability to return to work, etc.

**Paid Time Off, Vacation, Holiday and Sick Time Plans**

Please refer to the vacation, holiday and sick time plan that applies to you.

E H B 0 0 0 0 1 2

## *Section 1*

**Family and Medical Leave (FMLA)**

The company grants family and medical leave to eligible employees in accordance with the Family and Medical Leave Act (FMLA) of 1993. FMLA leave can be used to care for your newborn or newly adopted child or placement of a foster child; to take care of your spouse, parent, or child with a serious health condition; or if you are unable to work because of a serious health condition. It cannot be used for unmarried partners, in-laws, siblings and other relatives. You are eligible for family or medical leave if you have been employed for at least 12 months and have worked at least 1250 hours of service during the 12 months immediately preceding the commencement of leave.

Family and medical leave provides up to 12 workweeks of unpaid leave during any 12-month period to eligible employees for family and medical reasons. Leave for birth and care, or placement for adoption or foster care must conclude within 12 months of the birth or placement. Spouses working for the company are jointly entitled to a combined total of 12 workweeks of family leave for the birth and care of a newborn child, for placement of a child for adoption or foster care, and to care for a parent who has a serious health condition. For record keeping purposes, the company uses a rolling 12-month period, counting backwards from the current leave request to calculate and approve requests for family and medical leave.

Under some circumstances, you may take FMLA leave intermittently which means taking leave in blocks of time or by reducing your normal weekly or daily work schedule. If FMLA leave is for birth and care or placement for adoption or foster care, use of intermittent leave is subject to the employer's approval. You may take FMLA leave intermittently whenever medically necessary to care for a seriously ill family member or because you are seriously ill and unable to work. If you are on intermittent leave, you must try to schedule time away from work so as not to disrupt the company's operations.

The company requires you to use accrued paid leave such as sick, vacation or PTO time to cover some or all of the FMLA leave. The company is responsible for designating if your use of paid leave counts as FMLA leave, based on information from you.

Whenever possible, you should make a written request for leave to the supervisor at least 30 days before the date on which the leave is to begin. In the event of emergency leave, you must contact your super-



OUR EMPLOYEES ARE THE COMPANY.
QUALITY CARE IS OUR BOTTOM LINE.

7

# *Section 1*

**FMLA (continued)**

visor as soon as practical of the leave. The company will notify you in writing of the date your FMLA leave will begin. This notice will be documented on the employer's response form to your request for FMLA leave.

If you are requesting leave because of a serious health condition, you must provide medical certification of that serious health condition experienced by you or your family member by completing the medical certification form. You will be required to provide periodic updates during your leave regarding your status and intent to return to work.

**Serious health condition means** an illness, injury, impairment or physical or mental condition that involves either:

- any period of incapacity or treatment connected with inpatient care in a hospital, hospice or residential medical care facility, and any period of incapacity or subsequent treatment in connection with such inpatient care; or
- continuing treatment by a healthcare provider which includes any period of incapacity (inability to work, attend school or perform other regular daily activities) due to:

  1. a health condition (including treatment or recovery) lasting more than three consecutive days, and any subsequent treatment or period of incapacity relating to the same condition that also includes treatment two or more times by or under the supervision of a healthcare provider or one treatment by a healthcare provider with a continuing regimen of treatment; or
  2. pregnancy or prenatal care; or
  3. a chronic serious health condition which continues over an extended period of time, requires periodic visits to a healthcare provider, and may involve occasional episodes of incapacity (such asthma, diabetes); or
  4. a permanent or long-term condition for which treatment may not be effective (such as Alzheimer's, a severe stroke, terminal cancer); or
  5. any absences to receive multiple treatments for restorative surgery or for a condition which would likely result in a period of incapacity of more than three days if not treated (such as chemotherapy or radiation treatments for cancer).

E H B 0 0 0 0 1 4

**Healthcare provider means**
- doctors of medicine or osteopathy authorized to practice medicine or surgery by the state in which the doctors practice; or
- podiatrists, dentists, clinical psychologists, optometrists and chiropractors (limited to manual manipulation of the spine to correct a subluxation as confirmed by X-ray) authorized to practice, and performing within the scope of their practice under state law; or
- nurse practitioners, nurse midwives and clinical social workers authorized to practice, and performing within the scope of their practice, as defined under state law; or
- Christian Science practitioners listed with the First Church of Christ Scientist in Boston, Massachusetts; or
- any healthcare provider recognized by the employer or the employer's group health plan benefits manager.

If you choose to continue your group health insurance coverage while on FMLA leave, you will be required to continue to pay your share of the premium. Arrangements may be made with the benefits department for this payment. If you fail to return to work after FMLA leave, the company may recover from you its share of health premiums paid during your leave.

Upon return from an FMLA leave within the appropriate time frame, you are entitled to be reinstated to your original job or to an equivalent job with equivalent pay, benefits, and other terms and conditions of employment. Seniority and other benefits do not accrue during a period of FMLA leave. Any benefits accrued *prior* to the beginning of such leave will be restored to you upon your return to work. Your anniversary date will not be adjusted while you are on an approved FMLA.

Under specified and limited circumstances where reinstatement will cause substantial and grievous economic injury to its operations, the company may refuse to reinstate certain high level "key" employees after using FMLA leave. Key employees are salaried employees who are among the highest paid 10 percent of employees within 75 miles of the work site. In order to do so, the company must:
- notify you of your status as a "key" employee in response to your notice of intent to take FMLA leave;
- notify you as soon as the company decides it will deny reinstatement and explain the reasons for the decision;

E H B 0 0 0 0 1 5

# *Section 1*

**FMLA (continued)**

- offer you a reasonable opportunity to return to work from FMLA leave after giving this notice; and
- make a final determination as to whether reinstatement will be denied at the end of the leave period if you request reinstatement.

The company administers FMLA concurrent with other types of leaves whenever there is a qualifying event.

For further information about FMLA, contact your supervisor or the human resources representative.

**General Leave**

A general leave of absence is a temporary absence from work for illness, injury, maternity, or personal or educational purposes, which may be granted to full-time employees upon their written request. A general leave of absence is available to employees who are not eligible for FMLA or state leave and/or for reasons not covered by FMLA or state leave laws.

For further information about a general leave of absence, contact your supervisor or human resources representative.

**State-specific Leave**

Your location manager will provide you with information on any state-mandated leave programs.

