UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WENDY GAUTHIER,

        Plaintiff

v.

SUNHEALTH SPECIALTY SERVICES, INC. and SUNBRIDGE HEALTHCARE CORPORATION,

        Defendants

Civil Action No.: 05CV40119-FDS

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Plaintiff, Wendy Gauthier, worked for the Defendants, SunHealth Specialty Services, Inc. and SunBridge HealthCare Corporation (hereinafter collectively referred to as "Defendants"), as a Certified Nursing Assistant ("CNA") at a nursing and rehabilitation facility known as Sandalwood. The Defendants terminated the Plaintiff's employment on or about May 25, 2004, while she was pregnant, allegedly for failing to appear for a scheduled shift (an alleged no call/no show) in violation of the Defendants' attendance policy. However, the Plaintiff at all times complied with the attendance policy and never committed a no call/no show.

In addition, the Plaintiff's supervisor, Ann Kendall, made several comments to the Plaintiff about the Plaintiff's pregnancy and her ability to perform the essential functions of her position after the Plaintiff disclosed her pregnancy and that she was injured on the job. Ms. Kendall also failed to reasonably accommodate the Plaintiff in regard to her pregnancy and related medical conditions. The Plaintiff claims that the Defendants' articulated reason for termination is a pretext, and that the real reason for her termination was discrimination based on her pregnancy, handicap, and in retaliation for filing (or having filed on her behalf) a worker's compensation claim. Management of the Defendants have

presented significant conflicting accounts regarding the relevant attendance policy which was in effect at the time of the Plaintiff's termination and which the Plaintiff allegedly violated.

The Plaintiff timely filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (hereinafter referred to as the "MCAD"), and she properly withdrew the Charge before filing suit. The Plaintiff alleges in her Complaint that the Defendants discriminated against her by terminating her based on: Count I – her handicap, pursuant to M.G.L. c. 151B; Count II – her sex/gender/pregnancy, pursuant to M.G.L. c. 151B; Count III – retaliation, pursuant to M.G.L. c. 151B; Count IV – retaliation, pursuant to M.G.L. c. 152 § 75B. The Plaintiff opposes the Defendants' Motion for Summary Judgment on all claims therein for the reasons set forth below.

## STATEMENT OF MATERIAL FACTS IN DISPUTE

The Plaintiff's Statement of Material Facts in Dispute is filed herewith and incorporated by reference into this Memorandum. Specific paragraphs of the Statement are referenced by the designation "Fact, ¶ __."

## ARGUMENTS

I. **The Plaintiff Does Establish A Claim Of Handicap/Disability Discrimination Under Chapter 151B**

Under Chapter 151B, an individual has a handicap if: (1) she has a substantial impairment that substantially limits one or more major life activities; (2) has a record of such a physical or mental condition; or (3) is regarded by the employer as having such a condition. M.G.L. c. 151B, §§ 1(17), 1(20), and 4(16). Whether a plaintiff has a disability is to be made on a case-by-case basis. Calero-Cerezo v. U.S. Dep. of Justice, 355 F.3d 6, 20 (citing Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 [2002]; Sutton v. United Airlines, Inc., 527 U.S. 471, 483 [1999]). Whether a physical impairment constitutes a substantial limitation is often fact-dependent and not readily disposed of at the summary judgment stage. See School Bd. v. Arline, 480 U.S. 273, 287 (1987).

A. **The Plaintiff Suffered Impairments That Substantially Limited Her In The Activity Of Working And Lifting**

The Defendants were aware of the Plaintiff's pregnancy. As noted above, an employment medical examination was conducted of the Plaintiff upon her hire with the Defendants on or about December 22, 2003. Facts ¶ 4. The medical documentation indicated that the Plaintiff was 12 weeks pregnant at the time of her hire, and no heavy lifting was suggested from 12/22/03 to 5/25/04. Facts ¶ 4. However, it was not until the Plaintiff suffered an injury at work at the end of January 2004, that she was in need of an accommodation related to her pregnancy and the injury. The Plaintiff was kicked by a resident during patient care and suffered a strain in the abdomen. Facts ¶ 22. The Plaintiff went to the hospital and needed an accommodation in regard to lifting. Facts ¶ 22. The Plaintiff was unable to pursue the life activity of lifting. Facts ¶ 7. The MCAD has added "lifting" to the list of "major life activities." MCAD Guidelines, § II.A.5. The Equal Employment Opportunity Commission's Interpretive Guidance likewise has added, pertinently, "lifting" and "reaching" to the list. 29 C.F.R. Part 1630, App. § 1630.2(i).

In Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 23 (1st Cir. 2002), the court found that the plaintiff was substantially limited in the major life activity of lifting, even though there was evidence that she could lift 40 to 50 pounds, due to the fact that she only had one hand. See also, Dartt v. Browning-Ferris Incorporated, 427 Mass. 1, 8-9 (1998)(analogizing Chapter 151B, § 4[16] to federal law where the language is "substantially identical"). The Gillen court noted that even if the plaintiff could lift more weight than two-handed individuals, she was still substantially limited in that she could only use one hand. *Id.* at 23.

Like the Gillen plaintiff, the Plaintiff is substantially limited in the activity of lifting in that other health conditions combine to cause her substantial limitation around the activity of lifting as compared to the general population. The Plaintiff's pregnancy, combined with the strain she suffered to her abdomen, substantially limited her ability to lift. Furthermore, M.G.L.c. 152 § 75B (1) states:

> Any employee who has sustained a work-related
> injury and is capable of performing the essential functions of a
> particular job, or who would be capable of performing the essential
> functions of such job with reasonable accommodations, shall be

3

>deemed to be a qualified handicapped person under the provisions of
>chapter one hundred and fifty-one B.

Given this provision of M.G.L.c. 152 § 75B, it remains clear that the Plaintiff was a qualified handicapped person under M.G.L.c. 151B.

In addition to the injury suffered with regard to patient care in January 2004, the Plaintiff began experiencing pregnancy complications in January 2004. Facts ¶ 7-9. The Plaintiff had frequent morning sickness, swollen feet, and had to use the bathroom more frequently. Facts ¶ 8. The Plaintiff would vomit every day, approximately 20 times per day, due to her pregnancy. Facts ¶ 9. The Plaintiff was denied these basic accommodations. Id. Due to the severity of the morning sickness, the Plaintiff found that beginning in January 2004, she was unable to perform her job functions at SunBridge without accommodation. Facts ¶ 9. The Plaintiff then requested that she be given time off for morning sickness, and was denied on every occasion. Id.

Pregnancy-related complications can constitute a disability under the ADA.[1] See Hernandez v. City of Hartford, 959 F. Supp. 125 (D. Conn. 1997) (premature onset of labor that could only be controlled with medication constituted a disability); Gabriel v. City of Chicago, 9 F. Supp.2d 974 (N.D. Ill. 1998) (back pain, stomach pain, swelling, and premature birth constituted "physical impairments"); Soodman v. Wildman, Harrold, Allen & Dixon, No. 95C3834, 1997 WL106257, at *6 (N.D. Ill. Feb. 10, 1997) (incompetent cervix causing danger of pre-term labor constituted disability under ADA); Patterson v. Xerox Corp., 901 F. Supp. 274 (N.D. Ill. 1995) (severe pregnancy-related back pain constituted disability); Darian v. Univ. of Mass. Boston, 980 F. Supp. 77 (D. Mass. 1997) (severe pelvic bone pain, uterine contractions, irritation and pain of uterus, and back pain constituted disability); Cerrato v. Durham, 941 F. Supp. 388 (S.D.N.Y. 1996) (denying motion to dismiss ADA claim when the plaintiff suffered from spotting, leaking, cramping, dizziness, and nausea); see also Conley v. United Parcel Service, 88 F. Supp.2d 16, 20 (E.D.N.Y. 2000) (holding that it is the physiological impairment that results

---

[1] M.G.L. c. 151B "tracks the ADA in virtually all respects." Gillen v. Fallon Ambulance Service, 283 F.3d 11, 20 n.5 (1st Cir. 2002).

from complications that renders the person disabled and holding that miscarriage without resultant complications did not constitute disability).

The MCAD has also advised that "[c]hronic or episodic disorders that are substantially limiting may be handicaps." MCAD Guidelines, § II.A.6 and § 8.3.2. See also, MCAD Guidelines for MMLA, Section VII (Pregnancy-Related Medical Conditions As A Disability). The Plaintiff also was unable to clean her own home because the swelling in her feet was so severe that she was unable to wear regular shoes. Facts ¶ 7. The Plaintiff's morning sickness prevented her from performing normal daily life activities. Facts ¶ 7. The Plaintiff's substantial limitation with regard to lifting should be assessed in light of her complicating medical condition of pregnancy. Indeed, the Supreme Court has emphasized,

> Congress intended the existence of a disability to be determined…
> in a case-by-case manner…An individualized assessment of the
> effect of an impairment is particularly necessary when the impairment
> is one whose symptoms vary widely from person to person.

