UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WENDY GAUTHIER,

                    Plaintiff

v.

SUNHEALTH SPECIALTY SERVICES,
INC. and SUNBRIDGE HEALTHCARE
CORPORATION,

                    Defendants

Civil Action No.: 05CV40119-FDS

## PLAINTIFF'S STATEMENT OF MATERIAL FACT IN DISPUTE

Pursuant to Local Rule 56.1, the Plaintiff lists the following material facts in dispute, concerning which genuine issues remain.[1]  These material facts of record, together with the Plaintiff's Memorandum in Opposition to the Defendants' Motion for Summary Judgment, show that such genuine issues preclude the granting of summary judgment. [2]

1.      The Plaintiff does not dispute the contents of the Defendants' Paragraph 1 of its Statement of Material Facts ("Defendants' Facts").

2.      The Plaintiff does not dispute the contents of Paragraph 2 of the Defendants' Facts.

3.      The Plaintiff does not dispute the contents of Paragraph 3 of the Defendants' Facts.

4.      The Plaintiff told Ms. Kendall that she was pregnant during her interview. (Gauthier Dep. Vol. I, pg. 11; Exh. 1)  An employment examination was conducted on December 22, 2003.  The letter indicated that the Plaintiff was 12 weeks pregnant and no heavy lifting was suggested from 12/22/03 to 5/25/04. (Gauthier Dep. Vol. I, pg. 25; Exh. 1 and Medical Notes; Exh. 7)  At the time of her hire, the Plaintiff was able to perform her job functions as a certified nursing assistant. (Gauthier Dep. Vol. II, pg. 5-6; Exh. 2)

---

[1] The numbered paragraphs contained herein correspond to the numbered paragraphs appearing in the Defendants' Statement of Material Facts through ¶24.
[2] Attached hereto are Exhibits composed of documents from which the within facts are taken, and to which the Plaintiff cites throughout this Statement of Material Facts.

When asked whether she was aware of the Plaintiff's pregnancy, Ms. Kendall said she could not say that Wendy Gauthier was pregnant. (Kendall Dep., pg. 32; Exh. 4)  Ms. Kendall did not recall not having any conversation with the Plaintiff with her about her pregnancy. (Kendall Dep., pg. 72; Exh. 4)  Mr. Copper was an administrator throughout the course of his employment. (Copper Dep., pgs. 14-15; Exh. 3)  As an administrator at Sandalwood, Mr. Copper reviewed disciplinary actions, specifically written warnings and terminations. (Copper Dep., pg. 17; Exh. 3)  Mr. Copper indicated that he believed that Ann Kendall addressed him with regard to the fact that the Plaintiff was pregnant at the time of her employment. (Copper Dep., pgs. 28-29; Exh. 3)    Mr. Copper testified that Ms. Kendall requested a doctor's note due to the nature of the work that the Plaintiff was performing. (Copper Dep., pgs. 28-29; Exh. 3)  Mr. Copper was aware that the Plaintiff was pregnant during her employment. (Copper Dep., pg. 40; Exh. 3)   Ms. Kendall said that she did not ask the Plaintiff for a medical note relating to her pregnancy or an injury at work. (Kendall Dep., pg. 74; Exh. 4)

5.      The Plaintiff told Ms. Kendall upon her hire that she would eventually be taking maternity leave. (Gauthier Dep. Vol. I, pgs. 13-14; Exh. 1)  The Plaintiff, at some point, intended to take a 90 day maternity leave.  (Gauthier Dep. Vol. II, pg. 11; Exh. 2)

6.      The Plaintiff does not dispute the contents of Paragraph 6 of the Defendants' Facts.

7.      The Plaintiff was handicapped when she was pregnant, due to the complications she experienced during her pregnancy. (Gauthier Dep. Vol. I, pg. 50; Exh. 1)  The Plaintiff was unable to pursue the life activity of lifting. (Gauthier Dep. Vol. I, pg. 52; Exh. 1)  The Plaintiff was unable to clean her own home because the swelling in her feet was so severe that she was unable to wear regular shoes. (Gauthier Dep. Vol. I, pg. 52; Exh. 1)  The Plaintiff's morning sickness prevented her from doing the things that she really enjoyed.  (Gauthier Dep. Vol. II, pg. 19; Exh. 2)

8.      The Plaintiff began experiencing pregnancy complications in January 2004. (Gauthier Dep. Vol. II, pg. 13; Exh. 2)  The Plaintiff had frequent morning sickness, swollen feet, and had to use the bathroom more frequently. (Gauthier Dep. Vol. II, pg. 13; Exh. 2)  The frequent bouts of morning sickness began in January 2004 and continued until the Plaintiff delivered the baby in July. (Gauthier Dep. Vol. II, pg. 14;