**Bereavement Leave**

Sun allows you time off with pay if you experience the loss of a family member. You will be granted up to three normally sched-uled consecutive days off with pay (maximum of eight hours per day, not to exceed 24 hours). Bereavement leave becomes a paid benefit after you complete your 90-day introductory period as a full-time employee. Your supervisor will indicate on your time record the proper days taken for bereavement leave.

Your supervisor may request proof, such as an obituary notice of the death of the family member. Immediate family includes:

- parent.
- spouse.
- grandparent.
- stepchild.
- sibling.
- sister-in-law.
- daughter-in-law.

- stepparent.
- child.
- grandparent-in-law.
- grandchild.
- parent-in-law.
- brother-in-law.
- son-in-law.



E H B 0 0 0 0 1 6

# *Section 1*

## Jury Duty

If summoned to appear for jury duty, you must notify your supervisor immediately. If you are required to serve on a jury, you should speak with your location manager regarding the need for a general leave of absence. If it is determined that a general leave of absence is necessary, you will need to complete a jury duty leave of absence form and include a copy of the summons to serve.

Non-exempt (hourly) employees are not eligible for jury duty pay unless otherwise required by state law; however, you will be allowed to use your vacation or paid time off benefits for partial or full-day absences due to jury duty. Exempt employees will be paid their regular salary for work missed due to jury duty, unless a full week of work or more is missed. When a full week of work is missed, you will be allowed to use your vacation/paid time off benefits. You are expected to return to work each day you are released from jury duty in time to perform your assigned duties.

Employee benefits in which you are enrolled will continue while you are on jury duty leave. You will be required to continue payment of any required contributions for your benefits during the leave. You will be reinstated without loss of seniority while on an approved jury duty leave.

## Witness Duty

If you are required to serve as a witness for longer than five days, you may request an unpaid leave of absence. If the duration of time off is expected to be longer than five days, you should make a written request for an unpaid leave of absence together with evidence of the requirement to serve as a witness.

Non-exempt employees are not eligible for witness duty pay; however, you may use your vacation or paid time off.  Exempt employees will be paid your regular salary for work missed due to witness duty, unless a full week of work is missed. When a full week of work is missed, exempt employees are allowed to use your vacation/paid time off benefits.

*Note:* Witness duty leave does not apply if you are subpoenaed to appear as a witness on behalf of the company. In such cases, you will receive your standard compensation for the time spent serving in this capacity.

OUR EMPLOYEES ARE THE COMPANY.
QUALITY CARE IS OUR BOTTOM LINE.



EHB000017

# *Section 1*

**Military Leave**

The company grants military leaves of absence as required by law to eligible employees who are military service members. Military forces include:

- Armed Forces of the U.S., defined to include the Army, Navy, Air Force, Marine Corps, Coast Guard and their reserve components.
- the state National Guard and the state Guard.
- the U.S. Public Health Service, U.S. Coast Guard and Geodetic Survey and their reserve components.

The following types of military duty qualify for a leave of absence:

- annual duty for training.
- local or national emergency.

As an employee, you will be required to present official military orders or other evidence to support a request for military leave.

When you return from military leave, your benefits will be restored according to the applicable plans in effect at that time. Your seniority and any rights or benefits based on seniority that you would have attained had you remained continuously employed will be recognized at the time you return to work for the company. Military service will also be considered service with the employer for the purposes of vesting and benefits accrual.

**Employee Feedback**

It is very important to the company to solicit and receive feedback from you that will benefit and influence positive changes in the work environment for all employees. If you leave the company, your supervisor, location manager or human resources representative may request your cooperation in providing your opinion about your work experience with the company.


E H B 0 0 0 0 1 8

OUR EMPLOYEES ARE THE COMPANY.
QUALITY CARE IS OUR BOTTOM LINE.

**12**

# *Section 2*

## Surpass All Expectations

Because Sun is not about "just getting by," we strive

toward excellence in all aspects of performance. We also set

and exceed high standards that contribute positively to the

communities we serve.

CONTENTS

Recognition of
   Service                14

The Compliance
   Process                14

HIPAA Regulations        14

Confidential
   Matters                14

Job Posting              14

Transfers,
   Promotions and
   Portable Seniority    15

Reinstatement            15

Company Property         15

Conflict of Interest     16

Gifts and
   Gratuities            16

Employment of
   Family Members        16

Solicitations            17

Visitors                 17

Smoking                  17

# *Section 2*

**Recognition of Service**

To express the company's appreciation and to acknowledge your dedicated service, the company has formal recognition programs. Award events are held periodically to honor and recognize employees who have provided exceptional service and who have surpassed professional expectations.

**The Compliance Process**

As a company and individually, employees share a commitment to legal, ethical and professional conduct in everything we do. Whether we care for patients/residents, submit claims, order supplies, fill prescriptions, prepare meals, keep records, pay bills or make decisions about the future of our company, Sun's success as a quality healthcare provider depends on us—our personal and professional integrity, our responsibility to act in good faith, and our obligation to do the right things for the right reasons. Sun's compliance process was created as a structure to teach, support and monitor these commitments.

**HIPAA Regulations**

The company is committed to ethical care for each one of our patients and residents. You are responsible for ensuring that resident- and patient-protected health information is safeguarded at all times. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is a federal law that defines patients' rights to privacy and controls how their personal healthcare information is used. As part of Sun's compliance program, you are required to undergo annual training regarding HIPAA regulations, especially regarding the privacy rule.

**Confidential Matters**

As an employee, you may have access to confidential information. Examples include patient and resident information, employee data and financial information. You are reminded to keep such information confidential. Further, you are obligated to refrain from discussing such information with anyone except on a need-to-know basis in or out of the workplace. Engaging in such discussions is a breach of confidence and may be subject to disciplinary action up to and including termination of employment.

**Job Posting**

As a means of providing career opportunities for current employees, the company posts non-management job openings. To be considered for a posted position, you must:
- have been in your current position for a minimum of six months.
- be a full-time, part-time or per diem/PRN employee.

## *Section 2*

**Job Posting** (continued)

- have notified your present supervisor of the intention to apply for a posted position.
- be in good standing as evidenced by the absence of any record of disciplinary action in the previous 12 months.
- complete and submit a job posting application form.

Outside applications will also be considered if no employee currently working in the company location has the necessary qualifications and ability to fill the position and/or if no employee currently working in the location has submitted a request to transfer to this open position.

The hiring supervisor will interview you and consider such factors as education, experience, ability, skill set and seniority as well as your performance and work record when determining your eligibility for the position.