Toyota Motor Mfg., Kentucky, Inc., 534 U.S. 184,199 (2002). The Plaintiff was not substantially limited in performing the tasks of her job, provided she received a reasonable accommodation, which she did not. Facts, ¶¶ 16, 18, 19, 21, 22. In sum, and consistent with Toyota Motor Mfg., Kentucky, Inc., whether the Plaintiff's impairment rises to the level of "substantial limitation" presents a genuine issue of material fact, and should be assessed by a jury.

### B. The Plaintiff Was Regarded As Or Perceived To Be Disabled By The Defendants

A person is regarded as disabled if an entity mistakenly believes that the person's actual, non-limiting impairment substantially limits one or more major life activities. City of New Bedford v. Massachusetts Commission Against Discrimination, 440 Mass. 450 (2003), citing Murphy v. United Parcel Service, Inc., 527 U.S. 516, 521-522 (1999). Therefore, the Plaintiff must show that the impairment, *as the Defendant perceived it*, was substantially limiting. Deas v. River West, L.P. 152 F.3d 471, 480 (5th Cir. 1998)(emphasis added). The Plaintiff asserts that she was "regarded as" handicapped by the Defendants. In Petsch-Schmid v. Boston Edison Co., 914 F. Supp. 697, 704 (D. Mass. 1996), a case involving a claim of handicap discrimination under Chapter 151B, the court found that "the result is

no less pernicious if a person is discriminated against because she is *perceived* to be handicapped as it is if her condition is real."

The Defendants, in the instant litigation, perceived the Plaintiff as substantially limited in the major life activity of working and lifting due to her pregnancy and job injury. The Plaintiff informed Ms. Kendall, then Director of Nursing, that she was pregnant during her interview. Facts ¶ 4. An employment examination was conducted on December 22, 2003. The medical documentation from this examination indicated that the Plaintiff was 12 weeks pregnant and that no heavy lifting was suggested from 12/22/03 to 5/25/04. Facts ¶ 4. Despite this suggestion, the Plaintiff was cleared to work and was able to perform the essential functions of her position of Certified Nursing Assistant. *Id.* Despite this clearance, Ms. Kendall requested that the Plaintiff provide medical documentation regarding her physical condition and ability to perform her job. *Id.* Mr. Steven Copper, Administrator, indicated that he believed that Ms. Kendall addressed him with regard to the fact that the Plaintiff was pregnant at the time of her employment. Facts ¶ 4. Mr. Copper testified that Ms. Kendall requested a doctor's note from the Plaintiff due to the nature of the work that the Plaintiff was performing. *Id.* Mr. Copper testified that Ms. Kendall requested that the Plaintiff provide this note to ensure that the Plaintiff was capable of doing her job because the Plaintiff was responsible for lifting patients on her shift. Facts ¶ 16. Mr. Copper did not know whether SunBridge required all pregnant employees to get a note from a doctor. Facts ¶ 16. Furthermore, the Plaintiff provided numerous medical notes to support her requests for accommodations based upon her pregnancy and with regard to an injury she sustained in the course of her employment while pregnant. Facts ¶ 4, 16, 18, 19, 21, 22.

It is fairly evident, based upon Ms. Kendall's requests for medical documentation regarding the Plaintiff's ability to perform her job, that the Plaintiff was regarded as handicapped by the Defendants. In assessing the employer's alleged perception of the plaintiff as handicapped, the court declared that summary judgment is not appropriate where "credibility issues, particularly those delving into an actor's state of mind" remain. *Id.* at 704. One can infer from the Defendants' actions that they perceived the Plaintiff as substantially limited in performing, at least, the major activity of working and lifting. *See* G.L.

6

c. 151B, § 1(20). *See* Deane v. Pocono Medical Center, 142 F.3d 138, 144 (3d Cir. 1998)(even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability)(citing EEOC interpretive guidelines). See also, Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) (in order for an employer to be considered as "regarding" an employee as limited in a major life activity, "it is necessary that [the employer] entertain misperceptions about the individual.).

### C. The Plaintiff Would Have Been Able To Perform The Essential Functions Of Her Employment With Reasonable Accommodation

The jury must consider the issue of reasonable accommodation, since the Plaintiff, a handicapped individual in the eyes of the Defendants, was able to perform the essential functions of her job with some reasonable accommodation. *See* Tate v. Department of Mental Health, 419 Mass. 356, 362 (1995)(holding that courts only consider the issue of reasonable accommodation when the plaintiff is handicapped and cannot perform the essential functions of her job). The First Circuit has noted that it is the employer's burden to show that the requested accommodations are unreasonable. Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 36 (1st Cir. 2000).