Exh. 2)  The Plaintiff experienced morning sickness on the job at SunBridge. (Gauthier Dep. Vol. II, pg. 14; Exh. 2)  Ms. Raymond was aware that the Plaintiff was having problems with her pregnancy where she would frequently go to the bathroom and vomit due to morning sickness. (Raymond Dep., pgs. 30-31; Exh. 5)  Ms. Raymond also remembered that the Plaintiff had to keep her legs elevated at times due to her pregnancy because her feet were swollen. (Raymond Dep., pg. 31; Exh. 5)  Ms. Kendall indicated that she was never aware of any complications of the Plaintiff's pregnancy. (Kendall Dep., pg. 32; Exh. 4)  Ms. Kendall did not recall whether the Plaintiff was ill related to her pregnancy. (Kendall Dep., pg. 71; Exh. 4) Ms. Franks knew that the Plaintiff was having problems with her pregnancy at the time of her termination. (Franks Dep. pgs. 8-9; Exh. 6)  Ms. Franks recalled that the Plaintiff had pregnancy complications and that she had a need to take time off for those complications. (Franks Dep. pg. 12; Exh. 6)

9.       The Plaintiff would vomit every day, approximately 20 times per day.  (Gauthier Dep. Vol. II, pg. 14; Exh. 2) The Plaintiff found that, on occasion, beginning in January 2004, she was unable to perform her job functions at SunBridge because of morning sickness. (Gauthier Dep. Vol. II, pg. 14-15; Exh. 2) The Plaintiff asked that she be allowed to refrain from lifting, that she be accommodated for her swollen feet and that she be allowed to use the bathroom more frequently due to morning sickness. (Gauthier Dep. Vol. II, pg. 71; Exh. 2)  The Plaintiff also asked for time off for morning sickness on numerous occasions throughout the course of her employment and was denied on every occasion. (Gauthier Dep. Vol. II, pg. 71; Exh. 2)   The Plaintiff requested an accommodation to go to the bathroom for morning sickness and was denied. (Gauthier Dep. Vol. II, pg. 72; Exh. 2)    The Plaintiff had asked a supervisor to use the bathroom to vomit and was told no because the supervisor felt it was not appropriate to do that.  (Gauthier Dep. Vol. II, pg. 72-73; Exh. 2)  The Plaintiff requested that she be allowed to go to the bathroom to vomit frequently. (Gauthier Dep. Vol. II, pg. 74; Exh. 2)  On occasion, the Plaintiff was unable to request that she be allowed to use the bathroom and she just had to run in to vomit.  (Gauthier Dep. Vol. II, pg. 74-75; Exh. 2)  A supervisor told the Plaintiff that it was not appropriate for the Plaintiff to come in to work in that condition. (Gauthier Dep. Vol. II, pg. 75; Exh. 2)

3

10.     Mr. Copper indicated that the attendance policy was that employees were required to report to work on their designated shift, but that with approval of the department head, employees could get coverage and swap shifts.  (Copper Dep., pg. 57; Exh. 3)  Mr. Copper indicated that this could be a verbal agreement made with an employee and their supervisors. (Copper Dep., pg. 57; Exh. 3) The Plaintiff found that, on occasion, beginning in January 2004, she was unable to perform her job functions at SunBridge because of morning sickness. (Gauthier Dep. Vol. II, pg. 14-15; Exh. 2)  The Plaintiff asked for time off for morning sickness on numerous occasions throughout the course of her employment and was denied on every occasion. (Gauthier Dep. Vol. II, pg. 71; Exh. 2)  Mr. Copper indicated that, if Ms. Kendall had informed him that the Plaintiff was having complications with her pregnancy, it may have been reviewed in terms of a decision to give the Plaintiff more leeway in terms of taking time off. (Copper Dep., pg. 42; Exh. 3)  Mr. Copper indicated that he knew that the Plaintiff took lot of time off, but did not know whether it was related to her pregnancy. (Copper Dep., pgs. 41-42; Exh. 3)   The Plaintiff missed work time due to her pregnancy and was written up. (Gauthier Dep. Vol. I, pg. 46; Exh. 1)

11.     The Plaintiff does not dispute the contents of Paragraph 11 Defendants' Facts, except to state that the Plaintiff believed that she was an excellent CNA that went above and beyond the call of duty at work. (Gauthier Dep. Vol. II, pgs. 54-55; Exh. 2)   The Plaintiff took care of her patients and never hurt anyone. (Gauthier Dep. Vol. II, pgs. 54-55; Exh. 2) Ms. Raymond worked with the Plaintiff on the third shift, approximately 4 days a week. (Raymond Dep., pg. 11-12; Exh. 5)  The Plaintiff did a good job, and Ms. Raymond never observed the Plaintiff violate any policies of SunBridge. (Raymond Dep., pg. 12; Exh. 5) Ms. Franks said that the Plaintiff was a good employee and a hard worker. (Frank Dep. pgs. 11-12; Exh. 6)

12.     The Plaintiff attempted to switch shifts with Lisa Frank so she could attend a doctor's appointment. (Gauthier Dep. Vol. I, pg. 40; Exh. 1)  The Plaintiff never failed to show up for a shift without calling. (Gauthier Dep. Vol. I, pg. 42; Exh. 1)  Ms. Raymond knew that the Plaintiff was accused of a no call/no show. (Raymond Dep., pg. 20; Exh. 5)  Ms. Raymond indicated that she was aware that

4

the Plaintiff had switched shifts with Lisa Franks, and Lisa Franks did not show up for the shift.