**Transfers, Promotions and Portable Seniority**

Sun is committed to providing transfer and advancement opportunities for qualified personnel. To be considered for a promotion or transfer within the company, you should be an employee in good standing. To be eligible, you should be in your current position for a minimum of six months and you should not have received any progressive discipline for the previous 12 months. If you transfer from one company location and/or business line to another, you will maintain your original date of hire with the company. The rate of pay for transfers and promotions is based on prevailing ranges for the specific receiving location and your position.

**Reinstatement**

If you are reinstated within six months of your termination date, you will be restored to your same status for purposes of seniority, anniversary date, vacation time and certain other benefits. If you participated in the 401(k) plan, you may also be eligible for re-enrollment subject to the plan provisions. Contact a human resources representative or the benefits department for further information.

If you have been separated from the company longer than 30 days, you must undergo appropriate background screening.

**Company Property**

Company supplies and equipment represent valuable resources, and each employee is expected to exercise care and good judgment when using them. The company will bear the cost of normal breakage and deterioration; however, employees who maliciously or willfully harm, destroy, or remove company equipment or supplies will be subject to

# *Section 2*

**Company Property**
**(continued)**

disciplinary action up to and including termination of employment.

You may not use company-owned materials, equipment or facilities for personal use, unless authorized by your supervisor. This includes use of office supplies and telephones as well as larger assets such as computers and copiers. Upon separation from the company, you must return in good condition any and all company equipment, supplies and information used during your employment.

**Conflict of Interest**

As an employee, you are expected to comply with the Code of Conduct and refrain from conflicts of interest. An actual or potential conflict occurs when you are in a position to influence a business decision of the company, and such a decision may result in personal gain for you, a relative or someone with whom you share a close relationship. You should immediately bring to the attention of your supervisor any questions about potential or perceived conflicts of interest.

**Gifts and Gratuities**

You may not solicit or accept gifts, loans or gratuities from any patient, resident, customer, family member, visitor or any other person conducting business with the company. Acceptance of tips for services rendered is strictly prohibited. You should not participate, directly or indirectly, in any payment or gift for the purpose of inducing special consideration for yourself or your business location.

Under certain circumstances, gifts or gratuities are appropriate as a token of appreciation or gratitude. Incidental gifts from patients, residents, family members or visitors must be of nominal value not to exceed $50 and must be shared with all employees or a group of employees.

**Employment of**
**Family Members**

To enhance the quality of objective business decisions and to safeguard against potential problems relative to confidentiality, discrimination, favoritism, security, safety and employee morale, family members will not be employed in a position where one has direct line supervisory authority over another.

If a relative relationship is established after employment (for example, through marriage) that creates a direct or indirect supervisor/subordinate relationship between such employees or an actual conflict of interest, the appearance of a conflict of interest, or any operational disruption as determined by management, the company will attempt to find a suitable alternative position to which one of the employees

E H B 0 0 0 0 2 2

## Section 2

may transfer. If accommodations of this nature are not feasible, the employees will decide among themselves which of them will resign. If the employees refuse to choose, the company will determine who will leave based on business needs.

**Employment of Family Members**

You may not solicit, canvas, market, or sell articles or services for yourself or for any other outside organization while you or the person you wish to solicit is on working time. The distribution of handbills, leaflets, advertisements or printed or written literature of any kind is prohibited on working time or in working and patient care areas. If you have messages of interest you want posted in the workplace, you must provide them to your supervisor for approval and for applicable posting. Exceptions for company-approved programs may be made by management.

**Solicitations**

Due to the confidential and often serious nature of your work, friends and relatives may not visit you while you are working. If there is an important reason for someone to see you at work, please arrange approval from your supervisor. If you must visit your work location during off-duty hours, you are expected to be present only for a business-related purpose (for example, payday) or an authorized visit to a patient or resident.
Visitors, including vendors, must be accompanied by a Sun employee at all times during their visits. Where applicable, these individuals are asked to sign in and wear visitor identification badges.

**Visitors**

All corporate, division, region and other business locations are smoke-free. Smoking is permitted in assigned areas only, usually located outside. Employees may smoke during meal or break periods in these designated smoking areas.

**Smoking**



# *Section 3*

## Ownership and Accountability

Wherever possible, Sun encourages you to take ownership,

improve decision-making, focus on delivering high quality

service and be accountable for the results.

CONTENTS

Proof of Work
Authorization        20

Verification of Licenses,
Certificates and
Credentials          20

Personal
Appearance           20

Employee Safety      20

Schedules            20

Time Cards and
Time Clocks          21

Attendance and
Punctuality
Standards            21

Electronic
Communication        22

Polygraphs,
Searches and
Video
Surveillance         23

Drug- and Alcohol-free
Workplace            23

Workplace Violence   24

Progressive
Discipline           25

Harassment           31

Employee Problem-
Solving Process      32

# *Section 3*

**Proof of Work Authorization**

Sun is committed to employing only those individuals legally eligible to work in the United States in compliance with the Immigration Reform and Control Act of 1986. As a condition of employment, you will need to provide employment authorization and identification in accordance with the requirements of the employment eligibility verification form (I-9). Your hiring manager will explain those requirements. You must present verification of identity and employment eligibility within three business days of your hire date.

**Verification of Licenses, Certificates and Credentials**

Sun's policy requires verification of all applicable licenses, permits and certifications during the employment interview process. You are required to maintain applicable credentials, licenses and certificates in good standing throughout your employment. Your hiring manager will verify licensure status with the appropriate state board and arrange for appropriate background screening. Your manager will also monitor expiration dates of all licenses and credentials and notify you, when possible, in advance for renewal purposes. However, it is your responsibility to maintain your license and certification in good standing and to notify the company promptly of any change in status.

**Personal Appearance**

You are expected to present a positive and professional image in the workplace and to dress appropriately for your position. As an employee, your appearance represents pride in yourself, your work and the company. Your hiring manager will review with you the dress code standards specific to your location and position.

**Employee Safety**

You are responsible for complying with safety standards and for performing your job and duties in a safe manner. Sun is committed to providing a safe work environment and supports you in the prompt resolution of identified hazards/risks, the provision of education and training in safe work practices, the effective management of personnel issues involving safe work practices, and the effective management of injuries resulting from accidents. Safety concerns should be immediately reported to your location manager or supervisor.

**Schedules**

Because the nature of work varies across the company, starting, quitting, lunch and break times vary according to the needs of a particular department or location and in accordance with federal or state laws. Your hiring manager or supervisor will provide you with your scheduled work hours prior to your start date and at regular intervals thereafter.