Contrary to the Defendants' assertions, attendance is not always considered an essential job function. Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 35 ("a regular and reliable schedule may be an essential element of most jobs," but with an important caveat, namely, that the "resolution of the issue in each case requires a fact-intensive inquiry into the pattern of the attendance problem and the characteristics of the job in question"). In the instant case, it should be for a jury to decide whether attendance was an essential job function for the Plaintiff, particularly where, as here, the Plaintiff was able to freely change her work schedule so long as she had coverage. Managers of the Defendants have clearly testified that work schedules were routinely changed without any hardship to the Defendants. Facts ¶ 10, 12, 13, 17. Moreover, the Plaintiff requested time off from work for her pregnancy and injury-related conditions and could get coverage without undue hardship to the Defendants. Facts ¶ 10, 12, 13, 17.

With regard to lifting, the Plaintiff requested light duty for her lifting restriction on approximately four to five occasions. Facts ¶ 16, 18, 19. Each time, Ms. Kendall indicated that there was <u>no such thing as light duty</u>, and that if the Plaintiff could not perform her job, she could not continue to work there. *Id.* Ms. Kendall seemed frustrated with the Plaintiff when the Plaintiff provided medical notes and when she called out of work due to her pregnancy. Facts ¶ 22. However, conflicting testimony of management indicates that the Defendants did, in fact, have light duty jobs available in the form of filing, answering the phone, and activities assistant. Facts ¶ 19. Mr. Copper, Administrator, said that CNAs would be placed on light duty if they could be accommodated. *Id.* Mr. Copper indicated that there was a light duty position available on the day shift, consisting of various tasks such as filing, office work, answering phones and patient escorts. *Id.* Deposition testimony of the Plaintiff's former co-worker, Kathleen Raymond, revealed that Ms. Raymond was granted light duty, and remained on light duty, for over one year while employed with the Defendants. *Id.*

Mr. Cooper also testified that if an employee was experiencing pregnancy complications and requested an accommodation, Ms. Kendall would be involved in that process. Facts ¶ 16. Ms. Kendall's discriminatory animus toward the Plaintiff due to her injury at work, her pregnancy and her related medical conditions are the reason that the Plaintiff was denied accommodations, particularly since there seems to be no other credible explanation. The Plaintiff was not treated in the same manner that other employees of the Defendants were treated when injured and/or were ill and in need of an accommodation. The Plaintiff was not offered light duty on her shift, nor was she given the option to switch shifts or offered another available position with the Defendants. *Id.* Had the Plaintiff been offered light duty on her shift or another shift, she would have taken it. Facts ¶ 18, 21. The Defendants also failed to offer the Plaintiff assistance with lifting.

Contrary to the Defendants' misplaced assertion that the Plaintiff was, in effect, asking for a newly created position, requesting light duty where light duty is available is obviously not the same as requesting that the Defendants create an entirely new permanent position for the Plaintiff. The Plaintiff was requesting temporary light-duty work, and she was abruptly told that there was no such thing as light

duty available. It is also noteworthy that, even while Chapter 151B does not require reassignment of employees, the MCAD has made it clear that "[f]ailure to reassign an individual to a vacant position for which s/he is qualified may be evidence of discriminatory animus." MCAD Guidelines: Employment Discrimination on the Basis of Handicap – Chapter 151B, Section XI, Note 4.

In addition to her lifting restrictions and requests for light duty, the Plaintiff also requested accommodations pertaining to the complications she was experiencing as a result of her pregnancy. The Plaintiff also experienced severe morning sickness as a result of her pregnancy and vomited approximately 20 times a day. Facts ¶ 9. The Plaintiff requested that she be allowed to use the bathroom more frequently as, on occasion, the Plaintiff was unable to request that she be allowed to use the bathroom and she just had to run in to vomit. Id. A supervisor denied this accommodation and told the Plaintiff that it was not appropriate for the Plaintiff to come in to work in that condition. Id. The Plaintiff then asked for time off for morning sickness on numerous occasions throughout the course of her employment and was denied on every occasion. Id. The Plaintiff experienced severe swelling of her feet due to her pregnancy. Facts ¶ 8. The Plaintiff asked for accommodations that she be allowed to occasionally elevate her feet due to the swelling, and she was denied. Facts ¶¶ 8, 9. Additionally, the Plaintiff asked for days off to attend medical appointments for her pregnancy and was denied time off. Facts ¶ 16.

Under Chapter 151B, the Defendants must "make reasonable efforts to accommodate the particular needs of 'qualified' handicapped individuals, i.e. those who are able to perform their jobs if employers make some effort to adjust the working situation." Talbert Trading Company v. Massachusetts Commission Against Discrimination, 37 Mass. App. Ct. 56, 63 (1994). See also, Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 108-109 (1st Cir. 2005). Pursuant to the Talbert and Tobin cases, whether the Defendants had a duty under M.G.L.c. 151B to accommodate the Plaintiff for her pregnancy and related medical conditions presents a genuine issue of material fact that should be evaluated by a jury.