(Raymond Dep., pg. 20; Exh. 5)  On a few occasions, Ms. Franks had agreed to switch shifts with Ms.

Raymond and did not show up for work. (Raymond Dep., pgs. 20-21; Exh. 5)  Ms. Raymond believed

that the Plaintiff followed the procedures for switching time or taking time off. (Raymond Dep., pg. 22;

Exh. 5) Lisa Franks missed quite a bit of time and would switch shifts with people and then would not

show up for work and would say she was not supposed to be working.  (Raymond Dep., pg. 41; Exh. 5)

Ms. Franks continuously would be a no call/no show after switching shifts and would just say she was not

on the schedule.  (Raymond Dep., pgs. 41-42; Exh. 5)  Ms. Raymond was present when the Plaintiff and

Ms. Franks switched days.  (Raymond Dep. pg. 59; Exh. 5)  The nurse was erasing names and making

changes in the scheduling book for a switch between Ms. Franks and the Plaintiff. (Raymond Dep., pgs.

59-60; Exh. 5)  The CNAs all switched shifts all the time.  (Raymond Dep., pg. 61; Exh. 5) Ms. Raymond

was questioned by Ms. Kendall regarding the alleged no call/no show of the Plaintiff.  (Raymond Dep.,

pg. 56; Exh. 5)  Ms. Raymond said that she told Ms. Kendall that she was there when Ms. Franks and the

Plaintiff switched shifts. (Raymond Dep., pg. 56; Exh. 5)  Ms. Raymond never saw the Plaintiff again,

and when she asked about the Plaintiff, she was told by Ms. Kendall that the Plaintiff no longer worked

there. (Raymond Dep., pg. 58; Exh. 5) Ms. Franks agreed that she switched time with other CNAs.

(Franks Dep., pg. 7; Exh. 6) Ms. Franks indicated that she may have switched or swapped time with the

Plaintiff.  (Franks Dep. pg. 8; Exh. 6)  Ms. Franks stated that she probably swapped time or covered for

the Plaintiff on more than one occasion.  (Frank Dep. pg. 10; Exh. 6) Ms. Franks did not recall using a

form every time she switched time.  (Frank Dep. pg. 17; Exh. 6)   Ms. Franks was never questioned by

Ms. Kendall regarding switching time with the Plaintiff. (Frank Dep. pgs. 20-21; Exh. 6) Mr. Copper

never questioned Ms. Franks about switching time with the Plaintiff or regarding a no call/no show.

(Frank Dep. pg. 21; Exh. 6)  Ms. Franks may have switched on a verbal agreement with the Plaintiff.

(Frank Dep. pgs. 23-24; Exh. 6)  Ms. Kendall indicated that she did not know why the Plaintiff was

terminated.  (Kendall Dep., pg. 22; Exh. 4)  Ms. Kendall did not know when the Plaintiff was terminated.

(Kendall Dep., pg. 23; Exh. 4)  Ms. Kendall did not know who terminated the Plaintiff's employment, nor

did she know who made the decision to terminate the Plaintiff's employment. (Kendall Dep., pg. 24; Exh. 4) Ms. Kendall said she did not know whether the Plaintiff received any kind of reprimands at SunBridge related to her performance. (Kendall Dep., pgs. 31-32; Exh. 4)

13.     Ms. Kendall indicated that if a CNA wanted to move a date around on a work schedule, they would have to get permission directly from Ms. Kendall, or from the person who did the scheduling, who would then confirm with Ms. Kendall to obtain approval.  (Kendall Dep., pg. 48; Exh. 4)  When asked about the process that a CNA would need to undergo to move a scheduled shift, Ms. Kendall indicated that CNAs should submit in writing that the other person was going to work for them on a particular date and shift and both of the CNAs would sign and agree. (Kendall Dep., pgs. 48-49; Exh. 4)  Every CNA had to get approval and make a request in writing, unless there was not time to put it in writing.  (Kendall Dep., pg. 49; Exh. 4)  Ms. Kendall indicated that the request could be verbal, but it would only be under unusual circumstances. (Kendall Dep., pgs. 49-50; Exh. 4) Ms. Kendall said that the process would be that a CNA had to fill out a form and give in to the scheduler or Ms. Kendall directly. (Kendall Dep., pg. 50; Exh. 4)  Ms. Kendall could not recall whether there was a written policy of SunBridge or Sandalwood that required CNAs to put in writing these requests for changing a schedule. (Kendall Dep., pg. 54; Exh. 4)  Ms. Kendall said that if an employee changed their schedule verbally, there would not be a reprimand for that and that would not be inappropriate. (Kendall Dep., pg. 55; Exh. 4)  Ms. Kendall indicated that if a person verbally informed either her or the scheduler that they were not coming in for an assigned date, that they had coverage from another CNA and it was noted on the scheduling form, that was appropriate as long as it is agreed upon and approved through administration.  (Kendall Dep., pgs. 56-57; Exh. 4)  Ms. Kendall said the scheduler could have the authority to change the time on a schedule for a CNA who has a verbal agreement with another CNA to change the schedule. (Kendall Dep., pg. 57; Exh. 4)  Ms. Kendall said that it may have occurred that CNAs changed the schedule verbally.  (Kendall Dep., pg. 57; Exh. 4)  Ms. Raymond indicated that, as a CNA, the procedure for requesting a scheduled day off was to ask another CNA to switch days, verbally notify third shift nurse supervisor, and the nurse would automatically make the change on the schedule. (Raymond Dep., pgs. 19-20; Exh. 5)  After the Plaintiff