EHB000025

## *Section 3*

**Time Cards and Time Clocks**

Each non-exempt employee must clock in when reporting to work and clock out when leaving. For business locations that use time sheets, all hours worked must be recorded accurately and daily. You are responsible for accuracy in clocking in and out and notifying your supervisor or the payroll processor of any discrepancies prior to the end of your scheduled shift. Working off the clock or failing to record all hours worked is not permitted under any circumstances.

**Attendance and Punctuality Standards**

Sun has established a consistent standard for attendance and punctuality that considers the company's need to operate its business lines with minimal disruption. As an employee, you are expected to report to work as scheduled and on time. Your supervisor or his/her designee must approve any schedule variations in advance. Whenever you cannot report to work or know you will be tardy, you must notify your direct supervisor or designee as far in advance as possible, but at a minimum of two hours prior to the start of your shift. Your supervisor will discuss with you the disciplinary procedures regarding scheduled and unplanned absences and tardies as defined below.

**Absence:** failure to work one or more consecutive scheduled shifts for any reason (illness, personal or family problems, car trouble, etc.) will be considered one absence occurrence. For example, three consecutive workdays' absence is considered one occurrence. For the purposes of this policy, you will also be counted as "absent" if you fail to work more than one-half of a scheduled shift because you left work early or arrived late except as noted below. The following conditions will not be considered as absences:

- you have requested time off prior to the absence, and your supervisor has approved the request in writing (examples: bereavement leave, jury duty, military leave, vacation/PTO, etc.).
- absences covered by the Family and Medical Leave Act or any other protected leaves as required by state law will not be counted as absences under this policy.
- if management has reason to believe that your absence may have been for a Family and Medical Leave purpose, the location manager must advise you of the right to request that it be so designated.
- if you are absent due to a workers' compensation illness or injury.

# Section 3

**Attendance and
Punctuality Standards**
**(continued)**

**Tardiness**: reporting to work any time after the scheduled starting time. Leaving early for or returning late from break or meal periods will also be considered as a tardy. However, leaving the assigned workstation or the location without permission is job abandonment and will result in termination.

**Proper Notice:** failure to notify your supervisor or the appropriate location authority at least two hours before the start of your scheduled shift is unacceptable and may result in disciplinary action. Your notification of an absence must be timely to be considered proper notice in accordance with the progressive discipline policy.

**No call/no show:** failure to call and failure to show up for work for one scheduled shift or more is considered a voluntary resignation.

The list below outlines the consequences for absences and tardies.
- One absence or tardy occurrence in a 90-day period without proper notice: verbal counseling.
- Two absence occurrences in a 90-day period without proper notice: written warning.
- Three absence occurrences in a 90-day period with proper notice: written warning.
- Two tardies in a 90-day period without proper notice: written warning.
- Three tardies in a 90-day period with proper notice: written warning.
- Third written warning (for any reason) within a 12-month period: termination.

Violations of different rules are cumulative under the progressive discipline policy. That is, violations of this policy are cumulative along with other written warnings for poor performance or improper conduct. The result is that three written warnings for rule violations, either related or unrelated, within a 12-month period may result in discharge.

**Electronic
Communication**

The company encourages the use of electronic mail (e-mail) to facilitate work-related communication and reserves the right to access the use of our electronic communications system without notice to employees. The company provides electronic communication services primarily for business. However, the occasional use of electronic communication for personal purposes is permitted. You are expected to use this privilege responsibly.

## Section 3

**Polygraphs, Searches and Video Surveillance**

It is the company's policy to comply with federal and state laws regarding the use of polygraph tests, searches and surveillance methods in the workplace to maintain the well-being and safety of our patients, residents, clients, employees and resources.

The Employee Polygraph Protection Act of 1988 prohibits most employers from using polygraph testing for pre-employment screening or during the course of employment, and from discriminating against anyone for exercising his or her rights under the Act. The Act does permit the use of polygraph under certain conditions that apply to our company, including certain employees who are reasonably suspected of involvement in a workplace incident (theft, embezzlement, and so on) that results in economic loss to the company. This exemption also applies to dispensers of pharmaceuticals.

You should have no expectation of privacy in the workplace, including, but not limited to, electronic communications. When attempting to locate missing or stolen employee, resident/ patient, visitor or company property, the company reserves the right to conduct random searches of company property, such as vehicles, desks, file cabinets and lockers as well as employee vehicles, clothing, packages, purses, briefcases, lunch boxes and other containers brought onto company premises. You are expected to cooperate in such searches.

Video surveillance is conducted at certain business locations for purposes of patient/resident and staff safety and security. In those locations, it is the responsibility of the location manager to notify you through formal postings and during the orientation process.

Company employees who are assigned to work at non-company locations may be subject to video surveillance with or without their permission. Searches for illegal drugs are governed by our drug- and alcohol-free workplace policy.

Direct questions concerning polygraphs, searches and video surveillance to a human resources representative.

**Drug- and Alcohol-free Workplace**

The company is committed to a drug- and alcohol-free workplace to ensure a safe work environment for our employees, patients/residents, clients and visitors.

The company will not tolerate substance use and abuse in the workplace. If you use prescription drugs that may affect your work performance, you must report the use to your supervisor.

Bringing illegal, non-prescribed drugs or alcoholic beverages to

# *Section 3*

**Drug- and Alcohol-free Workplace (continued)**

work, being under the influence or using such substances while at work, diverting such substances while on company property, and/or dispensing, possessing, distributing, selling or illegally manufacturing such substances on company property are strictly prohibited and may result in disciplinary action, up to and including termination.

Every individual offered a position with the company will be screened for the illegal use of controlled substances and must successfully complete the drug screening process in order to be employed.

To ensure a safe environment for all, your supervisor may require you to take a drug- or alcohol-screening test if controlled substances are missing or if your behavior, appearance, conduct, or physical evidence found in or near the work area indicates you may be influenced by controlled substance(s) and/or alcohol. Employees involved in job-related accidents may be subject to drug/alcohol testing, in accordance with state law or regulations.

Sun recognizes that drug, narcotic and alcohol abuse is a serious health problem. If you experience problems that result from drug or alcohol abuse and/or dependencies or are diagnosed as a drug abuser or alcoholic, by reporting your problem to your department manager prior to any incident at work, you may request a leave of absence to undertake rehabilitation treatment. Return to work will be contingent upon the receipt of a certification of completion from a rehabilitation program along with approval from a physician to return to work unless your job has been eliminated during the leave as a result of reorganization or a reduction in force. If you have elected health coverage, you are responsible for all costs of treatment not covered by your health plan.