II.     **The Plaintiff Establishes A Prima Facie Case Of Sex/Pregnancy Discrimination**

The Plaintiff can meet her initial burden of establishing a prima facie case that she was unlawfully discriminated against based on her sex under Chapter 151B. As is true for the Plaintiff, meeting the prima facie burden "is not onerous." Santiago-Ramos v. Centennial P.R. Wireless, 217 F.3d 46, 54 (1st Cir. 2000)(quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 [1981]). The Plaintiff, at the time of her employment was a pregnant woman, she performed her job well, her employer took adverse action against her by terminating her soon after she legitimately requested a reasonable accommodation for her pregnancy and/or handicap, and her duties continued to be performed by other, comparably qualified employees. Facts, ¶¶ 21, 22.

Under Chapter 151B, the Plaintiff must establish that: (1) [she] is a member of a class protected by G.L. c. 151B; (2) performed [her] job at an acceptable level; (3) [she] was terminated; and (4) [her] employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's...[t]he elements...may vary depending on the facts of the case. Abramian v. President & Fellows of Harvard, 432 Mass. 107, 116 (2000)(quoting Blare v. Husky Injection Molding System Boston, Inc., 419 Mass. 437, 441 [1995]). The Defendants take issue with the second element of the Plaintiff's prima facie case, stating that the Plaintiff cannot show that she performed her job responsibilities well. See Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment (hereinafter referred to as "Defendant's Memo"), pp.5-7. The Defendants specifically take issue with the Plaintiff's lifting restriction and absences related to her morning sickness and medical appointments. As fully described above in Section I above, which is incorporated herein by reference, the Plaintiff would have been able to perform the essential functions of her position as a CNA with some accommodation. The Plaintiff requested that she be allowed to take some nights off to attend early morning medical appointments or to otherwise address her symptoms, and was she denied that request. Facts ¶ 14. In March or April 2004, the Plaintiff asked Ms. Kendall if she could take a shift off to go to a medical appointment and was denied that request. Facts ¶ 14. As is discussed in some detail below in Section III, the Plaintiff did not violate the Defendants' attendance policies.

At the third-stage of the Plaintiff's prima facie case of sex discrimination, she has the burden of showing that her employer terminated her as a result of discriminatory animus and that this animus was the determinative cause of its decision. Lipchitz v. Raytheon Co., 434 Mass 493, 504 (2001). As fully described below in Section III, which is incorporated herein by reference, the Plaintiff was terminated by the Defendants based upon her pregnancy, her real or perceived handicap and/or disability related thereto, and in retaliation for filing a worker's compensation claim and requesting an accommodation for her handicap, and not for any legitimate business reason. Facts ¶ 21, 22.

III. **The Plaintiff Can Prove That She Was Retaliated Against And Terminated, Based, In Part, Due To Her Handicap/Disability and Pregnancy**

A. **There Are Material Facts in Dispute Regarding Application Of The Defendants' Attendance Policy**

As is noted above, the Defendants terminated the Plaintiff's employment for an alleged no call/no show under an alleged attendance policy that the Defendants' managers themselves could not clearly articulate with any uniformity or precision. The deposition testimony regarding the Defendants' alleged attendance policy are rife with inconsistencies and contradictions. A plaintiff can show pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" for the adverse employment action. Santiago-Ramos, 217 F.3d at 56.

Mr. Copper indicated that the attendance policy required employees to report to work on their designated shift, but that with approval of the department head, employees could get coverage and swap shifts. Facts ¶ 10. Mr. Copper indicated that this shift swapping could be based on a verbal agreement made with an employee and their supervisors. *Id.* On the other hand, when asked about the process that a CNA would need to undergo to move a scheduled shift, Ms. Kendall indicated that CNAs should submit the change in writing and that both of the CNAs would sign and agree to the change. *Id.* Ms. Kendall stated that every CNA had to get approval and make a request in writing, unless there was not time to put it in writing. *Id.*

Ms. Kendall then indicated that she could not recall whether there was a written policy of

11

SunBridge or Sandalwood that required CNAs to put in writing a request for a schedule change.[2] Facts ¶ 10. Ms. Kendall then contradicted her earlier testimony and testified that if an employee changed their schedule verbally, there would not be a reprimand and that this approach would not be inappropriate. *Id.* Ms. Kendall also admitted that it may have been a past practice of the Defendants that CNAs could swap shifts without written confirmation. *Id.*