was terminated from her employment, the Defendants required that requests for schedule changes had to be signed and given to the scheduler and the director of nursing for authorization. (Raymond Dep., pgs. 28-29; Exh. 5) At the time of the Plaintiff's employment, the procedure was different. (Raymond Dep., pg. 29; Exh. 5) Prior to the Plaintiff's termination, an employee only had to ask a CNA to cover the shift and verbally notify the supervisor of the change. (Raymond Dep., pgs. 29-30; Exh. 5) Ms. Raymond stated that, when switching shifts, the nurse in charge would simply erase the names from the schedule and write the names on the schedule for the different shift. (Raymond Dep., pg. 33; Exh. 5) It is not the responsibility of a CNA to change the schedule. (Raymond Dep., pg. 33; Exh. 5) CNAs were not allowed to touch the schedule book. (Raymond Dep., pgs. 33-34; Exh. 5) It was not the CNA's responsibility to make sure that the scheduler did her job and actually changed the schedule. (Raymond Dep., pg. 34; Exh. 5) It was a fairly common practice for CNAs to swap times. (Frank Dep. pg. 14; Exh. 6) Ms. Franks indicated that the CNAs were expected to fill out a form to switch times, but there were incidents where this was done verbally as well. (Frank Dep. pg. 14; Exh. 6)

14.    Mr. Copper indicated that Ms. Kendall was responsible for enforcing the progressive disciplinary policy for the nursing department. (Copper Dep., pg. 26; Exh. 3) Ms. Kendall was the person that was responsible for initiating discipline for the nursing department. (Copper Dep., pg. 27; Exh. 3) Mr. Copper approved all disciplinary action administered by Ms. Kendall to the Plaintiff. (Copper Dep., pg. 28; Exh. 3) Personnel files of former and/or current CNAs at Sandalwood were reviewed by Mr. Copper at his deposition. (Copper Dep., pgs. 58-113; Exh. 3 and Personnel Files Exh. 8-13) An employee identified at the deposition as Employee No. 2 was allowed two no call/no shows after she had been cleared to return to work with no restrictions and was not terminated. (Copper Dep., pgs. 74-77; Exh. 3 and Employee No. 2 File; Exh. 8) Another employee, identified as Employee No. 6, called out of work five times from her date of hire of July 15, 2005 and September 4, 2005 and committed two no call/no shows and received only one written warning. (Copper Dep., pgs. 83-85; Exh. 3 and Employee No. 6 File; Exh. 9) Another employee, Employee No. 9, was suspended for a strong odor of alcohol, refusing alcohol testing and laying in bed with a resident. (Copper Dep., pg. 93; Exh. 3 and Employee No. 9 File;

Exh. 10)  Employee No. 9 was then reprimanded for no call/no shows. (Copper Dep., pgs. 94-96; Exh. 3 and Employee No. 9 File; Exh. 10)  The reprimand of Employee No. 9 states that three no calls/no shows within a reasonable time frame is cause for termination. (Copper Dep., pgs. 94-96; Exh. 3 and Employee No. 9 File; Exh. 10)  There was nothing in the file to indicate that Employee No. 9 was terminated from her employment. (Copper Dep., pg. 96; Exh. 3 and Employee No. 9 File; Exh. 10)  Employee No. 10 was counseled while on a 90-day probation for three call outs.  (Copper Dep., pg. 98; Exh. 3 and Employee No. 10 File; Exh. 11)  Wendy Gauthier was not on probation at the time of her termination. (Copper Dep., pg. 98; Exh. 3)  Employee No. 10 was not terminated after calling out during the 90-day probation period. (Copper Dep., pgs. 98-99; Exh. 3 and Employee No. 10 File; Exh. 11)  Employee No. 13 had several occasions of tardiness, several call outs and two no call/no shows and was not immediately terminated. (Copper Dep., pgs. 101-102; Exh. 3 and Employee No. 13 File; Exh. 12)  Employee No. 15 had excessive absenteeism and patient and safety care issues and was not terminated. (Copper Dep., pgs. 102-103; Exh. 3 and Employee No. 15 File; Exh. 13)   The Plaintiff requested that she be allowed to take some nights off to attend early morning doctor's appointments and was denied that request. (Gauthier Dep. Vol. I, pg. 38; Exh. 1)  In March or April 2004, the Plaintiff asked Ms. Kendall if she could take a shift off to go to a doctor's appointment and was denied that request. (Gauthier Dep. Vol. I, pg. 39; Exh. 1)