**Workplace Violence**

Sun is committed to providing a work environment that is free from violence. Any acts or threatened acts of violence will not be tolerated. Anyone engaging in violent behavior will be subject to discipline, up to and including termination of employment and may also be personally subject to other civil or criminal liabilities.

Violent behavior includes, but is not limited to:
- physically harming or threatening to harm an individual, group of individuals, or relatives of those individuals.
- the possession on company property or a customer's property of weapons of any kind, or the brandishing of any object that could reasonably be perceived as a weapon.

E H B 0 0 0 0 2 9

*Section 3*

- callous or intentional disregard for the physical safety or well being of others.
- intentional destruction of company, resident or employee property.
- any other conduct that would be perceived as constituting violence or a threat of violence.

If you are subjected to, witness or have knowledge of violent behavior of any of the types listed above, or have reason to believe that violent behavior may occur at or in connection with the activities of the company, you are required to report it promptly to your supervisor or human resources representative. All incidents of alleged workplace violence and/or violent behavior are thoroughly and promptly investigated.

**Progressive Discipline**

The company requires your compliance with policies and rules. Certain actions by employees may result in disciplinary action, including termination of employment. The policy applies to all employees with the exception of management personnel. (Managerial performance issues are addressed within policy HR 408.)

Progressive discipline simply means that less serious infractions will be treated as such. However, if the problem continues or recurs, it will "progress" to more serious steps. While most infractions may start with an initial counseling session, some are so serious that stronger action is appropriate for the first infraction. You will be asked to sign and will be provided copies of all documented progressive discipline.

All rule violations, including attendance warnings, are cumulative for progressive discipline purposes. This means that you do not need to violate the same rule to receive progressively more severe discipline, up to and including termination.

Management reserves the right to determine the type, form and severity of corrective action and/or disciplinary action, up to and including discharge. Management also reserves the right to suspend you with or without pay, pending an investigation. The company, at its sole discretion, may elect to use the disciplinary procedure or any part of the disciplinary procedure such as a verbal or written warning or termination of employment depending on the circumstances.

Such a serious management decision will be made after an investigation of the facts.



# Section 3

**Progressive Discipline**
**(continued)**

## Verbal Counseling

Your supervisor has the responsibility to counsel you verbally when you have committed infractions of a less serious nature. Supervisors are advised to document the counseling event.

## Written Warning

A written warning will be issued if you fail to correct your conduct or performance following verbal counseling. You may also receive a written warning if the offense warrants more than verbal counseling, or if this is not your first verbal or written warning. Your supervisor will discuss the infraction with you and complete a record of counseling form.

The written warning must be signed by you and kept in your personnel file. If you refuse to sign the written warning, your supervisor will ask another supervisor to witness the counseling and attest by his or her signature to the issues discussed. The supervisor will then document your refusal to sign and place the documentation in your personnel file.

## Final Written Warning

A final written warning is used when one prior written warning has been issued during the last 12 months for any infraction or when an infraction has been committed that warrants more than a written warning. Your supervisor and/or next level of management will discuss the infraction with you and complete a record of counseling form. Your supervisor will document on the notice that one more written warning within a 12-month period, starting from when you were first disciplined, may result in discharge. The problem must be corrected, or you will be subject to discharge. A witness in a supervisory level is also encouraged to sign the document.

## Suspension

A gross misconduct infraction will result in suspension pending investigation, subject to discharge. The company endorses the use of suspension for investigative purposes but does not endorse the use of suspension as a punitive action. Therefore, while a suspension is not absolutely necessary in all cases, it should be considered while conducting an investigation. If you are found innocent after the investigation, you will be compensated for the suspension. If you are found guilty, you will not be compensated for the suspension.

E H B 0 0 0 0 3 1

## Section 3

**Progressive Discipline** (continued)

**Guidelines for Implementation**

Sun reserves the right to determine the appropriate level of discipline in individual cases and to acknowledge mitigating factors where they apply. However, the following is a chart of work rule violations and their generally prescribed consequences.

It is not possible to list all types of offenses that may result in disciplinary action and/or termination. Any act that, in the company's discretion, hampers or tends to hamper patient/resident care, affects the performance of any employee, jeopardizes the safety or operation of the business location, or is otherwise inappropriate in management's discretion may also be subject to disciplinary action up to and including termination.

| Incident | First Offense | Second Offense | Third Offense |
|----------|---------------|----------------|---------------|
| Misconduct | Written Warning | Final Written Warning | Discharge |
| Gross Misconduct | Discharge | | |

Again, Sun reserves the right to determine the appropriate level of discipline in individual cases and to acknowledge mitigating factors where they apply.

**Misconduct or Poor Performance**

Misconduct or poor performance infractions may start with a verbal counseling or a written warning, progress to a final written warning and then to discharge. These infractions include, but are not limited to:

- failing to maintain acceptable standards of respect for residents, patients, visitors, co-workers and supervisors.
- failing to cooperate with fellow employees and supervisors.
- failing to carry out general and/or specific instructions promptly.
- failing to accept and/or perform job responsibilities.
- demonstrating poor work quality or productivity.
- violating the no solicitation/no distribution policy.
- failing to clock in or out for scheduled shifts or properly record time worked (non-exempt employees).
- working unauthorized overtime.
- working off the clock (non-exempt employees).
- use of abusive or profane language.
- receiving unauthorized visitors, including friends, children and other relatives, while on duty.
- making or receiving personal telephone calls, other than emergencies, during work time, including the use of cell phones and

OWNERSHIP AND ACCOUNTABILITY AND ACCOUNTABILITY

OWNERSHIP



# *Section 3*

**Progressive Discipline**
(continued)

pagers while performing direct care responsibilities and work responsibilities.
- smoking in unauthorized areas.
- not following location dress and grooming codes.
- habitually leaving early for or returning late from meal periods and breaks.
- leaving the department or assigned work area during work hours without the supervisor's permission.
- stopping work before the time specified by the supervisor.
- starting work before or continuing to work after specified work hours without the prior approval of the supervisor.
- posting, removing or altering notices, signs or writing in any form on any bulletin board or other posting area without permission of the administrator or supervisor.
- failing to attend scheduled mandatory meetings or in-service training sessions.
- failing to observe Safety First rules unless the act is flagrant or willful, in which case it is considered gross misconduct.
- failing to report an unsafe or unhealthy condition to management.
- failing to use proper body mechanics, lifting or transferring techniques and/or mechanical lifts.
- speeding, reckless driving or improper parking in company parking lots or elsewhere on company property.
- littering or failing to deposit rubbish in proper receptacles contributing to disorderly or unsanitary conditions.
- engaging in horseplay, running, scuffling or throwing objects of any kind on company property.
- failing to maintain acceptable standards of attendance.
- entering a facility or business line location at unauthorized times without proper permission.
- other instances of improper conduct of a less serious nature not specifically listed here.