    Former employees of the Defendants testified that the procedure for requesting a scheduled day off was to ask another CNA to switch days, verbally notify the third shift nurse supervisor, and the nurse would automatically make the change on the schedule. *Id.* Prior to the Plaintiff's termination, an employee only had to ask a CNA to cover the shift and verbally notify the supervisor of the change. *Id.* Ms. Raymond stated that, when switching shifts, the nurse in charge would simply erase the names from the schedule and write the names on the schedule for the shift swap. *Id.* It is important to note that only after the Plaintiff was terminated from her employment did the Defendants require that requests for schedule changes be signed (in writing) and given to the scheduler and the director of nursing for authorization. *Id.*

    B.  <u>**There Are Material Facts In Dispute Regarding Whether The Plaintiff Committed No Call/No Shows (The Alleged Reason For The Plaintiff's Termination Of Employment)**</u>

    The Defendants have alleged that the Plaintiff was terminated after committing two no calls/no shows. Yet Ms. Kendall herself did not know whether the Plaintiff ever committed a no call/no show. Facts ¶ 21. State and federal law shift the burden back to the plaintiff, after the defendant-employer has provided a non-discriminatory reason for termination, to show that the employer's reason was unlawful discrimination. The Plaintiff firmly disputes that she ever committed a no call/no show, and deposition testimony reflects that genuine issues of material fact are in dispute as to whether the Plaintiff obtained coverage of her shift from anther CNA, Lisa Franks. Facts ¶ 12.

---

[2] It is also important to note that Ms. Kendall, the Plaintiff's supervisor and prime mover in the Plaintiff's termination, remembered next to nothing about the Plaintiff's employment or even whether she was pregnant. Ms. Kendall also did not know whether the Plaintiff ever committed a no call/no show. Facts ¶ 21.

12

With respect to the alleged no call/no show which led to the Plaintiff's termination of employment, the Plaintiff switched shifts with Lisa Franks so she could attend a medical appointment. Facts ¶ 12. The Plaintiff never failed to show up for a shift without calling or scheduling coverage. *Id.* Deposition testimony reflects that Lisa Franks would switch with people and then would not show up for work and would say she was not supposed to be working. *Id.* A former coworker of the Plaintiff testified that she was present when the Plaintiff and Ms. Franks switched days, and that she witnessed the nurse was erasing names and making changes in the scheduling book for the schedule change between Ms. Franks and the Plaintiff. *Id.* The CNAs all switched shifts all the time. *Id.* Ms. Franks admitted her in deposition that she may have swapped the shift in question with the Plaintiff. *Id.* Ms. Kendall indicated that if a CNA wanted to move a date around on a work schedule they would have to get permission directly from Ms. Kendall, or from the person who did the scheduling, who would then confirm with Ms. Kendall to obtain approval. Facts ¶ 13. When asked about the process that a CNA would need to undergo to move a scheduled shift, Ms. Kendall indicated that CNAs should submit in writing that the other person was going to work for them on a particular date and shift, and both of the CNAs would sign and agree. *Id.* However, as noted above, Ms. Kendall said that it may have occurred that CNAs changed the schedule verbally. *Id.* Ms. Franks did not recall using a form every time she switched time and agreed that she may have switched on a verbal agreement with the Plaintiff. *Id.* Mr. Copper indicated that it was common for employees to arrange coverage and move the schedule around with the approval of the nursing supervisor. Facts ¶ 15.

### C. The Plaintiff Was Treated Harshly And Disparately Regarding Disciplinary Action Based Upon Sex/Gender and Handicap

Along with her claim that she was denied a reasonable accommodation for her handicap and pregnancy complications, the Plaintiff contends that Ms. Kendall's discriminatory animus was a determinative factor in the Plaintiff's termination. A plaintiff can show that an employer's articulated reason for termination is pretextual "in a number of ways," including by showing that a key decision-maker, and/or an employee in a position to influence such a decision-maker, made discriminatory

13

comments. Santiago-Ramos v. Centennial P.R. Wireless, 217 F.3d 46 (1st Cir. 2000)(citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 675-676 [1st Cir. 1996]). It is also important to note that, according to the First Circuit, "[a]sserting that a termination was based on [an employee's] absenteeism rather than her disability does not justify [an employer's] action <u>where the absence was the requested accommodation</u>." Criado v. IBM Corp., 145 F.3d 437, 441 [1st Cir. 1998])(emphasis supplied).