15.     There was a progressive discipline policy at Sandalwood. (Copper Dep., pg. 17; Exh. 3)  The policy was that verbal warnings issued initially, followed by written warnings, followed by further disciplinary action, suspension and/or termination. (Copper Dep., pg. 17; Exh. 3)  A minimum of two verbal warnings were given before warnings were reduced to writing. (Copper Dep., pg.18; Exh. 3)  Two written warnings were given prior to the next disciplinary action. (Copper Dep., pg. 18; Exh. 3)  After two verbal warnings and two written warnings are given, the Defendants would review the employee, the nature of events and determine whether to retain or terminate the employee. (Copper Dep., pgs. 18-19; Exh. 3)  The Plaintiff was accused of committing two no call/no shows. (Copper Dep., pg. 29; Exh. 3) After the first no call/no show, Ms. Kendall went to Mr. Copper and indicated that she had talked with the Plaintiff about her no call/no show, and that the decision was made not to terminate the Plaintiff's

employment. (Copper Dep., pg. 30; Exh. 3)  After the second no call/no show, Ms. Kendall and Mr.
Copper decided to terminate the Plaintiff's employment. (Copper Dep., pg. 30; Exh. 3)  Mr. Copper
indicated that he believed that the Plaintiff received a verbal warning for the first no call/no show.
(Copper Dep., pg. 31; Exh. 3)  The Plaintiff received a verbal warning for the second no call/no show.
(Copper Dep., pg. 33; Exh. 3)  Mr. Copper indicated that it was common for employees to arrange
coverage and move the schedule around with the approval of the nursing supervisor. (Copper Dep., pgs.
34-35; Exh. 3)  Mr. Copper said that he believed that the Plaintiff received a written warning for the
second no call/no show. (Copper Dep., pgs. 35-36; Exh. 3)  Mr. Copper said that after the warning was
issued for the second no call/no show, the Plaintiff was terminated. (Copper Dep., pg. 36; Exh. 3)  When
asked why she would be given a written warning and a termination at the same time, Mr. Copper stated
that they wanted to have something in writing—a "paper trail." (Copper Dep., pg. 37; Exh. 3)  Mr.
Copper said that discretion of the department head was used to provide leniency in regard to the
termination policy for an incident of a no call/no show. (Copper Dep., pg. 55; Exh. 3)  Mr. Copper said
that Ms. Kendall was the department head for the Plaintiff's department. (Copper Dep., pg. 55; Exh. 3)
Factors in that discretion would be performance, extenuating circumstances, as well as complications of
pregnancy. (Copper Dep., pg. 55; Exh. 3)  Mr. Copper indicated that these factors could be considered to
allow for absences and more than one no call/no show. (Copper Dep., pg. 55; Exh. 3)

16.     The Plaintiff was asked to provide Ms. Kendall with a note from her primary care physician
stating that she could work due to the nature of the Plaintiff's job responsibilities. (Copper Dep., pg. 43;
Exh. 3 and Medical Notes; Exh. 7)  Ms. Kendall requested that the Plaintiff provide this note to ensure
that the Plaintiff was capable of doing her job because the Plaintiff was responsible for lifting patients on
her shift. (Copper Dep., pgs. 43-44; Exh. 3)  Mr. Copper did not know whether SunBridge required all
pregnant employees to get a note from a doctor. (Copper Dep., pg. 44; Exh. 3)  If an employee was
experiencing pregnancy complications and requested an accommodation, Ms. Kendall would be involved
in that process. (Copper Dep., pgs. 45-46; Exh. 3)  If the Plaintiff asked for light duty or for an
accommodation for her pregnancy, Ms. Kendall would have been involved.  (Copper Dep., pgs. 46-47;

9

Exh. 3)  The Plaintiff asked Ms. Kendall for light duty four to five times.  (Gauthier Dep. Vol. II, pgs. 53-54; Exh. 2)  Each time, Ms. Kendall indicated that there was no such thing as light duty, and that if she could not perform her job, she could not continue to work there. (Gauthier Dep. Vol. II, pg. 54; Exh. 2)  The Plaintiff asked for accommodations to take days off to go to doctors' appointments and to put her feet up because they were so swollen. (Gauthier Dep. Vol. II, pg. 54; Exh. 2)   The Plaintiff requested time off for doctor's appointments on numerous occasions. (Gauthier Dep. Vol. II, pg. 55; Exh. 2)  The Plaintiff also asked for time off for morning sickness on numerous occasions throughout the course of her employment and was denied on every occasion. (Gauthier Dep. Vol. II, pg. 71; Exh. 2)   The Plaintiff requested an accommodation to go to the bathroom for morning sickness and was denied. (Gauthier Dep. Vol. II, pg. 72; Exh. 2)    The Plaintiff had asked a supervisor to use the bathroom to vomit and was told no because the supervisor felt it was not appropriate to do that.  (Gauthier Dep. Vol. II, pg. 72-73; Exh. 2)  The Plaintiff requested that she be allowed to go to the bathroom to vomit frequently. (Gauthier Dep. Vol. II, pg. 74; Exh. 2)  On occasion, the Plaintiff was unable to request that she be allowed to use the bathroom and she just had to run in to vomit.  (Gauthier Dep. Vol. II, pg. 74-75; Exh. 2)  A supervisor told the Plaintiff that it was not appropriate for the Plaintiff to come in to work in that condition. (Gauthier Dep. Vol. II, pg. 75; Exh. 2)   Ms. Kendall seemed frustrated with the Plaintiff when the Plaintiff provided medical notes and when she called out of work due to her pregnancy. (Gauthier Dep. Vol. II, pg. 69-70; Exh. 2)