## Gross Misconduct

Gross misconduct infractions are so serious that they warrant discharge even without prior disciplinary action being taken. Many of these offenses are a direct violation of the company's Code of Conduct and Corporate Integrity Agreement. These infractions include, but are not limited to:

E H B 0 0 0 0 3 3

## Section 3

**Progressive Discipline**
**(continued)**

- violating any part of the Code of Conduct and Corporate Integrity Agreement.
- physical, fiduciary, sexual, verbal or emotional/psychological abuse of a resident/patient.
- neglecting of resident/patient care duties directly related to the safety, health and/or physical comfort and well being of a resident/patient.
- committing theft, attempted theft, fiduciary malfeasance or abuse, and/or having unauthorized possession of property belonging to the company, a resident/patient, another employee or a visitor. This includes any instances of narcotic diversion or conversion.
- fighting, hitting, shoving, pushing, forcible grabbing, offensive touching, or threatening or provoking such acts toward another employee, resident/patient or visitor.
- making verbal threats of physical violence toward another employee, resident/patient, visitor or the location.
- sexually harassing any employee, resident/patient, visitor or volunteer, or harassing such individual because of race, color, religion, creed, sex, gender, gender identity, sexual orientation, pregnancy, age, national origin, ancestry, citizenship, physical or mental disability, or any other unlawful basis under state law.
- introducing, possessing, or consuming intoxicating beverages or controlled substances, or reporting to work under the influence of either. This pertains to company property as well as any other location where work-related duties are performed.
- diverting drugs, distributing, selling, using, offering to sell or purchase, or purchasing alcohol or a controlled substance while on the job.
- attempting to sabotage, abuse, damage, deface or destroy property, whether willful or not, that belongs to the company, a resident/patient, another employee, a visitor or other person doing business with the location.
- falsifying business location records, reports or other documents, such as employment applications, time cards or time sheets (including punching or signing another employee's time card/sheet), injury reports, health screenings, resident/patient records, financial records or being an accessory to any of these acts.



# *Section 3*

**Progressive Discipline**
**(continued)**

- disclosing or removing unauthorized confidential or privileged information concerning the company, location, other employees or residents/patients.
- insubordinating behavior, including, but not limited to, refusal or failure by words or actions to carry out a reasonable job direction or assignment after being warned that failure to do so could result in discharge. Example: the supervisor gives a specific direction that the employee refuses to follow.
- abandoning the job by walking off the shift or leaving the location without permission of the supervisor or location manager.
- being convicted of a felony. An indictment for an alleged felony may also serve as a basis for termination in cases where the sensitive nature of the employee's duties justifies such action.
- cheating or being fraudulent or dishonest.
- soliciting and/or accepting a loan of money or item/service of value from a resident/patient or family member.
- introducing, possessing, using or threatening to use firearms or any other dangerous weapons on company property.
- sleeping during work hours.
- violating safety rules in a flagrant and willful manner with the potential of causing direct and serious harm to the employee, fellow employees, residents/patients and/or visitors.
- engaging in any immoral, indecent or illegal act on company property.
- failing to obtain or maintain a current and valid professional license, certification or other credentials required to perform job duties.
- misrepresenting a material fact in an attempt to obtain a benefit or advantage.
- failing to call in or show up for work as scheduled for one or more consecutive days. This will be treated as a voluntary resignation.
- failing to report observed resident/patient abuse or neglect or a physical injury of a resident/patient, which is suspected to be a result of abuse or neglect.
- displaying other extreme instances of improper conduct not specifically listed.

E H B 0 0 0 0 3 5

# Section 3

**Harassment**

The company is committed to providing an environment free from harassment, including, but not limited to sexual harassment. Other forms of harassment include severe and pervasive conduct that offends an individual's race, color, religion, creed, age, national origin, ancestry, citizenship, physical or mental disability, medical condition, marital status, sexual orientation, gender identity or military/veteran status.

Sexual and other forms of harassment based on an individual's protected status are unlawful. Sexual harassment means sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when:

- submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; or
- such advances, request or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.
- sexual harassment may include any hostility directed to employees because of their gender (including same gender), even if that hostility is not sexual in nature.

While it may not be easy to define precisely what types of conduct may constitute sexual harassment, examples of prohibited behavior include unwelcome sexual advances, request for sexual favors, obscene gestures, displaying sexually graphic magazines, calendars, or posters, sending sexually explicit e-mail or voice-mail, and other verbal or physical conduct of a sexual nature, such as uninvited touching of a sexual nature, or sexually-related comments. Depending upon the circumstances, the conduct can also include sexual joking, teasing, vulgar or offensive conversation or jokes, commenting about an employee's physical appearance, conversation about your own or someone else's sex life, or other conduct directed toward a person which is sufficiently severe or pervasive because of his or her gender, thereby creating an unprofessional, hostile working environment. Physical conduct such as assault, blocking normal movement or interfering with an employee's work is considered harassment.

If you believe that you are being harassed, the company encourages you to inform the individual immediately that his or her language or actions are offensive. If you are not comfortable raising the issue directly with the individual or the behavior continues despite your protest, you should immediately report the matter to your supervisor.

# *Section 3*

**Harassment**
**(continued)**

If the supervisor is unavailable or if you believe it would be inappropriate to contact that person, contact a human resources representative or any other supervisor of the company with whom you feel comfortable. In certain states, you may contact a third party agency. Please refer to the state-specific contact information found in an addendum form available from your supervisor.

Every report of alleged harassment will be fully investigated and corrective action will be taken where appropriate, up to and including discharge for any employee in cases where an allegation is substantiated. In addition, the company will not tolerate any form of retaliation against individuals who report alleged harassment or who cooperate in the investigation of such reports in accordance with this policy. If the company determines that you knowingly made false accusations of harassment for retribution or other reasons or knowlingly made false statements in an investigation, you may also be subject to disciplinary action up to and including discharge.



## Section 3

**Employee Problem-solving Process**

The employee problem-solving process is a formal guideline to assist you in handling any concerns about work-related issues. You are encouraged to bring to the attention of your supervisor any concerns about such issues through the following procedure.