In the instant litigation, it is clear that Ms. Kendall, as a key-decision maker, harbored discriminatory animus toward the Plaintiff. Ms. Kendall questioned the Plaintiff regarding her ability to perform her job as a result of her pregnancy and related medical conditions and requested that she provide medical documentation clearing her to work under full-duty. Facts ¶¶ 16, 18, 19, 21, 22. Ms. Kendall then refused to provide any of the accommodations requested by the Plaintiff in regard to either her injury at work or her pregnancy and related medical conditions. Facts ¶ 16, 18, 19, 21, 22. As noted above, Ms. Kendall seemed frustrated with the Plaintiff when the Plaintiff provided medical notes and when she called out of work due to her pregnancy and pregnancy-related complications. Facts ¶ 22.

Perhaps the most telling evidence of this discriminatory bias is the fact that Ms. Kendall did not treat the Plaintiff similarly to other CNAs with regard to disciplinary action. Deposition testimony of management indicates that there was a progressive discipline policy at Sandalwood. Facts ¶ 15. The policy was that verbal warnings issued initially, followed by written warnings, followed by further disciplinary action, suspension and/or termination. *Id.* A minimum of two verbal warnings were given before it was reduced to writing, and two written warnings were given prior to the next disciplinary action. *Id.* After two verbal warnings and two written warnings are given, the Defendants would review the employee, the nature of events and determine whether to retain or terminate the employee. *Id.* As discussed in more detail below, the Plaintiff was not only wrongly disciplined because she did not commit a no call/no show, but she was disciplined far more harshly than those CNAs that actually committed numerous no call/no shows and other attendance-related violations.

The Plaintiff was accused of committing two no call/no shows. *Id.* After the first alleged no call/no show, Ms. Kendall went to Mr. Copper and indicated that she had talked with the Plaintiff about

14

her no call/no show, and that the decision was made not to terminate the Plaintiff's employment. *Id.* After the second alleged no call/no show, Ms. Kendall and Mr. Copper decided to terminate the Plaintiff's employment. *Id.* Mr. Copper indicated that he believed that the Plaintiff received a verbal warning for the first no call/no show and that the Plaintiff received a written warning for the second no call/no show. *Id.* Mr. Copper said that after the warning was issued for the second no call/no show, the Plaintiff was terminated after that warning was issued. *Id.* When asked why she would be given a written warning and a termination at the same time, Mr. Copper stated that they wanted to have something in writing—a "paper trail." *Id.*

Mr. Copper said that the discretion of the department head was used to provide leniency in regard to the termination policy and a no call/no show. *Id.* Certainly, no such leniency was afforded to the Plaintiff. Mr. Copper said that Ms. Kendall was the department head for the Plaintiff's department. *Id.* Discretionary factors included performance, extenuating circumstances and <u>complications of pregnancy</u>. *Id.* Mr. Copper indicated that these factors could be considered to allow for absences and more than one no call/no show, as well as overall leniency concerning the attendance policy and disciplinary action. *Id.* Mr. Copper indicated that if Ms. Kendall had informed him that the Plaintiff was having complications with her pregnancy, it may have been reviewed in terms of a decision to give the Plaintiff more leeway in terms of taking time off. *Id.* However, no such review was conducted with respect to the Plaintiff.

Personnel files of former and/or current CNAs at Sandalwood were reviewed by Mr. Copper at his deposition. Facts ¶ 14. A review of the personnel files of other CNAs revealed that leniency was granted to several other employees of the Defendants with regard to the attendance policy, particularly as compared to the Plaintiff. *Id.* An employee identified at the deposition as Employee No. 2 was allowed two no call/no shows after she had been cleared to return to work with no restriction, and she was not terminated. *Id.*[3] Another employee, identified as Employee No. 6, called out of work five times from her

---

[3] The Parties agreed to keep the names of comparator employees confidential for privacy purposes, and the Parties also agreed that the said employees were in comparable positions to the Plaintiff, e.g. CNAs.

date of hire of July 15, 2005 and September 4, 2005 and committed two no call/no shows and received only one written warning. *Id.* Another employee, Employee No. 9, was suspended, but not terminated, for a strong odor of alcohol, refusing alcohol testing and laying in bed with a resident. *Id.* Employee No. 9 was then reprimanded for no call/no shows. *Id.* The reprimand of Employee No. 9 states that three no calls/no shows within a reasonable time frame is cause for termination. *Id.* There was nothing in the file to indicate that Employee No. 9 was terminated from her employment. *Id.* Employee No. 10 was counseled while on a 90-day probation for three call outs. *Id.* Employee No. 10 was not terminated after calling out during the 90-day probation period. *Id.* Employee No. 13 had several occasions of tardiness, several call outs and two no call/no shows and was not immediately terminated. *Id.* Employee No. 15 had excessive absenteeism and patient, safety and care issues and was not terminated. *Id.* It is important to note that the Plaintiff was not on probation at the time of her termination and had only received two written warnings prior to her termination. Facts ¶ 14.