17.     The Plaintiff was injured on the job at the end of January 2004.  (Gauthier Dep. Vol. II, pg. 24-25; Exh. 2 and Position Paper[3]; Exh. 14) A worker's compensation claim was filed by the Defendants on behalf of the Plaintiff as a result of an injury she sustained during the course of her employment. (Position Paper; Exh. 14)  The Plaintiff suffered a strain in the abdomen after being kicked by a resident during patient care. (Gauthier Dep. Vol. II, pg. 25; Exh. 2)  The incident report indicating that the incident occurred on April 28, 2004 is erroneous. (Gauthier Dep. Vol. II, pg. 27; Exh. 2)   The report falsely states

_____

[3] Position Paper refers to the Position Paper of Respondents SunHealth Specialty Services, Inc. and SunBridge Healthcare Corporation without the exhibits attached thereto.

that the Plaintiff suffered a pull in the lower abdomen, when she actually was kicked by the resident during care. (Gauthier Dep. Vol. II, pg. 28; Exh. 2)  The Plaintiff refused to go to the hospital by ambulance, but drove herself to the hospital. (Gauthier Dep. Vol. II, pg. 29; Exh. 2)  The Plaintiff went to the Women's and Children's Center in Worcester Medical City Hospital. (Gauthier Dep. Vol. II, pg. 29; Exh. 2)  The Plaintiff was examined in the emergency room and released.  (Gauthier Dep. Vol. II, pg. 31; Exh. 2)

18.     The Plaintiff was given a note from the hospital indicating that she was able to return to work. Ms. Kendall refused to accept the note and indicated that it was not legitimate because it did not come from the Plaintiff's OB-GYN. (Gauthier Dep. Vol. II, pgs. 31-32; Exh. 2)  The Plaintiff then sought treatment with her OB-GYN, Dr. Farricy.  Dr. Farricy provided the Plaintiff with a note that indicated that he wanted the Plaintiff to lift with caution. (Gauthier Dep. Vol. II, pgs. 33, 45-46 and Medical Notes[4]; Exh. 7)  The Plaintiff brought the note to Ms. Kendall.  Ms. Kendall indicated that she could not accept the note since it did not come from the Plaintiff's primary-care physician.  The Plaintiff indicated that her OB-GYN was her primary care physician due to her pregnancy. (Gauthier Dep. Vol. II, pg. 46; Exh. 2)  Ms. Kendall then stated that there was no such thing as light duty. (Gauthier Dep. Vol. II, pg. 46; Exh. 2)  Light-duty was not offered to the Plaintiff, yet it was offered to other employees. (Gauthier Dep. Vol. II, pg. 46; Exh. 2)  If the had been offered light duty on another shift, the Plaintiff would have taken it. (Gauthier Dep. Vol. II, pg. 62; Exh. 2) After the Plaintiff's was refused light duty, she informed her doctor that she had to be allowed to return to full duty with no restrictions, because, otherwise, she would be without a job. (Gauthier Dep. Vol. II, pgs. 51-52; Exh. 2)  The Plaintiff was experiencing stress because she was trying to work, she was pregnant and was experiencing complications. (Gauthier Dep. Vol. II, pg. 56; Exh. 2)   Ms. Kendall would not accept her doctor's notes and would not allow her to return to work, and finally, in May 2004, the Plaintiff informed her doctor that she needed to be cleared to

---

[4] Medical Notes refer to the Plaintiff's various medical documentation submitted throughout the course of her employment to the Defendants.

return to work.  (Gauthier Dep. Vol. II, pg. 56; Exh. 2)  The Plaintiff was cleared to return, and was then

terminated for a no call/no show that she did not commit. (Gauthier Dep. Vol. II, pg. 56; Exh. 2)

19.    The Plaintiff asked for light duty after she was injured on the job. (Gauthier Dep. Vol. I, pg. 24;

Exh.1 and Medical Notes; Exh. 7) The Plaintiff submitted a note for light duty to Ms. Kendall. (Gauthier

Dep. Vol. I, pg. 24; Exh. 1 and Medical Notes; Exh. 7) The Plaintiff did not have any restrictions on the

amount of weight she could lift until after she was injured on the job. (Gauthier Dep. Vol. I, pg. 22; Exh.

1)  The Plaintiff had no lifting restrictions at the time of her hire with Sandalwood. (Gauthier Dep. Vol. I.

pg. 23; Exh. 1) The Plaintiff requested light duty in writing after the injury she sustained at work.