1. First discuss issues or concerns with your immediate supervisor. Your supervisor will attempt to resolve the issue and explain his or her response to the issue within five working days or as soon thereafter as possible. If you believe your immediate supervisor is directly involved in the problem or is treating you unfairly or adversely, you should speak to the next level of management.

2. If you are dissatisfied with your supervisor's response, you may submit a written description of the concern to the next level of management. The employee appeal form is used for this purpose. The manager will attempt to resolve your concern and respond in writing within five working days; however, it may be longer depending on the circumstances. In such cases, the employee will be provided an interim explanation and plan until a resolution can be reached and presented in writing.

3. If you are not satisfied with the response given in step two, you may submit a written description of the concern outlining the factual information. Management personnel involved to date will review the information relative to your concern and recommend a solution. A written decision may be presented to you.

4. If the response in step three is still unsatisfactory, you may again present your concern in writing to the next level of management.

If it is determined that the appropriate levels of management have not had an opportunity to review your concern, management reserves the right to redirect the concern back to the appropriate level of management.

At any time, you may consult a human resources representative to assist you with the process, including how the process works.

Management attempts to achieve certain time limits in its responses to a concern; however, adherence is not mandatory, and some responses will take longer than others, depending on the circumstances.

# *Section 4*

## Corporate Serves the Field

CONTENTS

Business Travel        36

Intranet (SunWeb)   36

Employee
  Acknowledgment 36

The company's executive headquarters are located in Irvine, Calif. Most senior staff, along with the benefits department, have offices either in Irvine or Albuquerque, N.M. The majority of the company's functional support departments are located in Albuquerque. Employees of these departments play a valuable role within the organization, working together to provide support for all of our field operations. Corporate departments include:

- accounting.
- clinical services and education.
- compliance.
- corporate communications.
- finance, treasury and tax.
- human resources and benefits.
- internal audit.
- legal.
- management information services (MIS).
- payroll.
- purchasing.
- real estate.
- reimbursement.
- risk management.
- travel.

# *Section 4*

**Business Travel**

If you travel on company business, you will be reimbursed for any out-of-pocket expenses for items such as meals, lodging, and transportation, in accordance with company policy. Consult with your supervisor and the company's travel policy for specific information. All travel-related policies and forms are available on SunWeb.

**Intranet (SunWeb)**

As an employee, you can access company education and training materials, policy and procedure manuals, operational reports, and health-related information, including claim forms, etc., via the company's Intranet, SunWeb. The address for SunWeb is http://sunweb.sunh.com.

**Employee Acknowledgment**

I have received a copy of the *Sun Healthcare Group, Inc. Employee Handbook*. I realize that it is my responsibility to familiarize myself with its contents. I understand that the contents of this handbook summarize current policies of the company, that they are intended as guidelines only, and that these policies may be amended at any time. I further understand that the contents of the handbook do not constitute the terms of a contract of employment and that nothing contained in the handbook can be construed as a guarantee of continued employment. I understand that employment with the company is on an at-will basis, which means that either the company or I, with or without reason, may terminate the employment relationship at any time. I understand that my manager or a human resources representative will answer any questions I have about this handbook.

Employee Name (print) _____

Date Received_____

Employee Signature_____

Date_____

This copy is for your records. Please sign the employee acknowledgment form (see insert) and return to your location supervisor.

E H B 0 0 0 0 4 0

# *Index*

## A

Attendance and
  Punctuality Standards    21

## B

Bereavement Leave    10
Business Travel    34

## C

Categories of Employees    4
Company Property    15
Compliance Process    14
Conflict of Interest    16
Confidential Matters    14

## D

Drug- and Alcohol-free
  Workplace    23

## E

Electronic Communication    22
Employee Acknowledgment    34
Employee Benefits    5
Employee Feedback    12
Employment of
  Family Members    16
Employee Physicals    2
Employee Problem-Solving
  Process    32

## F

Family and Medical Leave    7

## G

General Leave    10
Gifts and Gratuities    16

## H

Harassment    31
HIPAA Regulations    14

## I

Intranet (SunWeb)    36
Introductory Period    2

## J

Job Posting    14
Jury Duty    11

## M

Meal and Break Periods    3
Military Leave    12

## O

Orientation    2
Overtime    3

## P

Paid Time Off, Vacation,
  Holiday and Sick Plans    6
Paydays    4
Performance Appraisals    5
Personal Appearance    20
Personnel Files    3
Polygraphs, Searches and
  Video Surveillance    23
Progressive Discipline    25
Proof of Work Authorization    20

## R

Recognition of Service    14
Reinstatement    15

## S

Schedules    20
Smoking    17
Solicitations    17
State-specific Leave    10

## T

Time Cards and Time Clocks    21
Transfers, Promotions and
  Portable Seniority    15

## V

Verification of Licenses,
  Certificates and
  Credentials    20
Visitors    17

## W

Witness Duty    11
Workers' Comp.    6
Working Multiple Locations    4
Workplace Violence    24

37

E H B 0 0 0 0 4 1



© 2004, Sun Healthcare Group, Inc.



# Sun Healthcare Group

## PERSONNEL ACTION FORM

☐ REHIRE
☐ ADD
☐ CHANGE
☑ TERMINATE

```
>>SCREENING REQUIREMENT<<
OIG/GSA Date _____    Date of Hire _____
The Hire Date must be the same or later than the OIG/GSA screening date
```

EMPLOYEE # **177564**     FACILITY NAME **SANDALWOOD**     Fac#: | 1 | 4 | 0 | 3 |

EMPLOYEE LAST NAME FIRST: **GAUTHIER, WENDY**

ADDRESS

CITY/STATE     ZIP:

SS #     GENDER ☐    RACE CODE * ☐    WORKERS COMP CODE* | 0 | 8 | 8 | 2 | 9 |

DATE OF BIRTH:     DATE OF HIRE:     DATE OF TERM: **05/25/04**

STATUS CODE **TD**    EXEMPTION/NON-EXEMPT ☐    PTO ☐    TERM CODE * | N | 3 |    EEO JOB CODE | 0 | 9 |

LOCATION CHANGE CODE | 1 | 0 | 0 |    FACILITY | 1 | 4 | 0 | 3 |    DEPARTMENT     WORK TYPE

EFFECTIVE DATE     CHANGE TYPE     HOURLY RATE     HOURS PER PAY PERIOD

ACTIVITY DATE **05/25/04**    ACTIVITY CODE **123**    *Complete when making a change/addition to a status code

FEDERAL # OF DEPENDENTS ☐    MARITAL STATUS * ☐    FIXED FEDERAL TAX     ADD'L FED TAX

STATE WORK IN (SUI) | 2 | **MA**    RESIDENT CODE * **3**    STATE LIVE IN (SIT) | 2 | **MA**    RESIDENT CODE * **3**    FIXED STATE TAX     ADD'L STATE TAX

# OF DEPENDENTS ☐☐    MARITAL STATUS * ☐    CT ONLY TAX CODE ☐    CITY TAX **4**    RESIDENT CODE * ☐

COMMENTS     TERMINATE DUE TO POOR ATTENDANCE
EMPLOYEE ELIGIBILITY FOR REHIRE IS CONDITIONAL

Submitted By: _____     Date **05-25-04**

Approved: _____     Date **5-25-04**

Processed By: _____     Date _____
(For Corporate Use Only)

PFILE000031

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05cv40119-FDS

WENDY GAUTHIER,

                Plaintiff

v.