Given the above-referenced evidence, it is clear that genuine issues of material fact exist as to whether the disciplinary policy of the Defendants was evenly applied to the Plaintiff versus other CNAs, and whether accommodations should have been granted to the Plaintiff with regard to her absences due to her pregnancy and related medical conditions.

IV. **The Plaintiff Does Establish A Claim For Retaliation Under M.G.L. c. 152, § 75B And M.G.L.c. 151B**

Contrary to the assertions of the Defendants, the Plaintiff did in fact exercise rights afforded to her under the Workers' Compensation Act, as well as by making several requests for accommodation that were flatly denied. The Defendants appear to assert that, based upon the Plaintiff's deposition testimony, the Plaintiff did not file a workers compensation claim. This assertion is misplaced. The fact remains that a workers compensation claim was filed by the Defendants on behalf of the Plaintiff as a result of an injury she sustained during the course of her employment. Facts ¶ 17, 22. The Defendants' "Position Paper" filed at the MCAD by the Defendants in response to the Plaintiff's Charge in fact states very

clearly that a worker's compensation claim was filed in regard to the Plaintiff's injury on or about January 24, 2004. Facts ¶ 17, 22. Position Paper pg. 2, in relevant portion, states:

> Complainant, like all employees, is responsible for notifying the employer that a worker's compensation injury has occurred. Worker's Compensation Claim Number 9000541087 was opened for Complainant for an injury dated January 24, 2004.

For her part, the Plaintiff did notify the Defendants of her injury, as she was obligated to do, and, contrary to the Defendants' assertions, the Defendants were obligated under M.G.L.c. 152, § 7 to file a first report of injury, which apparently was done. Based upon the above-referenced representations made in the Defendants' Position Paper alone, it is clear that the Plaintiff exercised a right afforded by the Worker's Compensation Act when a worker's compensation claim was filed on her behalf. See Gilman v. C&S Wholesale Grocers, Inc., 170 F. Supp. 2d 77 (Mass. 2001).

M.G.L.c. 152, § 75B(2) states:

> No employer or duly authorized agent of an employer shall discharge, refuse to hire or in any other manner discriminate against an employee because the employee has exercised a right afforded by this chapter, or who has testified or in any manner cooperated with an inquiry or proceeding pursuant to this chapter...

To state a prima facie case of retaliation under M.G.L.c. 151B and the ADA, the Plaintiff must prove that (1) she was engaged in protected conduct, (2) she suffered an adverse employment action, and (3) there was a causal connection between the two. Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003); Gore v. Trustees of Deerfield Acad., 358 F. Supp. 2d 65, 70 (D. Mass. 2005).[4]

As the Defendants should be aware, termination of employment for requesting a reasonable accommodation constitutes an adverse employment action in a disability-based retaliation case. See Wright, 352 F.3d at 478. In the instant case, the Plaintiff has proffered sufficient evidence that the Defendants retaliated against her in violation of M.G.L.c. 151B and M.G.L.c. 152, § 75B when they terminated her soon after she requested reasonable accommodations for her pregnancy-related medical

---

[4] Retaliation is a separate cause of action under both the ADA and M.G.L.c. 151B. The Plaintiff need not prove an underlying case of discrimination to prevail on retaliation claims. See Wright, 352 F.3d at 477. See also 42 U.S.C. § 12203(a); M.G.L.c. 151B, § 4.

conditions and her workplace injury. See *Id.*(denying summary judgment on ADA and Chapter 151B retaliation claims where a reasonable jury viewing the evidence in a light most favorable to the Plaintiff "could infer that [the defendant]'s charge of insubordination masked retaliatory motives"). See also, Gilman at 86-87 (denial of summary judgment under M.G.L.c. 152, § 75B).

As described in detail above with reference to the Plaintiff's handicap/disability discrimination claims under M.G.L. c. 151B, it is fairly clear that material facts remain in dispute as to whether the Plaintiff was terminated, at least in part, based upon her injury sustained at work and her subsequent requests for light duty and other accommodations.

## V. CONCLUSION

For all of the foregoing reasons, the court should deny the Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted,

The Plaintiff
WENDY GAUTHIER
By Her Attorney

/s/ Michael O. Shea                                                        Date: April 30, 2007
MICHAEL O. SHEA, ESQ.
BBO No. 555474
Law Office Of Michael O. Shea, P.C.
451 Main Street
Wilbraham, MA 01095
Telephone No.: (413)596-8005
Facsimile No.: (413)596-8095

## CERTIFICATE OF SERVICE

I, Michael O. Shea, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 30, 2007 and that there are no non-registered participants.

/s/ Michael O. Shea
Michael O. Shea