(Gauthier Dep. Vol. I, pg. 46; Exh. 1 and Medical Notes; Exh. 7)  The Plaintiff was not offered light duty

on another shift, and was not given the option to switch shifts. (Gauthier Dep. Vol. II, pg. 61-62; Exh. 2)

Mr. Copper said that CNAs would be placed on light duty if they could be accommodated. (Copper Dep.,

pg. 59; Exh. 3)  Mr. Copper said that there was a light duty position available on the day shift, consisting

of various tasks such as filing, office work, answering phones and patient escorts. (Copper Dep., pg. 60;

Exh. 3)  Mr. Copper did not know whether anyone reviewed the Plaintiff's personnel file prior to her

termination.  (Copper Dep., pg. 64; Exh. 3)  Mr. Copper did not know whether Ms. Kendall looked at the

Plaintiff's personnel file prior to her termination. (Copper Dep., pgs. 64-65; Exh. 3)   Ms. Kendall did not

recall whether the Plaintiff asked for light duty. (Kendall Dep., pg. 77; Exh. 4)  Ms. Kendall would be the

person to speak with about light duty.  (Kendall Dep., pg. 77; Exh. 4) Ms. Kendall indicated that she may

have given light duty to a CNA at Sandalwood. (Kendall Dep., pg. 78; Exh. 4)   Ms. Raymond never

received any warnings or reprimands at SunBridge and, yet, was terminated.  (Raymond Dep., pg. 14;

Exh. 5)  Ms. Raymond was told that she could not be provided with light duty anymore and was

terminated.  (Raymond Dep., pg. 14; Exh. 5)  SunBridge has light duty jobs available in the form of

filing, answering the phone, and activities assistant responsibilities, which involve playing games with the

elderly. (Raymond Dep., pg. 14; Exh. 5)  Ms. Raymond was given light duty for a period of time and then

it was taken away from her and she was terminated. (Raymond Dep., pg. 15; Exh. 5)  Ms. Raymond

believed that she was terminated because she was injured and filed a worker's compensation claim.

12

(Raymond Dep., pg. 15; Exh. 5)  Other CNAs were injured and given the activities assistant responsiblities, answering phones, and filing as a light duty assignment and were then terminated. (Raymond Dep., pg. 16; Exh. 5)   Ms. Raymond was told that she was terminated because Sandalwood was unable to provide her with light duty. (Raymond Dep., pg. 23; Exh. 5)  Ms. Raymond indicated that light duty was available and she was given light duty. (Raymond Dep., pg. 23; Exh. 5)  Ms. Raymond said that there was an open position of activities assistant that she applied for and would have been able to work, but she did not receive an offer for this position. (Raymond Dep., pgs. 24-25; Exh. 5)  Ms. Raymond was on light duty for over one year.  (Raymond Dep., pg. 25-26; Exh. 5)  Ms. Raymond did full time filing and answering telephones in the social worker's office as a light duty position for one year. (Raymond Dep., pg. 26; Exh. 5)  Ms. Raymond believed that she was treated unfairly regarding the termination of her employment from SunBridge. (Raymond Dep., pg. 27; Exh. 5)  Ms. Raymond felt that the Plaintiff's treatment at SunBridge was unfair. (Raymond Dep., pg. 28; Exh. 5)  Ms. Raymond believed that the Plaintiff should have been provided with a light duty job and allowed to answer the phones since that was an option.  (Raymond Dep., pg. 28; Exh. 5)

20.     Ms. Kendall was the Director of Nursing at SunBridge. (Kendall Dep., pg. 36; Exh. 4)  Ms. Kendall was in charge of enforcing attendance policies. (Kendall Dep., pg. 37; Exh. 4) Ms. Kendall supervised all three shifts. (Kendall Dep., pgs. 77-78; Exh. 4)  Ms. Kendall seemed frustrated with the Plaintiff when the Plaintiff provided the medical notes and when she called out of work due to her pregnancy. (Gauthier Dep. Vol. II, pg. 69-70; Exh. 2)

21.     The Plaintiff was retaliated against by the Defendants. (Gauthier Dep. Vol. I, pg. 45-46; Exh. 1) The Plaintiff asked for light duty after she was injured on the job. (Gauthier Dep. Vol. I, pg. 24; Exh.1 and Medical Notes; Exh. 7) The Plaintiff submitted a note for light duty to Ms. Kendall. (Gauthier Dep. Vol. I, pg. 24; Exh. 1 and Medical Notes; Exh. 7) The Plaintiff requested light duty in writing after the injury she sustained at work. (Gauthier Dep. Vol. I, pg. 46; Exh. 1 and Medical Notes; Exh. 7)  The Plaintiff was not offered light duty on another shift, and was not given the option to switch shifts. (Gauthier Dep. Vol. II, pg. 61-62; Exh. 2) If the had been offered light duty on another shift, the Plaintiff

would have taken it.  (Gauthier Dep. Vol. II, pg. 62; Exh. 2) The Plaintiff was sick during her pregnancy

and needed light duty, but was refused this accommodation. (Gauthier Dep. Vol. I, pg. 46; Exh. 1)  The

Plaintiff missed work time due to her pregnancy and reprimanded. (Gauthier Dep. Vol. I, pg. 46; Exh. 1)

The Plaintiff requested an accommodation to go to the bathroom for morning sickness and was denied.