SUNHEALTH SPECIALTY SERVICES, INC. and SUNBRIDGE HEALTHCARE CORPORATION,

                Defendants

## PLAINTIFF'S RESPONSES TO THE DEFENDANTS' REQUESTS FOR ADMISSIONS TO THE PLAINTIFF

1.    Wendy Gauthier began her employment with SunBridge in December of 2003.

**RESPONSE: Admitted**

2.    Wendy Gauthier's employment with SunBridge ended in May of 2004.

**RESPONSE: Admitted**

3.    During her employment at SunBridge, Wendy Gauthier was paid at a rate of $12.00 per hour.

**RESPONSE: Admitted**

4.    On April 8, 2004, Wendy Gauthier was given a written warning concerning her work attendance.

**RESPONSE: Admitted**



5.      Wendy Gauthier was provided with a SunBridge employee handbook (See attached signed acknowledgment).

   **RESPONSE**: **Denied**

6.      Wendy Gauthier dos[sic] not suffer from a permanent physical injury.

   **RESPONSE**: **Denied**

The Plaintiff
WENDY GAUTHIER
By Her Attorney


MICHAEL O. SHEA, ESQ.                        Date: April 6, 2006
BBO No.: 555474
Law Office Of Michael O. Shea, P.C.
451 Main Street
Wilbraham, MA 01095
Telephone:(413) 596-8005
Facsimile: (413) 596-8095


## CERTIFICATE OF SERVICE

I, Michael O. Shea, hereby certify that on the 6th day of April, 2006, I caused the foregoing document to be served by mailing a copy of the same, first class, postage prepaid to the Defendant's Counsel, Scott Griggs, Esq., Lawson & Weitzen, LLP, 88 Black Falcon Avenue, Suite 345, Boston, MA 02110.


Michael O. Shea

0 0 0 3

# INCIDENT/ACCIDENT REPORT

| PERSON INVOLVED | (Last name) GAUTHIER | (First name) WENDY | (Middle initial) J | Adult ☑ | Child ☐ | Male ☐ | Female ☑ | Age 31 |

Date of incident/accident 4/28/04   Time of incident 8:30 A.M. ☐ P.M. ☐   Exact location of incident/accident   Resident's room ☑ No 18-C   Hallway ☐   Bathroom ☐   Other ☐ Specify ___

**RESIDENT** ☐ — Resident's condition before incident/accident
List diagnosis if contributed to incident/accident:
Normal ☐   Confused ☐   Disoriented ☐   Sedated ☐ (Drug ___ Dose ___ Time ___)   Other ☐ Specify ___
Were bed rails ordered? Yes ☐ No ☐   Were bed rails present? Yes ☐ No ☐   If Yes, Up ☐ Down ☐   Was height of bed adjustable? Yes ☐ No ☐   If Yes, Up ☐ Down ☐
Was a restraint in use? Yes ☐ No ☐
Physical restraint ☐ Type ___   Chemical restraint ☐ Specify ___

**EMPLOYEE** ☒ — Department NSG   Job title CNA   Length of time in this position 5 Months

**VISITOR** ☐   Home address ___   Home phone ___
**OTHER** ☐   Occupation ___   Reason for presence at this facility ___

Equipment involved ☐
Property involved ☐   Describe ___
Was person authorized to be at location of incident/accident? Yes ☐ No ☐

Describe exactly what happened; why it happened; what the causes were. If an injury, state part of body injured. If property or equipment damaged, describe damage.

While doing incontinent care on resident Bed C (Rm 18) — Felt a pull in Lower Abdomen — c/o Sharp Pains in Lower Abd — clear fluid leaked out of vagina at time of incident

Indicate on diagram location of injury:   Temp. 98.6   Pulse 99   Resp. 20   B.P. 159/98

**TYPE OF INJURY**
1. Laceration ☐
2. Hematoma ☐
3. Abrasion ☐
4. Burn ☐
5. Swelling ☐
6. None apparent ☐
7. Other (specify below) ☐
✓ ABD PAIN ✓

**LEVEL OF CONSCIOUSNESS** ___

ABD PAIN

Name of physician notified ___   Time of notification ___ A.M./P.M.   Time responded ___ A.M./P.M.
Name and relationship of family member/resident representative notified ___   Time of notification ___ A.M./P.M.   Time responded ___ A.M./P.M.

Was person involved seen by a physician? Yes ☐ No ☐   If Yes, physician's name ___   Where ___   Date ___   Time ___ A.M. P.M.
Was first aid administered? Yes ☐ No ☐   If Yes, type of care provided and by whom ___   Where ___   Date ___   Time ___ A.M. P.M.
Was person involved taken to a hospital? Yes ☐ No ☐   If Yes, hospital name WORC MED CITY   By whom PERSONAL PHYSICIAN CALLED HER DR. ELLACY   Time 2:15 A.M. P.M.

Name, title (if applicable), address & phone no. of witness(es)
KATHLEEN RAYMOND CNA
63 VINTON RD.
HOLLAND, MA. 01521   508-413-245-7276

Additional comments and/or steps taken to prevent recurrence:
Refused to go to Hosp By Ambulance

| SIGNATURE/TITLE/DATE | | SIGNATURE/TITLE/DATE | |
| Person preparing report | Deborah Quimpini RN   4/28/04 | Medical Director | |
| Director of Nursing | | Administrator | |

Form 3332R   © 1991 Briggs Corporation, Des Moines, IA 50306
R1100   To order, phone 1-800-247-2343   PRINTED IN U.S.A.

P F I L E 0 0 0 0 5 6