(Gauthier Dep. Vol. II, pg. 72; Exh. 2)  The Plaintiff was accused of committing a no call/no show that

she never committed.  (Gauthier Dep. Vol. I, pg. 46; Exh. 1) The Plaintiff attempted to switch shifts with

Lisa Franks so she could attend a doctor's appointment. (Gauthier Dep. Vol. I, pg. 40; Exh. 1)  The

Plaintiff never failed to show up for a shift without calling. (Gauthier Dep. Vol. I, pg. 42; Exh. 1)  Ms.

Franks indicated that she may have switched or swapped time with the Plaintiff.  (Franks Dep. pg. 8; Exh.

6) Ms. Franks did not recall using a form every time she switched time.  (Frank Dep. pg. 17; Exh. 6)

The attendance policy regarding no call/no shows was that the policy could be enforced up to and

including termination. (Kendall Dep., pg. 46; Exh. 4)  Ms. Kendall indicated that all employees were

treated individually with regard to the policy. (Kendall Dep., pg. 46; Exh. 4)  Ms. Kendall could not recall

whether there was a certain number of no call/no shows incidents that had to take place before a

reprimand would occur. (Kendall Dep., pg. 47; Exh. 4)  Ms. Kendall indicated that a termination did not

always occur after the first no call/no show.  (Kendall Dep., pg. 67; Exh. 4)  Ms. Kendall indicated that

she did not know whether the Plaintiff had a no call/no show. (Kendall Dep., pg. 69; Exh. 4)  Ms. Kendall

indicated that there were certain circumstances where more than one no call/no show may not lead to

termination. (Kendall Dep., pgs. 69-70; Exh. 4)  Ms. Kendall indicated that these circumstances depended

on the person and on the circumstances of the no call/no show. (Kendall Dep., pg. 70; Exh. 4)

22.    The Plaintiff was injured on the job at the end of January 2004.  (Gauthier Dep. Vol. II, pg. 24-

25; Exh. 2)  The Plaintiff suffered a strain in the abdomen after being kicked by a resident during patient

care. (Gauthier Dep. Vol. II, pg. 25; Exh. 2)  A worker's compensation claim was filed by the Defendants

on behalf of the Plaintiff as a result of an injury she sustained during the course of her employment.

(Position Paper; Exh. 14) Ms. Raymond and a nurse insisted that the Plaintiff go to the hospital after she

was kicked as she was pregnant and was experiencing severe pain.  (Raymond Dep., pg. 10; Exh. 5)   The

14

nurse on duty that night was aware that the Plaintiff had an injury on the job and left her shift to go to the hospital. (Raymond Dep., pg. 11; Exh. 5)  The nurses are basically considered supervisors on the third shift. (Raymond Dep., pg. 11; Exh. 5)  The Plaintiff returned to work and requested light duty after she was injured on the job. (Gauthier Dep. Vol. I, pg. 24; Exh.1 and Medical Notes; Exh. 7) The Plaintiff submitted a note for light duty to Ms. Kendall. (Gauthier Dep. Vol. I, pg. 24; Exh. 1 and Medical Notes; Exh. 7)  The Plaintiff was not spoken to regarding workmen's compensation by any person at SunBridge. (Gauthier Dep. Vol. II, pg. 48; Exh. 2 and Position Paper; Exh. 14)  The Plaintiff was aware that a workmen's compensation claim was filed on her behalf. (Gauthier Dep. Vol. II, pgs. 49-50; Exh. 2 and Position Paper; Exh. 14)  The Plaintiff was accused of committing a no call/no show that she never committed.  (Gauthier Dep. Vol. I, pg. 46; Exh. 1) The Plaintiff asked for light duty after she was injured on the job. (Gauthier Dep. Vol. I, pg. 24; Exh.1 and Medical Notes; Exh. 7)  The Plaintiff submitted a note for light duty to Ms. Kendall. (Gauthier Dep. Vol. I, pg. 24; Exh. 1 and Medical Notes; Exh. 7) The Plaintiff requested light duty in writing after the injury she sustained at work. (Gauthier Dep. Vol. I, pg. 46; Exh. 1 and Medical Notes; Exh. 7)  The Plaintiff was not offered light duty on another shift, and was not given the option to switch shifts. (Gauthier Dep. Vol. II, pg. 61-62; Exh. 2)

23.    See the facts set forth in Paragraph 22, which are incorporated herein by reference.

24.    See the facts set forth in Paragraph 22, which are incorporated herein by reference.


Respectfully Submitted,

The Plaintiff
WENDY GAUTHIER
By Her Attorney


/s/ Michael O. Shea                    Dated:  April 30, 2007
MICHAEL O. SHEA, ESQ.
BBO# 555474
Law Office Of Michael O. Shea, P.C.
451 Main Street
Wilbraham, MA 01095
Telephone: (413) 596-8005
Facsimile: (413) 596-8095

## <u>CERTIFICATE OF SERVICE</u>

      I, Michael O. Shea, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 30, 2007 and that there are no non-registered participants.


<u>/s/ Michael O. Shea</u>
Michael O. Shea