UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WENDY GAUTHIER,

                    Plaintiff

v.

SUNHEALTH SPECIALTY SERVICES,
INC. and SUNBRIDGE HEALTHCARE
CORPORATION,

                    Defendants

Civil Action No.: 05CV40119-FDS

## AFFIDAVIT OF MICHAEL O. SHEA

I, Michael O. Shea, under oath do hereby depose and say as follows:

1.    I make this Affidavit on personal knowledge.

2.    I am an Attorney with an office located at 451 Main Street, Wilbraham,
Massachusetts 01095, and I represent the Plaintiff in the above-entitled action.

3.    The Exhibits attached hereto contain true and accurate copies of following
documents produced in the discovery phase of this litigation and otherwise:

|  |  |
|---|---|
| Exhibit 1: | Deposition of Wendy Gauthier, Vol. I |
| Exhibit 2: | Deposition of Wendy Gauthier, Vol. II |
| Exhibit 3: | Deposition of Stephen G. Copper |
| Exhibit 4: | Deposition of Ann Marie Kendall |
| Exhibit 5: | Deposition of Kathleen D. Raymond |
| Exhibit 6: | Deposition of Lisa Franks |
| Exhibit 7: | Plaintiff's Medical Notes Submitted to Defendants |
| Exhibit 8: | Employee No. 2 File |
| Exhibit 9: | Employee No. 6 File |
| Exhibit 10: | Employee No. 9 File |
| Exhibit 11: | Employee No. 10 File |

Exhibit 12:    Employee No. 13 File

Exhibit 13:    Employee No. 15 File

Exhibit 14:    Defendants' Position Paper


Signed under the pains and penalties of perjury this 30th day of April, 2007.

Michael O. Shea

# EXHIBIT 1

# WENDY GAUTHIER
## February 8, 2007



Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3

 4

 5  *****************************

 6  WENDY GAUTHIER,                    *

 7              Plaintiff             *

 8  vs.                          *No.: 05cv40119-FDS

 9  SUNHEALTH SPECIALTY               *

10  SERVICES, INC. and SUNBRIDGE *

11  HEALTHCARE CORPORATION,           *

12              Defendants            *

13  *****************************

14

15        DEPOSITION OF:  WENDY GAUTHIER

16     CATUOGNO COURT REPORTING SERVICES

17             446 Main Street

18        Worcester, Massachusetts

19        February 8, 2007     3:21 p.m.

20

21

22

23          Elisabeth Zahariadis

24       Certified Shorthand Reporter
```

# WENDY GAUTHIER
# February 8, 2007

2 (Pages 2 to 5)

---

Page 2

1  APPEARANCES:

2

3  Representing the Plaintiff:

4      LAW OFFICE OF MICHAEL O. SHEA, P.C.

5      451 Main Street

6      Wilbraham, MA 01095

7      BY: MICHAEL O. SHEA, ESQ.

8      (413) 596-8005 FAX 596-8095

9

10  Representing the Defendant:

11      LAWSON & WEITZEN, LLP

12      88 Black Falcon Avenue

13      Boston, MA 02210

14      BY: K. SCOTT GRIGGS, ESQ.

15      (617) 439-4990 FAX 439-3987

16

17

18

19

20

21

22

23

24

---

Page 3

1          INDEX

2

3  WITNESS:      WENDY GAUTHIER

4

5  EXAMINATION BY:              PAGE:

6  Mr. Griggs              4

7

8  EXHIBIT:              PAGE:

9  Exhibit 1, Employee Acknowledgment.........17

10  Exhibit 2, 12/31/03 Letter.................25

11  Exhibit 3, 1/12/04 Letter..................26

12  Exhibit 4, 1/26/04 Letter..................29

13  Exhibit 5, 2004 Attendance Controller......43

14  Exhibit 6, MCAD Complaint..................49

15

16

17

18

19

20

21

22

23

24

---

Page 4

1          WENDY GAUTHIER, Deponent, having first

2  been satisfactorily identified and duly sworn,

3  deposes and states as follows:

4

5

6          EXAMINATION BY MR. GRIGGS:

7

8      Q.   Good morning, Ms. Gauthier, my

9  name is Scott Griggs and I represent SunBridge

10  Care and Rehabilitation for Sandalwood with

11  respect to the claim that you've brought against

12  them. I'm going to ask you a few questions

13  today and I just want you to answer to the best

14  of your ability and to the best of your

15  recollection.

16          Have you ever been deposed before?

17      A.   No.

18      Q.   I'll go over just a couple of

19  things you may have heard in the previous

20  deposition as a matter of instructions to the

21  deposition process.

22          You'll have to answer questions

23  without using your hands and just need to be

24  verbal answers. If you can wait for me to state

---

Page 5

1  my question before you answer, the transcript

2  will read better. And I would only ask that you

3  complete a question or complete your answers to

4  one of my questions before taking a break, which

5  you can do anytime. It's not an endurance test.

6  Certainly you can take a break, we can certainly

7  do that, so again, once you answer the question

8  that's on the table.

9          MR. GRIGGS: Michael, usual

10  stipulations?

11          MR. SHEA: Sure, and I'll have her

12  read and sign.

13          MR. GRIGGS: 30 days or it will be

14  deemed accurate.

15          MR. SHEA: Yes.

16          MR. GRIGGS: All objections except

17  as to form reserved until time of trial.

18          MR. SHEA: Yes.

19      Q.   (By Mr. Griggs) Can you please

20  state your full name?

21      A.   Wendy Jane Gauthier.

22      Q.   Where do you live?

23      A.   I live at 7 Grafton Street,

24  apartment two, Millbury, Massachusetts, 01527.

---

**WENDY GAUTHIER**
**February 8, 2007**

3 (Pages 6 to 9)

1    Q.    You say you're from Wellesley?
2    A.    No, Millbury, Massachusetts.
3    Q.    How old are you?
4    A.    34.
5    Q.    How many children do you have now?
6    A.    I have one.
7    Q.    Where were you born?
8    A.    I was born in Milford,
9  Massachusetts.
10    Q.    Did you grow up in Milford?
11    A.    No, I didn't.
12    Q.    Where would you say you grew up?
13    A.    I grew up in Northbridge until I
14  was about four or five and moved to Grafton and
15  I've been in Grafton since.
16    Q.    Where did you go to high school?
17    A.    I went to in Upton, Blackstone
18  Valley Regional Vocational Technical High
19  School.
20    Q.    Did you graduate from Blackstone
21  Regional Vocational Technical High School?
22    A.    Yes, I did.
23    Q.    What year did you graduate?
24    A.    I graduated in 1991.

1    Q.    It's okay if I just say Blackstone?
2    A.    That's fine.
3    Q.    Class of 1991?
4    A.    Yes.
5    Q.    Did you go to school for anything
6  after that?
7    A.    No, I did not.
8    Q.    No other higher education?
9    A.    No.
10    Q.    After you graduated from Blackstone
11  in 1991, did you go right to work?
12    A.    I went right for employment.
13    Q.    Where did you work?
14    A.    I worked at Beaumont Nursing Home
15  in Northbridge. That's where I got my
16  certification for CNA.
17    Q.    How long did you work for Beaumont?
18    A.    I worked there for two years.
19    Q.    After you worked at Beaumont, where
20  did you work after that?
21    A.    I went to WPI after that. I
22  worked with my mother there.
23    Q.    What part of Worcester Polytechnic
24  Institute was that or what department did you

1  work in?
2    A.    Maintenance, I'm sorry, plant
3  services.
4    Q.    Plant services?
5    A.    Yes.
6    Q.    What type of work did you do?
7    A.    Custodial work.
8    Q.    How long were you at WPI?
9    A.    Three years.
10    Q.    You say you worked with your mother
11  at WPI?
12    A.    Yes, I did.
13    Q.    Why did you leave Beaumont where
14  you had your CNA license?
15    A.    I left there to make more money as
16  anybody else would, benefits. Then I went back
17  to do the CNA.
18    Q.    Why did you leave WPI?
19    A.    Yeah, I went back to do the patient
20  care because I missed taking care of patients.
21    Q.    Where did you go after Worcester
22  Poly Tech?
23    A.    I don't remember. I went, I worked
24  at Northbridge Nursing Home.

1    Q.    For how long did you work at
2  Northbridge Nursing Home?
3    A.    Maybe two years.
4    Q.    So from approximately if my math is
5  right 1996 to?
6    A.    I'm kind of bad with dates.
7    Q.    From your best recollection, when
8  did you work at Northbridge Nursing Home?
9    A.    I worked there for two years.
10    Q.    So you left Northbridge?
11    A.    They closed down, they went out of
12  business.
13    Q.    That was around 1999?
14    A.    Somewhere around there, I believe.
15    Q.    Where did you work after
16  Northbridge?
17    A.    I had worked at the Sandalwood in
18  Oxford.
19    Q.    When did you start working at
20  Sandalwood?
21    A.    Back in 2004, three, I'm sorry,
22  2003.
23    Q.    Do you remember what month in 2003?
24    A.    I believe it was 12, it was

# WENDY GAUTHIER
# February 8, 2007

4 (Pages 10 to 13)

**Page 10**

1 December 22nd I want to say.
2    Q.    Between the time that the
3 Northbridge Nursing Home closed and your
4 employment at SunBridge Sandalwood, I have about
5 a five-year gap there?
6    A.    I worked different places. Doing
7 CNA work. I also took care of a client before I
8 went to Sandalwood was Maureen Robal?
9    Q.    Maureen what?
10    A.    R-O-B-A-L. That was private duty
11 care. I worked for her full time.
12    Q.    For five years?
13    A.    Yes.
14    Q.    How many hours a week was that?
15    A.    40 hours a week.
16    Q.    Have you ever had any periods of
17 unemployment during that time?
18    A.    Never.
19    Q.    After Blackstone?
20    A.    No.
21    Q.    When I mean unemployment, not that
22 you were collecting unemployment, but rather
23 there were periods when you were not working?
24    A.    No.

**Page 11**

1    Q.    How did you find the job at
2 SunBridge Sandalwood?
3    A.    I found it in the Telegram and
4 Gazette.
5    Q.    Who did you contact at SunBridge?
6    A.    I believe it was Ann Kendall. She
7 was the director of nursing.
8    Q.    Ann Kendall?
9    A.    Yes.
10    Q.    You went for an interview at
11 SunBridge Sandalwood?
12    A.    Yes, I did.
13    Q.    Who did you speak to during your
14 interview?
15    A.    I spoke to Ann.
16    Q.    What was said in that interview?
17    A.    She asked me work history. What I
18 was able to do. I told her that I was pregnant.
19 I told her I was looking for full-time work on
20 11:00 to 7:00 shift.
21    Q.    Why did you request 11:00 to 7:00?
22    A.    Because my boyfriend and I only
23 have one car so we worked opposite shifts.
24    Q.    Why did you tell Ann Kendall you

**Page 12**

1 were pregnant?
2    A.    So it wouldn't become an issue if
3 something had happened or they would know up
4 front before I even started.
5    Q.    What do you mean by become an
6 issue?
7    A.    Anything had happened, I just
8 wanted her to know up front that I was pregnant.
9 I had a lot of complications due to my
10 pregnancy.
11    Q.    Did you tell her in this interview
12 when you first went for your interview that you
13 had complications?
14    A.    No, it didn't get the complications
15 until after, after I started working there.
16    Q.    You told her that you were pregnant
17 because you didn't want it to become an issue?
18    A.    Yeah, you know, just to tell her up
19 front that I was pregnant. You know, that I was
20 going to be leaving within, I don't know, eight
21 months or nine months, whatever it is because
22 you can leave and I was going to come back. You
23 have 90 days.
24    Q.    Just to complete my question and

**Page 13**

1 I'll ask again you wait until I finish the
2 question.
3        To ask the question I was going to
4 ask was that you told her, but you didn't tell
5 her about any complications, but now you are
6 telling me that it's because you wanted to put
7 your future employer on notice that you would be
8 taking leave at some point because of pregnancy?
9    A.    Correct.
10    Q.    What did you tell her in that
11 regard?
12    A.    I just told her. She hired me and
13 I told her. She said, that's okay we had a lot
14 of pregnant woman working. And I said okay. I
15 just didn't want to make it, you know.
16    Q.    Ann Kendall said that there are
17 lots of pregnant woman working there?
18    A.    Not working there, but she worked
19 with pregnant woman before.
20    Q.    You told Ann Kendall during your
21 interview that you would need time off when your
22 baby was born?
23    A.    Yes.
24    Q.    Just when your baby was born?

**WENDY GAUTHIER**
**February 8, 2007**

5 (Pages 14 to 17)

Page 14

1    A.    Yes.
2    Q.    That you were going to take
3 maternity leave?
4    A.    Yes.
5    Q.    At that time, did you tell her you
6 were going to need time off before you gave
7 birth?
8    A.    Not at, no.
9    Q.    By the way, did you speak to
10 anybody about your testimony today prior to
11 coming here today?
12    A.    No.
13    Q.    That includes your attorney. Did
14 you speak to your attorney before?
15    MR. SHEA:    You just can't disclose
16 the content, you can say that you talked to
17 me.
18    THE WITNESS:    Yes.
19    Q.    (By Mr. Griggs) What dates did you
20 speak to your attorney about your testimony
21 today?
22    A.    Last week.
23    MR. SHEA:    Just your best memory.
24    Q.    (By Mr. Griggs) Did you speak to

Page 15

1 your attorney on more than one occasion about
2 your testimony today?
3    A.    Yes.
4    Q.    Were you coached by your attorney
5 about your testimony that you are going to give
6 today?
7    MR. SHEA:    Objection. Don't answer
8    that question. You are asking her what she
9    said and I'm not going to have her answer
10    that.
11    * Q.    (By Mr. Griggs) Did your attorney
12 refresh your recollection as to what you were
13 going to say today?
14    MR. SHEA:    Objection.
15    * THE WITNESS:    No.
16    Q.    (By Mr. Griggs) In your
17 conversation with your attorney, was your
18 recollection of the events regarding this
19 lawsuit refreshed?
20    MR. SHEA:    I'm instructing her not
21 to answer.
22    MR. GRIGGS:    It's the same question
23 you asked earlier to my client.
24    MR. SHEA:    I think you just asked

Page 16

1 it. Do you want to read it back and get
2 her answer.
3    MR. GRIGGS:    You are telling her
4 not to answer.
5    MR. SHEA:    You asked and she
6 answered it. Can we read back the last
7 question? She said no. I'm happy to go
8 back in the record.
9    MR. GRIGGS:    Let's read back the
10 question and the answer.
11
12    * (Question and answer read)
13
14    Q.    (By Mr. Griggs) At the time of
15 your interview, did you request any
16 accommodation in any regard?
17    A.    No.
18    Q.    When was your first day of
19 employment?
20    A.    December 22, 2004, I believe.
21    Q.    You started working 11:00 to 7:00?
22    A.    Correct.
23    MR SHEA:    Did you say three or
24 four?

Page 17

1    THE WITNESS:    It was December I
2 started working, 2003.
3    Q.    (By Mr. Griggs) When you were
4 hired, were you ever told you you were an
5 employee at will?
6    A.    No.
7    Q.    Did you ever sign a document
8 acknowledging that you were an employee at will?
9    A.    I don't understand what you mean by
10 that.
11    Q.    Did you ever sign a document where
12 by you acknowledged by your signature that you
13 were employee at will?
14    MR. SHEA:    If you know?
15    THE WITNESS:    I don't recall.
16    Q.    (By Mr. Griggs) Do you know what
17 an employee at will means?
18    MR. SHEA:    Objection. You can
19 answer if you know.
20    THE WITNESS:    I don't know, no.
21    MR. GRIGGS:    I'll mark this
22 document as Exhibit 1.
23
24    (Exhibit 1, Employee

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# WENDY GAUTHIER
# February 8, 2007

6 (Pages 18 to 21)

Page 18

1       Acknowledgment, marked)
2
3       Q.    (By Mr. Griggs) Have you ever
4   seen this document before that I'm just showing
5   you, Exhibit 1?
6       MR. SHEA: Do you have a copy of
7   that?
8       THE WITNESS: Yes, I do. Yes I've
9   seen this.
10      Q.    (By Mr. Griggs) Can you please
11  read for me this first paragraph, if you could?
12  Take your time.
13      MR. SHEA: Do you want her to read
14  that paragraph?
15      MR. GRIGGS: If she can just read
16  it into the record.
17      THE WITNESS: "I have received a
18  copy of the SunBridge Healthcare
19  Corporation's Employee Handbook and
20  addendum. I realize that it is my
21  responsibility to read and familiarize
22  myself with the handbook's contents and
23  addendum. I understand that the contents
24  of this handbook and addendum summarize

Page 19

1   current policies of SunBridge Healthcare
2   Corporation, that they are intended as
3   guidelines only, and that these polices may
4   be amended at any time. I further
5   understand that the contents of the
6   handbook and addendum do not constitute the
7   terms of a contract of employment, and that
8   nothing contained in the handbook or
9   addendum can be construed as a guarantee of
10  continued employment. I understand that
11  employment with SunBridge Healthcare
12  Corporation is on an at-will basis which
13  means that the employment relationship may
14  be terminated at any time by either me of
15  SunBridge Healthcare Corporation with or
16  without reason. I understand my supervisor
17  or manager will answer any questions I have
18  about this handbook and addendum."
19      Q.    (By Mr. Griggs) Is that your
20  signature at the bottom of the page?
21      A.    Yes, it is.
22      Q.    So by this, did you acknowledge
23  that you understood that there was an employee
24  handbook?

Page 20

1       A.    Yes, there was.
2       Q.    You also understood that your
3   employment was not for a specific term; is that
4   correct?
5       A.    I don't understand what you are
6   trying to say.
7       Q.    You understood that by the terms of
8   that document, that SunBridge wasn't agreeing
9   to, for instance, employ you for a said period
10  of time; is that correct?
11      MR. SHEA: Like a year or so.
12      THE WITNESS: Yeah.
13      MR. SHEA: We don't have a breech
14  of contract claim.
15      Q.    (By Mr. Griggs) You understood
16  that SunBridge could terminate your employment
17  at any time; is that correct?
18      MR. SHEA: Objection.
19      THE WITNESS: Correct.
20      MR. SHEA: But not for any reason.
21      MR. GRIGGS: Objection. Move to
22  strike. You are not testifying today.
23      Q.    (By Mr. Griggs) By signing that
24  document, you understood that this employee

Page 21

1   handbook was something that could be changed
2   from time to time and only serve as a guideline?
3       A.    Correct.
4       Q.    Did you understand that as a
5   guideline, that wasn't something that absolutely
6   had to be followed; is that correct?
7       MR. SHEA: Objection. The
8   handbook?
9       THE WITNESS: Yeah.
10      MR. SHEA: I don't think we've
11  established that there was, in fact, a
12  handbook, but go ahead.
13      THE WITNESS: I know there's an
14  employee handbook, but I never received an
15  employee handbook.
16      Q.    (By Mr. Griggs) Can you please
17  repeat to me the first sentence?
18      A.    "I have received a copy of the
19  SunBridge Healthcare Corporation's Employee
20  Handbook and addendum."
21      Q.    Is that a true statement?
22      MR. SHEA: That she received --
23      THE WITNESS: It is on paper, but
24  I didn't receive one because I had my

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# WENDY GAUTHIER
# February 8, 2007

7 (Pages 22 to 25)

| Page 22 |
| --- |

1 orientation at another facility because
2 they didn't have a person to do
3 orientation. So they told us to sign it
4 and then when we get to SunBridge or
5 Sandalwood, we would receive a handbook,
6 and we never received a handbook.
7   Q.  (By Mr. Griggs) You signed this
8 document without --
9   A.   I was told to sign it, yes. I was
10 told to sign it from an employee at SunBridge on
11 Hammond Street, Hammond House, that's where I
12 had to go for my orientation.
13   Q.   You signed this although you did
14 not receive a handbook?
15   A.   Correct.
16   Q.   Were you pregnant -- strike that.
17     When you started work at SunBridge
18 Sandalwood, did you have any restrictions on the
19 amount of weight you could lift?
20   A.   No, not until after I got injured
21 on the job.
22   Q.   At the time you started work on
23 December 22, 2003 you had no lifting
24 restrictions, is that your testimony?

| Page 23 |
| --- |

1   A.   Correct.
2   Q.   You wouldn't have told Ann Kendall
3 or anybody that you had lifting restrictions at
4 the time you were hired; is that correct?
5   A.   No.
6   Q.   There were no restrictions?
7   A.   No, none.
8   Q.   When were you injured on the job?
9   A.   4/28/04.
10   Q.   How did that take place?
11   A.   I got kicked in the abdomen and I
12 complained of pain and I was sent out to the
13 hospital. I drove myself during patient care.
14   Q.   Was an ambulance called on your
15 behalf?
16   A.   No, it was not. I was told I was
17 responsible to pay for the ambulance, so I went
18 on my own.
19   Q.   Did you have health insurance
20 coverage at the time?
21   A.   I had Mass Health.
22   Q.   Did somebody tell you that Mass
23 Health would not pay for the ambulance?
24   A.   No, they did not, they had no idea.

| Page 24 |
| --- |

1   Q.   Did you ever ask for light duty?
2   A.   Yes, I did.
3   Q.   When did you ask for light duty?
4   A.   I believe it was around after I had
5 got injured on the job which was 4/28. Maybe a
6 couple days after I was injured on the job. I
7 had to see my doctor and that's when he gave me
8 a note for light duty.
9   Q.   Did you ever submit that note for
10 light duty to --
11   A.   Yes, I did.
12   Q.   -- somebody at SunBridge?
13   A.   Yes, I did.
14   Q.   To whom did you submit it?
15   A.   I submitted it to Ann Kendall.
16   Q.   You are referring to a letter from
17 what doctor?
18   A.   Dr. Farricy.
19   Q.   Do you have a copy of that letter?
20   A.   No, I do not.
21     MR. GRIGGS: Off the record.
22
23     (Off record discussion)
24

| Page 25 |
| --- |

1     MR. GRIGGS: Back on the record.
2   Q.   (By Mr. Griggs) When you were
3 hired as of December 22, 2003, once again, and I
4 know I've already asked this, but I want to
5 clarify this, you say you had no lifting
6 restrictions?
7   A.   Correct.
8   Q.   I'm going to show you a document
9 which I'll have marked as Exhibit 2 from the
10 office of Lester Mietkiewicz, primary care
11 physician in Grafton.
12     MR. GRIGGS: Can you mark this?
13
14     (Exhibit 2, 12/31/03 Letter,
15     marked)
16
17   Q.   (By Mr. Griggs) Can you tell me
18 what that says if you can?
19   A.   "Wendy was seen today for an
20 employment examination. She is 12 weeks
21 pregnant and no heavy lifting is suggested."
22 12/22 to 5/25/04.
23   Q.   Do you see where it says no heavy
24 lifting?

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

**WENDY GAUTHIER**
**February 8, 2007**

8  (Pages 26 to 29)

Page 26

1    A.    Yes, it looks like no heavy lifting
2  to me is suggested.
3    Q.    Did you provide this to SunBridge?
4        MR. SHEA:  You haven't established
5  that she's ever seen that.  That looks like
6  an employment examination.
7    Q.    (By Mr. Griggs) Have you ever seen
8  this before?
9    A.    No.
10    Q.    Were you ever asked by Ann Kendall
11  for a doctor's note?
12    A.    Prior to hire?
13    Q.    Let's start with that, prior to
14  hire.
15    A.    No.
16    Q.    At any time?
17    A.    No.
18        MR. GRIGGS:  I'm going to mark this
19  as Exhibit 3.
20
21        (Exhibit 3, 1/12/04 Letter,
22        marked)
23
24    Q.    (By Mr. Griggs) I'm going to show

Page 27

1  you from Drs. Farricy and Kraft it appears?
2    A.    Yes, that's my doctor.
3    Q.    Dated January 12, 2004, have you
4  seen that before?
5    A.    Yes, I have.
6    Q.    When did you first see that letter?
7    A.    I saw it in my personnel file.
8    Q.    Did you ask that this doctor write
9  that letter?
10    A.    Yes, I did.
11    Q.    Why did you ask him to write the
12  letter?
13    A.    Because Ann has refused to give me
14  light duty when light duty was denied to me.
15    Q.    Let's go back.  You said you first
16  requested light duty after you were injured on
17  the job in April of 2004; is that correct?
18    A.    Right.
19    Q.    When did you first request light
20  duty?
21    A.    I first requested light duty after
22  I was injured on the job.  My doctor requested
23  light duty.
24    Q.    In April of 2004?

Page 28

1    A.    Yes.
2    Q.    The date of this letter is January
3  12, 2004?
4    A.    I must have given her doctor's
5  notes in between.  I don't recall.
6    Q.    What I'm asking is, in addition --
7    A.    Because I went to the doctors and I
8  gave her the notes kind of up to date.  I don't
9  know.
10    Q.    In addition to Exhibit No. 2 which
11  was a doctor's note dated December 31 of 2003
12  saying no heavy lifting.  Here's another one
13  from Dr. Farricy in addition to the one from Dr.
14  Mietkiewicz on December 31st.  The one on
15  January 12th also says working with the
16  assistance of another coworker.
17        If you could just please read this
18  letter?
19    A.    Yeah, I've read it.
20        MR. SHEA:  Do you want it read into
21  the record?
22    Q.    (By Mr. Griggs) Will you read it
23  into the record?
24    A.    It would be, "to whom it may

Page 29

1  concern, Wendy Gauthier is a patient under my
2  care for her pregnancy.  I am recommending she
3  be able to work and lift with assistance of
4  another coworker.  Any questions regarding this
5  matter, please call the office."
6    Q.    Did you ask him to write this
7  letter?
8    A.    No, he may have wrote it on his
9  own.
10    Q.    I'm going to show you another
11  letter from Dr. Farricy dated January 26, 2004.
12  Have you ever seen this?
13    A.    Yes.
14        MR. GRIGGS:  Mark this as Exhibit
15  4.
16
17        (Exhibit 4, 1/26/04 Letter, marked)
18
19    Q.    (By Mr. Griggs) Just read that
20  into the transcript record?
21    A.    "Attention Ann Kendall, to whom it
22  may concern, Wendy Gauthier was seen in my
23  office today.  It is my recommendation that she
24  be able to continue working and lifting with

**WENDY GAUTHIER**
**February 8, 2007**

9 (Pages 30 to 33)

---

Page 30

1  caution. Any questions regarding this matter,
2  please call the office. Thank you."
3      Q.    Did you ask Dr. Farricy to write
4  this letter?
5      A.    Yes, I did.
6      Q.    Why did you ask him to write this
7  letter?
8      A.    Because when I requested light
9  duty, I was not granted light duty. And I was
10  told if I was unable to perform my job and
11  perform it the way I need to perform it, I can't
12  work. I remember telling him I need a note
13  because I can't go back to work without a note
14  stating that I'm able to do my job the way I can
15  perform up to the fullest duty.
16      Q.    When did you first request light
17  duty, I'm little bit confused?
18      A.    I know it was after I got injured
19  on the job he had requested light duty for me.
20      Q.    That was after you got injured on
21  the job?
22      A.    Yes.
23      Q.    You got injured in April of 2004?
24      A.    Yes, correct.

---

Page 31

1      Q.    We have three doctors now that talk
2  about lifting restrictions back in December and
3  January.
4      A.    I believe she wanted those for her
5  records.
6      Q.    Who wanted those?
7      A.    Ann.
8      Q.    Why did she want those for her
9  records?
10      A.    Just to see how I was doing and if
11  I was able to perform my job.
12      Q.    You said you asked Dr. Farricy for
13  Exhibits 3 and 4, those letters dated January
14  12th and January 27th?
15      A.    Yeah, to give to her because she
16  was giving me a hard time.
17      Q.    What do you mean she was giving you
18  a hard time?
19      A.    Because I had brought a note in for
20  light duty, only she couldn't grant me light
21  duty and that there was no such thing as light
22  duty. So I kept going to my doctor's office
23  like I don't know how many times a week saying I
24  need a note, I need a note. And just to try to

---

Page 32

1  go back and do my job.
2              Meanwhile I'm not getting paid.
3  I'm out, trying to get back to work and I'm not
4  getting paid. I'm trying to give her these
5  notes and she wouldn't accept these notes. I
6  finally went to him saying I need a note stating
7  that I'm able to go back to work and do my full
8  duties.
9      Q.    Let's see if we can get the
10  chronology straight here. Your first day of
11  work was December 22, 2003; is that correct?
12      A.    Correct.
13      Q.    You had no restrictions at that
14  time with regard to lifting?
15      A.    No. They suggested no heavy
16  lifting, but they didn't come out and say no
17  heavy lifting.
18      Q.    Who suggested that?
19      A.    Dr. Mietkiewicz.
20      Q.    When did he say that you should
21  have no heavy lifting for the first time?
22      A.    I don't know.
23      Q.    Once again, on December 22nd, you
24  say you had no lifting restrictions; is that

---

Page 33

1  correct?
2      A.    Correct.
3      Q.    And on December 22, 2003, you had
4  no other things that you weren't able to do; is
5  that correct?
6      A.    Yes.
7      Q.    Were you able to walk?
8      A.    Yes.
9      Q.    You were able to brush your teeth?
10      MR. SHEA:  On December 22, 2003?
11      THE WITNESS:  Yes.
12      Q.    (By Mr. Griggs) You were able to
13  see?
14      A.    Yes.
15      Q.    Hear?
16      A.    Yes, I was fine.
17      Q.    Did you ever play any sport
18  growing up?
19      A.    Yes.
20      Q.    Any other activities you enjoyed?
21      A.    Fishing, deep sea fishing.
22  Camping, swimming. I like the outdoors.
23      Q.    As of December 22, 2003 although
24  you said at the time you were pregnant, you were

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**WENDY GAUTHIER**
**February 8, 2007**

10 (Pages 34 to 37)

| Page 34 |
|---|
| 1  able to do those things; is that correct?<br>2    A.    No, I wouldn't swim.<br>3    Q.    You wouldn't?<br>4    A.    No, I wouldn't swim. Technically<br>5  you are not supposed to swim when you are<br>6  pregnant.<br>7    Q.    Were there any other hobbies or<br>8  interests that you were not pursuing?<br>9    A.    No.<br>10    Q.    Or could not pursue?<br>11    A.    No.<br>12    Q.    On December 31st in Exhibit 2 Dr.<br>13  Mietkiewicz is saying no heavy lifting. As of<br>14  December 31, 2003, did you have lifting<br>15  restrictions?<br>16    A.    That was the note Ann needed for me<br>17  to get hired, I believe. She needed a note<br>18  saying that I was able to do lifting. I believe<br>19  that was from.<br>20    Q.    So the question was, did you have<br>21  lifting restrictions as of December 31st, 2003?<br>22        MR. SHEA: I think she's answered<br>23    that it's a doctor that she thinks was used<br>24    for an employment examination. |

| Page 35 |
|---|
| 1        MR. GRIGGS: You are not<br>2  testifying.<br>3        MR. SHEA: She's answered. I don't<br>4    want to have you ask her the same question<br>5    twice. I have a problem with that.<br>6        MR. GRIGGS: I have a problem with<br>7    different answers that's why I have to ask<br>8    them.<br>9        MR. SHEA: You can go back in the<br>10    record and get the answer.<br>11        MR. GRIGGS: There's two different<br>12    answers.<br>13        MR. SHEA: I don't think so.<br>14    Q.    (By Mr. Griggs) Did you have any<br>15  restrictions as of December 31, 2003?<br>16    A.    No. It says suggesting no heavy<br>17  lifting. He didn't say I can' do heavy lifting.<br>18  He's suggesting that I shouldn't be doing it.<br>19    Q.    Can you just read the last sentence<br>20  of this once again?<br>21    A.    "She is 12 weeks pregnant and no<br>22  heavy lifting is suggested."<br>23    Q.    Once again, Exhibits 3 and 4 you<br>24  said were requested by you of Dr. Farricy and |

| Page 36 |
|---|
| 1  I'm referring to these two letters in January<br>2  from Dr. Farricy were requested by you in<br>3  connection with your request for light duty; is<br>4  that correct?<br>5        MR. SHEA: Objection.<br>6        THE WITNESS: In January?<br>7    Q.    (By Mr. Griggs) Yes.<br>8    A.    No.<br>9    Q.    So these were not requested --<br>10    A.    No.<br>11    Q.    -- in connection with your request<br>12  for light duty?<br>13    A.    No.<br>14    Q.    You did not request light duty in<br>15  January?<br>16    A.    No, I did not.<br>17    Q.    It would follow then that you were<br>18  not denied light duty until January of 2004?<br>19    A.    I didn't ask for light duty in<br>20  January 2004. I asked for light duty in April.<br>21        MR. SHEA: Your question assumes<br>22    that she asked for it and she's saying she<br>23    didn't ask for it.<br>24        MR. GRIGGS: I understand it's a |

| Page 37 |
|---|
| 1    double negative.<br>2    Q.    (By Mr. Griggs) You were not<br>3  denied light duty in January of 2004?<br>4    A.    Correct.<br>5    Q.    Thank you.<br>6        When did you first have<br>7  complications from your pregnancy -- strike<br>8  that.<br>9        Did you have any symptoms that<br>10  arose subsequent to your employment commencing<br>11  at SunBridge?<br>12    A.    Yes.<br>13    Q.    What were those symptoms?<br>14    A.    I was vomiting, I had morning<br>15  sickness all the time. My feet were swollen and<br>16  my hands were swollen. It was rough.<br>17        MR. SHEA: You are talking strictly<br>18    related to the pregnancy.<br>19        MR. GRIGGS: That's correct.<br>20    Q.    (By Mr. Griggs) You were talking<br>21  about morning sickness, swollen feet?<br>22    A.    Yeah.<br>23    Q.    What else?<br>24        MR. SHEA: Vomiting. |

# WENDY GAUTHIER
# February 8, 2007

11 (Pages 38 to 41)

## Page 38

1    THE WITNESS: Vomiting.
2    Q.    (By Mr. Griggs) Did you ever
3 request any change in your work duties or
4 accommodations, if you will?
5    A.    Yes, I have.
6    Q.    With respect to the morning
7 sickness symptoms like vomiting and swollen
8 feet?
9    A.    The only accommodation that I had
10 told Ann was that I might need to take some
11 nights off because I had some early morning
12 doctor's appointments and she told me I was
13 unable to do that. Because it was too hard for
14 me to stay up all night and stay up all day to
15 go to my doctor's appointments. And I was
16 denied those accommodations.
17    Q.    When you asked Ann Kendall for a
18 day off or a night off so that you could attend
19 a doctor's appointment?
20    MR. SHEA: I think she said plural.
21    Q.    (By Mr. Griggs) When was the first
22 time?
23    MR. SHEA: If you don't remember
24 exactly.

## Page 39

1    THE WITNESS: I don't remember
2 exactly dates.
3    Q.    (By Mr. Griggs) Do you remember
4 rough dates?
5    A.    Yeah, I want to say it was maybe
6 the 16th.
7    Q.    Maybe the what, I'm sorry?
8    A.    I remember the date, maybe like the
9 16th, I don't know if it was March or April. I
10 don't remember. There was a few of them in
11 there that I needed off for doctor's
12 appointment.
13    Q.    Your testimony is that you asked
14 Ann Kendall if you could take a shift off to go
15 to a doctor's appointment the following day and
16 were denied?
17    A.    Yes.
18    Q.    How far in advance is your
19 testimony that you allegedly told her this?
20    A.    Like a couple weeks in advance.
21    Q.    Did she give you a reason for
22 reportedly denying this request?
23    A.    No, she said I can't accommodate it
24 and you'll just have to go when you have to go

## Page 40

1 and I said okay.
2    Q.    Did you make any attempt to get
3 somebody to cover a shift?
4    A.    I had. I had requested to switch
5 with another person who also worked at
6 Sandalwood.
7    Q.    Who was that?
8    A.    Lisa Franks.
9    Q.    What date was that?
10    A.    I want to say it was in April. I'm
11 not sure what date.
12    Q.    Did you ever put a request to swap
13 shifts in writing?
14    A.    No, it wasn't in writing, it was
15 with the supervisor that was on duty.
16    Q.    Who was that?
17    A.    I believe her name was Donna. I
18 don't remember.
19    Q.    You never made a request in writing
20 to take a day off?
21    A.    No, that's not how we did it at
22 Sandalwood. We switched along each other and
23 people would just go and switch it on the time
24 sheet with the 11:00 to 7:00 supervisor.

## Page 41

1    Q.    Who was the 11:00 to 7:00
2 supervisor?
3    A.    They didn't actually have an 11:00
4 to 7:00 supervisor, they were using nurses for
5 supervisors and they were using agency nurses
6 for supervisors.
7    Q.    So you would ask an agency nurse
8 that you say was operating as a supervisor if
9 you could swap shifts?
10    A.    Yes.
11    Q.    For a subsequent day, weeks ahead?
12    A.    No, it was that night. We had
13 switched. We had done it that night. We were
14 both on. We went up to the supervisor, she was
15 supposed to switch it in the book.
16    Q.    Your testimony is that you talked
17 to Lisa Franks one night because you both worked
18 11:00 to 7:00 asking to swap shifts?
19    A.    For the following night.
20    Q.    For the following night. This is
21 the very next night?
22    A.    Yes.
23    Q.    You simply asked this supervisor,
24 do you recall her name beyond Donna?

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

# WENDY GAUTHIER
# February 8, 2007

12 (Pages 42 to 45)

Page 42

1    A.    I think it was Donna. I'm not
2  sure.
3    Q.    Do you recall calling in sick a
4  number of times while you were employed at
5  SunBridge?
6    A.    Yes, I did.
7    Q.    Do you recall roughly how many
8  times you called out sick?
9    A.    Maybe nine, 10.
10    Q.    Did you ever receive a written
11  warning regarding your attendance?
12    A.    Yes.
13    Q.    Did you ever not show up for a
14  shift without calling?
15    A.    No.
16    Q.    On January 27th, did you not call
17  in and not show up for work?
18          MR. SHEA: She just said she never
19  did that.
20          THE WITNESS: No.
21          MR. GRIGGS: I'll mark this
22  document entitled the 2004 Attendance
23  Controller as Exhibit 5.
24

Page 43

1          (Exhibit 5, 2004 Attendance
2          Controller, marked)
3
4    Q.    (By Mr. Griggs) I'll show you a
5  document entitled 2004 Attendance Controller
6  we've marked as Exhibit 5. Then I'll show you
7  the month of January, can you read what's in the
8  box there?
9    A.    It says no call/no show.
10    Q.    What else does it say if you can
11  read it?
12    A.    In a.m., I don't work in the a.m.
13  I worked 11:00 to 7:00 shift.
14    Q.    Does it say called in a.m.?
15    A.    Yes.
16    Q.    Do you have any recollection of
17  that date?
18    A.    No, I don't.
19    Q.    Your testimony is that you've never
20  been a no call/no show?
21    A.    Correct.
22    Q.    This document is false?
23    A.    Yes.
24    Q.    Did you have written anywhere what

Page 44

1  days you called in sick or anything with regard
2  to your attendance?
3    A.    No, I don't.
4    Q.    Do you have any writings or any
5  notes, any personal notes that you've taken with
6  regard to the matters in this case?
7    A.    Yes, I have.
8    Q.    Do any of these writings describe
9  any injury that you have ever had?
10    A.    I don't understand what you are
11  asking. What do you mean the writing?
12          MR. SHEA: I'll object for the
13  record.
14    Q.    (By Mr. Griggs) You just said that
15  you wrote some notes?
16    A.    Yes, I have.
17          MR. SHEA: Did she write any notes
18  about injury?
19    Q.    (By Mr. Shea) My next question was
20  did you write any note about any injuries you
21  suffered on the job?
22    A.    No, I just remember in my head what
23  happened that night.
24    Q.    The night of January 27th, 2004?

Page 45

1    A.    28th.
2    Q.    What does that note say?
3    A.    I was kicked in the abdomen by a
4  patient during care.
5    Q.    I'm sorry, I said January.
6    A.    It's actually April 28th I got
7  injured on the job.
8    Q.    You are referring to that day?
9    A.    Yes.
10          MR. SHEA: Can we take a quick
11  break?
12          MR. GRIGGS: Sure.
13
14          (A recess was taken)
15
16          MR. GRIGGS: Back on the record.
17    Q.    (By Mr. Griggs) While you were
18  employed at SunBridge, did you ever complain to
19  anybody that you thought you were being
20  discriminated against?
21    A.    No.
22    Q.    Were you ever retaliated against
23  for saying that you were pregnant?
24    A.    Yes.

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**WENDY GAUTHIER**
**February 8, 2007**

13 (Pages 46 to 49)

| Page 46 |
|---|

```
1    Q.   When?
2    A.   After I was injured on the job.
3    Q.   And by whom?
4    A.   Because I had -- I felt like they
5    retaliated against me because I missed a lot of
6    time from work due to my pregnancy, they wrote
7    me up. They got me for a no call/no show which
8    I never committed. I was sick all the time. I
9    needed light duty, was refused it.
10   Q.   Did you ever request light duty in
11   writing?
12   A.   Yes, my doctor provided a note.
13   Q.   Do you have a copy of that?
14   A.   No, I do not.
15   Q.   What doctor was that?
16   A.   Dr. Farricy.
17   Q.   What was the date that he wrote
18   that letter?
19        MR. SHEA: You don't have to guess.
20        THE WITNESS: I don't recall.
21        MR. SHEA: We can get the medical
22   records and clear up these dates, but don't
23   speculate.
24   Q.   (By Mr. Griggs) Did Dr. Farricy
```

| Page 47 |
|---|

```
1    write this letter after the incident that you
2    were injured?
3    A.   Yes.
4    Q.   Was it at your request?
5    A.   No, it was at his request.
6    Q.   Do you know who he sent this letter
7    to?
8    A.   He sent it to Ann.
9    Q.   Do you know what it said?
10   A.   It said that Wendy Gauthier needs
11   to be on light duty, no lifting, no rolling
12   heavy patients over.
13   Q.   Did you request to move to the day
14   shift?
15   A.   No, did I not.
16   Q.   Did you request to move to any
17   other shift?
18   A.   No.
19   Q.   Were there any other instances
20   where anybody retaliated against you at
21   SunBridge because you said you were pregnant?
22        MR. SHEA: Other than what she's
23   already testified to?
24        MR. GRIGGS: Correct.
```

| Page 48 |
|---|

```
1         THE WITNESS: No.
2    Q.   (By Mr. Griggs) Did you ever file
3    for unemployment benefits after you were
4    terminated from SunBridge?
5    A.   Yes, I tried, I was denied.
6    Q.   Why were you denied?
7    A.   I had called unemployment.
8         MR. SHEA: Objection. For the
9    record, it shouldn't even be introduced in
10   a civil procedure.
11   Q.   (By Mr. Griggs) Why were you
12   denied?
13   A.   Because they told me in the state
14   of Massachusetts if a woman is pregnant then
15   they are unable to collect. And I was
16   terminated, so I didn't even have a chance.
17   They told me I was unable to collect anything.
18   Q.   Do you recall filing a charge with
19   the Mass Commission Against Discrimination?
20   A.   I had called them and they told me
21   they felt that I didn't have a good enough case,
22   I'd have to pay for it. I didn't go that route.
23        MR. SHEA: Other than in this
24   case.
```

| Page 49 |
|---|

```
1         THE WITNESS: Right.
2    Q.   (By Mr. Griggs) Your answer is
3    that you never filed a claim with the
4    Massachusetts Commission Against Discrimination?
5    A.   I had called them and talked to
6    them.
7    Q.   You're saying you did not file a
8    charge of discrimination with the Mass
9    Commission Against Discrimination?
10        MR. SHEA: I'll represent she did.
11        MR. GRIGGS: You are not
12   testifying.
13        MR. SHEA: I filed it for her.
14        THE WITNESS: Yes. This was
15   before I went to the lawyer and got a
16   lawyer. This was on my own. This was
17   after I had called unemployment, I had
18   called them on my own and then I got myself
19   a lawyer and I went this route.
20        MR. GRIGGS: I'm going to introduce
21   a three-page document as Exhibit 6.
22
23        (Exhibit 7 MCAD Complaint, marked)
24
```

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# WENDY GAUTHIER
# February 8, 2007

14 (Pages 50 to 53)

---

Page 50

1    Q.    (By Mr. Griggs) Charge of
2 discrimination, I'm just going to walk through a
3 few of these things here on page one. I'll
4 represent to you --
5        MR. SHEA: Do you want to show her
6    the document?
7        MR. GRIGGS: Sure.
8    Q.    (By Mr. Griggs) Have you ever seen
9 this document?
10        MR. SHEA: Take your time and look
11    through it.
12    Q.    (By Mr. Griggs) Do you have a
13 handicap?
14    A.    Now or then?
15    Q.    Do you have a handicap now?
16    A.    No.
17    Q.    Have you ever had a handicap?
18    A.    Yes.
19    Q.    What was that handicap?
20    A.    When I was pregnant, being
21 pregnant. I had complications due to my
22 pregnancy.
23    Q.    What was that handicap?
24        MR. SHEA: Objection. She said

---

Page 51

1 complications due to her pregnancy.
2        THE WITNESS: I had swollen feet,
3 my hands were swollen, I was sick, I had
4 morning sickness every night through the
5 whole night.
6        MR. SHEA: There's case law on
7    that. Go ahead.
8        MR. GRIGGS: There is, we can talk
9    about that.
10    Q.    (By Mr. Griggs) Did this prevent
11 you from doing anything?
12    A.    I felt like, yeah, because they
13 felt it prevented me from doing my job the way
14 that I'm supposed to do my job, but I felt that
15 I followed all the regulations and the rules and
16 tried to do my job to the best of my ability at
17 that time.
18        MR. SHEA: You mean doing anything
19    at all or life activities, which one are
20    you talking about? I think she's confused.
21    Q.    (By Mr. Griggs) Either. Let's
22 talk about life activities. Does being pregnant
23 prevent you from --
24        MR. SHEA: Does being pregnant or

---

Page 52

1 complications of being pregnant was the
2 previous question?
3    Q.    (By Mr. Griggs) Did being pregnant
4 prevent you from pursuing any life activities?
5    A.    Being pregnant?
6    Q.    Correct.
7    A.    Yes.
8    Q.    What life activities did it prevent
9 you from?
10    A.    I was unable to clean my own house.
11 I couldn't do any lifting.
12    Q.    Why couldn't you clean your own
13 house?
14    A.    Because I couldn't move. My feet
15 were swollen. I had to wear sandals, I couldn't
16 wear regular shoes. Even sometimes sandals I
17 couldn't wear because my toes would go right
18 through. They were so tight I couldn't get them
19 off.
20    Q.    Have you ever filed a workman's
21 comp claim?
22        MR. SHEA: She, herself?
23        THE WITNESS: No. I was never
24    given a workman's comp claim to file.

---

Page 53

1    Q.    (By Mr. Griggs) You never filed a
2 workman's comp claim?
3        MR. SHEA: She, herself or the
4    employer?
5    Q.    (By Mr. Griggs) You, yourself.
6    A.    No.
7    Q.    Did you ever request in writing
8 that a workman's comp claim be filed on your
9 behalf?
10    A.    No.
11        MR. GRIGGS: I guess we'll suspend
12    and I'll ask for those records that we've
13    been seeking.
14        MR. SHEA: Sure we can clear that
15    up.
16
17        (Deposition concluded at 4:59 p.m.)
18
19
20
21
22
23
24

---

**WENDY GAUTHIER**
**February 8, 2007**

15 (Pages 54 to 57)

| Page 54 | Page 56 |
|---|---|
| 1    I, ELISABETH ZAHARIADIS, a Notary Public | 1      UNITED STATES DISTRICT COURT |
| 2  in and for the Commonwealth of Massachusetts, do | 2        DISTRICT OF MASSACHUSETTS |
| 3  hereby certify that WENDY GAUTHIER appeared | 3 |
| 4  before me, satisfactorily identified herself, on | 4  ****************************** |
| 5  the 8th day of February, 2007, at Worcester, | 5  WENDY GAUTHIER,          * |
| 6  Massachusetts, and was by me duly sworn to | 6        Plaintiff   * |
| 7  testify to the truth and nothing but the truth | 7  vs.              *No.: 05cv40119-FDS |
| 8  as to her knowledge touching and concerning the | 8  SUNHEALTH SPECIALTY     * |
| 9  matters in controversy in this cause; that she | 9  SERVICES, INC. and SUNBRIDGE* |
| 10  was thereupon examined upon her oath and said | 10  HEALTHCARE CORPORATION,   * |
| 11  examination reduced to writing by me; and that | 11        Defendants  * |
| 12  the statement is a true record of the testimony | 12  ****************************** |
| 13  given by the witness, to the best of my | 13 |
| 14  knowledge and ability. | 14 |
| 15    I further certify that I am not a relative | 15    I, WENDY GAUTHIER, do hereby certify, |
| 16  or employee of counsel/attorney for any of the | 16  under the pains and penalties of perjury, that |
| 17  parties, nor a relative or employee of such | 17  the foregoing testimony is true and accurate, to |
| 18  parties, nor am I financially interested in the | 18  the best of my knowledge and belief. |
| 19  outcome of the action. | 19    WITNESS MY HAND, this  day of |
| 20    WITNESS MY HAND this 3rd day of March | 20  2007. |
| 21  2007. | 21 |
| 22 | 22 _____ |
| 23  Elisabeth Zahariadis  My Commission expires: | 23  EZ       WENDY GAUTHIER |
| 24  Notary Public    October 5, 2012 | 24 |

| Page 55 | Page 57 |
|---|---|
| 1  Today's date:      March 3, 2007 | 1      CORRECTION SHEET |
| 2  To:        K. Scott Griggs, Esq. | 2  DEPONENT: Wendy Gauthier |
| 3  Copied to:      Michael O. Shea, Esq. | 3  CASE: Gauthier V. Sunhealth Specialty Services |
| 4  From:        Elisabeth Zahariadis | 4  DATE TAKEN: February 8, 2007 |
| 5  Deposition of:    Wendy Gauthier | 5  ****************************** |
| 6  Taken:        February 8, 2007 | 6  PAGE/ LINE/ CHANGE OR CORRECTION AND REASON |
| 7  Action:        WENDY GAUTHIER | 7  ****************************** |
| 8          Vs. SUNHEALTH SPECIALTY | 8  ___/___/_____ |
| 9          SERVICES, INC., ET AL. | 9  ___/___/_____ |
| 10 | 10  ___/___/_____ |
| 11 | 11  ___/___/_____ |
| 12    Enclosed is a copy of Ms. Gauthier's | 12  ___/___/_____ |
| 13  deposition. Pursuant to the Rules of Civil | 13  ___/___/_____ |
| 14  Procedure, Ms. Gauthier has thirty days to sign | 14  ___/___/_____ |
| 15  the deposition from today's date. | 15  ___/___/_____ |
| 16    Please have Ms. Gauthier sign the enclosed | 16  ___/___/_____ |
| 17  signature page. If there are any errors, please | 17  ___/___/_____ |
| 18  have her mark the page, line and error on the | 18  ___/___/_____ |
| 19  enclosed correction sheet. She should not mark | 19  ___/___/_____ |
| 20  the transcript itself. This addendum should be | 20  ___/___/_____ |
| 21  forwarded to all interested parties. | 21  ___/___/_____ |
| 22    Thank you for your cooperation in this | 22  ___/___/_____ |
| 23  matter. | 23  ___/___/_____ |
| 24 | 24  ___/___/_____ |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# EXHIBIT 2

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3         CIVIL ACTION NO.:  05CV40119-FDS

 4

 5  *****************************

 6  WENDY GAUTHIER,                *

 7          Plaintiff,             *

 8  Vs.                            *

 9  SUNHEALTH SPECIALTY            *

10  SERVICES, INC., and           *

11  SUNBRIDGE HEALTHCARE          *

12  CORPORATION,                   *

13          Defendants.            *

14  *****************************

15

16          DEPOSITION OF:  WENDY GAUTHIER

17

18          CATUOGNO COURT REPORTING

19          446 Main Street, 18th Floor

20          Worcester, Massachusetts

21          March 5, 2007        10:15 a.m.

22

23              Dawn L. Halcisak

24          Certified Shorthand Reporter
```

# WENDY GAUTHIER, VOLUME II
# March 5, 2007

2 (Pages 2 to 5)

---

**Page 2**

1 APPEARANCES:
2
3 Representing the Plaintiff:
4   LAW OFFICES OF MICHAEL O. SHEA
5   451 Main Street
6   Wilbraham, MA 01608-2302
7   (413) 596-8005  FAX: (413) 596-8095
8   BY: MICHAEL O. SHEA, ESQUIRE
9   E-mail: (None provided)
10
11 Representing the Defendant:
12   LAW OFFICES OF LAWSON & WEITZEN, L.L.P.
13   88 Black Falcon Avenue
14   Boston, MA 02210
15   (617) 439-4990  FAX: (617) 439-3987
16   BY: K. SCOTT GRIGGS, ESQUIRE
17   E-mail: SGRIGGS@LAWSON-WEITZEN.COM
18
19
20
21
22
23
24

---

**Page 3**

1       I N D E X
2
3 WITNESS:     WENDY GAUTHIER
4
5 EXAMINATION BY:     PAGE:
6 Mr. Griggs     4
7 Mr. Shea     70
8
9 FURTHER EXAMINATION BY:     PAGE:
10 Mr. Griggs     72
11
12
13 EXHIBIT:     PAGE:
14 Exhibit 1, Medical Records.............11
15 Exhibit 2, Incident Report.............27
16 Exhibit 3, Letter, dated 01/12/04........38
17 Exhibit 4, Letter, dated 01/26/04........38
18
19     (Exhibits retained by Reporter)
20
21
22
23
24

---

**Page 4**

1     MR. GRIGGS: Okay. The usual
2 stipulations; all objections, except as to
3 form, are reserved until the time of
4 trial, read and sign, 30 days.
5     THE REPORTER: Waive the Notary?
6     MR. GRIGGS: Waive the notary after
7 30 days, the transcript will be deemed
8 accurate.
9
10     WENDY GAUTHIER, Deponent, having first
11 been satisfactorily identified and duly sworn,
12 deposes and states as follows:
13
14     THE REPORTER: Would you, please,
15 state your name, ma'am, spelling your last
16 name for the record?
17
18     THE WITNESS: Wendy Gauthier,
19 G-A-U-T-H-I-E-R.
20
21
22 DIRECT EXAMINATION BY MR. GRIGGS:
23
24   Q.   Good morning, Miss Gauthier.

---

**Page 5**

1 Thanks for coming back. We are resuming our
2 deposition from last month, when we ran out of
3 time. I apologize if I ask anything that was
4 repeated, that is going to be repeated from the
5 last time because we don't have the transcript
6 and so I may touch base on a couple of things
7 that we already talked about, but that's not my
8 desire, it's just to cover all the bases here.
9   A.   Okay.
10   Q.   Last time you were talking about
11 when you came to seek employment at SunBridge.
12 Do you remember the date that you did seek
13 employment at SunBridge?
14   A.   I -- December, 2003.
15   Q.   And who did you speak to?
16   A.   I spoke to Ann Kendall.
17   Q.   And when you were hired, did she
18 ask you about your ability to perform the job
19 functions of a certified nursing assistant?
20   A.   Yes.
21   Q.   And did you tell her you were able
22 to perform those?
23   A.   Yes.
24   Q.   And were you able to perform those?

---

WENDY GAUTHIER, VOLUME II
March 5, 2007

Page 6

1    A.    Yes.
2    Q.    Did you tell her, at that time,
3  that you were pregnant?
4    A.    Yes, I did.
5    Q.    Did you tell her how many months
6  you were pregnant?
7    A.    Yes, I did.
8    Q.    And that was in the initial
9  conversation; is that right?
10    A.    Correct.
11    Q.    And did you tell her when you
12  expected to take maternity leave?
13        MR. SHEA: I think we are covering
14    the same turf, and she's exhausted her
15    memory, I think, about that conversation.
16        MR. GRIGGS: We'll just hold for a
17    sec. I don't have a transcript from the
18    last time either, so we're just going to
19    run through the bases. I'm not looking
20    to -- puzzle over it.
21        MR. SHEA: All right. I just don't
22    want to go over old turf.
23        MR. GRIGGS: Well, we may need to
24    do that just a little bit to get our

Page 7

1    context together.
2    Q.    (By Mr. Griggs) Once again, in that
3  conversation, did you tell her roughly when you
4  believed you were going to take maternity leave?
5    A.    I believe I didn't bring it up at
6  that time because I wasn't sure myself.
7    Q.    But you did bring up -- you did
8  bring up the fact that you were pregnant, right?
9    A.    Yes.
10    Q.    But you did not talk about when you
11  expected to take maternity leave?
12    A.    No, no.
13    Q.    Did you know within, say, a 30-day
14  waiver of time as to when you expected that you
15  would probably take maternity leave?
16        At the time that you were speaking
17  with Miss Kendall in December of 2002?
18        MR. SHEA: Did she know within a
19    month from then --
20        THE WITNESS: No. I --
21        THE REPORTER: Honey, you have to
22    wait, just until the attorneys are done.
23        THE WITNESS: Okay.
24        THE REPORTER: That's okay.

Page 8

1        MR. SHEA: Did she remember in a
2    month from then, in December?
3    Q.    (By Mr. Griggs) In December of
4  2003, could you have predicted within a 30-day
5  time frame, roughly, when you expected to say --
6  give birth and take maternity leave?
7        MR. SHEA: Objection.
8        You can answer.
9        THE WITNESS: No, not at that time.
10    Q.    (By Mr. Griggs) Did you plan to
11  take maternity leave when your daughter was
12  born?
13    A.    Well, I was planning on working up
14  until I could no longer be able to work anymore,
15  and then I was going to give them a notice to
16  say, I'm going out, and I was willing to come
17  back to work after the baby was born. That was
18  my intention.
19    Q.    And how long after your baby was
20  born did you expect that you would come back to
21  work?
22    A.    I didn't. I was -- I was fired for
23  a "no call/no show" --
24    Q.    The question was --

Page 9

1    A.    -- that I never -- that I never
2  performed a "no call/no show."
3    Q.    The question I asked was: When you
4  took maternity leave, when you had planned to
5  acknowledge that you were returning prior to
6  your requesting maternity leave, but at some
7  point during your employment, you foresaw the
8  need to take maternity leave, right?
9    A.    Yes.
10    Q.    You foresaw that, at some point,
11  you would give birth and enjoy your time with
12  your newborn daughter, correct?
13    A.    Right.
14    Q.    So you anticipated taking some time
15  off, as you said, shortly before her birth or
16  whatever time you felt you were no longer able
17  to work --
18        MR. SHEA: Objection.
19    Q.    (By Mr. Griggs) -- until when?
20  How long did you intend to take
21  maternity leave for?
22        MR. SHEA: Objection.
23        THE WITNESS: Well, maternity leave
24  is only -- it's usually 90 days. Any

# WENDY GAUTHIER, VOLUME II
# March 5, 2007

4 (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|
| 1   place usually gives you 90 days, unless<br>2   you have complications.<br>3       MR. SHEA: Don't speculate. He's<br>4   just asking you if there's -- correct me<br>5   if I'm wrong -- if there was some point<br>6   while she was working at SunBridge?<br>7       MR. GRIGGS: You can object to the<br>8   point of the question. I'll have to --<br>9       MR. SHEA: I don't see -- if I'm<br>10  confused about the question. I think she<br>11  is.<br>12      MR. GRIGGS: Okay. Let me rephrase<br>13  the question. You can object to the form.<br>14  I'll duly acknowledge if it's a complex<br>15  question. I'm not intending to create<br>16  complex ambiguous questions.<br>17      MR. SHEA: Okay. All right.<br>18  Q.    (By Mr. Griggs) However, I'm<br>19  trying to formulate a question that asks how<br>20  long you intended to take maternity leave and<br>21  how much maternity leave did you intend to take?<br>22      MR. SHEA: When? When?<br>23      MR. GRIGGS: I'm going to ask the<br>24  question. | 1       of February 22, 2007?<br>2       Thank you.<br>3   Q.    (By Mr. Griggs) When you started<br>4   working at SunBridge, what was your<br>5   understanding as to how many months pregnant you<br>6   were at that time?<br>7   A.    When I started working at<br>8   SunBridge?<br>9   Q.    Yes.<br>10  A.    I was, approximately, about four<br>11  months pregnant.<br>12  Q.    And how was your pregnancy going at<br>13  that time?<br>14  A.    At that time, it was going okay.<br>15  Q.    And you were able to walk around?<br>16  A.    Yes.<br>17  Q.    You were able to turn and<br>18  reposition patients?<br>19  A.    Yes.<br>20  Q.    You were able to assist patients<br>21  and transfers to the bathroom?<br>22  A.    Yes.<br>23  Q.    You were able to ambulate<br>24  residents? |

| Page 11 | Page 13 |
|---|---|
| 1   Q.    (By Mr. Griggs) And if you can<br>2   answer it, go ahead and answer it.<br>3   A.    The normal 90-day maternity leave.<br>4   I believe it's 90 days.<br>5   Q.    (By Mr. Griggs) So you intended to<br>6   some point, you would take 90-days' maternity<br>7   leave, correct?<br>8   A.    Yes. But I had no benefits, so<br>9   I --<br>10  Q.    Well, I didn't ask about that, but<br>11  I appreciate it.<br>12  A.    Okay.<br>13      MR. GRIGGS: I'm going to mark as<br>14  Exhibit 1 a package of documents, which is<br>15  30 pages long, which I'll refer to as the<br>16  medical records from -- I'll just refer to<br>17  it as "medical records."<br>18<br>19      (Exhibit 1, Medical Records, marked<br>20       for identification)<br>21<br>22      MR. SHEA: Can we just say for the<br>23  record that these are medical records<br>24  produced by my office under a cover letter | 1   A.    Yes.<br>2   Q.    So, in short, you were able to<br>3   fulfill your job functions as a certified<br>4   nursing assistant; is that correct?<br>5   A.    Yes, when I first started there in<br>6   December. I didn't start receiving<br>7   complications until January.<br>8   Q.    Well, let's talk about the<br>9   complications of which you speak of. What kind<br>10  of complications?<br>11  A.    I had morning sickness all the<br>12  time --<br>13  Q.    Now, when you say "all the time" --<br>14      MR. SHEA: No, let her finish. Let<br>15  her finish her answer.<br>16      THE WITNESS: I had swollen feet.<br>17  I had to use the bathroom more frequently.<br>18  Q.    (By Mr. Griggs) Did you ever<br>19  receive medication for your morning sickness?<br>20  A.    No, I did not.<br>21  Q.    When you said you had morning<br>22  sickness all the time, what do you mean by "all<br>23  the time" exactly?<br>24  A.    It wasn't -- it was just -- it |

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

5 (Pages 14 to 17)

| Page 14 | Page 16 |
|---|---|

**Page 14**

1  would just come on all of a sudden.
2     Q.    So you would vomit every day?
3     A.    Yes.
4     Q.    How many times a day?
5     A.    I would say, like, 20 maybe. That
6  was throughout the 24-hour period. It could be
7  more.
8     Q.    And when did your frequent bouts of
9  morning sickness start?
10    A.    From January, all the way until
11 July, up until my pregnancy.
12         MR. SHEA: You mean delivery.
13         THE WITNESS: Delivery, yeah. I'm
14 sorry.
15    Q.    (By Mr. Griggs) Did you have
16 morning sickness on the job at SunBridge?
17    A.    Yes, I had.
18    Q.    Did you ever find you could not
19 perform your job functions at SunBridge because
20 of this morning sickness?
21    A.    On occasion.
22    Q.    And when were those occasions? Can
23 you name one occasion?
24    A.    It was just -- it was just all the

**Page 15**

1  time. I -- it was throughout my whole
2  pregnancy. I --
3     Q.    Well, the question that's posed,
4  I'll repeat it again and I'll shorten it, if you
5  will: Can you name or describe an instance
6  where you were unable to perform your job
7  functions at SunBridge as a CNA because of this
8  morning sickness?
9     A.    Well, yeah. I had -- I had asked
10 Lisa Franks to switch with me because I was sick
11 at work --
12    Q.    And --
13    A.    -- and I had asked her to work the
14 following night.
15    Q.    And when was that?
16    A.    I believe that was in May, 2004.
17    Q.    Was there any other times you were
18 unable to perform your job functions as a CNA
19 because of morning sickness?
20         MR. SHEA: That she specifically
21 recalls? She said, "throughout." I'll
22 object, for the record, this has been
23 asked and answered. She's said several
24 times "throughout." You asked her about a

**Page 16**

1  specific instance; she gave you one. And
2  now you're asking her again, "were there
3  other times?" You asked her this question
4  already -- asked and answered.
5         MR. GRIGGS: Okay. Well, I'll
6  object to your speaking objections, and
7  there are no speaking objections.
8         MR. SHEA: I'm going to give those
9  objections every time you ask her the same
10 questions over and over again, because --
11        MR. GRIGGS: I'm not asking the
12 same question. I'm asking for the next
13 one.
14        MR. SHEA: Are you asking her now
15 whether there's another instance, specific
16 instance, that she recalls? Is that what
17 you're asking her -- because I'm confused.
18 Or are you asking a different question?
19        MR. GRIGGS: Nope. Let me ask the
20 question --
21        MR. SHEA: Sure.
22        MR. GRIGGS: -- and I'd appreciate
23 it if you wouldn't continue -- not to
24 interrupt me --

**Page 17**

1         MR. SHEA: Me too. Me too.
2     Q.    (By Mr. Griggs) You just answered
3  that there was a time in May of 2004 when --
4     A.    Well, that's --
5         THE REPORTER: Wait, let him finish
6  the question, okay?
7     Q.    (By Mr. Griggs) You just testified
8  that in May of 2004, there was a time when you
9  could not perform the essential job functions of
10 your position, as a CNA, because of morning
11 sickness, and that you described as a time when
12 you had asked Lisa Franks to then take your next
13 shift, because I'm presuming you felt bad; is
14 that correct?
15    A.    Yes.
16        THE REPORTER: That she felt "bad"?
17    Q.    (By Mr. Griggs) Is that a fair
18 summary?
19        THE WITNESS: Yes.
20        And, like I said, I was sick
21 throughout my whole pregnancy. I was even
22 sick in the labor room, if you want to
23 know that.
24    Q.    (By Mr. Griggs) Now, in May, 2004,

# WENDY GAUTHIER, VOLUME II
# March 5, 2007

6 (Pages 18 to 21)

| Page 18 | Page 20 |
|---|---|
| 1 was that the first time that you felt you were<br>2 unable to perform your job functions?<br>3     A.   No, it was in January.  In the<br>4 beginning of January.  And, like I said,<br>5 beginning of January throughout my pregnancy.<br>6     Q.   When was the first time that you<br>7 can recall that you were prevented from<br>8 performing the essential job functions as your<br>9 position as a CNA because of morning sickness?<br>10     A.   I'd say January, 2004, because<br>11 that's when it started.<br>12     Q.   In January, 2004, and you<br>13 discovered that you -- that you were unable to<br>14 perform the essential job functions of your<br>15 position as a CNA because of morning sickness,<br>16 who did you tell about that?<br>17     A.   Who did I tell about that?  The day<br>18 that I was unable to come to work, I called in.<br>19 I told the 3-to-11 supervisor.<br>20     Q.   And who was that?<br>21     A.   I don't even remember.  They don't<br>22 really have supervisors.  They were using<br>23 agencies for supervisors, so they had anybody<br>24 come in and out.  It's hard to keep track of | 1 sickness to your knowledge?<br>2         MR. SHEA: Do you want her to go<br>3     through all the records?<br>4         MR. GRIGGS:  Sure, if it refreshes<br>5     her memory.<br>6         MR. SHEA:  Objection for the<br>7     record.<br>8         You may answer that.<br>9         THE WITNESS:  (Witness viewing<br>10     document) I don't see anything in here<br>11     about that.<br>12         MR. GRIGGS:  So you don't recall?<br>13         MR. SHEA:  Well, finish looking,<br>14     just to be sure.<br>15         THE WITNESS:  Okay.<br>16         (Witness viewing document) I can't<br>17     read that (indicating).<br>18         MR. GRIGGS:  Nor can I, don't<br>19     worry.<br>20         MR. SHEA:  There are pages you<br>21     can't read?<br>22         THE WITNESS:  Yeah.<br>23<br>24         (Brief pause) |
| Page 19 | Page 21 |
| 1 everybody.<br>2     Q.   Now, this morning sickness, aside<br>3 from making you vomit frequently, did it stop<br>4 you from going shopping?<br>5     A.   Yes.  It stopped me from doing the<br>6 things I really enjoy doing.  I couldn't clean<br>7 at home.  I had to put my feet up, because my<br>8 feet were so swollen.<br>9     Q.   Did you ever seek treatment for<br>10 this morning sickness?  I already asked if you<br>11 took medication you said no; is that correct?<br>12     A.   Correct.<br>13     Q.   Did you ever seek any other type of<br>14 treatment?<br>15     A.   No.  I just went to the doctor's<br>16 office and they just told me it's common and it<br>17 happens, and it was something I'd have to deal<br>18 with.<br>19     Q.   Can you show me anywhere in this<br>20 set of records that references -- did you ever<br>21 complain to your doctor about your morning<br>22 sickness?  I believe you just said you did.<br>23         Did he ever give you any written<br>24 advice, or make any diagnosis about this morning | 1<br>2         THE WITNESS:  I don't see anything<br>3     in here about that.  I can't understand<br>4     his writing.<br>5     Q.   (By Mr. Griggs)  So in the records<br>6 that you just reviewed, and in your own<br>7 recollection, you never received any medication<br>8 or treatment for your morning sickness; is that<br>9 correct?<br>10         MR. SHEA:  Objection.<br>11         THE WITNESS:  Correct.<br>12     Q.   (By Mr. Griggs)  And you had just<br>13 said that you also asked your physician about<br>14 swollen feet.  Did you ask him about your<br>15 swollen feet?<br>16     A.   Yes, he was aware of that.<br>17     Q.   And when you asked him about the<br>18 swollen feet and the morning sickness, what did<br>19 he say about that?<br>20     A.   He didn't really say too much about<br>21 the morning sickness, because it happens with<br>22 pregnancy.  And the swollen feet he just asked<br>23 me to keep my feet up.<br>24     Q.   How often? |

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

7 (Pages 22 to 25)

| Page 22 |
|---|
| 1    A.   Whenever possible, as often as |
| 2  possible. |
| 3    Q.   All right. Let's talk for a minute |
| 4  about the first time when we began to touch on |
| 5  this last time -- the first time that you ever |
| 6  believe or that you believed that you were |
| 7  subjected to discrimination at SunBridge, when |
| 8  was the first time? |
| 9    A.   The first time was when I had |
| 10  complications from my pregnancy. |
| 11    Q.   And when was that? |
| 12    A.   Like I said, it was from January |
| 13  to -- through May. |
| 14    Q.   And can you describe that first act |
| 15  of discrimination? Who committed this act of |
| 16  discrimination? |
| 17    A.   I believe SunBridge did. I had |
| 18  asked for accommodations, and I received no |
| 19  accommodations. |
| 20    Q.   When did you asked for |
| 21  accommodations? |
| 22    MR. SHEA: Let her -- |
| 23    Are you done with your answer? |
| 24    I want you -- I don't want you to |

| Page 23 |
|---|
| 1  cut her off -- |
| 2    Are you done with your answer? |
| 3    THE WITNESS: Yes. |
| 4    MR. SHEA: I just want to be sure. |
| 5    Q.   (By Mr. Griggs) So, once again, |
| 6  when was the first act of discrimination that |
| 7  you can recall? |
| 8    MR. SHEA: It's been asked and |
| 9  answered. It started in January, what's |
| 10  the -- |
| 11    MR. GRIGGS: Are you testifying or |
| 12  is this a -- |
| 13    MR. SHEA: I'm not going to let you |
| 14  ask her the same -- this is like the third |
| 15  time that you asked her, "When was the |
| 16  first time --" |
| 17    MR. GRIGGS: Well, her answers are |
| 18  extremely vague, and I was just -- |
| 19    MR. SHEA: "I was denied |
| 20  accommodations in January," is what she |
| 21  said. Is there some other question rather |
| 22  than go back to the same question that |
| 23  you've already asked? |
| 24    MR. GRIGGS: I'm only going to ask |

| Page 24 |
|---|
| 1  questions that are going to clarify it -- |
| 2    MR. SHEA: I'm going to say "It's |
| 3  been asked and answered" every single time |
| 4  that you do that, but -- and I'm saying it |
| 5  again, "asked and answered," if it keeps |
| 6  going on -- |
| 7    MR. GRIGGS: I'm going to have to |
| 8  get a referee, or a master here at this |
| 9  deposition, Mr. Shea. |
| 10    MR. SHEA: If it keeps going, I'm |
| 11  going to instruct her not to answer. Just |
| 12  so you know . . . |
| 13    MR. GRIGGS: Well, then we're going |
| 14  to have an unfortunate discovery dispute |
| 15  with Judge Saylor (phonetic), if you |
| 16  continue in this manner, and so -- |
| 17    MR. SHEA: That's fine. Let's just |
| 18  continue in this regard. |
| 19    Q.   (By Mr. Griggs) Do you have a |
| 20  specific date as to this first alleged act of |
| 21  discrimination? |
| 22    A.   When I was injured on the job, in |
| 23  January; at the end of January, I was injured on |
| 24  the job. |

| Page 25 |
|---|
| 1    Q.   The end of January you were injured |
| 2  on the job. And what injury did you suffer on |
| 3  the job in January? |
| 4    A.   I suffered a strain in the abdomen. |
| 5  I was kicked by a resident during patient care. |
| 6    Q.   Did you receive treatment for this? |
| 7    A.   Yes, I did. |
| 8    Q.   Where did you go for this |
| 9  treatment? |
| 10    A.   I went to Women's and Children's |
| 11  Center in Worcester Med city. |
| 12    Q.   Do you recognize any medical |
| 13  records in this package from that admission, or |
| 14  from that visit -- were you admitted; let me ask |
| 15  you this. |
| 16    A.   I was not admitted. I was seen in |
| 17  Women's and Children's Center |
| 18    MR. SHEA: This packet being |
| 19  Exhibit 1, is that what you're referring |
| 20  to? |
| 21    MR. GRIGGS: Correct. |
| 22   |
| 23    (Brief pause) |
| 24   |

# WENDY GAUTHIER, VOLUME II
# March 5, 2007

8 (Pages 26 to 29)

|  |  |
|---|---|
| Page 26 | Page 28 |

**Page 26**

1      MR. SHEA: For the record, these

2 are Dr. Farricy's records.

3      THE WITNESS: I don't see it in the

4 doctor's files, but there is in my -- and

5 I just want to make, for the record, that

6 in my employee files the last time I was

7 here when it said I got injured on the

8 job, it was actually January and not

9 April, but I said April because I was

10 looking in my employee file, in my

11 employee file record, and it indicates

12 that it says "April." It wasn't in April.

13 It actually was in January.

14      MR. SHEA: I think she was

15 referring to an incident report in the

16 employee file, it says "April."

17      MR. GRIGGS: I'm going to mark this

18 document as Exhibit 2.

19      Q.   (By Mr. Griggs) This is an

20 incident report, dated April 24 -- it's April 28

21 of 2004. Do you recognize this?

22      A.   (Witness viewing document) Yes, I

23 do.

24      Q.   Is this the incident report of

**Page 27**

1 which you speak?

2      A.   Yes, it is.

3      Q.   So you're saying that the date at

4 the top, which indicates 4-28-04, and the date

5 on the bottom, 4-28-04 are, in fact, erroneous?

6      A.   Yes, I am.

7

8      (Exhibit 2, Incident Report, marked

9      for identification)

10

11      Q.   (By Mr. Griggs) In that document,

12 does it say anywhere that you were kicked in the

13 stomach?

14      A.   (Witness viewing document)

15      MR. SHEA: Can you read that entire

16 document? I'm just curious, because I

17 can't read it. I can't read some of the

18 handwriting on there, but to the extent

19 you can answer that.

20      MR. GRIGGS: Once again, I'm going

21 to renew my objection as to coaching the

22 witness, by speaking objections, and renew

23 the questions [sic] that you are asking.

24      MR. SHEA: I guess, I'll object,

**Page 28**

1 for the record, that she cannot read

2 but --

3      THE WITNESS: It does not say

4 clearly that I was kicked in -- by a

5 resident. It said, "While during

6 incontinent on resident Bed C, (Rm 18) -

7 felt a pull in the lower abandon," and

8 that's not right. I was kicked by the

9 resident during patient care.

10      Q.   (By Mr. Griggs) And you see at the

11 bottom it says "Refused to go to the hospital by

12 ambulance"?

13      A.   By ambulance, because I didn't have

14 money. I -- I was struggling -- well, I

15 shouldn't say . . .

16      MR. SHEA: He's just asking you

17 whether you see that language, I think

18 that was the question --

19      THE WITNESS: Yes, I see it.

20      MR. SHEA: -- I think that was the

21 question.

22      THE WITNESS: Yes. I drove myself

23 to the hospital that night.

24      MR. SHEA: He's just asking you

**Page 29**

1 whether you see the language.

2      THE WITNESS: And I wasn't --

3      MR. GRIGGS: You don't have to

4 explain the question, Mr. Shea. I can do

5 that.

6      MR. SHEA: Well, that's what you

7 asked. "Do you see the language" is what

8 he asked you.

9      THE WITNESS: Yes.

10      MR. SHEA: Okay.

11      Q.   (By Mr. Griggs) And is that

12 language true?

13      A.   Yes, I refused to go to the

14 hospital by ambulance, and I drove myself there.

15      Q.   And who did you receive services

16 from?

17      A.   Women's and Children's Center in

18 Worcester Med city --

19      Q.   Is that the full name of that --

20      A.   Yes.

21      Q.   -- which would be Women's and

22 Children's Center --

23      A.   In Worcester Medical City Hospital.

24      Q.   Do you recall the names of any

# WENDY GAUTHIER, VOLUME II
# March 5, 2007

9 (Pages 30 to 33)

## Page 30

1 persons that treated you at Med City after this
2 incident?
3    A.    You're talking three years ago. I
4 don't recall, offhand. I don't know.
5    Q.    Now, you said you drove yourself to
6 the hospital, correct?
7    A.    Yes.
8    Q.    And -- and where did you park when
9 you went to the hospital that day?
10    A.    I parked in the emergency room.
11    Q.    Is there a parking lot there?
12    A.    Yes, there is.
13    Q.    And how far is the parking lot from
14 the door from where you parked?
15    A.    I parked straight -- I actually was
16 in the main entrance, because you couldn't
17 park -- I don't remember, offhand. Like I said,
18 this is three years ago. I drove myself to the
19 hospital. I don't remember if I went directly
20 right in and they wheeled me down in a
21 wheelchair. They knew I was coming. My work
22 called them, told them I was on my way. They
23 met me outside with the wheelchair -- I --
24    MR. SHEA: Just what you remember.

## Page 31

1    THE WITNESS: I -- I remember going
2 in by a wheelchair. I went down an
3 elevator and it was right there. And
4 that's also where I had my daughter, my
5 daughter was born in the same place.
6    Q.    (By Mr. Griggs) So you parked your
7 car and you walked to the front door?
8    A.    Yes. They met me outside in a
9 wheelchair.
10    Q.    And what happened after that?
11    A.    They brought me in. They examined
12 me. I was there until six, seven o'clock in the
13 morning. The incident happened at 2 a.m. at
14 work.
15    Q.    So you were in the emergency ward
16 that entire four to five hours --
17    A.    Yes. Yes, I was. They did
18 ultrasounds. They did blood work. I mean --
19    Q.    And then you were released in the
20 morning?
21    A.    I was released, yes. I brought the
22 document -- I had a note saying I was able to
23 return to work.
24    Q.    And who was that note from?

## Page 32

1    A.    That note was from the hospital,
2 itself, and Ann had refused the note. She told
3 me it wasn't legit, because it wasn't from my
4 OB-GYN.
5    THE REPORTER: She told you it
6 wasn't legit?
7    THE WITNESS: Yes. From the
8 hospital.
9    Q.    (By Mr. Griggs) Do you remember the
10 name of the physician that authored that note?
11 Do you have a copy of that note?
12    A.    No, I do not.
13    MR. GRIGGS: Have you produced a
14 copy of that note?
15    MR. SHEA: No, I don't have a copy
16 of that note.
17    Q.    (By Mr. Griggs) And do you remember
18 the name of this doctor?
19    A.    No. It was a lady doctor. It was
20 the only doctor. I really don't know.
21    Q.    Did you ever request light duty?
22    A.    Yes, I have. After I was injured
23 on the job.
24    Q.    And this was in January of 2004,

## Page 33

1 when you said you were injured on the job?
2    A.    Yes.
3    Q.    And who did you ask for light duty
4 from?
5    A.    Well, my doctor offered. He wanted
6 me to have light duty for no lifting, no heavy
7 lifting, no bending.
8    Q.    What doctor was this?
9    A.    Dr. Farricy.
10    I had brought the light-duty note
11 to Ann. She told me she could not accept
12 this -- there was no such thing as "light duty."
13 I had not received any accommodations for light
14 duty --
15    Q.    I didn't ask all those questions.
16    MR. SHEA: Well -- well, she's
17 giving you her answer.
18    MR. GRIGGS: I can ask questions
19 the way I want to, Mr. Shea. And I would
20 appreciate if you would just let me ask
21 the questions, not continue to coach the
22 witness --
23    MR. SHEA: You can't cut her off --
24    MR. GRIGGS: She's answering the

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

10 (Pages 34 to 37)

| Page 34 | Page 36 |
|---|---|
| 1 question -- in the middle of an answer --<br>2     MR. SHEA: You're asking her --<br>3     MR. GRIGGS: And you can't cut me<br>4 off in the middle of a statement, and you<br>5 can't cut your own witness off --<br>6     MR. SHEA: When you're done with<br>7 your statement, let me speak. Are you<br>8 done? Are you done?<br>9     MR. GRIGGS: No, I'm not done.<br>10 You've interrupted many-a-question; you've<br>11 also interrupted your own witness many<br>12 times, and you've coached her; you've told<br>13 her, "Not to answer"; you've told her,<br>14 "Only from her recollection"; you've<br>15 stopped her from talking at times, and<br>16 then you were trying to stop me from<br>17 stopping her from talking at times when<br>18 she's not answering the question.<br>19     This is my deposition. I'm taking<br>20 this deposition, and if you don't stop<br>21 doing this right now, we're going to have<br>22 to suspend, once again, and we're going to<br>23 go to Judge Saylor (phonetic) and get a<br>24 master for this deposition. | 1 finished, though.<br>2     MR. SHEA: Don't cut her off in the<br>3 middle of an answer, okay?<br>4     Thank you.<br>5     MR. GRIGGS: We have to start<br>6 again.<br>7     Q. (By Mr. Griggs) When did you first<br>8 ask for light duty?<br>9     A. After I was injured on the job.<br>10     Q. And do you remember the date?<br>11     A. I remember it was in January.<br>12     Q. And you said you spoke with Ann<br>13 Kimball?<br>14     A. Correct. I had given her the<br>15 light-duty note.<br>16     Q. And is this the light-duty note of<br>17 January 12, 2004, from Dr. Farricy? Do you<br>18 recall?<br>19     A. No. No, I don't.<br>20     Q. Do you recall being given a note by<br>21 Dr. Farricy that you were able to lift without<br>22 restrictions?<br>23     A. Yes. That was before I was injured<br>24 on the job. |

| Page 35 | Page 37 |
|---|---|
| 1     MR. SHEA: I completely disagree<br>2 with what you just said. And the question<br>3 before the witness was, who did she talk<br>4 to about light duty and she was giving you<br>5 an answer.<br>6     MR. GRIGGS: I didn't ask her what<br>7 was said.<br>8     MR. SHEA: You cut her off --<br>9     MR. GRIGGS: I didn't ask her what<br>10 was said. I can ask that as the next<br>11 question, and you don't have to sit here<br>12 and do this on the record, but I'll<br>13 appreciate if you let me ask questions,<br>14 and if I think it's been answered, I'll<br>15 move on to the next question.<br>16     MR. SHEA: You can't cut a witness<br>17 off in the middle of the answer. If you<br>18 don't like the answer, or you think that<br>19 she's going down a road that you don't<br>20 like or you don't think she's answering<br>21 the question the way you would like it<br>22 answered, you need to let her finish the<br>23 answer to the question. That's all I ask.<br>24     MR. GRIGGS: Well, I think she's | 1     Q. So you're saying that you were<br>2 given a so-called light-duty note --<br>3     A. No --<br>4     Q. After you were injured on the job?<br>5     A. It was a note saying that I was --<br>6 supposed to be no lifting, no bending, no heavy<br>7 lifting or nothing.<br>8     MR. GRIGGS: Can we go off the<br>9 record for a second?<br>10<br>11     (Brief break)<br>12<br>13     Q. (By Mr. Griggs) So you requested<br>14 light duty for the first time after you were<br>15 injured on the job; is that correct?<br>16     A. Yes.<br>17     Q. I'm going to show you --<br>18     A. After I was injured on the job, I<br>19 was asked for no lifting restrictions in<br>20 January.<br>21     Q. I'm sorry. Could you repeat that?<br>22     A. The January 12th note, was prior to<br>23 the no lifting restrictions, which I wasn't<br>24 accommodated for. I was accommodated -- I had |

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

11 (Pages 38 to 41)

Page 38

1 told Ann that my doctor told me I shouldn't be
2 lifting.
3     Q.    Let's go one step at a time, if we
4 could.
5     A.    Okay.
6         MR. GRIGGS: Let's try this. Why
7 don't I mark this as Exhibit 3.
8
9         (Exhibit 3, Letter, dated 01/12/04,
10        marked for identification)
11
12        MR. GRIGGS: And this letter dated
13 January 26, 2004.
14
15        (Exhibit 4, Letter, dated 01/26/04,
16        marked for identification)
17
18        MR. GRIGGS: So Exhibit 3 would be
19 Dr. Farricy's letter, dated January 12,
20 2004; and Exhibit 4 would be Dr. Farricy's
21 letter, dated January 26, 2004.
22    Q.    (By Mr. Griggs) So the letter
23 dated -- from Dr. Farricy, dated January 12 --
24 January 26, 2004, can you just briefly read

Page 39

1 those two letters?
2     A.    (Witness viewing document) Yes.
3 "January 12, 2004, To Whom It May Concern" --
4     Q.    You don't have to read them out
5 loud. I'm sorry. I just want you to
6 re-familiarize yourself with them.
7     A.    Okay.
8
9         (Brief pause)
10
11    Q.    (By Mr. Griggs) Okay. I'm just
12 finding the time line a little bit murky, so I'm
13 going to ask what may seem like some repetitive
14 questions; however, now that you've reviewed
15 these two letters, can you give me a date as to
16 when you were injured on the job?
17    A.    January 24, 2004.
18    Q.    So if I have you look at Exhibit 4,
19 the letter of January 26th, can you read the
20 first full sentence of that letter?
21    A.    (Witness viewing document) Out
22 loud?
23    Q.    Yes, please.
24    A.    (Witness viewing document) "To

Page 40

1 Whom to May Concern, Wendy Gauthier was seen in
2 my office today. It is my recommendation that
3 she is able to continue working and lifting with
4 caution. Any questions regarding this matter,
5 please call the office. Thank you. Sincerely,
6 Dr. Farricy."
7     Q.    So you say you were injured on the
8 job on January 26th -- I'm sorry --
9 January 24th --
10    A.    Correct.
11    Q.    -- 2004. And that's the same day
12 you drove to Women's and Children's Center in
13 Med city?
14    A.    Correct.
15    Q.    So January 24, 2004, was when you
16 were kicked in the stomach?
17    A.    Yes.
18    Q.    And so, Dr. Farricy then on
19 January 26th wrote this note, which you gave to
20 Ann Kimball; is that correct?
21    A.    That's correct.
22        MR. SHEA: Can you just say which
23    one --
24        MR. GRIGGS: Exhibit 4, the January

Page 41

1 26th letter.
2         MR. SHEA: All right.
3     Q.    (By Mr. Griggs) Do you know if he
4 sent this directly, or did he give it to you and
5 you gave it to Ann?
6     A.    I believe I gave it to Ann.
7     Q.    And you continued to work after
8 January 26, 2004; is that correct?
9     A.    Correct.
10    Q.    When did you ask -- now that you've
11 read these letters and we've determined that
12 January 24th was the date that you were kicked
13 in the stomach, now let me ask the question
14 again, and I'll ask it: When did you ask Ann
15 for light duty?
16    A.    I asked Ann for light duty after I
17 was injured on the job, and I had brought her a
18 doctor's note stating light duty, no heavy
19 lifting. I mean, I -- I could be wrong, I could
20 be wrong, I'm not sure. But this one might be
21 the light-duty one.
22        MR. SHEA: Exhibit 4.
23        THE WITNESS: Yeah, I'm sorry but
24    I'm not sure but there was -- I know there

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

12 (Pages 42 to 45)

Page 42

1    was definitely a light-duty note stating
2    that there was no heavy lifting and no
3    bending.
4        Q.    (By Mr. Griggs) So was it a
5    different letter than Exhibit 4?
6        A.    I believe there was.
7        Q.    Okay.  Do you have a copy of that
8    letter?
9        A.    I do not.  This is like three years
10   ago.  I -- I should have took [sic] notes, but
11   I -- I didn't.
12       Q.    So this package of records that
13   we've marked as Exhibit 1, 30 pages, is from
14   Dr. Farricy's office; is that correct?
15       A.    That's correct.
16       Q.    But you believe that he authored
17   another note; is that correct?
18       A.    Yes, that is correct.
19       Q.    And so this note is not in this
20   package?
21       A.    No, it's not.  I remember giving
22   the note specifically to Ann and I told her I
23   needed light duty.  And she told me there was
24   "no such thing as light duty," and that if I

Page 43

1    couldn't perform my job up to my fullest, then I
2    couldn't work here anymore.  That's what she had
3    told me in her exact words.
4        Q.    Now, Exhibits 3 and 4, do you see
5    those also within the 30 pages of Exhibit 1; if
6    you can flip through quickly and identify that
7    as the same letters?
8        A.    (Witness viewing document)  Yes.
9             MR. SHEA:  So far, I'm only seeing
10   January 4, 2004, but I could --
11            THE WITNESS:  I have a "May 6"
12   letter.
13            THE REPORTER:  I'm sorry, you have
14   a, what?  You have a "May 6" letter?
15            THE WITNESS:  That's a "May 6" one?
16       Q.    (By Mr. Griggs) But you see --
17   don't separate them.
18            Do you see a "January 26" one?
19       A.    No, I don't.
20            MR. SHEA:  I don't either.  I don't
21   know why, but I don't see it.
22            MR. GRIGGS:  Off the record.
23
24            (Off record discussion)

Page 44

1
2            MR. GRIGGS:  Back on the record.
3            I just want to request that a
4    certified copy of the records from
5    Dr. Farricy --
6            MR. SHEA:  That's fine.
7            MR. GRIGGS:  -- and that way you
8    can execute the appropriate authorization
9    here, and I'll get that in --
10           MR. SHEA:  Sure.
11           MR. GRIGGS:  -- then we can get the
12   certification --
13           MR. SHEA:  Sure.
14           MR. GRIGGS:  I just want to make
15   sure that we have it.
16           MR. SHEA:  We'll save this.  It's
17   my understanding that what we've marked as
18   Exhibit 1, is the records from his office,
19   this is what he produced.  And I would
20   just want any records that you get with a
21   certification, or a release, be stamped
22   "CONFIDENTIAL" and fall within the
23   confidentiality agreement, in this case.
24           MR. GRIGGS:  Certainly.  We agree.

Page 45

1            MR. SHEA:  All right.
2        Q.    (By Mr. Griggs) So, once again,
3    let me read Exhibit 4, the letter of
4    January 26th, did you speak to Ann Kendall about
5    light duty before or after January 26th?
6        A.    It was after.  After I was injured
7    on the job.
8        Q.    Well, before I believe, you had
9    said you were injured on the job with this
10   kick-in-the-stomach incident of January, 2004;
11   is that correct?
12       A.    Yes.
13       Q.    And this letter is two days later
14   than that; is that correct?
15       A.    Yes.
16       Q.    So my question was --
17       A.    I was seen in his office.  I had to
18   go back and see him at his office, because she
19   wouldn't accept the letter from the hospital.
20   So she told me I needed a letter from him
21   stating "light duty, no lifting."
22       Q.    So you had a letter from the
23   hospital, you said?
24       A.    I had a letter from the hospital,

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

Page 46

1  yes. I do not have the letter on me, no. I had
2  given it to Ann Kimball. She told me she could
3  not accept this note because it wasn't from my
4  OB-GYN. It needed to be from him, so I saw him
5  the next day; brought the note. She said, "I
6  can't accept this note because it's not from
7  your primary-care doctor." And then I tried to
8  explain to her that when you're pregnant, you
9  loose your primary-care physician, your OB-GYN
10  becomes your primary-care doctor. And my doctor
11  had asked for light duty, and I was not
12  accommodated for light duty. She told me --
13  what's that -- oh, she told me there was "no
14  such thing as light duty." And it wasn't
15  offered to me, but it was offered to other
16  employees that had worked there.
17  Q.    My question -- let me ask this
18  question: Who is "my doctor," when you say, "my
19  doctor"?
20  A.    Dr. Farricy. And he was my doctor
21  at the time.
22  Q.    When you were saying -- when you
23  just said that your doctor said what -- I'm
24  sorry -- your doctor -- you said that your

Page 47

1  doctor said, "no heavy lifting"?
2  A.    Correct.
3  Q.    So, once again, was it a hospital
4  doctor from Women's and Children's Center in Med
5  City that wrote this note or was it your
6  doctor --
7  A.    This one -- this is from my doctor.
8  Dr. Farricy.
9  Q.    Okay. So when you say, "My doctor
10  said 'no heavy lifting,'" which doctor is that?
11  A.    Dr. Farricy.
12  Q.    And did Dr. Farricy ever put that
13  in writing, to your knowledge?
14  A.    Yes, he did.
15  Q.    And is that Exhibit 3 or 4?
16  A.    I believe it's four. But, like I
17  said, I'm not sure. And, I believe, there was
18  another note with this one. It said, "no
19  lifting and no bending," due to complications of
20  my pregnancy.
21  Q.    But, nonetheless, you did return to
22  work; is that correct?
23  A.    That is correct.
24  Q.    And were you able to fulfill your

Page 48

1  essential job functions when you returned to
2  work after you were injured on the job?
3  A.    Yes, I had to.
4  Q.    Did you ever file a workmen's
5  compensation complaint?
6          MR. SHEA: Objection.
7          You can answer that.
8          THE WITNESS: Did I?
9  Q.    (By Mr. Griggs) Yes.
10  A.    At the time, no.
11          There was -- there was nothing
12  brought up to me about workmen's compensation.
13  Q.    Did you ever ask anyone about
14  workmen's compensation?
15  A.    No.
16  Q.    Did you ever speak to anyone at
17  SunBridge about workmen's compensation?
18  A.    No, I did not.
19  Q.    In your complaint relating to this
20  lawsuit, it was stated that you believe you were
21  discriminated against, or retaliated against --
22  I'm paraphrasing -- for filing a workmen's
23  compensation claim; is that correct?
24  A.    Correct.

Page 49

1  Q.    And you just said you never filed a
2  workmen's compensation claim.
3          MR. SHEA: Objection. It's not
4  even her responsibility to file --
5          MR. GRIGGS: I didn't ask you the
6  question. I'm asking if this is true?
7          MR. SHEA: Your company had filed
8  it on her physician statement, so -- we're
9  playing semantics here.
10          MR. GRIGGS: For the record, that's
11  an inaccurate statement, but we will move
12  on from there.
13  Q.    (By Mr. Griggs) Page 2 of your --
14
15          MR. GRIGGS: Off the record.
16
17          (Off record discussion)
18
19          MR. GRIGGS: Back on the record.
20  Q.    (By Mr. Griggs) Were you aware
21  that a workmen's compensation claim was filed on
22  your behalf?
23  A.    Yes.
24  Q.    And what was the results of that

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

14 (Pages 50 to 53)

Page 50

1 claim, to your knowledge?
2    A.    At this time?
3    Q.    At all. After you said you were
4 aware that a claim was filed; is that correct?
5    A.    Yes.
6    Q.    And did you ever hear back as to
7 whether your claim for benefits --
8    A.    Nothing.
9    Q.    -- was granted --
10    A.    Nothing.
11    Q.    You never heard anything back?
12    A.    No, nothing. So that's why I
13 didn't even know if a workmen's compensation had
14 been filed or not. I don't know, I believe, it
15 probably was, but no one got back to me and --
16    Q.    Okay. Can I direct your attention
17 to page 28 of Exhibit 1, it's a letter dated
18 May 6, 2004?
19    A.    (Witness viewing document) Yep.
20    Q.    And can you just read that letter?
21 It's three sentences.
22    A.    (Witness viewing document) Yes.
23 "To Whom It May Concern, Wendy Gauthier is a
24 patient under my care and was seen in my office

Page 51

1 today. It was my recommendation that she is
2 able to perform her full duties as usual at
3 work. Any questions regarding this matter,
4 please call the office. Thankyou." [sic]
5    Q.    So between January 24th and May 6,
6 2004, were you able to perform your essential
7 job functions as a CNA at SunBridge?
8    MR. SHEA: Objection.
9    THE WITNESS: Yes, under that note.
10 But technically, no; because I was told by
11 Ann. I needed the job. My doctor put me
12 on light duty. I was refused light duty.
13 I had to go back to my doctor. He was on
14 vacation. I had to wait a few weeks, four
15 weeks, three -- a couple of weeks. I
16 don't exactly remember. I was told I had
17 to perform my full duty to go back -- I
18 went back to my doctor and I told him the
19 situation. I said, "Look, I need a job."
20 And I said, "I need you to put me back on
21 full duty without no" -- no -- what am I
22 thinking of?
23    MR. SHEA: Restrictions.
24    THE WITNESS: Yeah -- "no

Page 52

1    restrictions."
2    Thank you.
3    Q.    (By Mr. Griggs) Once again, when
4 you're saying, "my doctor," you're talking about
5 Dr. Farricy, correct?
6    A.    I'm talking about Dr. Farricy,
7 correct. So that's when I went back to him, and
8 I told him that. I needed full duty to return
9 back to work because, otherwise, I told him, I
10 would be out without a job.
11    Q.    So aside from this request for
12 light duty which you say you made sometime after
13 January 24, 2004, and sometime before
14 January 26, 2004, are there any other times that
15 you requested light duty?
16    MR. SHEA: Light duty?
17    THE WITNESS: It was an on-going
18 thing throughout the whole time I asked
19 for accommodations, and I was refused
20 accommodations.
21    Q.    (By Mr. Griggs) Well, let's talk
22 about that a little bit. Just to clarify the
23 time frame for me one more time; the first time
24 you requested light duty was, in fact, after you

Page 53

1 were kicked in the stomach, January 24, 2004,
2 and this letter of January 26, 2004, which we've
3 marked as Exhibit 4; is that correct?
4    A.    Correct.
5    Q.    Did you request an accommodation in
6 the form of light duty subsequent to January 26,
7 2004?
8    A.    Yes, from the injury, and also from
9 the pregnancy.
10    Q.    When was the next time after this
11 first incident where you asked for light duty?
12 When was the second time you asked for light
13 duty?
14    A.    It's -- I don't know exactly the
15 dates, but it's been throughout. It's like it
16 was an on-going thing. I asked for light duty.
17 I asked for accommodations. I -- and I was
18 refused. It's just, I can't give you the
19 specific dates. I really don't know. I just
20 know there was numerous times I had asked her
21 for light duty and accommodations, and I was
22 turned down.
23    Q.    Let me ask you this, then: Roughly
24 how many times did you ask Ann Kendall for light

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

15 (Pages 54 to 57)

Page 54

1  duty?
2      A.    Maybe four to five times.
3      Q.    Did you ever ask anybody else for
4  light duty?
5      A.    No, because she was the D.O.N. and
6  she's the one that CNAs went through, or spoke
7  through, for work.
8            She's the one that the CNAs dealt
9  with because we worked -- she was our boss.
10     Q.    And on those four or five other
11 times, what can you tell me that she told you?
12     A.    The same thing.  She told me that
13 there was "no such thing as light duty."  She
14 told me if I couldn't work here, I wouldn't have
15 a job, that, if I couldn't perform my job, then
16 I couldn't work here.
17           I asked her for accommodations to
18 take days off to go to doctors' appointments and
19 she told me, no, she couldn't do that.  There
20 was numerous times I was at work, I needed my
21 feet to be up because they were swollen so bad
22 and I feel that I performed my job to my best
23 abilities and I -- I went above and beyond the
24 call of duty at work.  I believe I was a great

Page 55

1  CNA.  I mean, I never hurt anybody, you know,
2  I -- I took care of my patients and I was
3  planning on going back after I had my daughter,
4  but it didn't turn out that way.
5      Q.    Do you recall how many times you
6  asked for time off or days off for doctor's
7  appointments?
8      A.    There was numerous times, I
9  couldn't specifically tell you.  But I was also
10 written up for numerous call-outs, and that was
11 due to my pregnancy.
12     Q.    Did you ever seek treatment for any
13 symptoms in connection with any emotional
14 distress that you claim to have suffered as a
15 result of this?
16           Did I see anybody?  No.
17     A.    Yes.  Did you see anybody with
18 respect to any emotional distress you claim to
19 have suffered from your experience with
20 SunBridge?
21     A.    No, I did not.
22     Q.    And so you were never prescribed
23 any medications with regard to any emotional
24 issues?

Page 56

1      A.    No.
2      Q.    Did you ever see a psychiatrist?
3      A.    No, but it's just stressful when
4  you're trying to get back to work, and you can't
5  get back to work, and you have notes, and you --
6  and had no -- you know, I'm trying to go back to
7  work.  I'm trying to work.  I'm pregnant.  I'm
8  having complications.  She wouldn't accept the
9  notes, and I kept bringing her notes -- bringing
10 her notes and she kept rejecting me and
11 rejecting me, and I was trying to go back to
12 work and I had finally -- that's when I finally
13 went to my doctors in May and I said, "I need to
14 go back to work."  And I was terminated in May
15 for a "no call/no show" that they had me down
16 for, that I never -- I never -- that I never
17 did.
18     Q.    Did you ever file a claim for
19 unemployment benefits?
20     A.    I tried to.  I had called
21 unemployment because I never -- like I said,
22 I've never been in this situation before.  I
23 never had -- since I was 18 years old, I never
24 had to try to go for unemployment.  I always had

Page 57

1  a job.  The first time I tried unemployment, I
2  was turned down.  Unemployment told me -- I
3  don't know who it was.  I wish I could
4  remember -- he told me that Steve Copper told
5  him that I was pregnant, and I was unable to
6  collect.  In the State of Massachusetts this is
7  what I was told.  If I was pregnant, then I
8  cannot collect anything, so I wasn't collecting
9  anything.
10           But I had called unemployment
11 myself, but . . .
12     Q.    Now, after you --
13           MR. SHEA:  I'm just going to object
14     to the last question.
15     Q.    (By Mr. Griggs) After you were
16 terminated from SunBridge, when did you first
17 begin seeking new employment?
18     A.    Around October.
19     Q.    And who did you first contact about
20 new employment?
21     A.    Where I am now.  I work at Seven
22 Hills Foundation.
23     Q.    And when did you start your job at
24 Seven Hills Foundation?

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

16 (Pages 58 to 61)

Page 58

1    A.    I want to say it was in November.
2    Q.    Now, your daughter's name is
3 Hannah; is that correct?
4    A.    Correct.
5    Q.    A wonderful name.
6    A.    Thank you.
7    Q.    When was Hannah born?
8    A.    She was born 7-10-04.
9    Q.    And when did you start work at
10 Seven Hills; roughly in November?
11    A.    It was probably about November,
12 between October and November. Well, I was going
13 for -- it takes awhile, because you got to go
14 through three -- my God -- interviews. So I had
15 to go on, like, three job interviews before I
16 was hired, so that took awhile. So you're
17 probably looking at, like, maybe November.
18    Q.    So, once again, Seven Hills
19 Foundation was the first employment inquiry you
20 made?
21    A.    Yes.
22    Q.    And who did you speak to at Seven
23 Hills?
24    A.    At the time, it was -- oh, she's

Page 59

1 not there anymore. What the heck's her name? I
2 can't think of her name. She's not there
3 anymore.
4    Q.    It's okay.
5    A.    She hired me. I don't know. I'm
6 still working there. It will probably come to
7 me; but right now, no. She was only -- I was
8 only there for a few weeks then she left, so I
9 didn't really know her.
10    Q.    Okay. So you started -- to the
11 best of your recollection -- sometime in
12 November?
13    A.    Yes.
14    Q.    Do you think it was early November
15 or late November?
16    A.    Probably, late November, more late,
17 probably late November.
18    Q.    So when I asked you when the first
19 time was that you felt discriminated against at
20 SunBridge, you told me that it was when Ann
21 Kendall denied your request for light duty
22 sometime between January 24 and 26, 2004; is
23 that correct?
24    A.    Yes.

Page 60

1    Q.    And you said there were four or
2 five more times?
3    A.    Yes. It was an on-going thing,
4 between January and May because I had
5 complications during my pregnancy.
6    Q.    So were there any other times where
7 you felt discriminated against, other than those
8 times that we've just spoken about the first
9 time plus the additional four to five more times
10 when you requested light duty?
11    A.    Yes. It was for a "no call/no
12 show" --
13    Q.    And this "no call/no show" is --
14        MR. SHEA: Can she finish? I don't
15 know if she's done. I just get the sense
16 she's not --
17        Are you done with your answer?
18        THE WITNESS: Yes.
19        MR. SHEA: Okay. I just want to
20 make sure.
21        MR. GRIGGS: Did you have an
22 objection?
23        MR. SHEA: I think you're cutting
24 her off, is my objection. I'm getting the

Page 61

1 sense you're cutting her off, and she's
2 not done with her answer so if you could
3 just, you know, let her finish her answer,
4 that's fine with me.
5    Q.    (By Mr. Griggs) The "no call/no
6 show" of which you speak, was this in May of
7 2004?
8    A.    Yes.
9    Q.    And is it the one that resulted in
10 your termination?
11    A.    Yes, that I never committed.
12    Q.    So outside of these times, these
13 are -- this is -- are these times that we've
14 just talked about are the only instances of
15 discrimination that you have that you've been
16 subjected to at SunBridge?
17        MR. SHEA: Objection.
18        THE WITNESS: Through my whole -- I
19 guess that from January to May, I tried to
20 make accommodations -- for the pregnancy
21 and -- and after the injury, and I was
22 just turned down. I wasn't even offered
23 light duty on another shift because I
24 would have took [sic] It and if they

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

17 (Pages 62 to 65)

| Page 62 | Page 64 |
|---|---|
| 1  offered me light duty on another shift, I<br>2  would have said, "Okay." But I could have<br>3  worked something out, but I wasn't given<br>4  that opportunity.<br>5      Q.    (By Mr. Griggs) Did you ever ask<br>6  Ann Kendall if you could shift to another shift?<br>7      A.    She just told me "No." There was<br>8  "no such thing as light duty," and if I can't<br>9  perform my job here, then I can't work here. So<br>10  I was referring to the "no call/no show" as<br>11  their way to terminate me and to get rid of me<br>12  because they probably felt that I was a<br>13  liability towards them because I wasn't good on<br>14  the job.<br>15      Q.    The question was: Did you ask Ann<br>16  Kendall if you could change shifts, ever?<br>17      A.    No, because it wasn't given to me,<br>18  that option.  She just told me there was "no<br>19  such thing as light duty."<br>20      Q.    Did you ever speak to anybody else<br>21  about changing shifts, ever?<br>22      A.    No, I did not.<br>23      Q.    All right.  So you changed your<br>24  shifts changing from the night shift to -- | 1  expect that you would be paid for that maternity<br>2  leave? In other words, did you expect to be<br>3  getting paid during those 90 days?<br>4      A.    No, I did not.<br>5      Q.    When you were terminated on May 18,<br>6  2004, or thereabouts; is that correct?<br>7      A.    Somewhere -- I think it was a<br>8  little towards the end of -- that's correct,<br>9  yes.<br>10      Q.    If we could just, roughly, use that<br>11  date roughly a week or two before or after the<br>12  date --<br>13      A.    Yeah, that's fine.  I don't know<br>14  the exact date, okay, but, yes.<br>15      Q.    And when were you intending to take<br>16  90-days' maternity leave for which you didn't<br>17  expect to get paid --<br>18      A.    And that I was also planning on<br>19  coming back to SunBridge to work there, because<br>20  I enjoyed working there.<br>21      Q.    And then you started at Seven Hills<br>22  in November of 2004; is that correct?<br>23      A.    2004?<br>24      Q.    November of 2004? |

| Page 63 | Page 65 |
|---|---|
| 1      A.    Yeah.<br>2      Q.    -- to the day shift?<br>3      A.    Yeah.  Yeah, I know what you mean,<br>4  yeah.<br>5      Q.    That's what you do, shifting to a<br>6  different night shift?<br>7      A.    No, I did not.  Because, like I<br>8  said, Ann's the one that we went through.  She's<br>9  our boss.  She's over us, so . . .<br>10      Q.    What's your current salary or your<br>11  current wage right now, off a recent statement?<br>12      A.    Offhand, I believe, it's $10.46.<br>13      Q.    What wage rate did you start at<br>14  with Seven Hills?<br>15      A.    I believe it was a little over $12.<br>16  an hour.<br>17      Q.    At Seven Hills?<br>18      A.    Yes.  But, I believe, there was a<br>19  shift differential in that too.  But we're<br>20  talking three years ago.  I don't remember,<br>21  offhand, but I know there was a shift<br>22  differential.<br>23      Q.    So given that you were intending to<br>24  take some 90 days of maternity leave, did you | 1      A.    No, that's not correct.  I think<br>2  2005.<br>3      Q.    That you started with Seven Hills?<br>4      A.    Yes.<br>5      Q.    What was the first job you took<br>6  after SunBridge?<br>7      A.    That was it.  I tried -- I had a<br>8  hard time to find employment after my pregnancy.<br>9      Q.    So you're talking about November of<br>10  the same year that your daughter was born that<br>11  you started working at Seven Hills, or are you<br>12  talking about a year later?<br>13      A.    We're talking about a year later.<br>14      Q.    Did you have --<br>15          THE WITNESS:  We don't have that<br>16  here?  He sent me a sheet, too.<br>17          MR. SHEA:  The tax returns, tax<br>18  information?<br>19          THE WITNESS:  Yeah.<br>20          MR. GRIGGS:  Can we go off the<br>21  record for a minute?<br>22          THE REPORTER:  Sure.<br>23<br>24          (Off record discussion) |

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

18 (Pages 66 to 69)

| Page 66 |
|---|
| 1 |
| 2          MR. GRIGGS:  Back on the record. |
| 3      Q.   (By Mr. Griggs)  When did you first |
| 4  start at Seven Hills Foundation? |
| 5      A.   It's -- it was -- I'm all mixed up, |
| 6  I'm sorry.  It was 2006.  I'm still there now. |
| 7  I've been there a little over a year. |
| 8      Q.   Okay.  When did you work at |
| 9  anywhere prior to Seven Hills -- |
| 10      A.   After seven months.  I mean, after |
| 11  SunBridge, I worked for Senior Comfort Services. |
| 12      Q.   And when did you start with Senior |
| 13  Comfort Services? |
| 14      A.   It must have been in 2004.  That |
| 15  was October, November.  I don't exactly know, |
| 16  offhand.  You're going back three years ago, I |
| 17  don't . . . |
| 18      Q.   That's my question, though.  You |
| 19  started at Senior Comfort Services in October or |
| 20  November of 2004? |
| 21      A.   Yes, yes. |
| 22      Q.   That's correct? |
| 23      A.   Yes. |
| 24      Q.   And who did you speak to at Senior |

| Page 67 |
|---|
| 1  Comfort Services? |
| 2      A.   Elaine. |
| 3      Q.   Elaine.  Do you remember her last |
| 4  name? |
| 5      A.   No, I do not. |
| 6      Q.   And when did you first speak with |
| 7  Elaine for employment at Senior Comfort |
| 8  Services, to your best recollection? |
| 9      A.   They're a home agency, so we go |
| 10  into people's homes. |
| 11      Q.   And when did you first speak with |
| 12  her about employment with Senior Comfort |
| 13  Services, to the best of your recollection? |
| 14      A.   It must have been between October |
| 15  and November. |
| 16      Q.   And how long did you work for |
| 17  Senior Comfort Services? |
| 18      A.   I worked with them for a little |
| 19  over a year. |
| 20      Q.   And where did you work after Senior |
| 21  Comfort Services? |
| 22      A.   In 2005, I worked at the Lydia Taft |
| 23  House, out in Uxbridge. |
| 24      Q.   And why did you leave Senior |

| Page 68 |
|---|
| 1  Comfort Services? |
| 2      A.   Because I went back to the nursing |
| 3  home, and then I left Lydia Taft House and |
| 4  that's where I am today.  I'm no longer a CNA. |
| 5      Q.   And you left Lydia Taft House |
| 6  roughly when? |
| 7      A.   October, 2004, and then I started |
| 8  at Seven Hills. |
| 9      Q.   And what was your salary or your |
| 10  wage rate at Senior Comfort Services? |
| 11      A.   I believe it was 15. |
| 12      Q.   And what was your wage rate at |
| 13  Lydia Taft House? |
| 14      A.   I don't remember offhand.  It might |
| 15  be -- in the tax -- I don't know offhand. |
| 16          I want to say it was 12 or $13 an |
| 17  hour. |
| 18      Q.   Is there any other act of |
| 19  discrimination that you want to tell me about |
| 20  today that you would ascribe to SunBridge? |
| 21          MR. SHEA:  Objection. |
| 22          THE WITNESS:  Just when I had told |
| 23  you about the notes, not accepting the |
| 24  notes.  I felt that she felt that I was a |

| Page 69 |
|---|
| 1  high liability and the reason for the "no |
| 2  call/no shows" was the way to terminate |
| 3  me. |
| 4          And, like I said, just not |
| 5  accepting the notes and not giving me |
| 6  accommodations for light duty or not even |
| 7  offering me light duty when she told me |
| 8  there was "no such thing as light duty," |
| 9  then maybe, then, I should have just |
| 10  looked for another job then, but I didn't. |
| 11          Like I said, I enjoyed working |
| 12  there.  I enjoyed taking care of my |
| 13  patients and I felt that I did my ability |
| 14  to perform my job, you know, the best and |
| 15  I always went above and beyond the call of |
| 16  duty. |
| 17      Q.   (By Mr. Griggs)  Did she ever say |
| 18  anything to you that you would deem |
| 19  discriminatory? |
| 20      A.   She seemed like she was frustrated |
| 21  with me, when I was trying to give her the notes |
| 22  from the doctors or the light-duty notes.  She |
| 23  seemed like she was getting frustrated with me |
| 24  because I'd called out on numerous of times, due |

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

19 (Pages 70 to 73)

Page 70

1  to my pregnancy.
2      Q.   And how did she seem frustrated to
3  you?
4      A.   She seemed like -- just like her
5  facial expressions, "Well, there's no such thing
6  as light duty.  I can't give you that," and
7  she'd walk away from me.
8          MR. GRIGGS:  I don't think I have
9  anything further.
10         MR. SHEA:  I may have one or two
11  quick questions.  I just want to take a
12  quick break.
13
14      (Brief break)
15
16         MR. GRIGGS:  Back on the record.
17
18
19  EXAMINATION BY MR. SHEA:
20
21      Q.   I just have a couple of quick
22  questions.
23          You testified about some
24  accommodations that you asked of Ann Kimball for

Page 71

1  your pregnancy.  What accommodations did you ask
2  for, other than the ones that you already
3  testified about?
4      A.   The no lifting, the swollen of the
5  feet and using the bathroom more frequently
6  because I had morning sickness.
7      Q.   And did you also ask for time off
8  for your morning sickness?
9      A.   I asked for time off on numerous
10  occasions, throughout my time span working there
11  while I was pregnant, yes; and I was denied.
12      Q.   And did you ask for these
13  accommodations that you just described on
14  several occasions throughout the course of your
15  employment?
16      A.   Yes, several times.
17      Q.   And you were denied?
18      A.   Correct.
19         MR. GRIGGS:  Object to the form of
20  the question.
21      Q.   (By Mr. Shea)  On every occasion,
22  on every occasion you --
23      A.   On every occasions, yes.
24         MR. SHEA:  I don't have anything

Page 72

1      further.
2
3
4      FURTHER EXAMINATION BY MR. GRIGGS:
5
6      Q.   So you're saying that you requested
7  an accommodation to go to the bathroom for
8  morning sickness, and you were denied?
9      A.   Yes.
10      Q.   You asked Ann Kendall --
11      A.   Because --
12      Q.   -- if you can go to the bathroom to
13  throw up and she said, "No"?
14      A.   Well, Ann Kendall -- Ann Kendall is
15  kind of -- worked the 7-to-11 shift.  She was
16  on, like -- on a summer shift.  She was on the
17  day-shift.  She was our D.O.N.  She didn't work
18  nights, so I had asked a supervisor.
19      Q.   And what did you ask the
20  supervisor?
21      A.   I had asked the supervisor, you
22  know, "I have to go to the bathroom," you know,
23  quite a few times.  And then Ann told me -- the
24  next day she told me -- like I said -- if I was

Page 73

1  unable to perform my job, then I can no longer
2  work here anymore.
3      Q.   But I'm trying to understand what
4  the specific accommodation was that you were
5  requesting.  Did you ask if it was okay to go to
6  the bathroom to vomit, and they said, "No," or
7  this other supervisor said, "No"?
8      A.   Yes, because they felt that it
9  wasn't appropriate to do that and I had called
10  out a numerous of times [sic] because of that,
11  and I was written up for that.
12      Q.   Okay.  Once again, though, what was
13  the specific accommodation request --
14         MR. SHEA:  Objection.  I think
15  she's answered that; to go to the
16  bathroom --
17         MR. GRIGGS:  To go to the bathroom.
18         MR. SHEA:  -- to deal with her
19  morning sickness, and I think she said
20  that.  I think you asked.
21         MR. GRIGGS:  It's just that the
22  answer's confusing.
23      Q.   (By Mr. Griggs)  So you're saying
24  that Ann Kendall said that you -- strike that.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# WENDY GAUTHIER, VOLUME II
# March 5, 2007

20 (Pages 74 to 77)

---

**Page 74**

1    The accommodation you sought -- and
2 correct me if I'm wrong -- was that you be
3 allowed to go to the bathroom; was that correct?
4        MR. SHEA: One of them.
5        THE WITNESS: Yes.
6        MR. GRIGGS: Once again, you're not
7    testifying. I'm asking her what I thought
8    to be a simple question. You can object
9    to the point. Go ahead.
10        MR. SHEA: Okay.
11        MR. GRIGGS: Go ahead. Object to
12    the point, if you like. Let's start
13    again.
14    Q.    (By Mr. Griggs) So you're saying
15 that the accommodation you requested was that
16 you be allowed to go to the bathroom?
17        MR. SHEA: Objection.
18        THE WITNESS: To vomit. Yeah --
19    Q.    (By Mr. Griggs) That was your --
20    A.    Frequently, yeah, I was going like
21 there all the time.
22    Q.    And how frequently did you ask that
23 you be allowed to go to the bathroom?
24    A.    I couldn't. Sometimes I just ran

---

**Page 75**

1 right in there. I mean, there was like nothing
2 I could do, you know, but they told me that
3 that's not appropriate to come to work like
4 that.
5    Q.    Who said that it was inappropriate
6 to come to work like that?
7    A.    One of the supervisors that was on
8 11 to 7.
9    Q.    And what was her name?
10    A.    I don't recall.
11    Q.    Is it a female?
12    A.    I believe it was at the time. I'm
13 not sure.
14    Q.    Did you ever request that you be
15 allowed to go to the bathroom frequently, in
16 writing?
17    A.    No, it was not in writing.
18    Q.    Did you specify how frequently and
19 for what duration your visits to the bathroom
20 would be accommodated?
21    A.    No, because it changed all the
22 time.
23        MR. GRIGGS: I don't think I have
24    anything further.

---

**Page 76**

1        MR. SHEA: I don't have anything
2 further.
3        THE REPORTER: Can I just ask you
4 gentlemen how you would like your
5 transcripts?
6        MR. GRIGGS: A regular is fine.
7        MR. SHEA: Mini and the word index.
8        THE REPORTER: Thank you.
9
10    (Deposition concluded at 12:15 p.m.)

---

**Page 77**

1    I, DAWN L. HALCISAK, a Notary Public, do
2 hereby certify that WENDY GAUTHIER appeared
3 before me, satisfactorily identified herself, on
4 the 5th day of March, 2006, at the offices of
5 CATUOGNO COURT REPORTING, 446 Main Street, 18th
6 Floor, Worcester, MA, and was by me duly sworn
7 to testify to the truth and nothing but the
8 truth as to her knowledge touching and
9 concerning the matters in controversy in this
10 cause; that she was thereupon examined upon her
11 oath and said examination reduced to writing by
12 me; and that the statement is a true record of
13 the testimony given by the witness, to the best
14 of my knowledge and ability.
15    I further certify that I am not a relative
16 or employee of counsel/attorney for any of the
17 parties, nor a relative or employee of such
18 parties, nor am I financially interested in the
19 outcome of the action.
20        WITNESS MY HAND this 21st day of March,
21 2007.
22
23 Dawn L. Halcisak        My Commission expires:
24 Notary Public           October 2, 2009

---

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**WENDY GAUTHIER, VOLUME II**
**March 5, 2007**

Page 78

1  Today's date:    March 21, 2007
2  To:         K. SCOTT GRIGGS, ESQ.
3  Copied to:     MICHAEL O. SHEA, ESQ.
4  From:        Dawn L. Halcisak
5  Deposition of:   WENDY GAUTHIER
6  Taken:      MARCH 5, 2007
7  Action:      GAUTHIER
8        vs.
9        SUNHEALTH SPECIALTY SVS.
10        & SUNBRIDGE HEALTHCARE
11
12    Enclosed is a copy of the deposition of
13  WENDY GAUTHIER. Pursuant to the Rules of
14  Civil Procedure, Ms. Gauthier has thirty days to
15  sign the deposition from today's date.
16    Please have Ms. Gauthier sign the enclosed
17  signature page. If there are any errors, please
18  have her mark the page, line and error on the
19  enclosed correction sheet. She should not mark
20  the transcript itself. This addendum should be
21  forwarded to all interested parties.
22    Thank you for your cooperation in this
23  matter.
24

Page 79

1       UNITED STATES DISTRICT COURT
2        DISTRICT OF MASSACHUSETTS
3        CIVIL ACTION NO.: 05CV40119-FDS
4
5  *****************************
6  WENDY GAUTHIER,       *
7     Plaintiff,       *
8  Vs.           *
9  SUNHEALTH SPECIALTY      *
10  SERVICES, INC., and      *
11  SUNBRIDGE HEALTHCARE      *
12  CORPORATION,        *
13     Defendant.       *
14  *****************************
15
16    I, WENDY GAUTHIER, do hereby certify,
17  under the pains and penalties of perjury, that
18  the foregoing testimony is true and accurate, to
19  the best of my knowledge and belief.
20    WITNESS MY HAND, this_____day of
21  2007.
22
23  _____
          WENDY GAUTHIER
24  DLH

Page 80

1       CORRECTION SHEET
2  DEPONENT:   WENDY GAUTHIER
3  CASE:    GAUTHIER VS. SUNHEALTH SPECIALTY
4        SVS. & SUNBRIDGE HEALTHCARE
5  DATE TAKEN: MARCH 5, 2007
6  ***********************************
7  PAGE / LINE /  CHANGE OR CORRECTION AND REASO
8  ***********************************
9  _____/____/_____
10  _____/____/_____
11  _____/____/_____
12  _____/____/_____
13  _____/____/_____
14  _____/____/_____
15  _____/____/_____
16  _____/____/_____
17  _____/____/_____
18  _____/____/_____
19  _____/____/_____
20  _____/____/_____
21  _____/____/_____
22  _____/____/_____
23  _____/____/_____
24  _____/____/_____

# EXHIBIT 3

**STEPHEN G. COPPER**
**February 8, 2007**



Page 1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3

4

5  ****************************

6  WENDY GAUTHIER,                    *

7              Plaintiff            *

8  vs.                          *No.: 05cv40119-FDS

9  SUNHEALTH SPECIALTY             *

10 SERVICES, INC. and SUNBRIDGE *

11 HEALTHCARE CORPORATION,         *

12              Defendants         *

13 ****************************

14

15

16        DEPOSITION OF:  STEPHEN G. COPPER

17        CATUOGNO COURT REPORTING SERVICES

18                446 Main Street

19           Worcester, Massachusetts

20        February 8, 2007      10:12 a.m.

21

22

23           Elisabeth Zahariadis

24        Certified Shorthand Reporter

# STEPHEN G. COPPER
## February 8, 2007

2 (Pages 2 to 5)

**Page 2**

1  APPEARANCES:
2
3  Representing the Plaintiff:
4      LAW OFFICE OF MICHAEL O. SHEA, P.C.
5      451 Main Street
6      Wilbraham, MA 01095
7      BY: MICHAEL O. SHEA, ESQ.
8      (413) 596-8005 FAX 596-8095
9
10  Representing the Defendant:
11      LAWSON & WEITZEN, LLP
12      88 Black Falcon Avenue
13      Boston, MA 02210
14      BY: K. SCOTT GRIGGS, ESQ.
15      (617) 439-4990 FAX 439-3987
16
17  In attendance: Wendy Gauthier
18
19
20
21
22
23
24

**Page 3**

1          I N D E X
2
3  WITNESS:      STEPHEN G. COPPER
4
5  EXAMINATION BY:           PAGE:
6  Mr. Shea              4
7  Mr. Griggs            111
8
9  EXHIBIT:              PAGE:

10  Exhibit 1, Notice...........................4
11  Exhibit 2, Employee #2 File................63
12  Exhibit 3, Employee #5 File................77
13  Exhibit 4, Employee #6 File................83
14  Exhibit 5, Employee #7 File................87
15  Exhibit 6, Employee #9 File................90
16  Exhibit 7, Employee #10 File...............97
17  Exhibit 8, Employee #13 File..............101
18  Exhibit 9, Employee #15 File..............102
19  Exhibit 10, Employee #18 File.............103
20  Exhibit 11, Employee #22 File.............106
21  Exhibit 12, Employee #24 File.............107
22  Exhibit 13, Employee #26 File.............109
23
24  Mr. Shea retained exhibits.

**Page 4**

1      STEPHEN G. COPPER, Deponent, having first
2  been satisfactorily identified and duly sworn,
3  deposes and states as follows:
4
5      (Exhibit 1, Notice, marked)
6
7
8      EXAMINATION BY MR. SHEA:
9
10     Q.   Can you state your full name for
11  the record, please?
12     A.   Stephen Gerard Copper.
13     Q.   Can you state your current
14  residential address, please?
15     A.   45 Lebeaux Drive, Shrewsbury.
16     Q.   How long have you lived there?
17     A.   Two and a half years.
18     Q.   Who do you live with?
19     A.   Alone.
20     Q.   Are you currently employed?
21     A.   Yes.
22     Q.   Where are you employed?
23     A.   Ros Common Health Care.
24     Q.   Where is that located?

**Page 5**

1      A.   West Roxbury, Massachusetts.
2      Q.   How long have you worked there?
3      A.   Two years.
4      Q.   What is your position?
5      A.   Administrator.
6      Q.   You are an administrator there?
7      A.   (Witness complying)
8      Q.   Yes?
9      A.   Yes.
10         MR. GRIGGS: By the way, if you
11  want to put the usual stipulations on the
12  record.
13         MR. SHEA: Reserve all objections
14  to the time of trial. Do you want to have
15  him read and sign?
16         MR. GRIGGS: Read and sign, 30
17  days. All objections except as to the form
18  will be reserved until time of trial.
19         MR. SHEA: Yes.
20         MR. GRIGGS: Go ahead.
21     Q.   (By Mr. Shea) Have you ever been
22  deposed before?
23     A.   Yes.
24     Q.   How many times have you been

**STEPHEN G. COPPER**
**February 8, 2007**

3 (Pages 6 to 9)

| Page 6 | Page 8 |
|---|---|
| 1 deposed? | 1   A.   No. |
| 2   A.   Yes, once. | 2   Q.   Have you ever been a witness in a |
| 3   Q.   When were you deposed? | 3 case testifying at trial or a court proceeding? |
| 4   A.   2003. | 4   A.   No. |
| 5   Q.   What type of case was it? | 5   Q.   Have you ever been a plaintiff or a |
| 6   A.   I don't remember. It was probably | 6 defendant in a case? |
| 7 a similar situation to this. | 7   A.   No. |
| 8   Q.   It was an employment case? | 8   Q.   Have you ever been charged with a |
| 9   A.   An employment case, nursing home | 9 crime? |
| 10 employee. | 10   A.   No. |
| 11   Q.   Do you know which nursing home it | 11   Q.   How old are you? |
| 12 was? | 12   A.   51. |
| 13   A.   SunBridge. | 13   Q.   Just trying to get some background. |
| 14   Q.   Do you know which court it was in, | 14 Where did you go to high school? |
| 15 state or federal? | 15   A.   Burncoat High School, Worcester. |
| 16   A.   State, I believe. | 16   Q.   When did you graduate? |
| 17   Q.   Do you know which county it was out | 17   A.   '73. |
| 18 of, was it in Worcester? | 18   Q.   Where did you go to school beyond |
| 19   A.   It was Worcester. | 19 that? |
| 20   Q.   Do you know who the lawyers were in | 20   A.   Nichols College. |
| 21 that case? | 21   Q.   When did you graduate? |
| 22   A.   No. | 22   A.   '80. |
| 23   Q.   Do you know what type of | 23   Q.   With what type of degree? |
| 24 employment case it was? | 24   A.   PSBA. |

| Page 7 | Page 9 |
|---|---|
| 1   A.   No. | 1   Q.   PSBA? |
| 2   Q.   Just a couple of ground rules which | 2   A.   Public administration. |
| 3 you probably already heard these in your first | 3   Q.   From there, where did you go to |
| 4 deposition. | 4 school? |
| 5        If there's a question you don't | 5   A.   Seton Hall University, Immaculate |
| 6 understand, can you have me repeat the question | 6 Conception Seminary. |
| 7 or otherwise I'll assume you understand it? | 7   Q.   Did you graduate with a degree? |
| 8   A.   Okay. | 8   A.   Yes. |
| 9   Q.   You have to answer audibly for the | 9   Q.   What year was that? |
| 10 record? | 10   A.   1995. |
| 11   A.   Mm-hmm. | 11   Q.   What type of degree was that? |
| 12   Q.   Or an mm-hmm? | 12   A.   Masters in Divinity. |
| 13   A.   All right. | 13   Q.   Do you have any education beyond |
| 14   Q.   You have to use a yes or no so the | 14 that? |
| 15 stenographer can type what you're saying. Also, | 15   A.   No. |
| 16 if I ask a question, I would just ask that you | 16   Q.   Do you have any formal training |
| 17 wait until I finish asking the question before | 17 beyond what you've described? |
| 18 you start to answer even though you may know the | 18   A.   No. |
| 19 answer and I'll do the same. I'll wait until | 19   Q.   After high school, just trying to |
| 20 you answer before I ask the next question so the | 20 get a snapshot of your work history, after high |
| 21 stenographer can type a clean record. | 21 school what was your first full-time job? |
| 22        You are not under the influence of | 22   A.   Worked part time in a nursing home, |
| 23 anything that would impair your ability to | 23 a local nursing home in Worcester. |
| 24 answer questions today? | 24   Q.   Which was? |

**STEPHEN G. COPPER**
**February 8, 2007**

4  (Pages 10 to 13)

| | Page 10 | | Page 12 |
|---|---|---|---|

Page 10

1    A.    Heywood Valley.
2    Q.    Is that still there?
3    A.    I believe it's under a different
4  ownership.
5    Q.    What is that?
6    A.    It's a long-term care facility.
7    Q.    What is the name now, do you know?
8    A.    I don't recall.  It's been sold, I
9  believe, but I don't know the name.
10    Q.    Where was Heywood Valley?
11    A.    Worcester, Acton Street.
12    Q.    How long did you work there?
13    A.    Until 1990 in various capacities.
14    Q.    So from '74?
15    A.    '74 to 1990.
16    Q.    Can you tell me what you did for
17  Heywood Valley Nursing Home?
18    A.    I was part time and then full time,
19  department head and obtained a nursing home
20  administrator's license.  Assistant
21  administrator and then I went to Immaculate
22  Conception.
23    Q.    From there, you went to school?
24    A.    Yes.

Page 11

1    Q.    That was over what time period?
2    A.    1990 to 1995.
3    Q.    Full time at school?
4    A.    Yes.
5    Q.    Then from there, where did you
6  work?
7    A.    St. George's Church on Holden
8  Street -- Brattle Street in Worcester.
9    Q.    Over what time period did you work
10  there?
11    A.    1999 to 2002.
12    Q.    What did you do at the church?
13    A.    I was the parochial vicar, the
14  assistant pastor.
15    Q.    Then from there, where were you
16  employed?
17    A.    SunBridge.
18    Q.    When did you start at SunBridge?
19    A.    2002.
20    Q.    When you were hired at SunBridge,
21  what were you hired as?
22    A.    An administrator.
23    Q.    Was there only one administrator at
24  SunBridge when you were hired?

Page 12

1    A.    For the facility I was in?
2    Q.    Yes.
3    A.    Yes, I was the only administrator.
4    Q.    What facility was that?
5    A.    It was SunBridge of North Shore in
6  Lynn.
7    Q.    Do you know the address?
8    A.    No.
9    Q.    Is it still there?
10    A.    The building is, the facility is
11  closed.
12    Q.    How long did you work there?
13    A.    Two months.
14    Q.    From there, where did you go?
15    A.    From Lynn I went to Lexington.
16    Q.    Is that another facility in
17  Lexington?
18    A.    Yes.
19    Q.    For the same company?
20    A.    Yes.
21    Q.    How long were you there?
22    A.    Three months.
23    Q.    What was your position there?
24    A.    Administrator.

Page 13

1    Q.    Why did you leave the Lynn
2  location?
3    A.    They were interim, that's what I
4  was hired for.
5    Q.    They were meant to be temporary?
6    A.    Yes.
7    Q.    The same with Lexington?
8    A.    Yes.
9    Q.    From Lexington, where did you go?
10    A.    Lawrence.
11    Q.    Where was the facility in
12  Lexington?  Do you know what street it was on?
13    A.    Route 2, I believe.
14    Q.    Is there a name for the facility?
15    A.    It was SunBridge.  I believe it was
16  SunBridge for Lexington.
17    Q.    Where was the Lawrence location,
18  what street was that on?
19    A.    That was Lawrence, I don't recall
20  the name of the street.
21    Q.    Was there a name of the facility?
22    A.    Again, SunBridge.
23    Q.    At Lawrence?
24    A.    Yes.  Town Manor.

STEPHEN G. COPPER
February 8, 2007

Page 14

1    Q.    That's the Lawrence facility?
2    A.    Right.
3    Q.    How long were you at Lawrence?
4    A.    13 months.
5    Q.    Why did you leave that location?
6    A.    They closed the facility.
7    Q.    Then where did you go?
8    A.    To Oxford.
9    Q.    When was that, do you recall what
10   year was that?
11   A.    That was 2003, November of 2003 to
12   June of 2005.
13   Q.    Did you leave SunBridge in June of
14   2005?
15   A.    Yes.
16   Q.    Why did you leave SunBridge?
17   A.    I was offered a job as Ros Common.
18   Q.    You left voluntarily?
19   A.    Yes.
20   Q.    Were you a temporary administrator
21   in Lawrence as well?
22   A.    No, I was permanent.
23   Q.    Administrator?
24   A.    Yes.

Page 15

1    Q.    At Oxford, same thing, was that a
2    permanent position as administrator?
3    A.    Yes.
4    Q.    Did you always have the same job
5    responsibilities as an administrator throughout
6    your course of employment at SunBridge?
7    A.    Yes.
8    Q.    Can you just briefly tell me what
9    those responsibilities were?
10   A.    To oversee the overall operation of
11   the facility. Adhere to Medicare and Medicaid
12   guidelines. Enforce policies and procedures of
13   SunBridge. To provide highest quality of
14   patient care possible. Those are pretty much,
15   financial responsibilites.
16   Q.    Enforcing policies and procedures,
17   did that include any kind of H  Rt  function?
18   A.    Minimal. We had a department head
19   and we had a staff development coordinator.
20   Q.    What would they do, Hl  R-wise?
21   A.    Ho R-v wise they would interview, they
22   would train, they would review policies,
23   procedures.
24   Q.    With lower level employees?

Page 16

1    A.    Yes.
2    Q.    That's the same Ha Rd function that
3    department heads had and staff coordinators as
4    well?
5    A.    Yes.
6    Q.    What's the difference between a
7    department head and staff coordinator?
8    A.    The staff development coordinator
9    primarily is a person who is usually a nurse who
10   implements the nursing program, trains
11   employees, various job responsibilities.
12   Q.    Since your employment at Heywood
13   Valley, have you ever been reprimanded at a job?
14   A.    No.
15   Q.    No warnings?
16   A.    No.
17   Q.    You had no verbal or written
18   warnings?
19   A.    No.
20   Q.    Meaning correct?
21   A.    Yes, correct.
22   Q.    You've never been terminated from a
23   job before?
24   A.    No.

Page 17

1    Q.    What were your Hn Rt  functions as an
2    administrator at Sandalwood?
3    A.    Administrator, I would review any
4    disciplinary actions that were brought to my
5    attention. Make sure that there was fair
6    treatment of the employees, that policies and
7    procedures were followed.
8    Q.    What type of disciplinary would you
9    review?
10   A.    Written warnings, terminations.
11   Q.    Anything else?
12   A.    No.
13   Q.    Did you do that on a consistent
14   basis?
15   A.    Yes.
16   Q.    Was there a progressive discipline
17   policy at Sandalwood?
18   A.    Yes.
19   Q.    Can you tell me what that was?
20   A.    Verbal warnings were issued
21   initially followed by written warnings.
22   Q.    Followed by what?
23   A.    Further disciplinary action,
24   suspension and/or termination.

**STEPHEN G. COPPER**
**February 8, 2007**

6  (Pages 18 to 21)

| Page 18 |
|---|
| 1    Q.    Would an employee get a set number |
| 2  of verbal warnings before they get a written |
| 3  warning? |
| 4    A.    Yes. |
| 5    Q.    What was the policy in that |
| 6  respect? |
| 7    A.    Verbal warnings were used mostly |
| 8  with the hopes of changing the behavior that was |
| 9  being addressed and retaining the employee. |
| 10    Q.    How many verbal warnings would they |
| 11  get before they got a written one? |
| 12    A.    A minimum of two verbal warnings |
| 13  before it was reduced to writing. |
| 14    Q.    How many written warnings do they |
| 15  get before the next disciplinary action is |
| 16  taken? |
| 17    A.    Two. |
| 18    Q.    Or the next level of disciplinary |
| 19  action is taken? |
| 20    A.    Two. |
| 21    Q.    Two verbal warnings and two written |
| 22  warnings, right? |
| 23    A.    Yes. |
| 24    Q.    Then what would happen? |

| Page 20 |
|---|
| 1  without pay for a period of two to three days. |
| 2    Q.    What kind of offense would that |
| 3  depend on, termination versus suspension? |
| 4    A.    Oftentimes if there was a case of |
| 5  an alleged abuse, an investigation would need to |
| 6  proceed. |
| 7    Q.    Are there any other instances where |
| 8  suspension was appropriate? |
| 9    A.    Excessive absenteeism. |
| 10    Q.    So employees would also get |
| 11  suspended if they were excessively absent as |
| 12  well prior to termination? |
| 13    A.    Yes. |
| 14    Q.    Is there a certain length of |
| 15  suspension or a certain number of suspensions |
| 16  that an employee would get as part of this |
| 17  progressive discipline policy before they were |
| 18  terminated? |
| 19    A.    Generally there is one. |
| 20    Q.    Is this progressive discipline |
| 21  policy that you described in writing anywhere, |
| 22  do you recall? |
| 23    A.    I believe so, yes. |
| 24    Q.    Where do you believe it's located |

| Page 19 |
|---|
| 1    A.    Then, again, we would review the |
| 2  employee, the nature of the events and determine |
| 3  whether to retain or terminate the employee. |
| 4        MR. SHEA:  By the way, I've marked |
| 5  as Exhibit 1 the 30(b)t  (6) notice and that |
| 6  we're going to treat Mr. Copper as both a |
| 7  30(b)(6) witness in this deposition and a |
| 8  witness in his own capacity outside of the |
| 9  30(b)(6) capacity. |
| 10        MR. GRIGGS:  Yes, that's agreeable. |
| 11    Q.    (By Mr. Shea)  I'm trying to get a |
| 12  handle on what happens after two written |
| 13  warnings, does that depend on the facts and |
| 14  circumstances of each case or do you then follow |
| 15  a progressive discipline policy that mandates |
| 16  something happened after the two written |
| 17  warnings? |
| 18    A.    Generally after the two written |
| 19  warnings is termination. |
| 20    Q.    So suspension was not part of the |
| 21  progressive discipline policy, the normal |
| 22  progressive discipline policy? |
| 23    A.    Again, depending on the nature of |
| 24  the events.  Some employees were suspended |

| Page 21 |
|---|
| 1  in writing? |
| 2    A.    In the policies and procedures book |
| 3  at the individual facilities. |
| 4    Q.    Which policies and procedure book |
| 5  are you referring to? |
| 6    A.    SunBridge has a compilation of |
| 7  employee policies and procedures for every |
| 8  aspect of the operation.  One of them addresses |
| 9  the issues of employees and attendance, |
| 10  punctuality, appearance, inservice training, |
| 11  responsibility. |
| 12    Q.    Where are those policies and |
| 13  procedures kept, the written? |
| 14    A.    Generally in the administrator's |
| 15  office, director of nurse's office and/or the |
| 16  the staff development coordinator's office. |
| 17    Q.    Do you have a memory of where they |
| 18  were kept when you were employed at Sandalwood? |
| 19    A.    I did not have the entire volume of |
| 20  all of them, but they had each department had |
| 21  their own, their own volume pertaining to their |
| 22  department. |
| 23    Q.    Do you remember Wendy Gauthier |
| 24  working at Sandalwood? |

**STEPHEN G. COPPER**
**February 8, 2007**

7 (Pages 22 to 25)

| Page 22 | Page 24 |
|---|---|
| 1    A.    Yes. | 1    A.    Ann Kendall. |
| 2    Q.    Do you remember over what time | 2    Q.    Those policies and procedures that |
| 3  period she worked there? | 3  Ann Kendall had, you believe she had those in |
| 4    A.    She was employed I believe when I | 4  writing? |
| 5  started. I'm not certain of her dates of | 5    A.    Yes. |
| 6  employment, no. | 6    Q.    Did those policies and procedures |
| 7    Q.    Do you remember what years she was | 7  that she had contain progressive discipline |
| 8  there, can you sort of focus in on that? | 8  policies that you've described? |
| 9    A.    It would be when I arrived to 2003, | 9    A.    Yes. |
| 10  November. | 10    Q.    Did same policy that you described |
| 11    Q.    To the time she was terminated? | 11  apply to Wendy Gauthier? |
| 12    A.    To the time she was terminated. | 12    A.    Yes. |
| 13    Q.    Do you have any sense for how long | 13    Q.    Other than Ann Kendall, did anyone |
| 14  she was there? | 14  else have a copy of the policies and procedure |
| 15    A.    As an employee? | 15  manual for that department, the nursing |
| 16    Q.    Yes. | 16  department? |
| 17    A.    Just in the time frame that I was | 17    A.    No. |
| 18  the administrator. | 18    Q.    Do you know where they kept those |
| 19    Q.    Can you just describe the facility | 19  policies and procedures? |
| 20  for me, overall, just a general description of | 20    A.    Her office. |
| 21  what Sandalwood was about when you were there? | 21    Q.    Was there a progressive discipline |
| 22    A.    It's a 77-bed facility located on | 22  policy located in the handbook, was there a |
| 23  Pine Street in Oxford.  It was a skilled nursing | 23  handbook? |
| 24  facility. | 24    A.    Employee handbook? |

| Page 23 | Page 25 |
|---|---|
| 1    Q.    For the record, what does that | 1    Q.    Yes. |
| 2  mean, skilled nursing facility? | 2    A.    I'm not certain.  I can't recall if |
| 3    A.    That we received payment from | 3  we had one at SunBridge? |
| 4  Medicare, Medicaid, followed the CMS guidelines | 4    Q.    The policies and procedures that |
| 5  for health care. | 5  Ann Kendall had in her office, were those for |
| 6    Q.    Was it a nursing home? | 6  her use or were those for any employee who |
| 7    A.    A nursing home. | 7  wanted to walk in and take a look at them? |
| 8    Q.    The patients that you had there, | 8    A.    Mostly for her use. |
| 9  many of them were long term, I assume? | 9    Q.    Do you know if they were open to |
| 10    A.    Yes. | 10  the other employees to look at or no? |
| 11    Q.    What department did Wendy Gauthier | 11    A.    I would say yes.  I do not recall |
| 12  work in? | 12  anyone asking to see them, but there would be no |
| 13    A.    The nursing department. | 13  reason to deny access to them. |
| 14    Q.    Did the nursing department have | 14    Q.    Do you know whether any of the |
| 15  written guidelines, policies and procedures that | 15  employees were trained on the policies and |
| 16  you described? | 16  procedures that you are describing that Ann |
| 17    A.    Yes. | 17  Kendall held in her office? |
| 18    Q.    Do you know who kept those | 18    A.    At the time of hire, many of those |
| 19  policies and procedures, where they were kept? | 19  policies and procedures were discussed.  I don't |
| 20    A.    The director of nurses would have a | 20  think every page of every book was reviewed. |
| 21  copy and I believe the staff development | 21    Q.    Do you know whether the policies |
| 22  coordinator would. | 22  and procedures were discussed with Wendy |
| 23    Q.    Who was the director who held those | 23  Gauthier at SunBridge? |
| 24  two positions at the time Wendy Gauthier worked? | 24    A.    That, I would not know. |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**STEPHEN G. COPPER**
**February 8, 2007**

8  (Pages 26 to 29)

Page 26

1     Q.    Do you know whether the policies
2  and procedures, specifically the progressive
3  discipline policy that you outlined was
4  uniformly applied to all employees in the
5  nursing department?
6     A.    I believe it was.
7     Q.    Why do you say that?
8     A.    Because there was, we would not
9  discriminate against employees.  It was
10  impartial treatment to all employees.
11     Q.    Who is responsible for enforcing a
12  progressive discipline policy?
13     A.    The department.
14     Q.    And the nursing department?
15     A.    Yes.
16     Q.    So that was Ann Kendall?
17     A.    Yes.
18     Q.    Do you know whether she followed
19  the progressive discipline policy with respect
20  to Ms. Gauthier or not?
21     A.    Yes, I would say yes.
22     Q.    What do you base that on?
23     A.    By my reviewing of what her
24  procedure was in handling each case of employee

Page 27

1  discipline.
2     Q.    Every time Ann Kendall disciplined
3  an employee, and that would be her position,
4  right, that would be part of her role is to
5  initiate discipline in the nursing department if
6  someone needed to be disciplined?
7     A.    Yes.
8     Q.    It would be her responsibility and
9  solely her responsibility?
10     A.    Yes.
11     Q.    You would review that?
12     A.    Yes.
13     Q.    So if Ann Kendall was going to give
14  a verbal warning, that would not come to your
15  attention?
16     A.    In most cases it would.  I wanted
17  to know only in the event that the employee came
18  to me.  And it was an open-door policy, so if
19  the employee came to me, I wanted to know the
20  detail at least above a head's up.
21     Q.    You don't have a specific
22  recollection, do you, of the disciplinary action
23  that Ann Kendall administered to Wendy Gauthier?
24     MR. GRIGGS:  Form.  Go ahead and

Page 28

1  answer if you understand.
2     THE WITNESS:  I believe she
3  followed the policy and procedure as I
4  outlined.
5     Q.    (By Mr. Shea)  What did she do, do
6  you know?
7     A.    It was addressed verbally and
8  followed by written warnings.
9     Q.    What was addressed verbally?
10     A.    The disciplinary action that she
11  was taking at that time.
12     Q.    Did you approve all disciplinary
13  action that was administered by Ann Kendall to
14  Wendy Gauthier?
15     A.    Yeah.
16     Q.    Do you have a recollection of the
17  disciplinary action taken?
18     A.    Somewhat.
19     Q.    Can you tell me what you do
20  remember?
21     A.    I believe Ann Kendall addressing
22  with me that Wendy Gauthier was pregnant at the
23  time of her employment with us.  I believe that
24  Ann requested a doctor's note due to the nature

Page 29

1  of the work that Wendy was performing.  I
2  believe, I cannot say, I believe that Ann
3  received the note from the doctor and Wendy was
4  apparently a no call/no show, I know on two
5  occasions.  It was addressed with Wendy, he her
6  no call/no show by Ann Kendall.
7     Q.    Both of them?
8     A.    Both of them.
9     Q.    How were they addressed?
10     A.    With inquiry of what her status
11  was.  Policy was, no call/no show was
12  termination.
13     Q.    There were two no call/no shows you
14  said?
15     A.    Yes.
16     Q.    When was the first one, do you
17  recall?
18     A.    Somewhere between my arriving in
19  November and Wendy's termination date.
20     Q.    What happened as a result of that
21  first no call/no show?
22     A.    We chose to talk to Wendy to see
23  what her problem was.
24     Q.    Who talked to Wendy?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**STEPHEN G. COPPER**
**February 8, 2007**

9 (Pages 30 to 33)

### Page 30

1    A.   I believe Ann Kendall did.
2    Q.   Do you know whether she did?
3    A.   No, I do not know if it was Ann
4 Kendall.
5    Q.   I don't want you to guess today.
6    A.   Okay.
7    Q.   I want your specific memory not
8 what would have been?
9    A.   It would be Ann Kendall then
10 because Ann Kendall would be the only one.
11    Q.   You don't have a specific memory of
12 her talking to Wendy Gauthier on the first
13 occasion that you say there was a no call/no
14 show?
15    A.   Yes, she came to me and said she
16 talked to Wendy Gauthier about her no call/no
17 show.
18    Q.   What did she say?
19    A.   That we decided to not terminate,
20 but to allow it to happen this particular time.
21 The second time there was a no call/no show, is
22 when we decided to terminate Wendy Gauthier.
23    Q.   Who made that decision?
24    A.   Ann Kendall and myself.

### Page 31

1    Q.   Equally?
2    A.   Equally.
3    Q.   What were the circumstances of the
4 first no call/no show?
5    A.   She did not report to work.
6    Q.   Do you know why? Did you get an
7 explanation from Ms. Gauthier as to why?
8    A.   Not that I recall.
9    Q.   Do you remember in what month of
10 what year she first committed a no call/no show?
11    A.   No.
12    Q.   Do you know the circumstances of
13 the second no call/no show?
14    A.   No.
15    Q.   Was Ms. Gauthier ever given a
16 verbal warning or no?
17    A.   Yes.
18    Q.   For what?
19    A.   For the no call/no show.
20    Q.   For the first?
21    A.   The first no call/no show.
22    Q.   How many no call/no shows, is there
23 a certain number of no call/no shows that an
24 employee gets before they are terminated?

### Page 32

1    A.   We go with two.
2    Q.   You go with two?
3    A.   I believe policy was one. No
4 call/no show was equivalent to self-termination.
5    Q.   When you say you believe policy was
6 one, is there a written policy?
7    A.   A written policy, right.
8    Q.   That says one no call/no show
9 results in termination?
10    A.   Yes.
11    Q.   You've seen that policy?
12    A.   Yes.
13    Q.   Is that separate from the policy
14 that Ann Kendall has in her office, policies and
15 procedures she had?
16    A.   No.
17    Q.   It was part of that policy as well?
18    A.   Yes.
19    Q.   Did you ever see the physical
20 policy and procedures that Ann Kendall had in
21 her office?
22    A.   Yes.
23    Q.   Who created those policies and
24 procedures?

### Page 33

1    A.   SunBridge.
2    Q.   Who at SunBridge?
3    A.   Their corporate, they would
4 distribute.
5    Q.   Were they updated?
6    A.   Yes.
7    Q.   Have you ever read them thoroughly?
8    A.   Yes.
9    Q.   Sitting here today you have a
10 pretty good understanding of them?
11    A.   From what I can recall.
12    Q.   Back to Wendy Gauthier. How many
13 verbal warnings did she get, one you said?
14    A.   I believe it was two verbal
15 warnings.
16    Q.   Didn't you just tell me it was one
17 verbal warning for the first no call/no show?
18    A.   Right, followed with a second one.
19    Q.   What was that verbal warning for?
20    A.   The same offense.
21    Q.   For the second no call/no show?
22    A.   Yes.
23    Q.   She was terminated at some point?
24    A.   After the no call, the second no

**STEPHEN G. COPPER**
**February 8, 2007**

10 (Pages 34 to 37)

Page 34

1  call/no show.
2    Q.    You just said she got a verbal
3  warning after the second no call/no show, right?
4    A.    Right, and then we terminated. So
5  it would be one verbal, the no call/no show, we
6  terminated.
7    Q.    You just said she got two verbal
8  warnings, did she get two verbal warnings?
9    A.    I'm going to say yes, we did it
10  twice. And I thought it was she called out two
11  times and then we terminated as patient care was
12  being compromised.
13    Q.    Which patient care was being
14  compromised?
15    A.    On the shift that she was assigned
16  to work.
17    Q.    Do you know whether she had
18  coverage for the no call/no show incident,
19  whether she had arranged coverage for herself?
20    A.    No.
21    Q.    Was that a common thing to do?
22        MR. GRIGGS:  Form.
23    Q.    (By Mr. Shea)  To be able to
24  arrange coverage and move your schedule around?

Page 35

1    A.    Yes, I believe employees had that
2  right to do that with the approval of the
3  nursing supervisor.
4    Q.    Do you know whether Wendy Gauthier
5  had approval from the nursing supervisor to get
6  her shift covered for the times that she was
7  alleged to have committed a no call/no show?
8    A.    No, I wouldn't know that.
9    Q.    You don't know that?
10    A.    No.
11    Q.    Was that ever investigated by Ann
12  Kendall, do you know?
13    A.    I don't know.
14    Q.    Was it ever investigated with
15  anyone of that issue whether they had coverage?
16    A.    I don't recall ever hearing that.
17    Q.    Did Wendy Gauthier ever receive a
18  written warning prior to termination from
19  SunBridge?
20    A.    I believe she did.
21    Q.    When was that?
22    A.    I believe it was after the first.
23  I think it was after the second no call/no show
24  was the written warning.

Page 36

1    Q.    You just said there was the verbal
2  one?
3    A.    I cannot recall the event. I know
4  that there were two no call/no shows, that I
5  know. There were two no call/no shows. The
6  first one we let her slide.
7    Q.    Do you know whether, in fact, she
8  received a written warning or no?
9    A.    I believe she did. Yes, I believe
10  she did.
11    Q.    For what?
12    A.    For no call/no show.
13    Q.    For which one, you said there were
14  two?
15    A.    I would say the second one.
16    Q.    You think she got a written warning
17  for the second no call/no show?
18    A.    Yes.
19    Q.    Didn't you say she was terminated
20  for the second no call/no show?
21    A.    After the warning was issued, I
22  believe she was terminated after that second
23  warning was issued.
24    Q.    Did she come back to work after the

Page 37

1  second no call/no show?
2    A.    No.
3    Q.    She received a written warning for
4  that?
5    A.    Yes.
6    Q.    And then she was immediately
7  terminated?
8    A.    Yes.
9    Q.    Why did you terminate her, why did
10  you give her a written warning at that time if
11  you terminated her, if you were terminating her
12  anyway?
13    A.    We were terminating her because of
14  the two offenses.
15    Q.    My question is why would you give
16  her a written warning and a termination at the
17  same time?
18    A.    We wanted something in writing for
19  her. That was our policy to have a paper trail.
20    Q.    Well, a written warning is
21  different than a termination?
22    A.    Well, then there was a termination.
23    Q.    And not a written warning?
24        MR. GRIGGS:  Can we take a second

# STEPHEN G. COPPER
# February 8, 2007

11 (Pages 38 to 41)

Page 38

1   off the record, I just want to talk to my
2   client?
3       MR. SHEA:  Sure.  Off the record.
4
5       (A recess was taken)
6
7       MR. SHEA:  Back on the record.
8       Q.   (By Mr. Shea)  Do you know whether
9   Wendy Gauthier ever received any training about
10  the policies and procedures at SunBridge?
11      A.   Yes.
12      Q.   Who provided that training?
13      A.   The staff development coordinator.
14      Q.   Who was that?
15      A.   I do not know who the person was
16  that employed Wendy.
17      Q.   Do you know whether, in fact, the
18  staff development coordinator gave Wendy or
19  provided Wendy Gauthier training?
20      A.   Yes.
21      Q.   Did you witness that yourself?
22      A.   No.
23      Q.   How do you know that?
24      A.   It was procedure before they were

Page 39

1   allowed to.
2       Q.   What I'm asking you, do you have
3   personal knowledge that this happened or are you
4   assuming it happened because it was procedure?
5       A.   It was procedure.  It was not
6   personal knowledge, but she would not be allowed
7   to work the unit without being properly trained.
8       Q.   You don't know whether, in fact,
9   Wendy Gauthier was trained on the policies and
10  procedures that Ann Kendall had in her office,
11  correct?
12      A.   Yes.
13      Q.   You don't know whether, in fact,
14  she was?
15      A.   She was.
16      Q.   Tell me when she was trained?
17      A.   At the time of her hire.
18      Q.   Were you there at the time of her
19  hire?
20      A.   No.
21      Q.   How do you know whether she was
22  trained?
23      A.   Because our policy is that everyone
24  goes through the training process.  Paperwork is

Page 40

1   completed and that's how it is submitted, that's
2   how an employee is put on payroll without the
3   necessary paperwork.
4       Q.   I'm not asking you what the policy
5   is.  I'm asking you whether, in fact, the
6   paperwork was filed with respect to Wendy
7   Gauthier and whether you have specific personal
8   knowledge of that?
9       A.   No.
10      Q.   No, you do not?
11      A.   No.
12      Q.   Correct?
13      A.   Correct.
14      Q.   Do you know whether Wendy Gauthier
15  received any kind of handbook at SunBridge?
16      A.   No.
17      Q.   You do not know?
18      A.   Do not know.
19      Q.   You said that you knew Wendy
20  Gauthier was pregnant?
21      A.   Yes.
22      Q.   While he was an employee there?
23      A.   Yes.
24      Q.   What was Wendy Gauthier's position,

Page 41

1   she worked at Sandalwood, right?
2       A.   Yes.
3       Q.   The whole time she was there?
4       A.   Yes.
5       Q.   What was her position there?
6       A.   Nursing assistant.
7       Q.   When did she become pregnant in
8   relation to her termination of employment?
9       A.   I do not know.
10      Q.   Did you know she had complications
11  with her pregnancy?
12      A.   No, I did not know.
13      Q.   Ann Kendall never told you that?
14      A.   No.
15      Q.   Would she have brought that to your
16  attention?
17      A.   I would hope she would.
18      Q.   Why?
19      A.   Just for the well being of the
20  employee, it would be common.
21      Q.   Do you know whether Wendy Gauthier
22  was taking time off relating to the
23  complications with her pregnancy?
24      A.   I know that Wendy Gauthier took a

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

**STEPHEN G. COPPER**
**February 8, 2007**

12  (Pages 42 to 45)

Page 42

1 lot of time off. I do not know if it was
2 related to her pregnancy.
3     Q.    If it were relating to her
4 pregnancy and complications relating to her
5 pregnancy, should Ann Kendall have told you
6 that?
7         MR. GRIGGS: Form, facts not in
8 record.
9         THE WITNESS: She would have told
10 me.
11     Q.    (By Mr. Shea) She would have told
12 you that?
13     A.    Yes.
14     Q.    Why?
15     A.    I believe that's relevant to our
16 working relationship to know about an employee's
17 medical history and medical situation.
18     Q.    Would that have made a difference
19 in your decision as to whether or not to give
20 her more leeway in terms of taking time off?
21     A.    We would have reviewed it.
22     Q.    It's possible?
23     A.    It's possible, yes.
24     Q.    Do you know whether Wendy Gauthier

Page 43

1 was ever injured at work?
2     A.    No.
3     Q.    Do you know any of the reasons why
4 Wendy Gauthier took time off from work?
5     A.    No.
6     Q.    At SunBridge?
7     A.    No.
8     Q.    You don't know either way?
9     A.    No, I know she had an excessive
10 call out history.
11     Q.    Do you know how many times she was
12 out?
13     A.    No.
14     Q.    Do you know, I think you referenced
15 her trying to get back to work with notes of
16 some kind?
17     A.    Mm-hmm.
18     Q.    Yes?
19     A.    Yes.
20     Q.    What do you know about that?
21     A.    She was asked to provide Ann
22 Kendall with a note from her primary care
23 physician stating that she could work due to the
24 nature of her job responsibilities.

Page 44

1     Q.    Who requested that note and why?
2     A.    Ann Kendall.
3     Q.    Why did she request that note?
4     A.    To ensure that Wendy was capable of
5 doing her job.
6     Q.    Why?
7     A.    Because there was lifting.
8     Q.    There was lifting?
9     A.    Yes, she was responsible to lift
10 patients on her shift.
11     Q.    You mean this was in relation to
12 her pregnancy?
13     A.    Yes.
14     Q.    Does SunBridge require that of all
15 pregnant employees to get a note from a doctor
16 or was that with respect to Wendy Gauthier?
17     A.    I do not know that.
18     Q.    Is there some policy that was being
19 followed at SunBridge that Ann Kendall felt she
20 needed a note from Wendy Gauthier to clear her
21 from lifting patients?
22     A.    I do not know that either.
23     Q.    Do you know whether Wendy Gauthier
24 asked for any accommodations from Ann Kendall or

Page 45

1 anyone at Sandalwood, SunBridge relating to
2 complications to her pregnancy, concerning her
3 pregnancy?
4     A.    No.
5     Q.    Would you know that, should Ann
6 Kendall have shared that with you?
7     A.    Yes.
8 * Q.    If an employee, hypothetically, has
9 pregnancy complications that amount to a
10 physical impairment of some sort and they are
11 asking for an accommodation, would you have been
12 involved in that process during the time that
13 Wendy Gauthier was employed at Sandalwood?
14         MR. GRIGGS: Objection to the form.
15     Do you understand the question.
16         THE WITNESS: No.
17         MR. SHEA: Can you read that back?
18
19         * (Question read)
20
21         THE WITNESS: I don't know what
22 you are looking for, what kind of answer.
23         MR. SHEA: Maybe I can shorten it.
24     Q.    (By Mr. Shea) If an employee is

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI**

# STEPHEN G. COPPER
# February 8, 2007

13 (Pages 46 to 49)

## Page 46

1  pregnant and had complications relating to that
2  pregnancy that cause the employee a physical
3  impairment, like needing time off from work,
4  excessive morning sickness, maybe they need to
5  go to the bathroom a lot, maybe they need that
6  as an accommodation, maybe they need time off
7  from work for it. I'll give you morning
8  sickness as an example. If the employee is
9  asking for an accommodation for that, such as
10  time off from work or time to go to the bathroom
11  now and then that they normally wouldn't need,
12  would you be involved in that process or would
13  that be Ann Kendall that would be involved?
14     A.   Ann Kendall would be involved.
15     Q.   She wouldn't involve you in that
16  process?
17     A.   No.
18     Q.   Do you know whether Wendy Gauthier
19  ever asked for light duty at SunBridge or no?
20     A.   No.
21     Q.   If she asked for light duty or say
22  accommodation for her pregnancy, would that have
23  gone through just Ann Kendall or would you be
24  involved?

## Page 47

1     A.   It would have gone through Ann
2  Kendall.
3     Q.   You wouldn't be involved in that
4  process?
5     A.   No.
6     Q.   Meaning correct?
7     A.   Correct.
8     Q.   Do you know what happened, Wendy
9  Gauthier was asked to provide a note from her
10  doctor by Ann Kendall?
11     A.   No, I assume she provided it.
12     Q.   So was Wendy Gauthier okay to
13  return to work without restrictions?
14     MR. GRIGGS:  Form.
15     THE WITNESS:  That, I do not know
16  about that.
17     Q.   (By Mr. Shea) Did Wendy Gauthier
18  ever have restrictions, physical restrictions at
19  SunBridge? When I say SunBridge, understanding
20  I mean SunBridge, Sandalwood?
21     A.   Right.
22     Q.   Did she ever have any restrictions,
23  medical restrictions at Sandalwood or SunBridge?
24     A.   No.

## Page 48

1     Q.   Would you necessarily know that or
2  just Ann Kendall would know?
3     A.   Ann Kendall would.
4     Q.   You wouldn't know that?
5     A.   No.
6     Q.   Would that make a difference in the
7  decision to terminate her employment?
8     MR. GRIGGS:  I'll object to the
9  form. If you understand the question.
10     THE WITNESS:  You're saying that
11  if she had light duty, if we gave her light
12  duty, would that cause us to terminate her,
13  is that your question? By giving her light
14  duty, would that be the reason?
15     Q.   (By Mr. Shea) Let me restate the
16  question, it's a little vague.
17     If she had complications related to
18  her pregnancy where she needed time off from
19  work, would that have made a difference in yours
20  and Ann Kendall's decision to terminate Wendy
21  Gauthier's employment?
22     MR. GRIGGS:  Form.
23     Q.   (By Mr. Shea) Would that be an
24  important fact to know?

## Page 49

1     A.   No.
2     Q.   Why not?
3     A.   We'd review her situation in light
4  of her absenteeism.
5     Q.   As part of reviewing her
6  situation, wouldn't you want to know if she had
7  complications related to her pregnancy that
8  caused her the need to take time off?
9     MR. GRIGGS:  Objection.
10     THE WITNESS:  No, not necessarily.
11     Q.   (By Mr. Shea) How would you review
12  her complications in her pregnancy and need to
13  take time off for them?
14     A.   We would look at the overall
15  picture, the period of time when she was not
16  pregnant and had excessive absenteeism.
17     Q.   I'm sorry, can you explain that?
18     A.   There was a history of absenteeism
19  with Wendy prior to being pregnant. Pregnancy
20  gave her an opportunity or a tangible reason to
21  call in and not report to work.
22     Q.   Prior to her being pregnant, was
23  she ever warned for absenteeism?
24     A.   I wasn't there, I do not know that.

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**STEPHEN G. COPPER**
**February 8, 2007**

14  (Pages 50 to 53)

|  | Page 50 |
|---|---|
| 1 | Q.    Were you there prior to her being |
| 2 | pregnant? |
| 3 | A.    I do not know when she became |
| 4 | pregnant. |
| 5 | Q.    You don't know if there was any |
| 6 | absenteeism issues with Wendy Gauthier prior to |
| 7 | her being pregnant? |
| 8 | A.    Yes, I know that there was |
| 9 | absenteeism issues whether she was pregnant or |
| 10 | not pregnant, it was a lot of absenteeism for |
| 11 | the nature of the work she did. |
| 12 | Q.    Do you know whether there was |
| 13 | absentee issue with respect to Wendy Gauthier |
| 14 | prior to her being pregnant, do you know that? |
| 15 | A.    No. |
| 16 | Q.    Did you know that when you decided |
| 17 | to terminate her with Ann Kendall? |
| 18 | A.    The pregnancy complication issues? |
| 19 | Q.    No. Did you know whether she had |
| 20 | any absenteeism issues prior to her being |
| 21 | pregnant at the time you and Ann Kendall |
| 22 | terminated Wendy Gauthier? |
| 23 | A.    Yes, she was terminated for |
| 24 | absenteeism. |

|  | Page 51 |
|---|---|
| 1 | Q.    My question is, did you know at |
| 2 | that time whether there were any absenteeism |
| 3 | issues with Wendy Gauthier prior to her being |
| 4 | pregnant? |
| 5 | A.    Yes. |
| 6 | Q.    You did know that? |
| 7 | A.    What was your question? |
| 8 | Q.    I'm focusing on whether at the time |
| 9 | your decision to terminate Wendy Gauthier, you |
| 10 | or Ann Kendall knew that whether Wendy Gauthier |
| 11 | had absentee issues prior to becoming pregnant? |
| 12 | MR. GRIGGS: Answer what you know. |
| 13 | THE WITNESS: I'm assuming that |
| 14 | there were several documented absentees for |
| 15 | Wendy. |
| 16 | Q.    (By Mr. Shea) Do you know whether |
| 17 | there were prior to her pregnancy? |
| 18 | A.    No, I don't know when she became |
| 19 | pregnant. |
| 20 | Q.    Did you know at the time of her |
| 21 | termination -- |
| 22 | A.    If she had excessive absentees? |
| 23 | Q.    No. Do you know whether she had |
| 24 | absenteeism issues prior to becoming pregnant at |

|  | Page 52 |
|---|---|
| 1 | the time of the decision to terminate her |
| 2 | employment? |
| 3 | A.    No. |
| 4 | Q.    You did not know? |
| 5 | A.    No. |
| 6 | Q.    Can you tell me how often she was |
| 7 | absent prior to her termination? |
| 8 | A.    I don't recall the number, the |
| 9 | exact number. |
| 10 | Q.    Did you review any document -- |
| 11 | strike that. |
| 12 | How many meetings did you have with |
| 13 | Ann Kendall about Wendy Gauthier? |
| 14 | A.    I do not recall the number of |
| 15 | meetings. There were more than one. |
| 16 | Q.    Was there more than two? |
| 17 | A.    Yes. |
| 18 | Q.    Was there for more than three? |
| 19 | A.    Most likely, yes. |
| 20 | Q.    I don't want you to guess. |
| 21 | A.    There would be more than three.w We |
| 22 | tried to be as fair as possible. |
| 23 | Q.    How many meetings did you have with |
| 24 | Ann Kendall? |

|  | Page 53 |
|---|---|
| 1 | A.    A minimum of four meetings. |
| 2 | Q.    Do you recall those meetings or no? |
| 3 | A.    No. |
| 4 | Q.    Do you recall who was present in |
| 5 | those meetings? |
| 6 | A.    Ann Kendall. |
| 7 | Q.    Just Ann Kendall and yourself? |
| 8 | A.    Yes. |
| 9 | Q.    Do you remember where they were |
| 10 | held? |
| 11 | A.    In the facility. |
| 12 | Q.    Where in the facility? |
| 13 | A.    In an office. |
| 14 | Q.    Which office? |
| 15 | A.    One of the offices, Ann's or mine. |
| 16 | Q.    You don't know? |
| 17 | A.    Ann's office or my office would be |
| 18 | where meetings were held because of the limited |
| 19 | space in the building and the privacy that was |
| 20 | afforded to us. So it would be in my office or |
| 21 | Ann's office. |
| 22 | Q.    Do you remember meetings held |
| 23 | specifically? |
| 24 | A.    Yes. |

**STEPHEN G. COPPER**
**February 8, 2007**

15 (Pages 54 to 57)

Page 54

1    Q.    In either your office or any other
2    location at the facility?
3    A.    Yes.
4    Q.    But you don't remember the content
5    of any of the meetings, is that fair to say?
6    A.    Wendy's absenteeism was the
7    content.
8    Q.    You don't remember what was said in
9    the meetings?
10    A.    How I would handle it.
11    Q.    Do you remember what was said or
12    no?
13    A.    No.
14    Q.    Whether there were any documents
15    reviewed?
16    A.    No.
17    Q.    Do you remember -- strike that.
18          Was it just you and Ann Kendall
19    that made the decision to terminate Wendy
20    Gauthier?
21    A.    Yes.
22    Q.    You believe that there's a written
23    no call/no show policy that says that one
24    incident of a no call/no show results in a

Page 55

1    termination, is that what you said?
2    A.    There is a policy that states that.
3    Q.    Was there an unwritten policy to
4    sometimes provide leniency in that regard?
5    A.    Yes, it was the discretion of the
6    department head, depending on the circumstances
7    of the employee.
8    Q.    And Ann Kendall was Wendy
9    Gauthier's department head?
10    A.    Yes.
11    Q.    What factors into that discretion,
12    in what circumstances could you have more than
13    one no call/no show?
14    A.    As performance, again, extenuating
15    circumstances with family members.
16    Q.    What about complications of
17    pregnancy, that could factor into that?
18    A.    Yes.
19    Q.    And allow for more absences, more
20    than one no call/no show?
21    A.    Yes.
22    Q.    I'm sorry if you answered this, but
23    did you tell me everything you know about Wendy
24    Gauthier coming back to work with a medical

Page 56

1    note?
2    A.    Yes.
3    Q.    Was she cleared to come back to
4    work?
5    A.    Yes.
6    Q.    She was allowed to come back to
7    work with a medical note?
8    A.    Yes.
9    Q.    That was prior to her termination
10    of employment, correct?
11    A.    Yes.
12    Q.    Do you know how many times she had
13    to bring in a medical note?
14    A.    No.
15    Q.    Do you remember a Lisa Franks?
16    A.    Yes, I remember her being an
17    employee.
18    Q.    Do you remember anything about the
19    circumstances of the no call/no show, the two no
20    call/no shows that you referred to earlier with
21    respect to Wendy Gauthier?
22    A.    No.
23    Q.    Was there an attendance policy in
24    place at the time of Wendy Gauthier's employment

Page 57

1    at SunBridge?
2    A.    An attendance policy?
3    Q.    Yes.
4    A.    Yes.
5    Q.    What was the attendance policy?
6    A.    That employees were required to
7    report to work on their designated shift. I
8    believe with the approval with the department
9    head, they could get coverage and swap shifts.
10    Q.    That didn't have to be in writing,
11    right?
12    A.    It was preferred in writing, but
13    again, it could have been a verbal agreement
14    that one would make with an employee with their
15    supervisors.
16          MR. GRIGGS: I would object to the
17    form.
18    Q.    (By Mr. Shea) As part of the two
19    no call/no shows that you referenced with
20    respect to Wendy Gauthier, do you know whether
21    she had coverage?
22    A.    No.
23    Q.    You don't know either way?
24    A.    No.

**STEPHEN G. COPPER**
**February 8, 2007**

16 (Pages 58 to 61)

---

Page 58

1    Q.   Meaning, correct you don't know?
2    A.   Correct.
3    Q.   I have some employee files of
4  other employees at SunBridge that I'm going to
5  have you take a look at and ask you a few
6  questions about and just ask you what you know
7  about some of the action that was taken in these
8  files.
9         I'm going to refer to them as
10 Employee No. 2 or No. 1 or whatever. We've
11 labeled these files, we've redacted the names to
12 some degree. And so each of these subfiles are
13 listed by employee number, okay. And I want you
14 to take a look at them, Employee No. 2 --
15        MR. GRIGGS: Can we go off the
16 record for a second?
17        MR. SHEA: Sure.
18
19        (Off record discussion)
20
21        MR. SHEA: Back on the record.
22    Q.   (By Mr. Shea) Do you know whether
23 Wendy Gauthier was a good employee at SunBridge?
24    A.   No.

---

Page 59

1    Q.   You don't know?
2    A.   I would assume, yes, good employee.
3    Q.   You don't know whether she was
4  given any kind of opportunity to perform light
5  duty?
6    A.   No.
7    Q.   Do you know whether light duty was
8  available for someone in her position?
9    A.   No.
10   Q.   You don't know?
11   A.   I do know. Not for a CNA due to
12 the nature of the work lifting.
13   Q.   Do you know whether they put any
14 CNAs on light duty?
15   A.   No.
16   Q.   You don't know? You know they
17 didn't or you don't know either way?
18   A.   Yes, we would put CNAs on light
19 duty if we could accommodate them.
20   Q.   Where would they go on light duty?
21   A.   On the day shift if there was a
22 position available.
23   Q.   What would they do on the day shift
24 that needed light duty?

---

Page 60

1    A.   Various tasks as far as filing,
2  more office type of work.
3    Q.   Answering phones?
4    A.   Answering phones. Patient escorts.
5    Q.   How many shifts were there?
6    A.   Three shifts.
7    Q.   Did that necessarily have to happen
8  on the first shift, the light duty or could it
9  happen on the other shift?
10   A.   It was mostly 7:00 to 3:00, the
11 first shift.
12   Q.   Wouldn't there be light duty on the
13 second and third shift as well?
14   A.   No, because the reduction of work
15 force numbers and hours available did not allow
16 us to have light duty.
17   Q.   Was Wendy Gauthier a CNA?
18   A.   Yes.
19   Q.   Certified nursing assistant?
20   A.   Assistant.
21   Q.   Do you know whether she was ever
22 offered light duty of any kind?
23   A.   No.
24   Q.   Do you know whether she ever

---

Page 61

1  requested light duty of any kind?
2    A.   No.
3    Q.   If she did, would you know that
4  through Ann Kendall?
5        MR. GRIGGS: Form.
6        THE WITNESS: No.
7    Q.   (By Mr. Shea) Because you are not
8  involved in those requests?
9    A.   No, not with light duty.
10   Q.   Meaning correct you are not?
11   A.   Correct.
12   Q.   Would the need for light duty
13 factor into a decision to terminate an employee,
14 meaning could there be extenuating circumstances
15 where you wouldn't terminate an employee after
16 a no call/no show because they needed light duty
17 for medical reasons?
18        MR. GRIGGS: Form.
19        THE WITNESS: No.
20   Q.   (By Mr. Shea) No, there would not?
21   A.   No.
22   Q.   Why not?
23   A.   No call/no show was violation of
24 the policy.

---

**STEPHEN G. COPPER**
**February 8, 2007**

17 (Pages 62 to 65)

Page 62

1    Q.    Have you told me everything you
2 know about the attendance policy that applied to
3 Wendy Gauthier?
4    A.    Yes.
5    Q.    What's your understanding of that
6 policy in as much detail as you can give me?
7    A.    The attendance policy for
8 SunBridge?
9    Q.    That applied to Wendy Gauthier,
10 yes.
11    A.    It was the basic attendance policy
12 for all. Employees were assigned specific
13 shifts that they were required to report to,
14 they were required to call in, I believe it was
15 two hours prior to the shift if there was a call
16 out. They could get a replacement with the
17 approval of the supervisor and/or the department
18 head. And they would follow break times, if
19 they leave the facility, they would punch out.
20    Q.    Was there anything in the policy
21 that you recall that relates to discipline for
22 either tardiness or absenteeism?
23    A.    No.
24    Q.    You don't recall anything in the

Page 63

1 attendance policy that related to a warning
2 after a certain number of absenteeisms or
3 tardiness issues?
4    A.    I do not believe that SunBridge
5 listed the specific number. It was a discretion
6 of the department head.
7    Q.    As to what discipline would take
8 place after any given number of absences or
9 tardiness, correct?
10    A.    Yes.
11    Q.    Can you look at Employee No. 2?
12        MR. SHEA: We don't need to mark
13 these, maybe we should.
14        MR. GRIGGS: I don't know how we
15 are going to know after this who was
16 Employee No. 1 or without the files being
17 marked.
18        MR. SHEA: I'll give you the
19 question so you are not just randomly going
20 through the file. Before we do that, can
21 we just mark that?
22
23        (Exhibit 2, Employee #2 File,
24         marked)

Page 64

1
2    Q.    (By Mr. Shea) So let me ask you
3 what Employee No. 2 was verbally warned for or
4 warned for?
5    A.    Is there a written warning in here?
6 From that record of attendance, it looks like
7 tardiness.
8    Q.    You are familiar with the basic set
9 up of those personnel files, I assume?
10    A.    No.
11    Q.    You are not?
12    A.    No.
13    Q.    Did you ever review personnel
14 files?
15    A.    No.
16    Q.    Did anyone review Ms. Gauthier's
17 personnel file prior to her termination?
18    A.    No.
19    Q.    You don't know either way or they
20 did not?
21    A.    Correct.
22    Q.    Which one?
23    A.    That I do not know if they reviewed
24 her file prior to termination.

Page 65

1    Q.    The only two people involved in her
2 termination were you and Ann Kendall, right?
3    A.    Yes.
4    Q.    Do you know whether Ann Kendall
5 looked at Wendy Gauthier's personnel file prior
6 to her termination?
7    A.    No.
8    Q.    Do you know where Wendy Gauthier's
9 personnel file was located at the time of her
10 termination, the physical file?
11    A.    I believe it would be the files
12 were split, there were medical records and
13 medical information that needed to be locked.
14 And there was the financial and corporate
15 paperwork. Generally, the medical was left with
16 immunization records, past physical records and
17 the SDC office.
18    Q.    Who was the SDC?
19    A.    Staff development coordinator.
20    Q.    Who was that at the time of Wendy
21 Gauthier's tenure there?
22    A.    I do not, I am not sure. I can't
23 recall a name.
24    Q.    If it comes to mind, can you tell

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**STEPHEN G. COPPER**
**February 8, 2007**

18 (Pages 66 to 69)

1  me?
2      A.    Mm-hmm.
3      Q.    Was it the same person who was the
4  staff coordinator at the time of her
5  termination? In other words, was it the same
6  person the whole time she was there, Wendy
7  Gauthier, was employed at SunBridge?
8      A.    The staff development coordinator
9  was hired at my time, during my time as
10  administrator. I do not recall the exact time
11  frame that she was hired and whether Ms.
12  Gauthier was there.
13      Q.    Do you see anything referencing a
14  warning in that file, Employee No. 2 that we've
15  marked as Exhibit 2? Actually the tabs on there
16  may help you.
17      A.    I see this record of counseling
18  performance and improvement plan.
19      Q.    Do you see any warnings in the
20  file?
21      A.    Yes, performance improvement plan.
22      Q.    That is a warning?
23      A.    You've been late 37 times in two
24  and a half months, your attitude toward your job

1  may lead up to corrective action up to and
2  including termination of employment. I would
3  say that's a warning.
4      Q.    Was there a warning form that was
5  used at SunBridge, do you know, for a written
6  warning?
7      A.    It would be this one here.
8      Q.    What's the date of that performance
9  improvement plan?
10      A.    7/9/03.
11      Q.    Anything that was a written warning
12  was called performance improvement plan?
13      A.    That would be one of the
14  instruments. Record of counseling would be
15  another. I can't say not having written them or
16  used them, can I say it was Sandalwood or
17  SunBridge written warning.
18      Q.    You were involved in approving
19  written warnings, right?
20      A.    I was involved in being informed of
21  the written warnings being issued. I didn't see
22  the actual documents.
23      Q.    You didn't sign off on anything?
24      A.    No, not that I recall.

1      Q.    Can you go to the second page you
2  just referenced to and tell me what the date is
3  on that?
4      A.    3/1/04.
5      Q.    What's that document titled?
6      A.    Record of counseling.
7      Q.    So you think that's a warning or do
8  you know?
9      A.    I would say yes, failure to
10  correct.
11          MR. SHEA: Your counsel was
12  pointing to the employee document, I would
13  just ask that you not do that.
14          MR. GRIGGS: The document speaks
15  for itself.
16          THE WITNESS: It's right there.
17          MR. SHEA: We'll just let him look
18  at the document by himself.
19      Q.    (By Mr. Shea) How many warnings
20  did Employee No. 2 get, do you know and for
21  what?
22      A.    It looks like two.
23      Q.    Two warnings?
24      A.    Mm-hmm.

1      Q.    Yes?
2      A.    Yes.
3      Q.    Are they written warnings?
4      A.    Two written warnings.
5      Q.    Does Employee No. 2 get other
6  warnings?
7      A.    Are you asking me if there are
8  other written warnings in this file?
9      Q.    Any other warnings, verbal or
10  written?
11      A.    Verbal I would not know. It was
12  before my time there. I don't see any other.
13      Q.    Again, you were familiar with the
14  attendance policy at SunBridge the time Wendy
15  Gauthier was employed there, right?
16      A.    Yes.
17      Q.    You had a pretty good understanding
18  of it, correct?
19      A.    Yes.
20      Q.    You do sitting here today, correct?
21      A.    Somewhat, yes.
22      Q.    When you say somewhat, are you
23  fuzzy on the attendance policy, are you vague on
24  it?

**STEPHEN G. COPPER**
**February 8, 2007**

19 (Pages 70 to 73)

| Page 70 |
|---|
| 1    A.    Yes. |
| 2    Q.    You are? |
| 3    A.    I'm familiar with it, but I've been |
| 4   out of the facility for almost two years, so to |
| 5   recall the specific details of that policy. |
| 6    Q.    But you are sure that there was no |
| 7   number of times you could be tardy within a |
| 8   certain time frame before you get a warning? |
| 9    A.    No. |
| 10    Q.    Right, that wasn't part of the |
| 11   policy, right? |
| 12    A.    Correct. |
| 13    Q.    I'm not sure you answered this |
| 14   question, is there any other warnings in the |
| 15   file? |
| 16    A.    No. |
| 17    Q.    Is there anything in Exhibit 2 with |
| 18   respect to Employee No. 2 that indicates that |
| 19   Employee No. 2 was verbally warned? |
| 20    A.    No, I see no verbal warnings. |
| 21    Q.    Was Employee No. 2 changed to full |
| 22   time on June 25th, '03, is there anything in the |
| 23   file that indicates that? |
| 24    A.    Would that be marked? |

| Page 71 |
|---|
| 1    Q.    It may be, you may want to go to |
| 2   the labeled document. I'm looking for |
| 3   information that would indicate to you that the |
| 4   employee was made full time and/or given a raise |
| 5   after being tardy 37 times? |
| 6    A.    I don't see that. I don't see |
| 7   that. What you are looking for? |
| 8    Q.    In your review of Exhibit 2, is |
| 9   there anything in there that you saw that |
| 10   indicated that Employee No. 2 went out on |
| 11   disability for any reason? |
| 12    A.    Just this form that I see, employee |
| 13   is on disability. |
| 14    Q.    Can you just tell me which form you |
| 15   are looking at? |
| 16    A.    It looks like a performance form. |
| 17   Employee is out on disability. |
| 18    Q.    Is there anything in the file that |
| 19   indicates why the employee was out on |
| 20   disability? |
| 21    MR. SHEA: While he's looking at |
| 22   that and I'm going to try to shorten this |
| 23   up a little bit, but I know that I talked |
| 24   to Mike Williams about possibly using their |

| Page 72 |
|---|
| 1   names if there were employee files that had |
| 2   some information in them that we wanted to |
| 3   ask questions about. If I mentioned the |
| 4   names to him, which I know, to see if he |
| 5   knows the particular employee or the |
| 6   performance or the reason the employee was |
| 7   out on disability, would that be a problem? |
| 8    MR. GRIGGS: Well, as far as we are |
| 9   going on the record, I'd rather not have |
| 10   their names in the record. |
| 11    MR. SHEA: I'm trying to jog his |
| 12   memory on whether outside of looking at the |
| 13   personnel file whether he has an |
| 14   independent recollection of either the |
| 15   performance or the reason the employee was |
| 16   out on disability because the file itself |
| 17   is not helping him. |
| 18    MR. GRIGGS: I have an idea. |
| 19   Perhaps we can just go off the record for a |
| 20   second? |
| 21    MR. SHEA: Sure. |
| 22 |
| 23    (Off record discussion) |
| 24 |

| Page 73 |
|---|
| 1    MR. SHEA: Back on the record. |
| 2    Q.    (By Mr. Shea) When you were |
| 3   working at Sandalwood, did you just work at that |
| 4   facility? |
| 5    A.    Yes. |
| 6    Q.    Your basic hours were what? |
| 7    A.    8:00 to 5:00. |
| 8    Q.    You had an office there? |
| 9    A.    Yes. |
| 10    Q.    And Ann Kendall has an office |
| 11   there? |
| 12    A.    Yes. |
| 13    Q.    Was Ann Kendall's office an |
| 14   enclosed office with a door on it? |
| 15    A.    Yes. |
| 16    Q.    And your's was too? |
| 17    A.    Yes. |
| 18    Q.    Were they near each other? |
| 19    A.    Yes. |
| 20    Q.    Were they right next to each other? |
| 21    A.    A foyer separated us. |
| 22    Q.    Did Employee No. 2 have a no |
| 23   call/no show? |
| 24    A.    I do not know. |

**STEPHEN G. COPPER**
**February 8, 2007**

20 (Pages 74 to 77)

---

Page 74

1   Q.   You can't tell from looking at the
2 file?
3        The only thing I would ask is try
4 to keep the papers in the same order, record of
5 attendance. I didn't mean to lose your space.
6        My question that was pending was
7 did Employee No. 2 have a no call/no show
8 according to the file?
9   A.   There's an absent report no
10 call/no show.
11   Q.   What date is that?
12   A.   6/14/04.
13   Q.   Was Employee No. 2 terminated at
14 any point from SunBridge involuntary?
15   A.   I don't recall if she was
16 terminated.
17   Q.   Was there more than one no call/no
18 show with respect to this employee or is that
19 it?
20   A.   I see two.
21   Q.   When was the second no call/no
22 show?
23   A.   6/22, it looks like eight days
24 later and it states no call/no show, states she

---

Page 75

1 resigned.
2   Q.   Because that's considered a
3 voluntary resignation?
4   A.   Yes.
5   Q.   Why was Wendy Gauthier terminated
6 for the second no call/no show?
7   A.   Because of her attendance.
8   Q.   Was she terminated for a no call/no
9 show?
10   A.   I believe, yes.
11   Q.   Do you remember the date she was
12 terminated?
13   A.   No.
14   Q.   Do you know who, if anyone, had
15 been informed that Employee No. 2 would be
16 absent from her shift?
17   A.   Excuse me?
18   Q.   Do you know who, if anyone, had
19 been informed that Employee No. 2 would be
20 absent from her shift when she had the no
21 call/no show?
22   A.   No.
23   Q.   You did not alert Employee No. 2's
24 supervisor that this employee would not be in

---

Page 76

1 for her scheduled shift, correct?
2   A.   Correct.
3   Q.   Why was Employee No. 2 allowed two
4 no call/no shows after she had been cleared to
5 return to work with no restrictions, do you
6 know?
7   A.   No.
8   Q.   You don't know?
9   A.   I do not know.
10   Q.   Does it seem to you from the file
11 that the two no call/no shows in Employee No. 2
12 should have resulted in termination?
13   A.   Yes.
14   Q.   You don't know why Employee No. 2
15 was not terminated immediately after two no
16 call/no shows?
17        MR. GRIGGS: Objection. The
18 document spoke for itself.
19   Q.   (By Mr. Shea) You don't know why?
20   A.   No.
21   Q.   When was Employee No. 2 terminated?
22   A.   Is that in the file?
23   Q.   I think it is.
24        I believe you'll find a

---

Page 77

1 termination date of October 13, '04.
2   A.   If she were per diem status, which
3 means used as needed, she would be on the books
4 until significant time had lapsed and then she
5 would be removed, so that's why it would show
6 the window being.
7   Q.   Looking at Employee No. 2's file,
8 do you know on what date she was terminated?
9   A.   I don't find what date she was
10 terminated.
11   Q.   So if I told you she was terminated
12 on October 13, '04, you wouldn't know what the
13 reason was why she was terminated on 10/13/04?
14   A.   For Employee 2, no.
15   Q.   And not sooner after the second no
16 call/no show, correct?
17   A.   Correct.
18        MR. SHEA: Can you mark that,
19 please?
20
21        (Exhibit 3, Employee #5 File,
22        marked)
23
24   Q.   (By Mr. Shea) Are you still

---

**STEPHEN G. COPPER**
**February 8, 2007**

Page 78

1  looking at Exhibit 2?
2      A.    This is the employee, it looks like
3  it's a letter of resignation and then it was
4  terminated off the books.  She was terminated
5  off of payroll at your October date.  That's
6  what it appears.
7      Q.    Do you know the reason for the
8  termination or no?
9      A.    No.  If we are talking about the
10 same person, what I seem to see is a letter of
11 resignation that she cannot perform her duties,
12 however, she remained on our payroll and
13 appearing as an active employee.
14     Q.    Do you know whether, in fact --
15     A.    Was removed from the per diem
16 status in October.
17     Q.    Do you know whether Employee No. 2
18 was a per diem employee or not?
19     A.    I think, well, reading this,
20 therefore keep in mind status from 32 to that of
21 per diem as effective 6/21/04.
22     Q.    That's the handwritten note from
23 the employee to you?
24     A.    Yes.

Page 79

1      Q.    Do you know whether the employee
2  was per diem or no?
3      A.    It would be full time, reading this
4  she would be full time.
5      Q.    Is there any reason she'd still be
6  on the books in October if she wasn't working?
7      A.    Yes.
8      Q.    What is that?
9      A.    That the necessary paperwork to
10 remove her from the payroll was never submitted.
11     Q.    How long does that usually take?
12     A.    Generally, it ideally should be
13 done probably by the end of the work week.
14     Q.    Do you know whether Employee No. 2
15 ever worked between 6/22/04 and 10/13/04?
16     A.    I do not know that.
17     Q.    For all you know, she could have,
18 correct?
19           MR. GRIGGS:  Form.
20           THE WITNESS:  I don't know.
21     Q.    (By Mr. Shea)  Either way, right?
22     A.    She did not work.
23     Q.    Do you know whether she worked at
24 SunBridge between 6/22/04 and 10/13/04 or no?

Page 80

1      A.    No, because of her letter of
2  resignation dated June '04.
3      Q.    I'm asking you if you know whether
4  she worked, notwithstanding a note you saw in
5  the file?
6      A.    No, I do not know.
7      Q.    Can you look at Employee No. 5
8  which is marked as Exhibit 3?  And focusing
9  right in on that file, I'll suggest to you on
10 April 19, 2004 there was a no call/no show with
11 this employee.
12           MR. SHEA:  Do you want to go off
13 the record for a second to see if he knows
14 this person?
15           MR. GRIGGS:  Sure.
16
17           (Off record discussion)
18
19           MR. SHEA:  Back on the record.
20     Q.    (By Mr. Shea)  Focusing on April
21 19, '04, can you tell me whether Employee No. 5
22 had a no call/no show?
23           I'm just focusing on one thing.
24 When the file indicates that the employee had a

Page 81

1  no call/no show on 4/19/04, does that look
2  accurate?
3      A.    I see NCe  slash NC 4/19.
4      Q.    NC l slash?
5      A.    NC,d  that must be no call/no show.
6      Q.    Do you know the reason for that no
7  call/no show?
8      A.    No.
9      Q.    Do you recollect that no call/no
10 show?
11     A.    This was before I was employed
12 there.
13     Q.    Were the no call/no shows with
14 respect to Employee No. 2 that we talked
15 about --
16     A.    I take that back, let me see.  I
17 don't recall the employee though.
18           I said this was before I was
19 employed, but I was employed there.
20     Q.    Okay.  Do you recall --
21     A.    I don't recall that employee or
22 that no call/no show, no.
23     Q.    What about with respect to Employee
24 No. 2, do you recall those no call/no shows?

**STEPHEN G. COPPER**
**February 8, 2007**

22 (Pages 82 to 85)

| Page 82 | Page 84 |
|---|---|

**Page 82**

1    A.    No.
2    Q.    Looking at Employee No. 5, can you
3  tell me why that employee was not terminated as
4  a result of a no call/no show on 4/19/04?
5    A.    No.
6    Q.    You can't tell me why?
7    A.    Why the employee was not
8  terminated?
9    Q.    Yes.
10   A.    No.
11   Q.    Do you know whether Employee No. 5
12 was put on a schedule to work after not showing
13 up for your scheduled shift?
14   A.    I don't know that.
15   Q.    You can't tell that by looking at
16 the file you have in front of you marked as
17 Exhibit 3, correct?
18   A.    Your question was that she was on
19 the schedule after a no call/no show?
20   Q.    Yes. And along with that, why it
21 was not documented in her file that she didn't
22 show up for her shift between 4/19/04 and
23 5/10/04.
24        MR. GRIGGS: Objection to the form

**Page 83**

1  of the question. I'm not sure it's clear.
2        THE WITNESS: I don't see that.
3        MR. SHEA: Let's mark that?
4
5        (Exhibit 4, Employee #6 File,
6        marked)
7
8    Q.    (By Mr. Shea) I'm going to show
9  you what's been marked as Exhibit 4, Employee
10 No. 6 file, can you take a look at that. And my
11 question is how many times did Employee No. 6
12 call out of work between her date of hire on
13 July 15, '05 and September 4, '05, if you can
14 tell that from the record?
15        MR. SHEA: Off the record.
16
17        (Off record discussion)
18
19        MR. SHEA: Back on the record.
20   Q.    (By Mr. Shea) My question was why
21 it was not documented -- I'm sorry, how many
22 times Employee No. 6 called out of work between
23 her date of hire of July 15, '05 and 9/4/05? My
24 count is five, by the way. Does that look

**Page 84**

1  accurate?
2    A.    Yes.
3    Q.    How many of those instances was
4  there a no call/no show?
5    A.    I think there was two.
6    Q.    What, if any, written warnings did
7  Employee No. 6 receive?
8    A.    I see one.
9    Q.    What date is that?
10   A.    9/6.
11   Q.    What is that document titled?
12   A.    Record of counseling.
13   Q.    Is the record of counseling a
14 written warning?
15   A.    Yes.
16   Q.    Then was there more than one
17 written warning? The employee was then given
18 another warning; is that correct?
19   A.    I only see the one.
20   Q.    Do you see anything in the file
21 that indicates previous written warnings had not
22 been delivered and then there was a final
23 written warning?
24        You only see one written warning?

**Page 85**

1    A.    Mm-hmm.
2    Q.    Yes?
3    A.    Yes.
4    Q.    Do you know why this Employee No. 6
5  was terminated?
6    A.    No.
7    Q.    Do you know why Employee No. 6 was
8  not terminated immediately after the second no
9  call/no show?
10   A.    This employee?
11   Q.    Please, No. 6, yes.
12   A.    No.
13   Q.    You don't know why?
14   A.    No.
15   Q.    Should that employee should have
16 been terminated after the first no call/no show?
17        MR. GRIGGS: Form.
18        THE WITNESS: I wasn't there.
19   Q.    (By Mr. Shea) I'm speaking in
20 general.
21   A.    No, I don't know if Sun changed
22 their policies at that point in time, so I can't
23 answer that question.
24   Q.    When you were at Sandalwood, should

**STEPHEN G. COPPER**
**February 8, 2007**

23  (Pages 86 to 89)

| Page 86 | Page 88 |
|---|---|
| 1 an employee be terminated after the first or | 1 Steve. |
| 2 second no call/no show? | 2     Q.     What was the termination date? |
| 3     A.     The employee should have been | 3     A.     6/16/04. |
| 4 terminated after the first no call/no show. | 4     Q.     Do you know what the reason for the |
| 5     Q.     Didn't you say earlier in your | 5 termination was or no? |
| 6 deposition testimony that the employees could | 6     A.     The no call/no show. |
| 7 have more than one? | 7     Q.     Who terminated that employee? |
| 8     A.     Yes, but I believe that the policy | 8     A.     It appears I did. |
| 9 with Sun was no call/no show unless it's | 9     Q.     Did anyone else, was anyone |
| 10 self-termination. | 10 involved in that termination? |
| 11     Q.     Are you sure that was the policy or | 11     A.     I do not think so. |
| 12 do you know? | 12     Q.     Do you recall the circumstances of |
| 13     A.     Again, I'm not, I'm not 100 percent | 13 that no call/no show? |
| 14 certain that was the policy. It's applied on an | 14     A.     No. |
| 15 individual basis. | 15     Q.     Do you know why you terminated that |
| 16     Q.     With discretion? | 16 Employee No. 7 and didn't give that employee |
| 17     A.     With discretion. | 17 another chance? |
| 18     Q.     As to whether a second no call/no | 18     A.     No. |
| 19 show could be accepted? | 19     Q.     Could that employee have been |
| 20     A.     Yes. | 20 eligible for another chance depending on the |
| 21         MR. GRIGGS: Form of the question. | 21 circumstances? |
| 22         MR. SHEA: Can we mark that, | 22     A.     No. |
| 23 please? | 23     Q.     No? |
| 24 | 24     A.     Termination only came after a |

| Page 87 | Page 89 |
|---|---|
| 1         (Exhibit 5, Employee #7 File, | 1 serious reflection in reviewing the records. |
| 2         marked) | 2     Q.     Do you remember what you were |
| 3 | 3 reflected on with respect to Employee No. 7? |
| 4     Q.     (By Mr. Shea) Focusing on | 4     A.     No. |
| 5 Employee No. 7 which we've marked as Exhibit 5. | 5     Q.     All I'm asking you whether there |
| 6 That file was marked as Exhibit 5, do you see | 6 would be circumstances, not necessarily with |
| 7 any no call/no shows in that file? | 7 this employee, but circumstances that could have |
| 8         Do you see any no call/no shows in | 8 allowed you to keep Employee No. 7 or any other |
| 9 that file? | 9 employee who had a first no call/no show? |
| 10     A.     No call/no show 6/16/04. | 10         MR. GRIGGS: Form. |
| 11     Q.     Do you know how many no call/no | 11         THE WITNESS: No. |
| 12 shows Employee No. 7 had? | 12     Q.     (By Mr. Shea) Not with Employee |
| 13     A.     No. | 13 No. 7? |
| 14     Q.     Can you tell from the file? | 14     A.     I don't recall anything with this |
| 15     A.     It appears to be one. | 15 employee. |
| 16     Q.     Was this employee terminated for a | 16     Q.     What about with other employees, |
| 17 no call/no show? | 17 did you give other employees more that one no |
| 18     A.     I do not know. | 18 call/no show? |
| 19     Q.     Was this employee terminated? | 19     A.     Yes, it's indicated in the files |
| 20     A.     I do believe so. | 20 that we reviewed. |
| 21     Q.     You don't believe so? | 21     Q.     Which files, Employee 2? |
| 22     A.     I do believe so. | 22     A.     Employee 2 I saw two no call/no |
| 23     Q.     Why do you say that? | 23 shows. |
| 24     A.     Because it says terminated per | 24     Q.     You don't recall why that employee |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**STEPHEN G. COPPER**
**February 8, 2007**

24 (Pages 90 to 93)

| Page 90 | Page 92 |
|---|---|
| 1 was given more that one no call/no show?<br>2 A. No.<br>3 MR. SHEA: Can you mark that,<br>4 please?<br>5<br>6 (Exhibit 6, Employee #9 File,<br>7 marked)<br>8<br>9 Q. (By Mr. Shea) Can you look at<br>10 what's been marked as Exhibit 6?<br>11 MR. SHEA: Off the record.<br>12<br>13 (Off record discussion)<br>14<br>15 MR. SHEA: Back on the record.<br>16 Q. (By Mr. Shea) Was Employee No. 9<br>17 employed with the company for 15 plus years?<br>18 A. This one?<br>19 Q. Yes. Do you recall that employee?<br>20 A. It looks like she was termed before<br>21 I got there in '03.<br>22 Q. It looks like she was counseled on<br>23 8/20/1996 for being late to work four times in<br>24 one week? | 1 that?<br>2 A. Yes.<br>3 Q. Was this Employee No. 9 given a<br>4 verbal warning on July 10 of 2003?<br>5 A. A verbal warning?<br>6 Q. Yes, on July 10, 2003?<br>7 A. I don't see that.<br>8 Q. You don't see that. Was employee<br>9 No. 9 tardy 11 times and absent during a<br>10 two-and-a-half month period and given a verbal<br>11 warning?<br>12 A. What was the date?<br>13 Q. I asked you about a verbal warning<br>14 that may have been issued on July 10 of '03.<br>15 A. 1/21/03 there's a written warning.<br>16 Q. I was asking you about 7/10/03<br>17 within a period of two and a half months. Then<br>18 I asked you whether this employee was tardy 11<br>19 times and absent during a two-and-a-half month<br>20 period and was given a verbal warning, do you<br>21 see that?<br>22 A. 11 times, two and a half months.<br>23 Q. Is that a violation of policy at<br>24 SunBridge? |

| Page 91 | Page 93 |
|---|---|
| 1 A. What was the date again, please?<br>2 Q. 8/20/96 counseling for being late<br>3 to work four times in one week, does that look<br>4 accurate?<br>5 A. Yes.<br>6 Q. On 9/21/97 the employee was<br>7 counseled for behavioral issues, do you see<br>8 that?<br>9 A. Yes.<br>10 Q. By the way, these are all CNAs,<br>11 right, these employee files?<br>12 A. Yes.<br>13 Q. And on 11/20/98 the employee was<br>14 counseled for patient safety, do you see that?<br>15 A. Yes.<br>16 Q. And on 12/3/98 the employee was<br>17 counseled, given a written warning for<br>18 behavioral issues, do you see that?<br>19 A. 12/3?<br>20 Q. '98, yes. Written warning for<br>21 behavioral issues?<br>22 A. Yes.<br>23 Q. Then on 12/8 the written warning<br>24 was given for a policy violation, do you see | 1 A. I would say yes.<br>2 Q. Why was the policy bent for this<br>3 individual?<br>4 A. I do not know.<br>5 Q. You referred to a note on December<br>6 1, '03. Was Employee No. 9 written up and/or<br>7 suspended on 12/1/03 and if so, why?<br>8 A. I do not know.<br>9 Q. Was the employee suspended on<br>10 12/1/03 for a strong odor of alcohol and<br>11 refusing alcohol testing and laying in bed with<br>12 a resident?<br>13 A. I do not know.<br>14 Q. On 12/10. You don't know.<br>15 If that occurred, if all of what I<br>16 have just covered occurred, should that employee<br>17 have been terminated?<br>18 A. Yes.<br>19 Q. You don't know why that employee<br>20 was not terminated?<br>21 A. No.<br>22 Q. Do you know whether Employee No. 9<br>23 was ever impaired at work, intoxicated?<br>24 MR. GRIGGS: Form. |

**STEPHEN G. COPPER**
**February 8, 2007**

25 (Pages 94 to 97)

### Page 94

1    Q.    (By Mr. Shea)  You don't know?
2    A.    No.
3    Q.    You don't know either way?
4    A.    No.
5    Q.    Do you see a no call/no show
6  policy in Employee No. 9's file?
7    A.    Yes.
8    Q.    What does that no call/no show
9  policy say about no call/no shows?
10    A.    That "it is the policy of
11  Sandalwood Convalescent Home for each employee
12  to work scheduled hours and to personally call
13  in well in advance of scheduled shift if unable
14  to work.  Failure to call in before start of the
15  shift and not work scheduled hours is totally
16  unacceptable.  Such no call/no show shows lack
17  of responsibility and demises ability to
18  maintain high level of quality care given to our
19  residents."
20    Q.    Let me stop you for a second.  Was
21  that the no call/no show policy in place at
22  Sandalwood?
23          MR. GRIGGS:  Objection to form.
24    Q.    (By Mr. Shea)  Was it?

### Page 95

1    A.    I don't have anything to compare it
2  to, so I would do not know.
3    Q.    Are you familiar with the policy,
4  the no call/no show policy?
5    A.    Yes.
6          MR. GRIGGS:  Objection to form.
7          THE WITNESS:  You are asking me if
8  I understand what I'm reading?
9    Q.    (By Mr. Shea)  Have you seen the
10  document before, have you?
11    A.    No, this was first time I've seen
12  this document.
13    Q.    Have you seen a document that
14  outlines in writing or specifies a no call/no
15  show policy at Sandalwood, have you ever seen
16  such a policy?
17          MR. GRIGGS:  Objection to form.
18          THE WITNESS:  I don't recall.
19    Q.    (By Mr. Shea)  Is there a no
20  call/no show policy?
21    A.    I don't know.
22    Q.    Was there one when Wendy Gauthier
23  was there?
24    A.    I don't know.

### Page 96

1    Q.    Can you continue on and read that,
2  please?
3    A.    "Three no calls/no shows within a
4  reasonable time frame is cause for termination."
5    Q.    So that says three no call/no
6  shows, correct?
7    A.    Yes.
8    Q.    You don't know whether that was the
9  policy in place when Wendy Gauthier worked
10  there?
11    A.    No.
12    Q.    You don't know either way?
13    A.    No.
14    Q.    Correct, you don't?
15    A.    Correct.
16    Q.    Was this Employee No. 9
17  terminated?  I'll represent to you that I found
18  nothing in the file that indicates Employee No.
19  9 was terminated.
20          Do you know?
21    A.    I didn't see anything.
22    Q.    Do you have an independent
23  recollection or knowledge outside of Exhibit 6
24  as to whether Employee No. 9 was terminated?

### Page 97

1    A.    No.
2    Q.    So for all you know Employee No. 9
3  could still be there, correct?
4    A.    Correct.  Unlikely, but correct.
5          MR. SHEA:  Off the record.
6
7          (A recess was taken)
8
9          MR. SHEA:  Back on the record.  Can
10  we have that marked, please?
11
12          (Exhibit 7, Employee #10 File,
13          marked)
14
15    Q.    (By Mr. Shea)  Take a look at
16  Exhibit 7, please, that's Employee No. 10.  My
17  question is was Employee No. 10 terminated for
18  excessive call outs?
19          While you are looking for the
20  answer to that, can you tell me what a call out
21  is, do you know what a call out is?
22    A.    A call out is when an employee is
23  scheduled for a certain day and notifies the
24  facility they will not report to work.

**STEPHEN G. COPPER**
**February 8, 2007**

26 (Pages 98 to 101)

| Page 98 |
|---|
| 1    Q.    Let me cut to the chase. Was this |
| 2  employee counseled on 12/10/04 during the 90-day |
| 3  probation period for three call outs? |
| 4    A.    Excessive absenteeism employee will |
| 5  have no call out. Doesn't say the amount. |
| 6  Excessive call outs. Employee has had three |
| 7  call outs. |
| 8    Q.    Was this employee on probation? |
| 9    A.    During probation, yes. |
| 10    Q.    Wendy Gauthier wasn't on probation, |
| 11  correct? |
| 12        MR. GRIGGS:  Objection to the form. |
| 13    Q.    (By Mr. Shea)  You may answer; is |
| 14  that correct? |
| 15        Wendy Gauthier was not on |
| 16  probation at the time of her termination? |
| 17    A.    No, I believe she was not on |
| 18  probation. |
| 19    Q.    Not on probation, correct? |
| 20    A.    Yes. |
| 21    Q.    This employee was on probation, |
| 22  correct, and counseling on 12/10/04? |
| 23    A.    Yes. |
| 24    Q.    For what? |

| Page 99 |
|---|
| 1    A.    Excessive call outs. |
| 2    Q.    Do you see the performance plan |
| 3  there, the employee's performance plan where the |
| 4  employee was to have no sick call outs for a |
| 5  period of 90 days? |
| 6    A.    Yes. |
| 7    Q.    This employee was not terminated, |
| 8  Employee No. 10 upon calling out on January 5, |
| 9  2005 during the 90-day period, correct? |
| 10    A.    No. |
| 11    Q.    Pardon me? She was not terminated |
| 12  upon calling out on January 5, 2005, correct? |
| 13    A.    I don't see where she called out on |
| 14  January 5th. Okay, I do. No, she was not |
| 15  terminated. |
| 16    Q.    Should she have been terminated at |
| 17  that point? |
| 18    A.    I do not know. I don't know the |
| 19  extenuating circumstances. |
| 20    Q.    There could have been extenuating |
| 21  circumstances which would allow the employees to |
| 22  stay on? |
| 23        MR. GRIGGS:  Can we go off the |
| 24  record? |

| Page 100 |
|---|
| 1 |
| 2        (Off record discussion) |
| 3 |
| 4        MR. SHEA:  Back on the record. |
| 5    Q.    (By Mr. Shea)  Employee No. 10 was |
| 6  also a CNA just like Wendy Gauthier? |
| 7    A.    Yes. |
| 8    Q.    In Employee No. 10's case, was |
| 9  there a verbal written warning, a first written |
| 10  warning and a final written warning combined to |
| 11  formulate one warning which resulted in |
| 12  termination? |
| 13    A.    I see a termination here on May |
| 14  25th. |
| 15    Q.    Why was this employee terminated, |
| 16  do you know? |
| 17    A.    No, but it's not signed by me. |
| 18    Q.    Not signed by whom? |
| 19    A.    It has my name, but it's not signed |
| 20  by me. |
| 21    Q.    You don't recall Employee No. 10 |
| 22  though? |
| 23    A.    No, nor do I recall writing up |
| 24  something like that. |

| Page 101 |
|---|
| 1    Q.    The this you're referring to, can |
| 2  you tell me what it is? |
| 3    A.    This document stating that she is |
| 4  now terminated. |
| 5    Q.    What's the date of that document? |
| 6    A.    May 15th. |
| 7    Q.    '05, yes? |
| 8    A.    (Witness complying) |
| 9    Q.    Let me show you the next file. |
| 10    A.    I don't recall this. This is not |
| 11  my style of writing. |
| 12        MR. SHEA:  Can I have that |
| 13  marked? |
| 14 |
| 15        (Exhibit 8, Employee #13 File, |
| 16  marked) |
| 17 |
| 18    Q.    (By Mr. Shea)  Can you look at |
| 19  Exhibit 8 and this is Employee No. 13. |
| 20        Let me move along. This employee |
| 21  had several tardinesses and call outs and two no |
| 22  call/no shows, correct? |
| 23    A.    Yes. |
| 24    Q.    Why was this employee not |

**STEPHEN G. COPPER**
**February 8, 2007**

27 (Pages 102 to 105)

Page 102

1 terminated at least for the two no call/no
2 shows, not to mention the tardinesses and call
3 outs, do you know?
4     A.    No, I do not know.
5     Q.    Could there have been extenuating
6 circumstances that allowed the employee to stay
7 on after the first no call/no show?
8     A.    Yes.
9     Q.    You don't know what they were in
10 this case?
11     A.    No.
12     Q.    You don't know if there were
13 extenuating circumstances with respect to
14 Employee No. 13?
15     A.    Correct.
16     Q.    Thank you.
17         MR. SHEA:  Let's mark this, please?
18
19         (Exhibit 9, Employee #15 File,
20         marked)
21
22     Q.    (By Mr. Shea)  Looking at Employee
23 No. 15 which is Exhibit 9, that file, did this
24 employee have attendance issues, as well as,

Page 103

1 patient safety and care issues?
2     A.    Excessive absenteeism, written
3 warning.
4     Q.    So yes, this employee has
5 attendance issues?
6     A.    Yes.
7     Q.    Why wasn't Employee No. 15
8 terminated for attendance issues?
9     A.    I do not know.
10     Q.    That same employee had patient care
11 issues and safety issues or can you tell from
12 the file?
13     A.    This document states a resident
14 falling out of bed.  That would be a patient
15 care issue.
16     Q.    Why wasn't this employee
17 terminated?
18     A.    No, I do not know.
19     Q.    Can I take that back from you?
20     A.    (Witness complying)
21         MR. SHEA:  Can you mark that as
22 the next one?
23
24         (Exhibit 10, Employee #18 File,

Page 104

1         marked)
2
3     Q.    (By Mr. Shea)  Before you take a
4 look at Exhibit 10, where were these personnel
5 files kept?  I know you started to tell me that.
6 Were they kept in the custody of Ann Kendall or
7 somebody else?
8     A.    Somebody else.
9     Q.    Do you remember that name, yes or
10 no?
11     A.    No.
12     Q.    Physically where were they located
13 in relation to your office, they were under lock
14 and key?
15     A.    Yes.
16     Q.    These personnel files, yes?
17     A.    Yes.
18     Q.    Did Ann Kendall have any access to
19 them?
20     A.    I do not know.
21     Q.    Who's responsibility was it to
22 maintain the personnel file and the records?
23     A.    The department head, the staff
24 development coordinator.

Page 105

1     Q.    Did Ann Kendall have any role in
2 maintaining the personnel file?
3     A.    No.
4     Q.    If I showed her the personnel
5 files, would she say that she's seen them
6 before?
7         MR. GRIGGS:  Form.
8         THE WITNESS:  I don't know.
9     Q.    (By Mr. Shea)  Have you ever seen
10 her looking at or heard of her looking at
11 personnel files of other employees or no?
12     A.    I don't recall.
13     Q.    Looking at Exhibit 10.
14         MR. SHEA:  Off the record.
15
16         (Off record discussion)
17
18         MR. SHEA:  Back on the record.
19     Q.    (By Mr. Shea)  Employees 15 and 18
20 are CNAs, correct?
21     A.    Yes.
22     Q.    Looking at Employee No. 18's file,
23 Exhibit 10, can you tell me why Employee 18 was
24 terminated?

**STEPHEN G. COPPER**
**February 8, 2007**

28 (Pages 106 to 109)

Page 106

```
 1   A.   No.
 2   Q.   Can I take that back from you?
 3   A.   (Witness complying)
 4        MR. SHEA: Can you mark that?
 5
 6        (Exhibit 11, Employee #22 File,
 7        marked)
 8
 9        MR. SHEA: Off the record.
10
11        (Off record discussion)
12
13        MR. SHEA: Back on the record.
14   Q.   (By Mr. Shea) Employee No. 22,
15   Exhibit 11, that employee's personnel file,
16   focusing on that, was the employee terminated
17   and for what reason?
18   A.   For attendance.
19   Q.   On what date?
20   A.   5/10/04.
21   Q.   Do you know what the last date that
22   employee worked was?
23   A.   At this time, no.
24   Q.   Do you know whether that Employee
```

Page 107

```
 1   No. 22 committed any no call/no shows?
 2   A.   No.
 3   Q.   Is there something in the employee
 4   file that indicated that Employee No. 22 did not
 5   show up for her shifts and did not pick up her
 6   schedule?
 7   A.   No call/no show, 3/20/04.
 8   Q.   How many no call/no shows did this
 9   employee have, do you know?
10   A.   I don't know.
11   Q.   And the no call/no show is
12   indicated that occurred on 3/20/04 or 3/10/04?
13   A.   It would be 3/20/04.
14   Q.   Do you know why this employee was
15   not terminated until May 10, '04?
16   A.   No.
17   Q.   Do you know how many days the
18   employees worked between 3/20/04 and 5/10/04?
19   A.   No.
20   Q.   Can I have that back, please?
21   A.   (Witness complying)
22        MR. SHEA: Can you mark that?
23
24        (Exhibit 12, Employee #24 File,
```

Page 108

```
 1        marked)
 2
 3        MR. SHEA: Off the record.
 4
 5        (Off record discussion)
 6
 7        MR. SHEA: Back on the record.
 8   Q.   (By Mr. Shea) Can you tell from
 9   Employee No. 24's file whether Employee 24 had
10   attendance issues?
11   A.   Excessive absenteeism.
12   Q.   Are there no call/no shows in the
13   file as well?
14        While you are looking for the
15   answer to that question, let me ask you, did Ann
16   Kendall have any reason to put any documentation
17   in any personnel file?
18        MR. GRIGGS: Form.
19        THE WITNESS: I don't know.
20   Q.   (By Mr. Shea) None that you are
21   aware of?
22   A.   No.
23   Q.   Meaning, correct?
24   A.   Correct. I see no paperwork
```

Page 109

```
 1   indicated on no call/no show.
 2   Q.   Can I have that back, please?
 3   A.   (Witness complying)
 4        MR. SHEA: Will you mark that,
 5   please?
 6
 7        (Exhibit 13, Employee #26 File,
 8        marked)
 9
10        MR. SHEA: Off the record.
11
12        (Off record discussion)
13
14        MR. SHEA: Back on the record.
15   Q.   (By Mr. Shea) Looking at Exhibit
16   13 which is Employee No. 26.
17        What is the reason for the
18   termination of Employee No. 26, can you tell me?
19   A.   Quit.
20   Q.   Does it indicate why?
21   A.   Too many call outs.
22   Q.   The call outs, again, are calling
23   in sick or calling out for whatever reason?
24   A.   Yes.
```

# STEPHEN G. COPPER
# February 8, 2007

29 (Pages 110 to 113)

## Page 110

1    Q.    A no call/no show is just what it
2  says, no call, no show?
3    A.    Yes.
4    Q.    Would this Employee No. 26 be
5  eligible for rehire?
6    A.    I don't know.  It says no on the
7  termination.  Personal action notice, no.  And
8  again for absenteeism.
9          MR. SHEA: I'm just going to take
10   two minutes and I think we are done.
11
12         (A recess was taken)
13
14         MR. SHEA:  Back on the record.
15   Q.    (By Mr. Shea)  I apologize if I
16 asked this.  Are you aware of Wendy Gauthier
17 ever being injured at work?
18   A.    No.
19   Q.    At SunBridge?
20   A.    No.
21   Q.    Lifting a patient or otherwise?
22   A.    No.
23         MR. SHEA:  Nothing further.
24         MR. GRIGGS:  I just have a couple

## Page 111

1    things to follow up.
2
3
4    EXAMINATION BY MR. GRIGGS:
5
6    Q.    Do you know what the term at-will
7  employment means?
8    A.    Yes.
9    Q.    What does this mean in your own
10 words?
11   A.    An employee selects to work at a
12 certain facility.
13   Q.    Does it mean that they are to be
14 employed for a specific term of time?
15         MR. SHEA: Objection.
16         THE WITNESS: Yes.
17   Q.    (By Mr. Griggs) Does it mean that
18 you can terminate them at any time?
19         MR. SHEA: Objection.
20         THE WITNESS: Yes.
21   Q.    (By Mr. Griggs)  Was Wendy Gauthier
22 an at-will employee?
23   A.    Yes.
24   Q.    Can I see file No. 9 of the

## Page 112

1  employee files, Exhibit 6, I believe?
2          I'm going to again show you the
3  document entitled no call/no show policy and
4  request you to look at the date at the bottom?
5    A.    12/31/90.
6    Q.    That's December 31, 1990?
7    A.    Yes.
8    Q.    Was the Sandalwood Convalescent
9  Home, to your knowledge, operated by SunBridge
10 in December of 1990?
11         MR. SHEA: Objection.
12         THE WITNESS: No.
13   Q.    (By Mr. Griggs) So was this the
14 SunBridge no call/no show policy at the time of
15 Wendy Gauthier's employment?
16         MR. SHEA: Objection.
17         THE WITNESS: No.
18   Q.    (By Mr. Shea)  At the time of Wendy
19 Gauthier's employment, was your understanding
20 that the no call/no show policy was that one no
21 call/no show was a terminable offense?
22         MR. SHEA: Objection.
23         THE WITNESS: Yes.
24   Q.    (By Mr. Griggs)  You are certain of

## Page 113

1  that?
2          MR. SHEA: Objection.
3          THE WITNESS: Yes.
4    Q.    (By Mr. Griggs) I have one last
5  question about staffing a nursing home in
6  general.  As an administrator of a nursing home,
7  do you face challenges of finding competent
8  staff for your nursing home?
9          MR. SHEA: Objection.
10         THE WITNESS: Yes.
11   Q.    (By Mr. Griggs)  While you were the
12 administrator at SunBridge of Sandalwood in
13 Oxford, Massachusetts, did you find challenges
14 with regard to staffing your facility?
15         MR. SHEA: Objection.
16         THE WITNESS: Yes.
17   Q.    (By Mr. Griggs)  Did you have
18 trouble finding competent CNAs?
19         MR. SHEA: Objection.
20         THE WITNESS: Yes.
21   Q.    (By Mr. Griggs)  In your opinion,
22 do you think that leniency with regard to
23 attendance policies may have been driven by
24 these challenges?

# STEPHEN G. COPPER
# February 8, 2007

30 (Pages 114 to 117)

Page 114

1  MR. SHEA: Objection.
2  THE WITNESS: Yes.
3  MR. GRIGGS: No further questions.
4  MR. SHEA: Nothing further.
5
6  (Deposition concluded at 12:49 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 115

1    I, ELISABETH ZAHARIADIS, a Notary Public
2  in and for the Commonwealth of Massachusetts, do
3  hereby certify that STEPHEN G. COPPER appeared
4  before me, satisfactorily identified himself, on
5  the 8th day of February, 2007, at Worcester,
6  Massachusetts, and was by me duly sworn to
7  testify to the truth and nothing but the truth
8  as to his knowledge touching and concerning the
9  matters in controversy in this cause; that he
10  was thereupon examined upon his oath and said
11  examination reduced to writing by me; and that
12  the statement is a true record of the testimony
13  given by the witness, to the best of my
14  knowledge and ability.
15    I further certify that I am not a relative
16  or employee of counsel/attorney for any of the
17  parties, nor a relative or employee of such
18  parties, nor am I financially interested in the
19  outcome of the action.
20    WITNESS MY HAND this 3rd day of March,
21  2007.
22
23  Elisabeth Zahariadis    My Commission expires:
24  Notary Public          October 5, 2012

Page 116

1  Today's date:       March 3, 2007
2  To:          K. Scott Griggs, Esq.
3  Copied to:       Michael O. Shea, Esq.
4  From:        Elisabeth Zahariadis
5  Deposition of:     Stephen G. Copper
6  Taken:       February 8, 2007
7  Action:       WENDY GAUTHIER
8             Vs. SUNHEALTH SPECIALTY
9             SERVICES, INC., ET AL.
10
11
12    Enclosed is a copy of Mr. Copper's
13  deposition. Pursuant to the Rules of Civil
14  Procedure, Mr. Copper has thirty days to sign
15  the deposition from today's date.
16    Please have Mr. Copper sign the enclosed
17  signature page. If there are any errors, please
18  have him mark the page, line and error on the
19  enclosed correction sheet. He should not mark
20  the transcript itself. This addendum should be
21  forwarded to all interested parties.
22    Thank you for your cooperation in this
23  matter.
24

Page 117

1       UNITED STATES DISTRICT COURT
2        DISTRICT OF MASSACHUSETTS
3
4  *****************************
5  WENDY GAUTHIER,          *
6        Plaintiff     *
7  vs.            *No.: 05cv40119-FDS
8  SUNHEALTH SPECIALTY       *
9  SERVICES, INC. and SUNBRIDGE*
10  HEALTHCARE CORPORATION,    *
11       Defendants      *
12  *****************************
13
14
15    I, STEPHEN G. COPPER, do hereby certify,
16  under the pains and penalties of perjury, that
17  the foregoing testimony is true and accurate, to
18  the best of my knowledge and belief.
19    WITNESS MY HAND, this   day of      ,
20  2007.
21
22  _____
23  EZ        STEPHEN G. COPPER
24

**STEPHEN G. COPPER**
**February 8, 2007**

Page 118

```
 1          CORRECTION SHEET
 2   DEPONENT:  Stephen G. Copper
 3   CASE:  Gauthier V. Sunhealth Specialty Services
 4   DATE TAKEN: February 8, 2007
 5   ••••••••••••••••••••••••••••••••••••••••••••••••
 6   PAGE/ LINE/ CHANGE OR CORRECTION AND REASON
 7   ••••••••••••••••••••••••••••••••••••••••••••••••
 8   ___/ ___/ _____
 9   ___/ ___/ _____
10   ___/ ___/ _____
11   ___/ ___/ _____
12   ___/ ___/ _____
13   ___/ ___/ _____
14   ___/ ___/ _____
15   ___/ ___/ _____
16   ___/ ___/ _____
17   ___/ ___/ _____
18   ___/ ___/ _____
19   ___/ ___/ _____
20   ___/ ___/ _____
21   ___/ ___/ _____
22   ___/ ___/ _____
23   ___/ ___/ _____
24   ___/ ___/ _____
```

# EXHIBIT 4

# ANN MARIE KENDALL
# February 8, 2007



Page 1

```
 1               UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS

 3

 4

 5  ****************************

 6  WENDY GAUTHIER,                *

 7                 Plaintiff       *

 8  vs.                    *No.: 05cv40119-FDS

 9  SUNHEALTH SPECIALTY            *

10  SERVICES, INC. and SUNBRIDGE  *

11  HEALTHCARE CORPORATION,        *

12               Defendants        *

13  ****************************

14

15       DEPOSITION OF:  ANN MARIE KENDALL

16       CATUOGNO COURT REPORTING SERVICES

17              446 Main Street

18         Worcester, Massachusetts

19       February 8, 2007    1:08 p.m.

20

21

22         Elisabeth Zahariadis

23     Certified Shorthand Reporter

24  APPEARANCES:
```

# ANN MARIE KENDALL
## February 8, 2007

2 (Pages 2 to 5)

|  | Page 2 |
|---|---|
| 1 |  |
| 2 | Representing the Plaintiff: |
| 3 | LAW OFFICE OF MICHAEL O. SHEA, P.C. |
| 4 | 451 Main Street |
| 5 | Wilbraham, MA 01095 |
| 6 | BY: MICHAEL O. SHEA, ESQ. |
| 7 | (413) 596-8005 FAX 596-8095 |
| 8 |  |
| 9 | Representing the Defendant: |
| 10 | LAWSON & WEITZEN, LLP |
| 11 | 88 Black Falcon Avenue |
| 12 | Boston, MA 02210 |
| 13 | BY: MICHAEL WILLIAMS, ESQ. |
| 14 | (617) 439-4990 FAX 439-3987 |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 4 |
|---|---|
| 1 | ANN MARIE KENDALL, Deponent, having first |
| 2 | been satisfactorily identified and duly sworn, |
| 3 | deposes and states as follows: |
| 4 |  |
| 5 | MR. SHEA: Usual stipulations? I |
| 6 | don't know if you want to have her read and |
| 7 | sign. |
| 8 | MR. GRIGGS: Read and sign, 30 |
| 9 | days. |
| 10 |  |
| 11 |  |
| 12 | EXAMINATION BY MR. SHEA: |
| 13 |  |
| 14 | Q. Ms. Kendall, can you state your |
| 15 | full name? |
| 16 | A. Ann Marie Kendall. |
| 17 | Q. Where do you reside? |
| 18 | A. I reside at 12 Lakeview Avenue, |
| 19 | Dudley, Massachusetts. |
| 20 | Q. How long have you lived there? |
| 21 | A. Three or four months. |
| 22 | Q. Do you own or rent there? |
| 23 | A. We own. |
| 24 | Q. Do you have a residence anywhere |

|  | Page 3 |
|---|---|
| 1 | INDEX |
| 2 |  |
| 3 | WITNESS:    ANN MARIE KENDALL |
| 4 |  |
| 5 | EXAMINATION BY:              PAGE: |
| 6 | Mr. Shea              4 |
| 7 | Mr. Griggs              67 |
| 8 |  |
| 9 | FURTHER EXAMINATION BY:         PAGE: |
| 10 | Mr. Shea              69 |
| 11 | Mr. Griggs              84 |
| 12 |  |
| 13 | EXHIBIT:              PAGE: |
| 14 | Exhibit 1, 1/29/07 Letter................12 |
| 15 |  |
| 16 |  |
| 17 | Mr. Shea retained exhibit. |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 5 |
|---|---|
| 1 | else? |
| 2 | A. Currently, yes, in Florida. |
| 3 | Q. Is that like a second home? |
| 4 | A. No, it's a home we're trying to |
| 5 | sell. |
| 6 | Q. Where is that located? |
| 7 | A. Dunedin, D-U-N-E-D-I-N, Florida. |
| 8 | Q. What's the address? |
| 9 | A. 1239 Lazy Lake Road. |
| 10 | Q. In Dunedin? |
| 11 | A. Do you want the zip code? |
| 12 | Q. Sure. |
| 13 | A. 34698. |
| 14 | Q. Have you ever been deposed before? |
| 15 | A. No. |
| 16 | Q. No one is representing you in this |
| 17 | deposition, you don't have legal counsel for |
| 18 | purposes of this deposition? |
| 19 | MR. GRIGGS: I'm here on your |
| 20 | behalf. |
| 21 | MR. SHEA: Are you representing her |
| 22 | in this deposition? |
| 23 | MR. GRIGGS: Yes. |
| 24 | Q. (By Mr. Shea) I'm sorry, have you |

# ANN MARIE KENDALL
# February 8, 2007

3 (Pages 6 to 9)

| Page 6 |
| --- |

1 ever been deposed before or no? That's what
2 this is today.
3    A.    No, I have not.
4    Q.    Have you ever testified in a court?
5    A.    I've testified, I don't know, in
6 unemployment hearing.
7    Q.    Other than that, have you testified
8 in court?
9    A.    No.
10    Q.    Just a couple of quick ground rules
11 since you've never been deposed before. You
12 have to answer audibly for the record. I'm
13 going to ask you a few questions, it shouldn't
14 be too long. The stenographer needs to type
15 down what I'm saying and you're saying. So I
16 would ask that you let me get my question out
17 before you start your answer and I won't cut you
18 off hopefully when you answer. And I won't
19 start my next question until you've answered the
20 last one. Okay?
21    A.    Yes.
22    Q.    So you can't do a nod of the head
23 or mm-hmm because we have to get what you're
24 saying on the record. So a yes or no or an

| Page 7 |
| --- |

1 explanation for an answer is fine.
2       Do you understand?
3    A.    Yes.
4    Q.    Are you under the influence of any
5 medication or anything that may impair your
6 ability to answer questions today?
7    A.    No.
8    Q.    Are you currently employed?
9    A.    Yes, I am.
10    Q.    Where do you work?
11    A.    At Overlook Masonic Home.
12    Q.    Where is that located?
13    A.    Charlton, Massachusetts.
14    Q.    What do you do there?
15    A.    I work as a registered nurse.
16    Q.    How long have you held that
17 position?
18    A.    I think I started right after the
19 first of the year, January 3rd, 4th, somewhere
20 in that area.
21    Q.    Have you talked to anyone about
22 this deposition?
23       MR. GRIGGS: Besides your attorney.
24    Q.    (By Mr. Shea) Outside of

| Page 8 |
| --- |

1 conversations with this attorney who's here
2 today on your behalf?
3    A.    No, sir.
4    Q.    Have you had conversations with
5 your husband about this deposition?
6    A.    Yes.
7    Q.    What's your husband's name?
8    A.    Jeffrey H. Kendall.
9    Q.    He lives with you?
10    A.    Yes, he does.
11    Q.    You've never talked to me before
12 today, correct?
13    A.    No.
14    Q.    In fact, you've never talked to me
15 prior to the commencement of this deposition,
16 correct?
17    A.    No.
18    Q.    Meaning correct?
19    A.    Meaning correct I have not spoken
20 with you.
21    Q.    You've not spoken with anyone from
22 my office prior to the commencement of this
23 deposition?
24    A.    No, sir.

| Page 9 |
| --- |

1    Q.    Meaning correct?
2    A.    That's correct I have not spoken
3 with anyone from your office.
4    Q.    Your husband lives with you?
5    A.    Yes, he does.
6    Q.    How long have you been Mary?
7    A.    Six years.
8    Q.    What conversations did you have
9 with him about this deposition?
10    A.    I asked him if he would send a
11 letter, I had a letter prepared because I don't
12 know what you call it, the information I had to
13 appear.
14    Q.    Under a subpoena?
15    A.    Okay. Came to our current address
16 only because the mailman, our mailman knows my
17 husband, but it was really sent to a prior
18 address. So the conversation was, it was just
19 received and I work 11:00 to 7:00 and could not
20 physically be here and asked him if he would
21 please deliver the letter stating why I could
22 not be here, deliver a letter here.
23    Q.    Meaning at this court reporting
24 office?

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# ANN MARIE KENDALL
# February 8, 2007

4 (Pages 10 to 13)

## Page 10

1   A.   That's correct because I didn't
2   want it to appear as if I was purposely --
3   Q.   Avoiding the deposition.
4   A.   Avoiding the deposition.  That is
5   the conversation that I had.
6   Q.   With your husband?
7   A.   That's correct, sir.
8   Q.   Is that the only conversation you
9   had about this case or the deposition?
10   A.   Mm-hmm.
11   Q.   Yes?
12   A.   Yes, sir.
13   Q.   Other than talking to your husband
14   and outside of any conversation you may have had
15   with lawyers for SunBridge, have you talked to
16   anyone about this deposition or this case?
17   A.   No, sir.
18   Q.   What did you say in the letter
19   that, did your husband hand deliver the letter
20   to this court reporting office?
21   A.   Yes.
22   Q.   That was on the last date that you
23   think you may have been scheduled for a
24   deposition in this office in this case?

## Page 11

1   A.   Yes, and I don't remember the exact
2   date.
3   Q.   That's okay.  A couple weeks ago
4   maybe?
5   A.   Approximately.
6   Q.   What did the letter say, do you
7   remember?
8   A.   I don't remember offhand.  It was
9   something to the effect that I wouldn't be able
10   to be here because I worked 11:00 to 7:00 and I
11   did not recall anything about.
12   Q.   Anything about Wendy Gauthier?
13   A.   Yeah.  I think it was very short.
14   Q.   Was the contents of the letter
15   accurate?
16   A.   Yes, sir.
17   Q.   You don't recall Wendy Gauthier or
18   anything about Wendy Gauthier; is that correct?
19   A.   At the time of the letter, no, I
20   did not recall.
21   Q.   Do you recall anything today or no?
22   A.   I don't know, depends on.
23   Q.   Do you recall anything about Wendy
24   Gauthier today, sitting here today?

## Page 12

1   A.   I recall that she was an employee.
2   Q.   Where?
3   A.   Sandalwood.
4   Q.   Do you recall anything else or no
5   about Wendy Gauthier other than she was an
6   employee?
7   A.   I recall that she worked 11:00 to
8   7:00 and that at the time there was some
9   attendance issues.
10   Q.   You don't recall what those
11   attendance issues are or were, do you?
12   A.   Not specifically.
13   Q.   What do you recall about any
14   attendance issues, if anything?
15   A.   I recall that I know on at least
16   one occasion she was a no call/no show and there
17   were some call outs.
18       MR. SHEA:  Can I have that marked,
19   please?
20
21       (Exhibit 1, 1/29/07 Letter, marked)
22
23   Q.   (By Mr. Shea)  I'm going to show
24   you a copy of what you said your husband hand

## Page 13

1   delivered to this court reporting office.  And I
2   would ask you to look at the second to the last
3   paragraph, by the way, that's your signature
4   down at the bottom?
5   A.   Mm-hmm.
6   Q.   You have to answer yes?
7   A.   Yes, sir.
8   Q.   It's dated January 29, 2007, right?
9   A.   Yes, sir.
10   Q.   This is the letter that you had
11   written and had your husband hand deliver to
12   this court reporting office, correct?
13   A.   Yes, sir.
14   Q.   The second to last paragraph says,
15   "most importantly, I have no recollection of
16   Wendy Gauthier as either a resident or employee
17   at SunBridge?"
18   A.   That's correct.
19   Q.   Have you had any conversations with
20   anyone since January 29, 2007 about Wendy
21   Gauthier?
22       MR. GRIGGS:  Except your counsel?
23       MR. SHEA:  No including, I don't
24   want the content.

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# ANN MARIE KENDALL
# February 8, 2007

5 (Pages 14 to 17)

## Page 14

1    THE WITNESS: The only
2 conversation I had was I did make a phone
3 call to Alan Bernard after receiving the
4 letter, the summons -- am I using the
5 correct terminology?
6    Q.    (By Mr. Shea) Subpoena.
7    A.    Subpoena. And stating to him that
8 I really at that time had no idea who this
9 person was. I really and at that time I did
10 not.
11    Q.    When was that conversation?
12    A.    I don't know what date this was.
13 It was maybe the day before this letter.
14    Q.    The day before January 29th?
15    A.    I'm guessing. I don't know. What
16 day was this?
17    Q.    You dated it up top, do you see
18 that, January 29, 2007, can you read that?
19    A.    Yes, I can, sir.
20    Q.    Was it prior to that date or after
21 that date?
22    A.    It could have even been the same
23 date. I don't recall. Because I worked 11:00
24 to 7:00, I came home I stayed awake in an

## Page 15

1 attempt to contact Mr. Bernard to ask him if
2 there was an attorney and who I should be
3 talking to. That's it.
4    Q.    Why did you call Mr. Bernard, did
5 you know who he was prior to?
6    A.    Yes, sir.
7    Q.    Who is he?
8    A.    I think he was, I don't know his
9 exact title, it would be executive vice
10 president, but he was in charge of several of
11 the Sandalwood facilities and I had known him in
12 that text.
13    Q.    You called him on the phone?
14    A.    Yes, sir.
15    Q.    Where's he located?
16    A.    I really don't know.
17    Q.    Is he in Massachusetts?
18    A.    I don't recall if he was in
19 Massachusetts or New Hampshire.
20    Q.    How did you get his phone number?
21    A.    I called Sandalwood and asked for
22 Mr. Bernard's phone number.
23    Q.    Then somebody there gave it to you,
24 do you know who gave it to you?

## Page 16

1    A.    Yes, it was Cheryl in the business
2 office.
3    Q.    What's Cheryl's last name, do you
4 know?
5    A.    I don't recall.
6    Q.    So you called Mr. Bernard after
7 this letter marked Exhibit 1, you think?
8    A.    No, prior to this letter.
9    Q.    What did Mr. Bernard say to you,
10 what did you say to him?
11    A.    Mr. Bernard stated that he would be
12 in contact with H Ri and someone would be in
13 contact with me.
14    Q.    Let's start with what did you say
15 to him. How did you open the conversation?
16    A.    I opened the conversation by
17 stating that I had received this letter,
18 subpoena, and was not sure who the person was,
19 I could not at that time recall and asked him
20 what I should do. And at that time his response
21 was that he would be in contact with HR and
22 someone would be in contact with me.
23    Q.    How long was this conversation?
24    A.    Three minutes, two minutes.

## Page 17

1    Q.    What phone did you dial him from?
2    A.    I dialed him from my home phone in
3 the kitchen.
4    Q.    A land line, not a cell phone?
5    A.    Land line.
6    Q.    Did he tell you that he knew Wendy
7 Gauthier?
8    A.    No, he did not tell me he knew
9 Wendy Gauthier.
10    Q.    Who did you talk to next after that
11 conversation about these depositions?
12    A.    I believe it was Mr. Griggs.
13    Q.    On what date was that?
14    A.    I don't recall the exact date.
15    Q.    How many days after this letter did
16 you talk to Mr. Griggs, the one we've marked as
17 Exhibit 1?
18    A.    You know, I do not recall.
19    Q.    Was it more than a couple days, was
20 it more than a week, was it yesterday, do you
21 have any sense?
22    A.    I'm going to say it was last week,
23 Thursday or Friday.
24    Q.    How long was that conversation with

# ANN MARIE KENDALL
# February 8, 2007

6 (Pages 18 to 21)

| Page 18 | Page 20 |
|---|---|
| 1  Mr. Griggs? | 1  testimony today in this deposition? |
| 2  A.   It was approximately five minutes | 2  A.   We had a discussion. |
| 3  or less. | 3  Q.   About your testimony? |
| 4  Q.   Did you have any other | 4  A.   Yes, sir. |
| 5  conversations with Mr. Griggs or any other | 5  Q.   Prior to yesterday, did he refresh |
| 6  lawyers from Southbridge? | 6  your memory about anything? |
| 7  A.   I did not have any conversation | 7  MR. GRIGGS: Objection to the form |
| 8  with any lawyers from Southbridge. | 8  of the question.  You are asking for some |
| 9  Q.   Sorry, SunBridge. | 9  attorney/client privileged conversation. |
| 10  A.   Okay, SunBridge. | 10  MR. SHEA: I'm just asking her in |
| 11  Q.   Did you have any other | 11  general. |
| 12  conversations with Mr. Griggs other than that | 12  Q.   (By Mr. Shea) Did he refresh your |
| 13  five-minute conversation you just referred to? | 13  memory? |
| 14  A.   I spoke with Mr. Griggs yesterday. | 14  MR. GRIGGS: I'll renew the |
| 15  Q.   Was that over the phone? | 15  objection. |
| 16  A.   It was in person. | 16  Q.   (By Mr. Shea) With respect to |
| 17  Q.   Where was that located, where did | 17  Wendy Gauthier. Did he? |
| 18  you meet? | 18  A.   Am I not answering? |
| 19  A.   We met at a small restaurant. | 19  Q.   You are answering the question. |
| 20  Q.   Where? | 20  A.   Excuse me? |
| 21  A.   In I believe it's Auburn. | 21  MR. GRIGGS: I really don't think |
| 22  Q.   What's the name of the restaurant? | 22  you can ask her about the substance of your |
| 23  A.   The Picadilly Pub. | 23  conversation, so I think you don't have to |
| 24  Q.   That was yesterday? | 24  answer.  Don't answer. |

| Page 19 | Page 21 |
|---|---|
| 1  A.   That was yesterday. | 1  MR. SHEA: You are instructing her |
| 2  Q.   What street that on? | 2  not to answer about a general question |
| 3  A.   I don't know. | 3  about whether her memory was refreshed. |
| 4  Q.   Do you have any idea? | 4  I'm not asking about the content of the |
| 5  A.   It could be Route 12. | 5  conversation. |
| 6  Q.   How long did you meet with Mr. | 6  MR. GRIGGS: Okay.  Go ahead. |
| 7  Griggs yesterday at the Picadilly Pub? | 7  THE WITNESS:  The only thing that |
| 8  A.   Approximately an hour. | 8  Mr. Griggs said to me was that she was -- |
| 9  Q.   Did he bring some documents with | 9  MR. GRIGGS: You don't have to say |
| 10  him? | 10  anything I said. I'll renew the objection. |
| 11  A.   He had paperwork with him, yes. | 11  Don't answer the question. |
| 12  Q.   Was anyone else present, was your | 12  Q.   (By Mr. Shea) I don't want to know |
| 13  husband there? | 13  what was said, I just want to know if he |
| 14  A.   No, he was not. | 14  refreshed your memory in general about Wendy |
| 15  Q.   Was anyone else present? | 15  Gauthier at all? |
| 16  A.   No one was present. | 16  MR. GRIGGS: I'll object the form |
| 17  Q.   Did you bring any documents? | 17  of the question, too. |
| 18  A.   I did not. | 18  Q.   (By Mr. Shea) Yes.  You may |
| 19  Q.   Did Mr. Griggs bring any documents? | 19  answer. |
| 20  A.   I don't know what Mr. Griggs | 20  A.   I'm sorry, I am waiting for my |
| 21  brought, he had paperwork with him. | 21  attorney to stop coughing so I can answer. |
| 22  Q.   Did he show you any documents? | 22  MR. GRIGGS: Go ahead. |
| 23  A.   He did not show me anything. | 23  THE WITNESS: I'm sorry, would you |
| 24  Q.   Did he talk with you about your | 24  repeat the question? |

**ANN MARIE KENDALL**
**February 8, 2007**

Page 22

1    Q.    (By Mr. Shea) Did Mr. Griggs
2  refresh your memory about Ms. Gauthier as a
3  result of the meeting at the Picadilly Pub
4  yesterday?
5    A.    Yes, sir.
6    Q.    Prior to that time, you had no
7  memory of Wendy Gauthier, correct?
8    A.    Correct.
9    Q.    Sitting here today, do you
10  remember anything about Wendy Gauthier other
11  than what you've already testified to?
12    A.    I really don't know.
13    Q.    Meaning you don't have any other
14  memory other than what you've told me that you
15  recall about Wendy Gauthier sitting here today?
16    A.    That's it.
17    Q.    Do you know that Wendy Gauthier was
18  terminated from SunBridge which is also known as
19  Sandalwood?
20    A.    Yes.
21    Q.    Do you know why she was terminated
22  or no?
23    A.    No, I really don't know exactly why
24  she was terminated.

Page 23

1    Q.    Were you her supervisor at the time
2  of her termination or do you know?
3    A.    I guess I'm trying -- I had
4  resigned the end of May. And I would have
5  left -- I'm sorry, the end of April, I'm sorry.
6  I resigned the end of April and was leaving the
7  end of May, first of June. So by the second or
8  third week in May.
9    Q.    Of what year?
10    A.    2003, 2004, I'm sorry, 2004. I was
11  not officially working in full capacity as a
12  director at that time.
13    Q.    Meaning what, what were you doing
14  at that time?
15    A.    I was stepping down, cleaning up
16  and passing on information.
17    Q.    Who was the director of nursing at
18  the time Wendy Gauthier was terminated, do you
19  know?
20    A.    I don't know when Wendy Gauthier
21  was terminated.
22    Q.    Do you have any idea when she was
23  terminated?
24    A.    No.

Page 24

1    Q.    Do you know what year was she was
2  terminated from SunBridge?
3    A.    I don't know exactly.
4    Q.    Do you know who she was terminated
5  by?
6    A.    No, I do not know who terminated
7  her.
8    Q.    You don't know who made the
9  decision to terminate her employment at
10  SunBridge?
11    A.    No, I do not know that.
12    Q.    You already said you don't know
13  exactly why she was terminated, correct?
14    A.    Not the exact reason.
15    Q.    When did you say you resigned?
16    A.    I handed in my termination I
17  believe and it's a little vague, but I think it
18  was the end of April because I would have been
19  gone by approximately June 1st.
20    Q.    So when do you think you
21  relinquished your responsibilities, at the end
22  of April?
23    A.    No, I did not. My
24  responsibilities were relinquished the day I

Page 25

1  left.
2    Q.    When was what day?
3    A.    I don't remember exactly. It's on
4  or before or about June 1st.
5    Q.    You've told me everything about
6  your memory of Wendy Gauthier, correct?
7    A.    I don't believe you asked me.
8    Q.    I asked you if you remember her?
9    A.    I'm sorry, repeat the question.
10    Q.    Have you told me everything in this
11  deposition today about your memory of Wendy
12  Gauthier?
13    A.    Oh, Wendy Gauthier. I'm sorry, I
14  thought you said, when I got there.
15    Q.    Sorry.
16    A.    That's what I heard, I'm sorry.
17    Q.    You have told me everything you
18  know about Wendy Gauthier today?
19      MR. GRIGGS: Objection to the form.
20    Q.    (By Mr. Shea) Everything you
21  remember about her, right?
22    A.    I have responded to your questions
23  correctly.
24    Q.    So you have told me everything you

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# ANN MARIE KENDALL
## February 8, 2007

8 (Pages 26 to 29)

---

Page 26

1  remember about Wendy Gauthier?
2      MR. GRIGGS: Objection to the form.
3      THE WITNESS: I responded to your
4  questions of what you asked about.
5      Q.   (By Mr. Shea) Is there anything
6  else you remember about Wendy Gauthier other
7  than what you've already told me today?
8      A.   I don't know.
9      Q.   You don't know of anything else?
10     A.   I don't recall.
11    * Q.   You don't recall anything else
12  about Wendy Gauthier other than what you've told
13  me today, is that fair to say?
14      MR. GRIGGS: I'll object to the
15  form.
16      THE WITNESS: I guess I'm finding
17  it very difficult.
18      MR. SHEA: Can you read that back?
19
20      * (Question read)
21
22      Q.   (By Mr. Shea) You can answer.
23      A.   The only answer I can say to you is
24  that I have responded to any questions you've

---

Page 27

1  asked me about Wendy Gauthier.
2      Q.   That's not many question.
3      MR. SHEA: Can you read back the
4  question?
5
6      * (Question read)
7
8      THE WITNESS: I can say that she
9  was a female, that she worked 11:00 to
10  7:00, that she was married, I mean.
11      Q.   (By Mr. Shea) Do you remember what
12  she looked like?
13      A.   Honestly, no.
14      Q.   Do you remember whether she was
15  ever pregnant or no?
16      A.   I believe she may have been
17  pregnant.
18      Q.   Well, do you know, do you have a
19  memory of whether she was pregnant or not?
20      A.   I do remember something about her
21  being pregnant.
22      Q.   What do you remember?
23      A.   All I can say is I remember and I
24  cannot tell you whether or how it came about

---

Page 28

1  that she was pregnant. Whether she stated it or
2  I heard it from someone else.
3      Q.   Was she pregnant? Do you know
4  whether Ms. Gauthier was pregnant while she was
5  employed at SunBridge or not?
6      A.   I believe she was pregnant at
7  SunBridge.
8      Q.   Did she work there the whole time
9  that you worked at SunBridge, Ms. Gauthier?
10     A.   I don't know because I don't know
11  when she left.
12      Q.   Do you know when she started?
13     A.   Not exactly.
14      Q.   Do you have any idea?
15     A.   She would have had to start
16  sometime I was employed.
17      Q.   Did you know sitting here today in
18  what year she was employed at SunBridge?
19     A.   Exactly no, sir.
20      Q.   Do you have any idea?
21     A.   Either 2003 or 2004.
22      Q.   You are not sure?
23     A.   No, sir.
24      Q.   Do you know what her position was

---

Page 29

1  at SunBridge?
2      A.   She was a CNA.
3      Q.   Was she a CNA the whole time she
4  was employed at SunBridge?
5      A.   Yes, sir.
6      Q.   Did she do a good job?
7      A.   I can't answer that honestly.
8      Q.   I'm just trying to get your best
9  memory. Whatever your memory is that's fine.
10      Do you know whether Ms. Gauthier
11  was ever injured at work or no?
12     A.   I don't have a recall on that.
13      Q.   She may have, you just don't
14  recall?
15     A.   She may have, I don't recall.
16      Q.   Do you know whether Ms. Gauthier --
17  do you recall any conversation with Ms. Gauthier
18  or no?
19     A.   I vaguely remember a conversation
20  when perhaps hiring her because I usually speak
21  to all new employees.
22      Q.   Do you remember her ever asking for
23  any kind of light duty work?
24     A.   No, I do not remember her asking

---

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# ANN MARIE KENDALL
## February 8, 2007

9 (Pages 30 to 33)

| Page 30 | Page 32 |
|---|---|

**Page 30**

1 me.
2 Q. The conversations you remember when
3 she was hired, what do you remember, or
4 conversation I think you said?
5 A. Conversations with me and new
6 employees. Depending on the employee in a
7 situation would be to welcome them, to explain
8 and reiterate policies, the importance of being
9 on time, that's me reiterating policies. Asking
10 them if there's any questions. And like I say,
11 everything is individual per employee.
12 Q. Meaning what?
13 A. Well, meaning that there is
14 something missing from a record that needs to
15 be, an employment record upon hiring that needs
16 to be complete before they can start. Maybe
17 something to do about the schedule. Each person
18 is an individual, so that, you know, I really
19 couldn't tell you. Maybe it was looking for
20 references, maybe it was looking for, like I
21 said, it was all individual.
22 Q. But I'm just focusing on your
23 specific memory of speaking with Wendy Gauthier,
24 do you have any specific memory of speaking with

**Page 32**

1 SunBridge related to her performance or no?
2 A. I have no recall.
3 Q. Do you know whether Wendy Gauthier
4 ever had any complications in her pregnancy that
5 you referred to?
6 A. I was never aware of any
7 complications of pregnancy.
8 Q. Are you sure you were aware of her
9 pregnancy or no?
10 MR. GRIGGS: Asked and answered,
11 but go ahead and answer if, again, if you
12 want.
13 THE WITNESS: You know, I can't
14 sit here and honestly say that Wendy
15 Gauthier was pregnant. There was rumors
16 that Wendy Gauthier was pregnant, but I do
17 not have any validation.
18 Q. (By Mr. Shea) Do you know who you
19 heard the rumor from?
20 A. No, I do not.
21 Q. Did you ever talk to Wendy Gauthier
22 about any attendance issues that you recall?
23 A. I don't recall.
24 Q. How old are you?

**Page 31**

1 Wendy Gauthier?
2 A. Not specific.
3 Q. Ever?
4 A. Ever?
5 Q. Yes.
6 A. Can I give you the content, no, I
7 cannot.
8 Q. I'm asking you if you have a
9 specific memory of speaking with her?
10 A. Yes, I did speak with her.
11 Q. When did you speak with her?
12 A. I don't know.
13 Q. What did you talk to her about, do
14 you know or?
15 A. I cannot honestly answer that.
16 Q. Again, I'm just trying to get your
17 best memory.
18 A. Mm-hmm.
19 Q. You have no memory of conversation
20 with her, correct?
21 A. I have no memory of any content of
22 conversation.
23 Q. Do you know whether Wendy Gauthier
24 ever received any kind of reprimands at

**Page 33**

1 A. How old am I?
2 Q. Yes.
3 A. 65.
4 Q. I want to just get a little back
5 ground. Where did you go to school?
6 A. What school?
7 Q. Starting with high school?
8 A. I went to Catholic Central High
9 School in Troy, New York.
10 Q. When did you graduate?
11 A. I graduated 1959.
12 Q. Where did you go from there?
13 A. From there I went to Albany Medical
14 Center School of Nursing in Albany, New York.
15 Q. You graduated with a degree?
16 A. I graduated with a registered nurse
17 and received that January '63.
18 Q. Then did you go to school beyond
19 that?
20 A. Yes, sir.
21 Q. Where did you go?
22 A. I went to nurse practitioner's
23 school in Syracuse. I'm trying to remember, it
24 was back in 1974. I'm trying to recall, I think

# ANN MARIE KENDALL
# February 8, 2007

10 (Pages 34 to 37)

| Page 34 |
| --- |

1  it was St. Joseph's Hospital in Syracuse, New
2  York.
3      Q.    Did you graduate with some degree?
4      A.    I did not graduate because we moved
5  to Indiana.
6      Q.    What type of program was that?
7      A.    It was a nurse clinician's program.
8      Q.    Beyond that, did you go to any
9  other higher level of education?
10     A.    Yes, sir.
11     Q.    Where was that?
12     A.    In New York state I went to Suny
13 Utica/Rome for bachelor's.
14     Q.    Was the nursing degree a
15 bachelor's?
16     A.    It was in health.
17     Q.    But the nursing degree in 1963, was
18 that a four year bachelor's?
19     A.    It was a three-year diploma.
20     Q.    Then this one that you are talking
21 about at Suny, that's a four-year bachelor's
22 degree?
23     A.    Yes.
24     Q.    What was that in?

| Page 35 |
| --- |

1      A.    Health systems management.
2      Q.    Did you graduate?
3      A.    Yes, sir.
4      Q.    In what year was that?
5      A.    I can't exactly remember.
6      Q.    Beyond that, did you go to school?
7      A.    Yes, sir.
8      Q.    Where did you go?
9      A.    Suny Binghamton.
10     Q.    What degree were you pursuing
11 there?
12     A.    Master's.
13     Q.    Did you graduate?
14     A.    Yes, sir.
15     Q.    What year?
16     A.    Can't recall.
17     Q.    Do you have any idea?
18     A.    1988, 1990, somewhere around there.
19     Q.    Prior to that other degree, prior
20 to the four-year degree at Suny, when do you
21 think you graduated?
22     A.    There was about two or three years.
23     Q.    Gap between the two?
24     A.    Yes, sir.

| Page 36 |
| --- |

1      Q.    Any other higher level of education
2  that you had?
3      A.    No formal school, no.
4      Q.    Why is it that when you left
5  SunBridge you went back to being a registered
6  nurse?
7      A.    I don't believe I said that.
8      Q.    I think you said that. When you
9  left SunBridge, are you a nurse now?
10     A.    I am a nurse now.
11     Q.    Obviously you are educated as a
12 nurse.
13     A.    Yes, sir.
14     Q.    And you have been for some time.
15 Were you acting as a nurse at SunBridge?
16     A.    Yes, sir.
17     Q.    What was your title at SunBridge,
18 director of nursing?
19     A.    I was director of nursing.
20     Q.    The whole time?
21     A.    Yes, sir.
22     Q.    Can you tell me what job
23 responsibility you had in that role at
24 SunBridge?

| Page 37 |
| --- |

1      A.    I was responsible for the overall
2  care of all the residents, employees as far as
3  assuring that there was adequate staffing, that
4  the employees that were hired were appropriate,
5  as per the job title.
6      Q.    Were you in charge of enforcing any
7  attendance policies there that you know of?
8      A.    Yes, sir.
9      Q.    Which attendance policies were you
10 enforcing when you were employed at SunBridge?
11     A.    Which?
12     Q.    Yes.
13     A.    Attendance policies?
14     Q.    Yes.
15     A.    It would be all attendance
16 policies.
17     Q.    Do you recall what the attendance
18 policies were?
19     A.    I don't understand your question,
20 if you'd like to clarify that, sir.
21     Q.    Sure. Whenever you have a question
22 about one of my questions, feel free to ask me
23 to rephrase it or explain it. Otherwise, can I
24 assume you understand the question?

**ANN MARIE KENDALL**
**February 8, 2007**

11 (Pages 38 to 41)

| Page 38 |
| --- |

1    A.    Okay.
2    Q.    When you were employed at
3 SunBridge, you said you were involved in
4 enforcing attendance policies and my question
5 was do you recall what those attendance policies
6 were that you enforced?
7          What were the attendance policies
8 at SunBridge in other words?
9    A.    The attendance policies at
10 SunBridge is that employees were expected to
11 show up for their work schedule and work their
12 work schedule as assigned.
13    Q.    Is that your best memory of what
14 the attendance policies were at SunBridge or do
15 you recall any more detail about the attendance
16 policies other than what you've just testified
17 to?
18          MR. GRIGGS: Objection to the form.
19 Go ahead and answer.
20          THE WITNESS: Specifically, no.
21 Other than I'm trying to think. They would
22 be expected I believe and I don't know
23 exactly because of other places, if you
24 cannot attend or be at your scheduled

| Page 39 |
| --- |

1 employment at that date, you would have to
2 call at least four hours prior to your
3 schedule time. Such that if someone was
4 going to work at 3:00 in the afternoon,
5 they should call at 11:00 to allow us time
6 to try to cover your shift. That's one
7 specific policy.
8    Q.    (By Mr. Shea) I'll get back to
9 that in a minute.
10          Over what time period did you work
11 at SunBridge?
12    A.    I believe I started on or about
13 August 21, 2003 through the end of May of 2004.
14    Q.    Did you have Ht R   functions in your
15 role as director of nursing?
16    A.    I'm sorry?
17    Q.    He Rs  function, human resource
18 function.
19    A.    The only human resource function I
20 would have is as it pertains to the nursing
21 department.
22    Q.    Do you recall whether Wendy
23 Gauthier worked under your supervision in the
24 nursing department or not?

| Page 40 |
| --- |

1    A.    In all honesty, I cannot recall her
2 personally, but if she was there at that time,
3 she work under me.
4    Q.    Was Wendy Gauthier a good employee
5 or do you know?
6    A.    I cannot honestly answer that.
7    Q.    Did she have any performance
8 problems or do you know?
9    A.    I don't recall.
10    Q.    If she had performance issues,
11 would you be the one to reprimand her if a
12 reprimand was in order such as a warning?
13    A.    If there were a warning and I was
14 there, yes, I would be involved in that.
15    Q.    How would you be involved, would
16 you be the one who decides to issue the warning
17 or not?
18    A.    Please repeat that one more time?
19    Q.    Did you issue warnings to CNAs?
20    A.    Yes, I did.
21    Q.    Did you issue verbal warnings?
22    A.    Yes.
23    Q.    Did you issue written warnings?
24    A.    Yes.

| Page 41 |
| --- |

1    Q.    Did you terminate CNAs or no?
2    A.    At Sandalwood?
3    Q.    Yes.
4    A.    I may have, I remember terminating
5 one CNA.
6    Q.    Who was that?
7    A.    I don't recall the person's name.
8    Q.    It wasn't Wendy Gauthier?
9    A.    It was not Wendy Gauthier.
10    Q.    Do you know why you terminated this
11 employee?
12    A.    I don't recall the specific
13 circumstances.
14    Q.    Do you recall them generally?
15    A.    I cannot honestly answer that.
16    Q.    Again, just your best memory.
17          Do you recall reprimanding or
18 warning or terminating any employee for
19 attendance issues or no?
20    A.    Are we specifically talking at
21 Sandalwood?
22    Q.    Yes.
23    A.    Yes, I remember terminating.
24    Q.    Employees for attendance issues?

# ANN MARIE KENDALL
## February 8, 2007

12 (Pages 42 to 45)

Page 42

1   A.   Yes.
2   Q.   But not CNAs?
3   A.   I'm sorry?
4   Q.   Who were these employees?
5   A.   Well, a CNA is an employee.
6   Q.   Well, I asked you if you remembered
7   terminating a CNA?
8   A.   And I said yes.
9   Q.   Yes, one, but you weren't sure of
10  the reason.
11  A.   Correct.
12  Q.   Does that still hold true?
13  A.   Yes, sir.
14  Q.   When I asked you about whether you
15  terminated any employees or reprimanded any
16  employees for attendance issues, does the same
17  answer hold true, you don't remember?
18  A.   I guess I'm confused.
19  Q.   Do you remember terminating any
20  employees at Sandalwood, which we agree that we
21  are referring to as SunBridge interchangeably,
22  right?
23  A.   Okay. I can remember terminating
24  and unsure of the situation where an employee

Page 43

1   left and never showed up again. So if it's
2   terminating, it's completing the paperwork not
3   being able to reach an employee.
4   Q.   Who was that?
5   A.   I can't recall the person's name.
6   Q.   Is that the one you were referring
7   to earlier?
8   A.   No, sir.
9   Q.   You did you terminate more than one
10  person?
11  A.   Yes.
12  Q.   How many did you terminate?
13  A.   I can't recall.
14  Q.   You said earlier it was one and
15  then --
16  A.   There was one that I was very
17  specific about, yes.
18  Q.   Do you have any idea how many you
19  terminated?
20  A.   No, sir.
21  Q.   Could it be more than 10?
22  A.   I don't think so.
23  Q.   Could it be more than five?
24  A.   I don't know.

Page 44

1   Q.   Do you remember any employees, CNAs
2   at SunBridge or Sandalwood again using those
3   terms interchangeably throughout this deposition
4   that you reprimanded in any way for attendance
5   issues?
6   A.   I remember reprimanding, who the
7   employees are, I don't recall by name.
8   Q.   Was anyone else involved with you
9   in those reprimands?
10  A.   At times.
11  Q.   Who was that?
12  A.   My administrator.
13  Q.   Who was that?
14  A.   Mr. Copper, Stephen Copper.
15  Q.   What was his involvement?
16  A.   His involvement?
17  Q.   Yes.
18  A.   Two of us together sitting down and
19  talking with an employee.
20  Q.   Who would make the decision to
21  reprimand an employee for attendance issues
22  during the time that you were at Sandalwood?
23  Who would be responsible?
24  A.   It would always be myself and the

Page 45

1   administrator.
2   Q.   Who was the administrator who you
3   are talking about at the time you were employed
4   at Sandalwood?
5   A.   At first it was Administrator
6   Laurie Solomon. Then I had a couple interim
7   administrators. And then I had Steve Copper.
8   Q.   Whenever you terminated or
9   reprimanded an employee, it would be Steve
10  Copper that would assist you?
11  A.   Not always.
12  Q.   Or one of the other individuals you
13  just mentioned, correct?
14  A.   They were usually involved in the
15  process.
16  Q.   Do you recall any employee
17  committing a no call/no show at Sandalwood or
18  not?
19  A.   I'm trying to think back. I know
20  there were employees, but I can't remember who
21  or why or how.
22  Q.   Was there any kind of a written
23  policy at Sandalwood regarding no call/no shows?
24  A.   Yes.

**ANN MARIE KENDALL**
**February 8, 2007**

13 (Pages 46 to 49)

Page 46

| | |
|---|---|
| 1 | Q. What was that policy, do you know? |
| 2 | A. The policy stated that they could |
| 3 | be, I'm trying to think the correct terminology, |
| 4 | enforce certain policy up to and including |
| 5 | termination. |
| 6 | Q. Was that in writing or do you know? |
| 7 | A. Yes, sir. |
| 8 | Q. Is that your best memory of the no |
| 9 | call/no show policy that you think was in |
| 10 | writing? |
| 11 | A. Mm-hmm. |
| 12 | Q. Yes? |
| 13 | A. Yes, sir. |
| 14 | Q. Can you remember anything more |
| 15 | specifically about the no call/no show policy |
| 16 | that was in writing when you were at Sandalwood |
| 17 | other than what you've just said? |
| 18 | A. No, sir. |
| 19 | Q. Was an employee allowed of number |
| 20 | of no call/no shows before certain action would |
| 21 | be taken? |
| 22 | A. I believe that all employees were |
| 23 | treated per individual. |
| 24 | Q. Per what, I'm sorry, I'm not sure |

Page 47

| | |
|---|---|
| 1 | what you said? |
| 2 | A. Well, if an employee was a no |
| 3 | call/no show and they were in an accident and |
| 4 | they couldn't call, then obviously I wouldn't |
| 5 | necessarily enforce the policy. |
| 6 | Q. My question was, was there a |
| 7 | certain number of no call/no shows -- |
| 8 | A. No, there was not. |
| 9 | Q. You have to let me finish my |
| 10 | question. |
| 11 | Under the policy that you just |
| 12 | described at Sandalwood while you were there, |
| 13 | were there a number of no call/no show incidents |
| 14 | that had to take place before a reprimand |
| 15 | occurred? |
| 16 | A. I don't recall if there was a |
| 17 | specific number. |
| 18 | Q. Was there a certain number of no |
| 19 | call/no shows that had to take place or that |
| 20 | could lead to a termination of employment, do |
| 21 | you know? |
| 22 | A. I do not know. |
| 23 | Q. If an employee, a CNA wanted to |
| 24 | reschedule their work time or move a day around |

Page 48

| | |
|---|---|
| 1 | on their schedule, they could do that, they |
| 2 | could switch with other CNAs as long as they had |
| 3 | coverage? |
| 4 | A. No, sir. |
| 5 | Q. That's not correct? |
| 6 | A. No, sir. |
| 7 | Q. If a CNA wanted to move a date |
| 8 | around on work schedule, they couldn't do that? |
| 9 | A. Not automatically. |
| 10 | Q. What would they have to do to do |
| 11 | that? |
| 12 | A. They would have to get permission |
| 13 | either from myself and/or the person who did the |
| 14 | scheduling who would confirm with me to approve |
| 15 | it. |
| 16 | Q. They would make that request |
| 17 | verbally, correct? |
| 18 | A. There should be something in |
| 19 | writing that I recall. |
| 20 | Q. Not by the CNA moving the time? |
| 21 | A. Yes, sir. Usually there was a |
| 22 | contractual agreement between the two CNAs which |
| 23 | was then approved or disapproved. |
| 24 | Q. Tell me about that process. What |

Page 49

| | |
|---|---|
| 1 | would a CNA have to submit in writing to move |
| 2 | their schedule to shift a day or some time? |
| 3 | A. They would state specifically that |
| 4 | the other person was going to work for them on a |
| 5 | particular date and shift and/or they could be |
| 6 | switching a date and shift and both of them were |
| 7 | signed and agreed upon. |
| 8 | Q. What would they sign is my |
| 9 | question? |
| 10 | A. The form that they are writing. |
| 11 | Q. What form? |
| 12 | A. Usually a simple form that says so |
| 13 | and so agrees to work for so and so on such and |
| 14 | such a date or they are switching this date and |
| 15 | that person is working that specific date and |
| 16 | then we both sign and date it. |
| 17 | Q. Is it your testimony that every CNA |
| 18 | had to get approval, make a request in writing |
| 19 | to change time? |
| 20 | A. Unless there was not time to put it |
| 21 | in writing, but they all had to get. |
| 22 | Q. It could be verbal as well, a |
| 23 | verbal request? |
| 24 | A. Yes, it could be, but that would be |

**ANN MARIE KENDALL**
**February 8, 2007**

14 (Pages 50 to 53)

Page 50

1 unusual circumstances.
2    Q.   So tell me about this form, what
3 did the form say that you say the CNAs fill out?
4    A.   I don't know exact verbage on the
5 form, how many lines there are or anything other
6 than the agreement.
7    Q.   Is there a name for the form?
8    A.   I don't know if there is a name.
9    Q.   Was this form used routinely the
10 whole time that you were there?
11    A.   I believe so.
12    Q.   Are you sure?
13    A.   No, I'm not.
14    Q.   So if I'm a CNA, I have to fill out
15 a form and let's say this was the form, is it a
16 one-page form?
17    A.   Yes, sir.
18    Q.   And so I fill the form out and who
19 do I give it to?
20    A.   The scheduler usually or myself
21 directly.
22    Q.   You could give it to either one?
23    A.   Mm-hmm.
24    Q.   Yes?

Page 51

1    A.   Yes, sir.
2    Q.   Who is the scheduler? Is the
3 scheduler a nurse?
4    A.   No, sir.
5    Q.   What does the scheduler do with the
6 form?
7    A.   What does she do with the form?
8    Q.   Yes.
9    A.   She would look at it, look at the
10 dates and then check with me and tell me whether
11 we felt we could do it or not do it.
12    Q.   Was there a written policy that
13 says a CNA has to change their time in writing,
14 make a written request at Sandalwood?
15    A.   Excuse me, sir, that's very vague.
16    Q.   Was there a written policy at
17 Sandalwood that required CNAs to make a request
18 that changed their time in writing?
19    A.   Yes, usually, yes.
20    Q.   Usually?
21    A.   From what I can recall, they put it
22 in writing and there was a book and/or a form
23 that they kept at the scheduler's office. Such
24 as if somebody wanted three days off for

Page 52

1 vacation and they gave the scheduler three weeks
2 notice or two weeks notice then that was put in
3 writing as a request. Therefore, that would be
4 a change in the schedule.
5       If someone needed a doctors day off
6 and wanted to use a personal day, that would be
7 a change in the schedule and they would notify
8 the scheduler and then the scheduler would then
9 work that out.
10    Q.   I understand that. That's been my
11 understanding throughout.
12       The scheduler would put it in
13 writing, but not the CNA?
14    A.   The CNA would.
15    Q.   If I go back to 2003 and 2004, I'm
16 going to find forms from all the CNAs on a
17 regular basis whenever they change their times,
18 I'm going to find written forms from them that
19 were submitted by the CNAs --
20    A.   Mm-hmm.
21    Q.   -- to change their time in writing?
22       MR. GRIGGS: Objection to the form.
23       THE WITNESS: No, I do not believe
24 they kept all the forms in the book. What

Page 53

1 was kept was the schedule itself.
2    Q.   (By Mr. Shea) What did they do
3 with the forms?
4    A.   I don't know.
5    Q.   So when you say the schedule
6 itself, it's the scheduler's notes is what you
7 are talking about?
8    A.   Scheduler's notes.
9    Q.   We're going to go through this as
10 thoroughly as we can to understand it.
11       The scheduler makes notes on the
12 sheet about any changes on the schedule, right?
13    A.   Mm-hmm.
14    Q.   Yes?
15    A.   Yes, sir.
16    Q.   What are those sheets called?
17    A.   You know, it's her working format
18 that she uses on a daily basis to make
19 corrections to the schedule or to try to fill in
20 the schedule.
21       MR. GRIGGS: Can I take a rest
22 room break?
23       MR. SHEA: Sure.
24

**ANN MARIE KENDALL**
**February 8, 2007**

15 (Pages 54 to 57)

| Page 54 |
| --- |

1          (A recess was taken)
2
3          MR. SHEA: Back on the record.
4     Q.    (By Mr. Shea) Was there a written
5  policy of SunBridge or Sandalwood that required
6  C NAs to put in writing these requests for
7  changing a schedule?
8     A.    I don't honestly recall that.
9     Q.    Was there a verbal policy?
10    A.    I know that it was a policy.
11    Q.    It was a verbal policy, I assume?
12    A.    I can't tell you whether it was
13  verbal or written.
14    Q.    So would the other CNAs submit
15  something in writing as well, the one taking
16  over?
17    A.    The one form, the one separate
18  paper would be completed.
19    Q.    Would it be signed by the CNAs or
20  do you know?
21    A.    They were signed by the CNAs. If it
22  required a shift change between two CNAs.
23    Q.    Is it your testimony that that
24  policy was consistently applied to all CNAs the

| Page 55 |
| --- |

1  entire time you were there?
2     A.    Primarily in writing yes, sir,
3  there may have been a few verbal instances.
4     Q.    So where are those sheets?
5     A.    I do not know.
6     Q.    Did they have them when you left?
7     A.    I can't honestly say they were
8  there when I left.
9     Q.    You just told me they didn't keep
10  those, right?
11    A.    Yes, do they have them. You didn't
12  say whether they kept were.
13    Q.    Did they keep those forms?
14    A.    I don't know.
15    Q.    Did they keep them while you were
16  working there? Did SunBridge management keep
17  those forms?
18    A.    I don't know.
19    Q.    If an employee changed their
20  schedule verbally, is there any reprimand for
21  that, was that inappropriate?
22    A.    No, sir.
23          MR. GRIGGS: Form.
24    Q.    (By Mr. Shea) Do you understand

| Page 56 |
| --- |

1  what I'm saying?
2     A.    You're saying if one employee
3  came --
4     Q.    To the scheduler?
5     A.    Mm-hmm.
6     Q.    Or to you?
7     A.    Mm-hmm.
8     Q.    And said, you know, I'm not going
9  to come in on that date, but I have coverage
10  from another CNA and the scheduler makes a note
11  of that on the schedule form, is that
12  appropriate?
13    A.    As long as it's agreed upon and
14  approved through administration.
15    Q.    That could be approved through the
16  scheduler or yourself?
17    A.    Through myself primarily.
18    Q.    Or the scheduler?
19    A.    The scheduler would contact me
20  reason being I'm not going to put somebody into
21  overtime.
22    Q.    Is it your testimony that while you
23  were employed at Sandalwood, you approved and
24  reviewed and approved every single schedule

| Page 57 |
| --- |

1  change?
2     A.    I cannot say I approved every
3  single.
4     Q.    Could the scheduler have the
5  authority to change the time on a schedule or a
6  CNA who has a verbal agreement with another CNA
7  to change the schedule?
8     A.    Depending on, everything was
9  considered individual.
10    Q.    What does that mean, so that could
11  happen?
12    A.    It could happen if it were a simple
13  change and if I was not there, then perhaps she
14  would have called the charge nurse -- sorry,
15  Steve and/or administrator just, oh, by the way,
16  this is happening. And it's okay because I
17  checked the schedule, it doesn't put anybody
18  into overtime and it's agreed upon.
19    Q.    It wasn't unusual for a CNA to
20  change the schedule verbally?
21    A.    I can't say whether it was usual or
22  unusual, it may have occurred.
23    Q.    Do you know who Lisa Franks is,
24  does that name ring a bell?

# ANN MARIE KENDALL
## February 8, 2007

16 (Pages 58 to 61)

| Page 58 | Page 60 |
|---|---|
| 1    A.    She was a CNA.<br>2    Q.    Do you remember her?<br>3    A.    I remember she worked 11:00 to<br>4 7:00.<br>5    Q.    Do you remember her?<br>6    A.    I couldn't identify her in a line<br>7 up.<br>8    Q.    Do you know whether she had a no<br>9 call/no show at Sandalwood?<br>10    A.    I don't recall.<br>11    Q.    Do you recall any other employee<br>12 who may have had a no call/no show at<br>13 Sandalwood?<br>14    A.    Off the top of my head, no.<br>15    Q.    How many no call/no shows do you<br>16 get as a CNA and Sandalwood before you are<br>17 terminated?<br>18    A.    I don't know.<br>19    Q.    Do you know whether Lisa Franks and<br>20 Wendy Gauthier ever had an agreement to change<br>21 their schedules as CNAs at Sandalwood?<br>22    A.    I couldn't recall that.<br>23        MR. SHEA: I'm just going to take<br>24    one minute and I think we're done. | 1 written warning at any employer?<br>2    A.    I received a verbal warning about<br>3 being late and that was it.<br>4    Q.    Where was that?<br>5    A.    Child's Hospital.<br>6    Q.    Where was that located?<br>7    A.    Albany, New York.<br>8    Q.    Is that still there?<br>9    A.    I believe it is.<br>10    Q.    What street is that on?<br>11    A.    You know, I really don't know.<br>12    Q.    Is that downtown Albany?<br>13    A.    It's like up around, what the<br>14 exact, could be Holland Avenue, it could have<br>15 been some other street. I really don't know.<br>16 Albany Child's Hospital, the VA and St. Peter<br>17 are all within three or four blocks of each<br>18 other. The exact street, I don't know.<br>19    Q.    Why did you resign your employment<br>20 at Sandalwood?<br>21    A.    Because my husband and I were<br>22 moving to Florida.<br>23    Q.    You moved to Florida?<br>24    A.    Yes, sir. |
| **Page 59** | **Page 61** |
| 1<br>2        (A recess was taken)<br>3<br>4        MR. SHEA: Back on the record.<br>5    Q.    (By Mr. Shea) Have you ever been<br>6 reprimanded or terminated from a job?<br>7    A.    No, I've never been terminated from<br>8 a job.<br>9    Q.    Have you ever been reprimanded?<br>10    A.    Reprimanded, I believe someone may<br>11 have said I want you to do it this way and not<br>12 that way or I can't really recall. But I've<br>13 never been terminated from a position.<br>14    Q.    Who may have said don't do it this<br>15 way and do it that way, which employer?<br>16    A.    Back in early '60s I worked in the<br>17 operating room and I wore sandals down to lunch<br>18 and they said I was not professional to wear<br>19 sandals. We had to change our shoes from<br>20 conductive to nonconductive shoes.<br>21    Q.    Where was this?<br>22    A.    Child's Hospital in Albany back in<br>23 1965.<br>24    Q.    Did you ever receive a verbal or | 1    Q.    Now you are moving back or you've<br>2 moved back?<br>3    A.    Yes, sir.<br>4    Q.    You are selling your house in<br>5 Florida?<br>6    A.    Yes, sir.<br>7    Q.    Did you ever re-apply to<br>8 Sandalwood?<br>9    A.    No, sir.<br>10    Q.    Or any SunBridge entity?<br>11    A.    No, sir.<br>12    Q.    Why not?<br>13    A.    I didn't choose to.<br>14    Q.    In your entire employment history,<br>15 did anyone ever make any complaints about you?<br>16    A.    Not that I can recall.<br>17    Q.    You were never a party to a<br>18 lawsuit?<br>19    A.    A lawsuit, no, sir.<br>20    Q.    Did you work in Florida?<br>21    A.    My husband and I opened, actually<br>22 took over a small assisted living facility.<br>23    Q.    You were employed there?<br>24    A.    We were self-employed. |

**ANN MARIE KENDALL**
**February 8, 2007**

17  (Pages 62 to 65)

Page 62

1   Q.   What happened with that?
2   A.   We sold it.
3   Q.   Who did you sell it to?
4   A.   I think her name was Barbara
5   Surrette, S-U, I don't know how to spell her
6   name correctly.
7   Q.   Why did you sell it?
8   A.   Because I became lonely for my
9   family and my grandchildren.
10  Q.   Back here in Massachusetts?
11  A.   Yes, sir, we came back for a visit
12  and I started feeling nostalgic, whatever you
13  want to say. I found that the separation, I was
14  wasn't able to adjust to that separation.
15  Q.   What did you do at the assisted
16  living facility, what's the name of it?
17  A.   It was called Cozy Coachman.
18  Q.   Is it still there?
19  A.   Yes, sir.
20  Q.   What did you do there?
21  A.   We took care of the residents, we
22  had staff. I did PR   , went to visit hospitals,
23  other nursing homes. However one does to look
24  for new residents, most of them were word of

Page 63

1   mouth. Set up their plan of care. Make sure
2   there was food, clothing, the whole continuum of
3   care of the assisted living.
4   Q.   From high school to now, do you
5   remember the places you worked?
6   A.   Probably.
7   Q.   Can you tell me what they are and
8   when you worked there?
9   A.   Oh, God, no. I'm sorry, sir, it's
10  45 years of.
11  Q.   Employment?
12  A.   Yes, sir.
13  Q.   Can you give me the ones you do
14  recall off the top?
15  A.   I worked at Albany Med when I first
16  graduated. Then I worked at Child's Hospital.
17  Then we moved to California. I worked at
18  Glendora Community Hospital in Glendora in the
19  operating room. Moved back to New York.
20  Q.   Just your best memory.
21  A.   Leonard Hospital is no longer
22  there. Then I worked in a free-standing surgery
23  center, it's like an on-call emergency
24  free-standing building in a remote community

Page 64

1   away from the hospital.
2   Q.   Like a walk-in facility?
3   A.   Sort of a walk in, yes.
4   Q.   What's the name of that?
5   A.   I don't remember. It was in
6   upstate New York, Steventown.
7   Q.   What's the next place you recall
8   working at?
9   A.   For the next 13 years or so I
10  worked for my husband who is a physician and I
11  was a physician's assistant.
12  Q.   Where was that, do you remember?
13  A.   Canajoharie, New York.
14  Q.   What was the name of the place?
15  A.   I don't know if it really had a
16  name other than the physician's names.
17  Q.   What was the physician's name?
18  A.   Dr. Paul Rockwell.
19  Q.   Then where did you work?
20  A.   I worked as an administrator for
21  Montgomery County Nursing Home. I went through
22  a divorce. Relocated with my youngest child to
23  Cambridge, New York. And I worked for
24  Presbyterian and I was the administrator for

Page 65

1   Presbyterian Home for 11 or 12 years. I worked
2   at Coleman House.
3   Q.   What's that?
4   A.   It's a nursing home in
5   Northborough, I was the director of nursing
6   there.
7   Q.   Northborough?
8   A.   Massachusetts.
9   Q.   That was sometime in the '90s?
10  A.   Yeah, I want to say '96, '98. I'm
11  sorry.
12  Q.   Just your best memory?
13  A.   I wasn't thinking about.
14  Q.   Your entire work history.
15  A.   Clark Manor 2000 to 2002 somewhere
16  around there, February of 2002. I worked at
17  Havens Health Care in Connecticut and then went
18  to Sandalwood.
19  Q.   That's what I was looking for just
20  a brief summary.
21  A.   Okay.
22  Q.   Where is Haven Health Care located?
23  A.   Danielson, I think it was another.
24  Q.   Sorry, what?

# ANN MARIE KENDALL
## February 8, 2007

18 (Pages 66 to 69)

---

Page 66

1    A.   There they went through a name
2  change, so I don't know if could have been
3  something else.
4    Q.   But it's in Danielson?
5    A.   Yes, sir.
6    Q.   What did you do for them?
7    A.   I started off as the assistant
8  director and then assumed the role director when
9  the director left.
10    Q.   You didn't receive any warnings or
11  reprimands at Sandalwood, correct?
12    A.   No, sir.
13    Q.   Progressive discipline policy at
14  Sandalwood, was there one?
15    A.   Yes.
16    Q.   What was it?
17    A.   I can't tell you off the top of my
18  head exactly.
19    Q.   Do you know whether there were a
20  certain number of tardies or absenteeisms that a
21  CNA would have to reach before they would be
22  reprimanded or disciplined?
23    A.   I do not honestly know specifics.
24       MR. SHEA: I don't have anything

---

Page 67

1   further.
2
3
4       EXAMINATION BY MR. GRIGGS:
5
6    Q.   With regard to no call/no shows,
7  what was the SunBridge policy in that regard?
8       MR. SHEA: Objection. You may
9  answer.
10       THE WITNESS: There's one
11  policy -- I'm sorry, one no call/no show.
12    Q.   (By Mr. Griggs) One no call/no
13  show would result in what?
14       MR. SHEA: Objection.
15    Q.   (By Mr. Griggs) I'm asking you
16  what the policy is?
17    A.   I believe it's up to and including
18  termination.
19    Q.   Did you always terminate somebody
20  after the first no call/no show?
21       MR. SHEA: Objection.
22       THE WITNESS: No, sir.
23    Q.   (By Mr. Griggs) Why would you not?
24       MR. SHEA: Objection.

---

Page 68

1       THE WITNESS: Variety of reasons.
2  I believe some of it being it was difficult
3  to get staffing sometimes, so sometimes you
4  try to make exceptions and also in doing
5  so, you would help try to educate the
6  employee and try to work with them.
7    Q.   (By Mr. Griggs) So sometimes you
8  had no choice but to keep somebody?
9       MR. SHEA: Objection.
10       THE WITNESS: Yes.
11    Q.   (By Mr. Griggs) Did you find it a
12  challenge to find CNAs to staff shifts at
13  Sandalwood?
14       MR. SHEA: Objection.
15       THE WITNESS: Very much so.
16    Q.   (By Mr. Griggs) So you were saying
17  it was hard to find CNAs?
18       MR. SHEA: Objection.
19       THE WITNESS: Yes.
20    Q.   (By Mr. Griggs) Did you find it
21  also hard to find nurses as well?
22       MR. SHEA: Objection.
23       THE WITNESS: Yes, sir.
24       MR. GRIGGS: No further questions.

---

Page 69

1       MR. SHEA: I have a couple of quick
2  ones based on what he just said.
3
4
5       FURTHER EXAMINATION BY MR. SHEA:
6
7    Q.   The no call/no show policy at
8  Sandalwood, do you recall, do you have a
9  specific recollection of that policy today?
10    A.   The specific recollection I had was
11  that they can terminated after one no call/no
12  show. I think they said up to and including
13  termination.
14    Q.   Do you know whether Wendy Gauthier
15  had a no call/no show?
16    A.   I can't be very specific with it,
17  no.
18    Q.   Do you know whether she had any
19  absenteeism issues or tardiness issues?
20    A.   I believe there's some absenteeism.
21    Q.   You don't know whether she had a no
22  call/no show?
23    A.   I don't know, no, I don't.
24    Q.   You said there are certain

---

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**ANN MARIE KENDALL**
**February 8, 2007**

19 (Pages 70 to 73)

Page 70

1 circumstance where more than one no call/no show
2 may not lead to termination?
3    A.    That's so.
4    Q.    Is that correct?
5    A.    That's so.
6    Q.    What are those circumstances?
7    A.    Sometimes depending on the person
8 and the circumstances of the no call/no show,
9 you would make -- like I said, if somebody were
10 in an accident or they depended on their
11 neighbor and the neighbor didn't show up and
12 they didn't have whatever. I mean, I can't sit
13 here and give you each and every personal
14 circumstance, but sometimes we did.
15        Also, in order to staff because I
16 really had to maintain staffing and if I didn't,
17 then I on several occasions because of no
18 call/no shows with CNAs, I've worked 3:00 to
19 11:00, I've worked nights and days and evenings
20 as a nurse because of staffing issues. Because
21 regardless of whether that person shows or
22 doesn't show, I have to as a director maintain
23 certain staffing hours.
24    Q.    The circumstance under which more

Page 71

1 than one no call/no show may be acceptable,
2 would those include medical reasons?
3    A.    You know, I can't tell you
4 specifically what they were.
5    Q.    If someone had a no call/no show
6 because they were sick, would that be
7 acceptable?
8        MR. GRIGGS: Objection to the form.
9    Q.    (By Mr. Shea) Say they were
10 unexpectedly sick?
11    A.    I believe I addressed that. If
12 they were in the hospital and -- if they were in
13 a position where they could not, if they were in
14 an accident and they couldn't get to a phone.
15    Q.    I'm not talking about an accident,
16 I'm asking you about being ill.
17    A.    That's an individual situation that
18 I can't sit here and answer honestly.
19    Q.    Do you know whether Wendy Gauthier
20 was ill related to her pregnancy?
21    A.    Not that I recall.
22    Q.    Do you know whether she was or not?
23    A.    Pregnant or ill?
24    Q.    Ill related to her pregnancy was my

Page 72

1 question.
2    A.    Not that I recall.
3    Q.    So she may have and you just don't
4 recall?
5        MR. GRIGGS: Objection to the form.
6        THE WITNESS: I'm sorry?
7    Q.    (By Mr. Shea) She may have been
8 ill related to her pregnancy and you just don't
9 recall, is that fair to say?
10    A.    I don't recall. I don't recall her
11 being ill because of her pregnancy.
12    Q.    Do you know whether, in fact, she
13 was ill and not related to her pregnancy?
14    A.    No, I don't.
15    Q.    You don't recall having any
16 conversation with her about her pregnancy?
17    A.    I don't recall.
18    Q.    You don't recall her being injured
19 at work, correct?
20    A.    I don't recall her being injured at
21 work.
22    Q.    Do you know whether, in fact, she
23 was injured at work?
24    A.    I don't know that.

Page 73

1    Q.    Do you recall asking Wendy Gauthier
2 for any medical notes at any time?
3    A.    Asking for any?
4    Q.    Medical notes.
5    A.    Off the top of my head, no, I
6 don't.
7    Q.    If I told you that Steve Copper
8 said in his deposition that you asked for a
9 medical note from Wendy Gauthier related to her
10 pregnancy in whether she could do her job and,
11 lift, does that refresh your memory that you
12 received a medical note from Wendy Gauthier?
13        MR. GRIGGS: Objection.
14        THE WITNESS: No, sir.
15    Q.    (By Mr. Shea) Does that sound like
16 something you would do?
17        MR. GRIGGS: Objection.
18    Q.    (By Mr. Shea) Or would have done?
19    A.    Would have done what?
20    Q.    Ask Wendy Gauthier for a medical
21 note to clear her to do her job?
22    A.    For what reason?
23    Q.    To do her job as a CNA because she
24 was pregnant?

**ANN MARIE KENDALL**
**February 8, 2007**

20 (Pages 74 to 77)

| Page 74 | Page 76 |
|---|---|
| 1    A.    No, sir. | 1    light duty, who would she go to, you? |
| 2    Q.    You would not do that? | 2        A.    If she were injured at work and on |
| 3    A.    No, sir. | 3    compensation and the physician from the |
| 4    Q.    Meaning correct you would not do | 4    compensation that she went to sent her back to |
| 5    that, correct? | 5    work with an accommodation for light duty, the |
| 6    A.    I would not. | 6    light duty is very specified. |
| 7    Q.    Ask her for a medical note? | 7        Q.    Like lifting restriction? |
| 8    A.    For what reason? | 8        A.    And/or bending or sitting or |
| 9    Q.    Related to her pregnancy? | 9    whatever, it's very specific.  If I could |
| 10    A.    Never. | 10    accommodate it, I would do so.  But it would |
| 11    Q.    Did you ask for a medical note | 11    have to be accommodated on like if Wendy was |
| 12    related to anything, injury at work? | 12    working 11:00 to 7:00, I can't accommodate that, |
| 13    A.    You know, I don't recall asking her | 13    we do not have light duty on 11:00 to 7:00. |
| 14    for a medical note for anything. | 14        Q.    Do you know whether she asked for |
| 15    Q.    Do you recall her taking any time | 15    light duty on another shift? |
| 16    off for any reason, Wendy Gauthier? | 16        A.    I don't remember her asking for |
| 17    A.    No, scheduled time off, no. | 17    light duty. |
| 18    Q.    Or unscheduled time off? | 18        Q.    You don't remember either way? |
| 19    A.    As I said prior, I do remember | 19        A.    No, sir. |
| 20    there were some attendance issues.  What and | 20        Q.    Meaning correct you don't remember |
| 21    how, I cannot tell you. | 21    either way? |
| 22    Q.    If Wendy Gauthier had | 22        MR. GRIGGS:  Form of the question. |
| 23    complications related to her pregnancy and she | 23        THE WITNESS:  I don't know what |
| 24    needed an accommodation for that, who would she | 24    you are asking. |

| Page 75 | Page 77 |
|---|---|
| 1    have gone to, you? | 1        Q.    (By Mr. Shea) Meaning I'm correct |
| 2        MR. GRIGGS:  Objection. Assumes | 2    that you don't remember either way whether she |
| 3    facts not in the record. | 3    asked for light duty on another shift? |
| 4    Q.    (By Mr. Shea) You may answer? | 4        A.    I don't recall her ever asking for |
| 5    A.    If she had complications with her | 5    light duty. |
| 6    pregnancy, I hoped she would go to her | 6        Q.    You don't know either way? |
| 7    physician. | 7        A.    I don't know what either way? |
| 8    Q.    If she needed an accommodation for | 8        Q.    You don't recall either way whether |
| 9    a physical impairment, would she go to you on | 9    she did or she didn't? |
| 10    that? | 10        A.    I don't recall her asking for light |
| 11        MR. GRIGGS:  Objection to the form. | 11    duty. |
| 12        THE WITNESS:  Am I supposed to | 12        Q.    She may have and you just don't |
| 13    answer? | 13    recall? |
| 14    Q.    (By Mr. Shea) Yes. | 14        A.    I don't recall. |
| 15        MR. GRIGGS:  Objection to the form | 15        Q.    My question to you is could she |
| 16    of the question.  Answer if you understand | 16    have and you just don't recall? |
| 17    it. | 17        A.    I suppose she could have.  I just |
| 18        THE WITNESS:  I'm not, can you just | 18    don't recall her every asking. |
| 19    clarify that?  I just really want to answer | 19        Q.    Okay, that was my question. |
| 20    honestly and that I understand it. | 20        Would you be the person she would |
| 21    Q.    (By Mr. Shea) Sure.  I'll give you | 21    talk to about that light duty? |
| 22    two different scenarios. | 22        A.    Eventually, yes. |
| 23        If Wendy Gauthier was injured at | 23        Q.    Which shift did you supervise, all |
| 24    work and she needed an accommodation such as | 24    of them? |

# ANN MARIE KENDALL
## February 8, 2007

**Page 78**

1    A.    All of them.
2    Q.    How many were there?
3    A.    Three.
4    Q.    Did you ever give light duty to a
5    CNA?
6    A.    Yes, I believe I may have.
7    Q.    Which ones, do you remember?
8    A.    I don't remember.
9    Q.    For what reason?
10    A.    If someone, I believe, if someone
11    were injured at work and had a compensation
12    claim and as part of them working and starting
13    to return to work, to accommodate them, if I had
14    something to accommodate that for them, I would
15    then provide that. Who the employee was, I
16    couldn't tell you off the top of my head. It's
17    been some time and I honestly don't recall.
18    Q.    Did Wendy Gauthier ever ask you for
19    light duty?
20    A.    I don't recall that.
21    Q.    Did she ever have a compensation
22    claim?
23    A.    I don't recall that.
24    Q.    Do you have to have a worker's

**Page 79**

1    compensation claim to get an accommodation?
2    A.    Accommodation for what?
3    Q.    Such as light duty?
4    A.    Yes, sir.
5    Q.    Do you have to be on worker's comp?
6    A.    Yes, sir.
7    Q.    Is that your rule?
8    A.    No, sir.
9    Q.    That was SunBridge's rule?
10    A.    It's a rule every place I've
11    worked, sir.
12        MR. GRIGGS: I'll object to
13    everything in terms of all the questions
14    you asked regarding accommodations in terms
15    of requiring lead a conclusion. Insofar as
16    implicating the terms in the American
17    Disabilities Act. I'm not sure she
18    understands what that means.
19    Q.    (By Mr. Shea) Are you familiar
20    with the handicap laws, handicap discrimination
21    laws?
22    A.    No, I can't tell you that I'm
23    familiar with it.
24    Q.    If a CNA had a handicap at

**Page 80**

1    Sandalwood for which they needed an
2    accommodation, who would they talk to, you?
3    A.    No.
4    Q.    Who would they talk to?
5    A.    I'm trying to think. I can't ever
6    recall that ever happening in my career really.
7    Q.    I'm not asking you whether it
8    occurred, I'm just asking you who would they
9    talk to. If I'm a CNA --
10    A.    I think that would have to go
11    through HR. I'm thinking that has to be
12    approved by HYR , policy.
13    Q.    You don't know?
14    A.    No, because I never had anybody.
15    * Q.    Do you know whether a physical
16    impairment in the form of complications from a
17    pregnancy can amount to a physical impairment
18    for which an accommodation may need to be
19    granted?
20        MR. GRIGGS: Objection. She's not
21    an expert.
22    Q.    (By Mr. Shea) You can answer.
23    A.    I didn't hear the question.
24        MR. SHEA: Can you read that back,

**Page 81**

1    please?
2
3    * (Question read)
4
5        MR. GRIGGS: Objection, she's not
6    an expert.
7        THE WITNESS: I don't know.
8    Q.    (By Mr. Shea) You don't know.
9        In my second hypothetical. If I'm
10    a pregnant woman with complications relating to
11    my pregnancy and I'm at Sandalwood and I'm a CNA
12    and I want an accommodation such as time off
13    from work or to use the ladies room more often
14    than I normally would, those sorts of
15    accommodations, who would I go to on that, do
16    you know?
17    A.    You know what, I would imagine
18    myself and administration and H□R□.
19    Q.    Who would that be for Wendy
20    Gauthier at the time? Who would that have been
21    back in 2003 and 2004, yourself and?
22    A.    It was Steve at that time.
23    Q.    Steve Copper?
24    A.    I think it was in 2004, I don't

# ANN MARIE KENDALL
# February 8, 2007

22 (Pages 82 to 85)

---

Page 82

1  know when it exactly started 2004 and Ha R,  I'm
2  sure would go to corporate.
3      Q.   Who's corporate?
4      A.   Hx Rc  I believe is out in Texas.  I
5  really don't know, but it would go through
6  corporate and that would be the administrator
7  who would follow through with it.
8      Q.   Are you aware of any reason you
9  would be asking Wendy Gauthier for medical notes
10 while she was employed as a CNA at Sandalwood.
11     A.   I know all employees had physicals
12 prior to employment.
13     Q.   Other than that I mean?
14     A.   Let's see.  I believe an employee
15 out for three days or greater, they would have
16 to have a doctor's note.  I think there's a
17 policy to that effect.
18     Q.   You are not sure?
19     A.   The exact time no, but I believe
20 there's something that if you're absent for
21 three days or more, you would have to have a
22 doctor's note.
23     Q.   What would the doctor's note say?
24     A.   I have no idea.

---

Page 83

1      Q.   What would be the purpose of the
2  doctor's note?
3      A.   If a person were ill with strep
4  throat and they saw a physician, the note might
5  say that I saw Jane Doe on such and such a date
6  for whatever and was unable to work for such and
7  such a time or able to return in such and such a
8  time.  It would validate their absences for
9  three days greater than.
10     Q.   Is there any other reason that you
11 are aware of that you would need a doctor's note
12 as a CNA?
13     A.   It wouldn't be seen as a CNA, it
14 was an HR policy.  I believe if you were ill the
15 day before or day after a holiday, something to
16 that extent.
17     Q.   Any other reason?
18     A.   Workman's comp.
19     Q.   Anything else?
20     A.   Not that I'm aware of.  I really
21 honestly can't just sit here and come up with an
22 answer for you, sir.
23          MR. SHEA:  I don't have anything
24 further.

---

Page 84

1
2
3          FURTHER EXAMINATION BY MR. GRIGGS:
4
5      Q.   I guess just while you were at
6  Sandalwood, do you recall any employees that
7  were pregnant?
8      A.   No.
9          MR. GRIGGS:  No further questions.
10         MR. SHEA:  Thank you.
11
12         (Deposition concluded at 2:47 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 85

1      I, ELISABETH ZAHARIADIS, a Notary Public
2  in and for the Commonwealth of Massachusetts, do
3  hereby certify that ANN MARIE KENDALL appeared
4  before me, satisfactorily identified herself, on
5  the 8th day of February, 2007, at Worcester,
6  Massachusetts, and was by me duly sworn to
7  testify to the truth and nothing but the truth
8  as to her knowledge touching and concerning the
9  matters in controversy in this cause; that she
10 was thereupon examined upon her oath and said
11 examination reduced to writing by me; and that
12 the statement is a true record of the testimony
13 given by the witness, to the best of my
14 knowledge and ability.
15     I further certify that I am not a relative
16 or employee of counsel/attorney for any of the
17 parties, nor a relative or employee of such
18 parties, nor am I financially interested in the
19 outcome of the action.
20     WITNESS MY HAND this 3rd day of March,
21 2007.
22
23 Elisabeth Zahariadis   My Commission expires:
24 Notary Public          October 5, 2012

---

# ANN MARIE KENDALL
## February 8, 2007

23 (Pages 86 to 88)

**Page 86**

1  Today's date:     March 3, 2007
2  To:               K. Scott Griggs, Esq.
3  Copied to:        Michael O. Shea, Esq.
4  From:             Elisabeth Zahariadis
5  Deposition of:    Ann Marie Kendall
6  Taken:            February 8, 2007
7  Action:           WENDY GAUTHIER
8                    Vs. SUNHEALTH SPECIALTY
9                    SERVICES, INC., ET AL.
10
11
12       Enclosed is a copy of Ms. Kendall's
13  deposition. Pursuant to the Rules of Civil
14  Procedure, Ms. Kendall has thirty days to sign
15  the deposition from today's date.
16       Please have Ms. Kendall sign the enclosed
17  signature page. If there are any errors, please
18  have her mark the page, line and error on the
19  enclosed correction sheet. She should not mark
20  the transcript itself. This addendum should be
21  forwarded to all interested parties.
22       Thank you for your cooperation in this
23  matter.
24

**Page 87**

1           UNITED STATES DISTRICT COURT
2           DISTRICT OF MASSACHUSETTS
3
4  ******************************
5  WENDY GAUTHIER,        *
6        Plaintiff    *
7  vs.           *No.: 05cv40119-FDS
8  SUNHEALTH SPECIALTY    *
9  SERVICES, INC. and SUNBRIDGE*
10 HEALTHCARE CORPORATION,   *
11       Defendants  *
12 ******************************
13
14
15       I, ANN MARIE KENDALL, do hereby certify,
16  under the pains and penalties of perjury, that
17  the foregoing testimony is true and accurate, to
18  the best of my knowledge and belief.
19       WITNESS MY HAND, this  day of     ,
20  2007.
21           _____
22              ANN MARIE KENDALL
23  EZ
24

**Page 88**

1           CORRECTION SHEET
2  DEPONENT: Ann Marie Kendall
3  CASE: Gauthier V. Sunhealth Specialty Services
4  DATE TAKEN: February 8, 2007
5  *******************************************
6  PAGE/ LINE/ CHANGE OR CORRECTION AND REASON
7  *******************************************
8   ___/___/ _____
9   ___/___/ _____
10  ___/___/ _____
11  ___/___/ _____
12  ___/___/ _____
13  ___/___/ _____
14  ___/___/ _____
15  ___/___/ _____
16  ___/___/ _____
17  ___/___/ _____
18  ___/___/ _____
19  ___/___/ _____
20  ___/___/ _____
21  ___/___/ _____
22  ___/___/ _____
23  ___/___/ _____
24  ___/___/ _____

# EXHIBIT 5

Page 1

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3

4  *****************************

5  WENDY GAUTHIER,                    *

6                 Plaintiff          *

7  vs.                          *No.: 05cv40119-FDS

8  SUNHEALTH SPECIALTY             *

9  SERVICES, INC. and SUNBRIDGE    *

10 HEALTHCARE CORPORATION,         *

11              Defendants          *

12 *****************************

13

14

15      DEPOSITION OF:   KATHLEEN D. RAYMOND

16        CATUOGNO COURT REPORTING SERVICES

17                446 Main Street

18             Worcester, Massachusetts

19          January 24, 2007      9:46 a.m.

20

21

22

23              Elisabeth Zahariadis

24         Certified Shorthand Reporter

# KATHLEEN D. RAYMOND
# January 24, 2007

2 (Pages 2 to 5)

## Page 2

1  APPEARANCES:
2
3  Representing the Plaintiff:
4      LAW OFFICE OF MICHAEL O. SHEA, P.C.
5      451 Main Street
6      Wilbraham, MA 01095
7  BY: MICHAEL O. SHEA, ESQ.
8      (413) 596-8005 FAX 596-8095
9
10 Representing the Defendant:
11     LAWSON & WEITZEN, LLP
12     88 Black Falcon Avenue
13     Boston, MA 02210
14 BY: MICHAEL WILLIAMS, ESQ.
15     (617) 439-4990 FAX 439-3987
16
17 In attendance: Wendy Gauthier
18
19
20
21
22
23
24

## Page 3

1          INDEX
2
3  WITNESS:      KATHLEEN D. RAYMOND
4
5  EXAMINATION BY:          PAGE:
6  Mr. Shea            4
7  Mr. Williams           34
8
9  FURTHER EXAMINATION BY:
10 Mr. Shea           52/61
11 Mr. Williams          58
12
13
14 EXHIBIT:             PAGE:
15 (none offered)
16
17
18
19
20
21
22
23
24

## Page 4

1      KATHLEEN D. RAYMOND, Deponent, having
2  first been satisfactorily identified and duly
3  sworn, deposes and states as follows:
4
5          MR. SHEA: Usual stipulations?
6          MR. WILLIAMS: Yes.
7
8
9      EXAMINATION BY MR. SHEA:
10
11     Q.    Good morning, thank you for coming
12 here today. I know that you had to arrange your
13 schedule and whatnot to be here.
14     A.    Yes.
15     Q.    We served a subpoena on you a while
16 back, so you are here under a valid subpoena,
17 correct?
18     A.    Yes.
19     Q.    Have you ever been deposed before?
20 This a deposition, have you ever been deposed?
21     A.    What's that mean?
22     Q.    Sat down with a stenographer in the
23 room and asked questions.
24     A.    Never.

## Page 5

1      Q.    My name is Michael Shea and I
2  represent Wendy Gauthier who's a plaintiff in a
3  case against Sunhealth Specialty Services and
4  Sunbridge Healthcare Corporation. I'm just
5  going to ask you a few questions here today. It
6  shouldn't be too long.
7          If you have any questions about the
8  questions I'm asking you or you want me to
9  rephrase them, will you ask me to rephrase them,
10 otherwise can I assume you understood the
11 question?
12     A.    Yes.
13     Q.    You have to answer audibly for the
14 record so the stenographer can type what you're
15 saying.
16     A.    Okay.
17     Q.    A nod of the head or mm-hmm won't
18 do.
19     A.    Okay.
20     Q.    Doesn't mean you have to answer yes
21 or no, it just means that you have to give an
22 audible response.
23          Are you under the influence of any
24 medication or anything that would impair your

**KATHLEEN D. RAYMOND**
**January 24, 2007**

3 (Pages 6 to 9)

Page 6

1  ability to answer questions today?
2      A.    No.
3      Q.    Have you talked to anyone about
4  Wendy Gauthier's employment at Sunbridge since
5  she was terminated?
6      A.    No.
7      Q.    Do you know why Wendy Gauthier was
8  terminated from Sunbridge?
9      A.    No.
10     Q.    Do you know she was pregnant at
11 Sunbridge?
12     A.    Yes.
13     Q.    Do you think that had something to
14 do with it?
15     A.    I'm not sure.
16     Q.    Did you receive a phone call from
17 some lawyers regarding this case or a lawyer
18 regarding this case other than my office?
19     A.    Yes.
20     Q.    Do you remember who you spoke to?
21     A.    No.
22     Q.    Do you remember if it was from the
23 employer, Sunhealth or Sunbridge, a lawyer
24 representing?

Page 7

1      A.    It was lawyers representing
2  Sunbridge and my attorney spoke to him. I
3  didn't speak to him. I let my attorney speak to
4  him.
5      Q.    You don't remember who he spoke to.
6  Who is your attorney?
7      A.    Rickie T. Weiner.
8      Q.    Does he represent you regarding a
9  worker's comp case?
10     A.    Yes, he does.
11     Q.    Who is that with?
12     A.    Sunbridge, Sandlewood, same
13 company.
14     Q.    You worked for Sunbridge?
15     A.    Yes, I did.
16     Q.    For how long, over what time
17 period?
18     A.    Three years.
19     Q.    What did you do for them?
20     A.    Certified nursing assistant.
21     Q.    What's your educational background
22 basically?
23     A.    I graduated 12th grade. I went to
24 special school for asbestos and lead.

Page 8

1      Q.    What school was that?
2      A.    You are asking me, this has been a
3  while ago. Certification through the state of
4  Massachusetts for asbestos and lead. It was in
5  Springfield. I can't remember the name.
6      Q.    Did you graduate from that school?
7      A.    Yes, I did.
8      Q.    When?
9      A.    I don't remember dates.
10     Q.    Do you have any education or
11 training beyond that?
12     A.    Just being a certified nursing
13 assistant.
14     Q.    What did you have to do to become a
15 certified nursing assistant?
16     A.    Take a course.
17     Q.    Where did you complete that course?
18     A.    In Florida.
19     Q.    Do you remember where?
20     A.    No.
21     Q.    Do you remember how long the course
22 was?
23     A.    The course is a four-week course.
24     Q.    You have a certificate?

Page 9

1      A.    I do, yes.
2      Q.    Do you remember approximately when
3  you got that certificate, how many years ago?
4      A.    In the state of Massachusetts, I
5  got it approximately seven years ago.
6      Q.    No other training or education
7  other than that?
8      A.    No.
9      Q.    Over what time period did you work
10 as a CNA at Sunbridge?
11     A.    Three years.
12     Q.    Over what time period, from when to
13 when? You can give me approximate dates. I'm
14 trying to get your best memory.
15     A.    My last day of employment was July
16 of last year.
17     Q.    July of '06?
18     A.    Right.
19     Q.    So three years prior to that is
20 when you started roughly?
21     A.    Right.
22     Q.    You worked with Wendy Gauthier?
23     A.    Yes, I did.
24     Q.    Do you remember an incident where

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# KATHLEEN D. RAYMOND
# January 24, 2007

4 (Pages 10 to 13)

---

**Page 10**

1 she was injured on the job?
2    A.    Yes.
3    Q.    Can you tell me what you remember
4 about that incident, was she kicked by a
5 patient?
6    A.    Yes, she was.
7    Q.    Do you remember what happened as a
8 result of being kicked by a patient?
9    A.    Me and a nurse, I can't remember
10 the nurse that was on duty, said she needed to
11 go to the hospital because she had severe pain
12 and we were concerned her being pregnant.
13    Q.    Who, Wendy?
14    A.    Wendy Gauthier was pregnant and we
15 were concerned that something was wrong with the
16 baby and we both insisted that she go to the
17 emergency room that night.
18    Q.    Something was wrong with the baby
19 in terms of being kicked?
20    A.    Right.
21    Q.    Who was your supervisor at that
22 time?
23    A.    I don't remember, Anne somebody,
24 Kendall. She was the director of nursing at the

---

**Page 11**

1 time, Kendall.
2    Q.    They were notified, Anne Kendall
3 was notified of this injury?
4    A.    I don't know.
5    Q.    Was anyone in management or
6 supervision notified of the injury?
7    A.    I'm not sure.i   We worked third
8 shift.
9    Q.    Did Wendy Gauthier go to the
10 hospital?
11    A.    Yes, she did.
12    Q.    During your shift?
13    A.    Yes.
14    Q.    Somebody must have known she had an
15 injury on the job for her to leave her shift?
16    A.    The nurse that was on duty that
17 particular night.
18    Q.    She knew?
19    A.    She knew and sent her to the
20 emergency room.
21    Q.    The nurses are basically your
22 supervisor?
23    A.    On third shift, yes.
24    Q.    How often did you work with Wendy

---

**Page 12**

1 Gauthier on average?
2    A.    Most of the time when she worked
3 third shift.
4    Q.    How many days a week would you say
5 on average?
6    A.    Four days a week.
7    Q.    You both worked third shift?
8    A.    Yes.
9    Q.    Wendy Gauthier is a CNA and you are
10 a CNA?
11    A.    Yes.
12    Q.    Did Wendy Gauthier do a good job?
13    A.    Yes.
14    Q.    Did you ever see her violate any
15 policies of Sunbridge?
16    A.    No.
17    Q.    In relation to the termination
18 date of Wendy Gauthier from Sunbridge which I
19 assume was prior to your termination date?
20    A.    Yes.
21    Q.    When do you think that injury
22 occurred, the injury where Wendy Gauthier was
23 kicked in the stomach?
24    A.    I couldn't tell you exactly to be

---

**Page 13**

1 honest with you.
2    Q.    If you had to approximate, would
3 you say six months prior to her termination, a
4 year prior to her termination?
5    A.    I don't remember.
6    Q.    Do you remember if there were any
7 ramifications or repercussions as a result of
8 Wendy Gauthier medically, did she have any
9 issues after that?
10    A.    I don't know.
11    Q.    Did you work with her after the
12 kicking incident?
13    A.    I believe they fired her. I can't
14 remember exactly.
15    Q.    You believe they fired her after
16 that kicking incident?
17    A.    I believe so, yes.
18    Q.    You don't know why they terminated
19 her employment, Wendy Gauthier?
20    A.    No, I don't know.
21    Q.    Did you ever receive any warnings
22 or reprimands at Sunbridge?
23    A.    No.
24    Q.    You know I'm referring to

---

# KATHLEEN D. RAYMOND
## January 24, 2007

5 (Pages 14 to 17)

| | Page 14 |
|---|---|
| 1 | Sunbridge -- |
| 2 | A.    Sandlewood, right. |
| 3 | Q.    Yes. No warnings or reprimands and |
| 4 | yet you were terminated? |
| 5 | A.    Yes. |
| 6 | Q.    Why were you terminated? |
| 7 | A.    I was terminated because they said |
| 8 | they couldn't provide me a light duty job |
| 9 | anymore. |
| 10 | Q.    Isn't it true they had light duty |
| 11 | jobs available at Sunbridge? |
| 12 | A.    Yes, they do. |
| 13 | Q.    What are those jobs? |
| 14 | A.    Filing, answering the phone, I did |
| 15 | activities assistant for a while. |
| 16 | Q.    I'm sorry what the last part? |
| 17 | A.    Activities assistant. |
| 18 | Q.    What is that? |
| 19 | A.    You go and play games with the |
| 20 | elderly, play cards, bingo. |
| 21 | Q.    Did they let other employees have |
| 22 | that in terms of light duty, have those job |
| 23 | responsibilities. |
| 24 | A.    They do for certain a period of |

| | Page 15 |
|---|---|
| 1 | time. |
| 2 | Q.    Did you do the activities |
| 3 | assistant? |
| 4 | A.    Yes, I did. |
| 5 | Q.    They gave you light duty for some |
| 6 | period of time and then they took it away when |
| 7 | they terminated you? |
| 8 | A.    Yes. |
| 9 | Q.    Do you believe that they terminated |
| 10 | you because of the worker's comp claim and the |
| 11 | fact that you were injured? |
| 12 | A.    Yes. |
| 13 | Q.    By the way, you never spoke to me |
| 14 | before today, right? |
| 15 | A.    No. |
| 16 | Q.    As far as speaking with anyone from |
| 17 | my office, did you speak with anyone from my |
| 18 | office about scheduling a deposition or anything |
| 19 | like that? |
| 20 | A.    I believe a lady called and said I |
| 21 | was scheduled for a deposition. |
| 22 | Q.    Other than that, did you speak to |
| 23 | anyone from my office? |
| 24 | A.    No. |

| | Page 16 |
|---|---|
| 1 | Q.    Have you ever been fired from any |
| 2 | other job? |
| 3 | A.    No. |
| 4 | Q.    Other than Sunbridge? |
| 5 | A.    No. |
| 6 | Q.    When you say activities assistant, |
| 7 | answering phones and filing as a light duty job, |
| 8 | did you witness other CNAs getting light duty |
| 9 | jobs of this sort? |
| 10 | A.    Yes. |
| 11 | Q.    Do you remember any names of those |
| 12 | employees? |
| 13 | A.    I don't remember names. They were |
| 14 | just other CNAs that got provided light duty |
| 15 | like myself and then terminated. |
| 16 | Q.    For similar reasons do you think |
| 17 | because they got injured? |
| 18 | MR. WILLIAMS: Objection. You can |
| 19 | answer. That's just for the record. |
| 20 | THE WITNESS: I believe honestly |
| 21 | in my heart that's exactly why they were |
| 22 | terminated. |
| 23 | Q.    (By Mr. Shea) Do you remember the |
| 24 | names of any of those employees? |

| | Page 17 |
|---|---|
| 1 | A.    No, not offhand. |
| 2 | Q.    If I give you a minute, is it |
| 3 | possible that you could think of? |
| 4 | A.    I know there was a Debbie Laranger. |
| 5 | That's one of them off the top of my head. |
| 6 | Q.    She was injured on the job? |
| 7 | A.    Yes. |
| 8 | Q.    How was she injured on the job? |
| 9 | A.    I think by lifting a patient. |
| 10 | Q.    How were you injured on the job? |
| 11 | A.    Patient grabbed my wrist and |
| 12 | twisted and that's how my injury occurred. But |
| 13 | I continued to work for two months after that |
| 14 | until my hand got so bad, I couldn't, I had a |
| 15 | hard time functioning doing my regular work. |
| 16 | Q.    You would have gone back to your |
| 17 | regular job if you had light duty? |
| 18 | A.    I can never be a certified nursing |
| 19 | assistant again. |
| 20 | Q.    What about Debbie Laranger you |
| 21 | said? |
| 22 | A.    I don't know. |
| 23 | Q.    Is it Laranger? |
| 24 | A.    I believe that's how you say her |

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# KATHLEEN D. RAYMOND
# January 24, 2007

6 (Pages 18 to 21)

## Page 18

1 name.
2     Q.   Or Lagranger?
3     A.   Laranger, I believe.
4     Q.   She was injured on the job, did she
5 received light duty?
6     A.   Yes.
7     Q.   Did she injure her back or what
8 part of her body?
9     A.   She injured her back.
10     Q.   What kind of light duty did they
11 do?
12     A.   I'm not sure of her light duty.
13 They brought her back. They terminated me and
14 then she came back.
15     Q.   Why did they bring her back, do you
16 know?
17     A.   I don't know.
18     Q.   Did you say they terminated
19 ultimately?
20     A.   I believe so.
21     Q.   Can you remember the names of any
22 other CNAs that were injured and terminated?
23     A.   I'm not sure. Honestly, I couldn't
24 tell you.

## Page 19

1     Q.   As a CNA, if you wanted to take
2 some time off, sick time, personal time, would
3 the procedure be that you notified your
4 supervisor of the change in the schedule?
5     A.   We usually if we were going to need
6 a day off, we usually would ask another CNA to
7 switch days with us.
8     Q.   Then someone would notify the
9 supervisor of that verbally, I assume?
10     A.   Verbally, yes.
11     Q.   The supervisor would be whom, the
12 nurse?
13     A.   The nurse on duty or the scheduler.
14     Q.   Either one?
15     A.   Yes.
16     Q.   So the normal procedure would be
17 you just make arrangements with your coworker?
18     A.   Right.
19     Q.   Fellow CNA to cover your time?
20     A.   Right.
21     Q.   That's not necessarily put in a
22 schedule at this point, you are confirming
23 coverage, right?
24     A.   Right.

## Page 20

1     Q.   Then you are telling your
2 supervisor verbally the nurse on duty or the
3 scheduler about the change, right?
4     A.   Well, usually if the nurse, the
5 third shift supervisor would just automatically
6 just change it, erase it and put the names on
7 whatever day. Say that I needed a day off and I
8 asked Wendy to cover for me that day, she would
9 just erase it and just change the schedule.
10     Q.   You wouldn't erase it?
11     A.   No, the nurse has to erase it.
12     Q.   The nurse or the scheduler?
13     A.   Right.
14     Q.   Do you remember if Wendy Gauthier
15 was ever accused of a no call, no show?
16     A.   I do believe one time.
17     Q.   Do you know whether that led to her
18 termination of employment?
19     A.   I can't say that led her to her
20 termination. I know they had switched. Her and
21 Lisa Franks had switched days and Lisa didn't
22 show up. And Lisa has been known because I
23 have switched with her a few times myself and
24 she didn't show up for work.

## Page 21

1     Q.   That wouldn't be Wendy Gauthier's
2 fault, right, it would be Lisa Franks who didn't
3 show up?
4     MR. WILLIAMS: Objection.
5     Q.   (By Mr. Shea) Right?
6     A.   Yes.
7     Q.   So long as in that example that you
8 just gave me, instance that you just gave me.
9     A.   Right.
10     Q.   So long as Wendy Gauthier made the
11 proper arrangements, in other words, went to
12 Lisa Franks, said, can you cover me on this
13 date, somebody communicated that to the
14 supervisor?
15     A.   Right.
16     Q.   Then Wendy Gauthier has to fill her
17 responsibilities under the policies and
18 procedures of Sunbridge, right?
19     MR. WILLIAMS: Objection.
20     Q.   (By Mr. Shea) You may answer.
21     A.   I'm not sure what the policies and
22 procedures are at Sunbridge.
23     Q.   Well, the policy and procedure for
24 changing time is what I'm talking about, that

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

**KATHLEEN D. RAYMOND**
**January 24, 2007**

7 (Pages 22 to 25)

| Page 22 |
|---|
| 1  you just outlined as far as you -- |
| 2      A.    As far as I know, yes. |
| 3          MR. WILLIAMS: Objection. Just so |
| 4  you know, when I say objection, you go |
| 5  ahead and answer. It's just something we |
| 6  have to do for the record. |
| 7          MR. SHEA: Right. Unless somebody |
| 8  tells you not to answer, you can answer. |
| 9          THE WITNESS: Okay. |
| 10     Q.    (By Mr. Shea) Let me be clear. |
| 11 The policies and procedures for switching time |
| 12 or taking time off that we just discussed, you |
| 13 just outlined for me, very well I think, were |
| 14 those followed by Wendy Gauthier as far as you |
| 15 know? |
| 16     A.    As far as I know, yes. |
| 17     Q.    In a that instance, did Lisa |
| 18 Franks, did she follow those procedures, Wendy |
| 19 Gauthier? |
| 20     A.    I believe so, yes. |
| 21     Q.    Was Lisa Franks terminated as a |
| 22 result of that incident? |
| 23     A.    I'm not sure about Lisa. |
| 24     Q.    Was she terminated at some point, |

| Page 23 |
|---|
| 1  do you know? |
| 2      A.    I'm not sure. |
| 3      Q.    Do you recall whether Wendy |
| 4  Gauthier had any complications with her |
| 5  pregnancy? |
| 6      A.    I don't know. I really don't know. |
| 7  I hope not, but I don't know for sure. |
| 8      Q.    You worked at Sunbridge which is |
| 9  also known as Sandlewood? |
| 10     A.    Right. |
| 11     Q.    That's the name of the location? |
| 12     A.    Right. |
| 13     Q.    You worked there for three years |
| 14 and had good performance evaluations? |
| 15     A.    Always. |
| 16     Q.    What exactly were you told was the |
| 17 reason for your termination? |
| 18     A.    They couldn't provide me a light |
| 19 duty job. |
| 20     Q.    Yet there was light duty available? |
| 21     A.    Yes. |
| 22     Q.    What light duty job do you think |
| 23 was available at the time that they terminated |
| 24 you? |

| Page 24 |
|---|
| 1      A.    Actually, I just went back there, I |
| 2  don't know, six months ago and applied for the |
| 3  activities assistant job. I was told that, I |
| 4  don't know how exact words, but I was told they |
| 5  couldn't provide me with any job. |
| 6      Q.    Back when you were terminated, you |
| 7  were eligible, you believe that medically, |
| 8  physically you could have gone back to light |
| 9  duty, filing, answering phones, activities |
| 10 assistant, right? |
| 11     A.    Yes. |
| 12     Q.    They said we don't have that for |
| 13 you, right? |
| 14     A.    Yes. |
| 15     Q.    In fact, they did have that for |
| 16 you, right? |
| 17     A.    They did have it at the time. |
| 18     Q.    They did have light duty available? |
| 19     A.    When I was working. |
| 20     Q.    In terms of filing, yes? |
| 21     A.    I don't know so much as filing as |
| 22 an actual job opening. They provided light duty |
| 23 for me or a light duty job. This was actually a |
| 24 job opening, activities assistant and the job |

| Page 25 |
|---|
| 1  that I applied for. I went in and I was told |
| 2  you don't have to fill out the application |
| 3  completely, just sign it, turn it in and we'll |
| 4  look at it. I proceeded to call for two weeks |
| 5  saying, do I get the job, I never missed hardly |
| 6  any time from work. I just didn't understand |
| 7  why. So I was told that they weren't interested |
| 8  in me more or less. That's what I got out of |
| 9  the conversation. |
| 10     Q.    But the activities assistant job, |
| 11 there was an opening that you could have gone |
| 12 into? |
| 13     A.    Yes, there was. |
| 14     Q.    That could have been light duty? |
| 15     A.    It's a job opening. They said I |
| 16 didn't meet the qualifications. You have to |
| 17 lift 50 pounds, but I don't ever remember an |
| 18 activities assistant lifting 50 pounds. You sit |
| 19 there and play games with the clients, you push |
| 20 a little cart around. It's just one of their |
| 21 stipulation of their job descriptions as an |
| 22 activities assistant. |
| 23     Q.    How long were you on light duty, I |
| 24 think you said at some point that you were on |

**KATHLEEN D. RAYMOND**
**January 24, 2007**

8 (Pages 26 to 29)

| Page 26 |
|---|
| 1  light duty? |
| 2     A.   Over a year. |
| 3     Q.   During that time frame, what did |
| 4  you do? |
| 5     A.   I filed. |
| 6     Q.   Where did you go the filing? |
| 7     A.   Downstairs in the social worker's |
| 8  office. |
| 9     Q.   You filed full time for about a |
| 10  year? |
| 11    A.   Yes. |
| 12    Q.   Did you also answer phones? |
| 13    A.   Yes. |
| 14    Q.   In the social worker's office, who |
| 15  did you work for when you were on light duty? |
| 16  If you don't remember the name. |
| 17    A.   I don't remember the name. |
| 18    Q.   If it comes to you, tell me what it |
| 19  is. |
| 20        Sitting here today, do you remember |
| 21  any other employees that were on light duty such |
| 22  as yourself and Debbie Laranger? |
| 23    A.   Not offhand, no. |
| 24    Q.   When you answered the phones down |

| Page 27 |
|---|
| 1  in the social worker's office, during that |
| 2  one-year period, what phone calls were you |
| 3  answering basically? |
| 4     A.   To the facility. |
| 5     Q.   Just outside calls into the |
| 6  facility? |
| 7     A.   Right. |
| 8        MR. SHEA: We're going to take a |
| 9  few minutes. I think I'm almost done. |
| 10 |
| 11        (A recess was taken) |
| 12 |
| 13        MR. SHEA: Back on the record. |
| 14  Just a few more questions. |
| 15    Q.   (By Mr. Shea) Is it fair to say |
| 16  that Wendy Gauthier worked at Sunbridge with you |
| 17  about three to six months, in that range, does |
| 18  that sound about right? |
| 19    A.   It could be, yes. |
| 20    Q.   Is it fair to say that you feel |
| 21  that you were not treated fairly regarding your |
| 22  termination of employment from Sunbridge? |
| 23        MR. WILLIAMS: Objection. |
| 24    Q.   (By Mr. Shea) Is that fair to say? |

| Page 28 |
|---|
| 1     A.   For myself? |
| 2     Q.   Yes. |
| 3     A.   Yes. |
| 4     Q.   How do you feel about how Sunbridge |
| 5  treated Wendy Gauthier? |
| 6        MR. WILLIAMS: Objection. |
| 7        THE WITNESS: My personal opinion? |
| 8     Q.   (By Mr. Shea)  Yes. |
| 9     A.   I think it was unfair. |
| 10    Q.   Why? |
| 11    A.   I believe, she was pregnant. I've |
| 12  been pregnant myself at 39 years old.  Wendy's |
| 13  younger than I am, but working in a nursing |
| 14  home, I believe if they should have provided her |
| 15  a light duty job, my personal, opinion. Let her |
| 16  go on days, give her answering the phones like |
| 17  what I did. |
| 18    Q.   Because they could have done that? |
| 19        MR. WILLIAMS: Objection. |
| 20        THE WITNESS: They could have done |
| 21    that, yes. |
| 22    Q.   (By Mr. Shea) Anything else on |
| 23  that subject that comes to mind? |
| 24    A.   Just one other thing that I'd like |

| Page 29 |
|---|
| 1  to point out. I believe after Wendy got |
| 2  terminated from employment, they started to |
| 3  where we had to sign, actually have it signed, |
| 4  you know, like if I wanted to trade with |
| 5  somebody, it had to be signed and given to the |
| 6  scheduler and the director of nursing.  You had |
| 7  to get authorization to have these days off. |
| 8     Q.   In writing and signed? |
| 9     A.   Writing and signed by the |
| 10  supervisor. |
| 11    Q.   They didn't have that when Wendy |
| 12  Gauthier was there? |
| 13    A.   They didn't have that at the time, |
| 14  no. |
| 15    Q.   The procedure was different before |
| 16  Wendy Gauthier was terminated versus after? |
| 17    A.   Right. |
| 18    Q.   Before, Wendy Gauthier was |
| 19  terminated all you had to do was ask a CNA to |
| 20  take time off or change your schedule is to |
| 21  again, notify your coworker, get coverage from |
| 22  that coworker and then either the coworker or |
| 23  you notified the supervisor verbally, right? |
| 24        MR. WILLIAMS: Objection. |

# KATHLEEN D. RAYMOND
# January 24, 2007

9  (Pages 30 to 33)

## Page 30

1      THE WITNESS:  On third shift?
2      Q.   (By Mr. Shea)  Yes.
3      A.   Right.
4      Q.   The supervisor is either the
5  scheduler or the nurse on the third shift?
6      A.   It's usually the nurse, the
7  supervisor on third shift whoever happened to be
8  supervisor that night.  It changed all the time.
9      Q.   Do you remember who the nurse or
10  supervisor was on the third shift on that Lisa
11  Franks incident?
12      A.   I'm not sure who it was.
13      Q.   Did you ever get a copy of an
14  employee handbook at Sunbridge?
15      A.   Yes.
16      Q.   When did you get that?
17      A.   When I first got hired.
18      Q.   Did you sign for that?
19      A.   Yes.
20      Q.   Do you remember that Wendy Gauthier
21  was having problems with her pregnancy where she
22  would go to the bathroom and throw up with
23  morning sickness?
24      A.   Yes.

## Page 31

1      Q.   That happened on a fairly frequent
2  basis; is that correct?
3      A.   While she was working with me, yes.
4      Q.   Do you remember she also had to
5  keep her legs elevated at times because of her
6  pregnancy?
7      A.   Yes, her feet are swollen.
8      Q.   Do you remember her telling you
9  that she did get light duty notes from her
10  doctor to give to Sunbridge relating to her
11  medical complications relating to her pregnancy?
12      A.   Yes.
13      Q.   Do you remember her telling you
14  that she was trying to get back to work and they
15  wouldn't let her have light duty or get back to
16  work with the medical note she was provided?
17      A.   Yes.
18      Q.   Do you think that was unfair?
19      MR. WILLIAMS:  Objection.
20      THE WITNESS:  Yes, I believe it's
21  unfair.
22      Q.   (By Mr. Shea)  Because there was
23  light duty for her to have?
24      MR. WILLIAMS:  Objection.

## Page 32

1      THE WITNESS:  To be honest with
2  you, it's hard for me because of the
3  treatment that I got from Sunbridge.  So I
4  believe whatever they had done to Wendy
5  Gauthier, they do it to a lot of employees.
6      Q.   (By Mr. Shea)  You believe that's
7  unfair you said earlier?
8      A.   I believe it's very unfair.
9      Q.   Last question.  Any other names
10  come to mind, I just thought I'd see if any of
11  this jogged your memory?
12      A.   You have to understand something,
13  they changed administrators or director of
14  nursing, it seems like every few months, so I
15  mean.
16      Q.   Who trained you on the call
17  procedure where you get coverage and you notify
18  the supervisors verbally when Wendy Gauthier was
19  there, was it the nurse?
20      A.   Say that again, I didn't
21  understand.
22      Q.   Somebody told you I assume how to
23  change your schedule if you need to by way of –
24      A.   We've been doing this for a long

## Page 33

1  time.  I mean, when the director of nursing was
2  there, it was different.  It's just the way we
3  handled it between ourselves.  More or less we
4  did it between ourselves.
5      Q.   Sort of the way you were trained on
6  the job?
7      A.   I don't know about any training.
8  We were never trained to do this.  We were just
9  told if we wanted to switch a day, we could do
10  it.
11      Q.   This is how you do it.  You get
12  coverage and somebody notifies the supervisor
13  verbally?
14      A.   Normally I can remember, normally
15  the nurse that was in charge would just erase it
16  out of the book into the schedule.  You have to
17  understand the scheduler, I'm sure she doesn't
18  remember who's on what nights and whoever was
19  the nurse that particular night.  If I was
20  switching with Wendy or Lisa, she would just
21  erase our names and put us on a different day.
22      Q.   It's not your responsibility to
23  change the schedule as a CNA?
24      A.   No, we are not allowed to touch the

# KATHLEEN D. RAYMOND
## January 24, 2007

10 (Pages 34 to 37)

Page 34

1 book.
2  Q.  It's not your responsibility to
3 make absolutely sure that the scheduler is doing
4 her job in changing the schedule?
5  A.  Right.
6  MR. SHEA:  I don't have anything
7 further.
8
9
10  EXAMINATION BY MR. WILLIAMS:
11
12  Q.  Just a moment ago you were talking
13 about a change in policy where now you have to
14 get written authorization for swapping shifts
15 with another CNA?
16  A.  It was a paper.  I don't know.  I
17 can't remember.  It's just a paper saying I'm
18 switching this date with this one.
19  Q.  You said that that policy was
20 implemented after Wendy Gauthier was fired?
21  A.  I believe so, yes.
22  Q.  Was it immediately after?
23  A.  I can't tell you 100 percent sure.
24  Q.  Do you know if this incident had

Page 35

1 anything to do with the change in policy?
2  A.  I'm not sure.
3  Q.  I'm going to be going back over a
4 few of the points jumping around, if I confuse
5 you, just let me know.
6  A.  Okay.
7  Q.  Earlier you said that you could
8 never be a CNA again, what did you mean by that?
9  A.  I cannot do certified nursing
10 assistant anymore.  I cannot lift over 10 pounds
11 with my hand.  I can't do that.  It's just
12 something I can't do anymore.
13  Q.  Is that an essential element of the
14 job of being a CNA?
15  A.  Yes.
16  Q.  If you can't do the lifting, you
17 can't be a CNA?
18  A.  Right.
19  MR. SHEA:  Objection to the last
20 question.
21  Q.  (By Mr. Williams)  You talked about
22 how you had been on light duty, I think you said
23 for a year; is that correct?
24  A.  A year, maybe a little bit more.

Page 36

1  Q.  During that year, were you
2 performing the job of a CNA?
3  A.  No.
4  Q.  Were you performing a different job
5 at Sunbridge?
6  A.  Yes.
7  Q.  Was there a title for that job that
8 you were performing?
9  A.  There was no title.  But I want you
10 to understand that when I first came back to
11 Sunbridge, I was on the floor with the
12 residents, I was providing a light duty job, but
13 I was helping the CNAs.  I was providing drinks,
14 cleaning pumps and then I got re-injured because
15 one of the residents went to go to the bathroom
16 and affected my arm even more.  So my physician
17 said not to have any patient contact.
18  Q.  Is it a normal part of a CNA's duty
19 to help residents move, help them stand up,
20 basically have to lift or move them?
21  A.  Yes.
22  Q.  Let me break down what you were
23 just telling me.
24  When you first came back from being

Page 37

1 injured --
2  A.  Right.
3  Q.  -- you were working at Sunbridge,
4 was it true when you were -- let me start over.
5  The first time you came back and
6 were working at Sunbridge again, the light duty
7 that you were performing, was that acting as a
8 CNA or not a CNA?
9  A.  It's helping the CNA out.
10  Q.  You were doing a different job
11 helping the CNA as opposed to acting as a CNA
12 yourself?
13  MR. SHEA:  Objection.
14  THE WITNESS:  I don't understand
15 what you are trying to ask me.  The job
16 that I was performing -- the CNAs have a
17 very hectic thing that they do, very
18 hectic.  If I can save the CNA time by
19 providing drinks to the residents, snacks
20 to the residents, that cuts off time for
21 them to spend more time with the residents.
22  Q.  (By Mr. Williams)  You were
23 assisting the CNAs but you weren't performing
24 CNA duties?

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**KATHLEEN D. RAYMOND**
**January 24, 2007**

Page 38

```
 1          MR. SHEA: Objection.
 2          THE WITNESS: I wasn't cleaning
 3     the patients or transferring the patients,
 4     no.
 5     Q.   (By Mr. Williams)  When you were
 6     re-injured, again, you were doing light duty,
 7     were you doing other duties other than CNA
 8     duties?
 9     A.    My physician made it a point to let
10     Sunbridge know that I am not allowed to have no
11     patient contact.  That means if a resident goes
12     to fall, I can't help.
13     Q.    Within the duties of certified
14     nursing assistant, one of the things would
15     prevent residents from falling?
16     A.    Yes.
17     Q.    Which would require lifting or
18     supporting a considerable weight?
19          MR. SHEA: Objection.
20          THE WITNESS: Not every resident
21     at Sunbridge, someone will ambulate.  When
22     you are an elderly person, someone would
23     fall.  They could weigh 90 pounds and
24     someone could fall.
```

Page 39

```
 1     Q.    (By Mr. Williams)  You also talked
 2     about the activities assistant job that you were
 3     applying for?
 4     A.    Yes.
 5     Q.    That's not a job that a CNA --
 6     that's a completely different job, correct?
 7     A.    Right.
 8     Q.    Earlier we were describing the
 9     incident between with Wendy Gauthier and Lisa
10     Franks.
11     A.    Yes.
12     Q.    Who told you about that?
13     A.    Who told me about that?
14     Q.    How do you know that?
15     A.    Because Wendy had told me that she
16     had switched with Lisa and Lisa didn't come in
17     for work.  And then I was questioned about it, I
18     don't remember, by one of nurses, they had to
19     erase the schedule and switch the names.  And
20     that's how I knew about that.
21          You have to understand something,
22     we did this all the time.  I had a brother that
23     was in a severe accident and I switched days
24     with people.  My brother got ran over by a semi
```

Page 40

```
 1     and I had to, you know, you are working like
 2     myself third shift takes a lot out of you.  Most
 3     people can't do that shift.  You might need a
 4     day to recuperate being at the hospital for 12
 5     hours and you would just switch with somebody.
 6     That was just the understanding we had.
 7          This policy wasn't in effect.  I
 8     don't know what they are telling you.  But I
 9     know because I've done it myself switch with
10     somebody.
11     Q.    When you say this policy was in
12     effect, what policy?
13     A.    When we used to switch days, you
14     have a schedule book that sits out on the
15     nurse's station.  You don't know if Jack
16     whatever -- we are all busy on third shift, you
17     know, I don't know what transpired, but I know
18     that particular thing, they did switch.  But you
19     have different people in the schedule book.  It
20     could have been one of the other CNAs for all we
21     know.
22          We were told not to be erasing or
23     adding names on or anything else because the
24     scheduler doesn't know.  If she thinks I'm
```

Page 41

```
 1     supposed to be there, my name's in the book and
 2     I switch with whoever, they are going to come
 3     after me and ask me why that was switched in the
 4     book.  It sits on the nurse's station.  If the
 5     nurse is in there giving medication, you don't
 6     know who's erasing or adding names.
 7     Q.    Do you have any firsthand knowledge
 8     about what happened between Wendy Gauthier and
 9     Lisa Frank or is it just based on what you've
10     been told by Wendy Gauthier?
11          MR. SHEA: Objection.
12          THE WITNESS: I know for a fact
13     that they had switched on prior accounts.
14     And to be honest with you, I don't know if
15     this is relevant or whatever, but Lisa
16     Franks has missed quite a bit of time, she
17     would switch with people and then she
18     wouldn't show up for work  and said I'm not
19     supposed to be working.  That's why I would
20     never switch with her again because it was
21     a continuous thing with her.
22          When I heard that Wendy got fired,
23     I didn't understand, to be honest with you
24     and said Lisa should have been fired months
```

# KATHLEEN D. RAYMOND
# January 24, 2007

12 (Pages 42 to 45)

**Page 42**

1  ago because she would be a no call, no show
2  and she would say I wasn't on the schedule.
3  I'm just giving you my honest opinion about
4  that.
5      Q.    (By Mr. Williams)  That knowledge
6  is based on prior incidents, right, not the
7  particular one that Wendy Gauthier was
8  terminated for?
9          MR. SHEA: Objection.
10         THE WITNESS: I can't answer that
11  honestly because I don't know the dates.
12  This has been a while ago.
13     Q.    (By Mr. Williams) Let me see if I
14  could put this topic, kind of boil it down to
15  the key points.  That's simply what the source
16  of your knowledge for that particular incident
17  is.
18         Do you have any personal knowledge
19  or is this knowledge about there being a switch
20  scheduling between based just on what you were
21  told?
22         MR. SHEA: Objection.  This is the
23  third time you've asked that.  She's
24  already said that she actually witnessed

**Page 43**

1  the schedule being changed.  She was
2  interviewed --
3          MR. WILLIAMS: I don't want a
4  speaking objection, first of all.  I don't
5  want the answer coming from you.  I'm not
6  hearing the same thing you are hearing.
7  Let me continue to explore this.
8          MR. SHEA: I think she's answered
9  it a few times.
10         MR. WILLIAMS: I'm just trying to
11  get a clear answer.
12         MR. SHEA: You are trying to get
13  the answer you want.
14         MR. WILLIAMS: I'm trying to get a
15  clear answer here and I'm going to ask you
16  not to make these speaking objections.
17         MR. SHEA: I think I've stated my
18  objection clearly.
19     Q.    (By Mr. Williams) My question to
20  you is simply and I'm just trying to get a
21  simple little fact out here.
22         When we are talking about this one
23  time when Wendy Gauthier was terminated for, I
24  just want to know how you know what you

**Page 44**

1  testified earlier, what's the source of your
2  knowledge for that?
3      A.    First, I don't know what particular
4  incident, I know of several incidents where they
5  would switch.  I don't know this particular
6  incident.  You know, you could ask me if it was
7  such and such a date, I can't tell you specific
8  dates.  I've known they switched, she's switched
9  with me and I know what transpired between me
10  and Lisa Franks.
11         I've switched with Wendy, Wendy's
12  always showed up for me when we switched.  If
13  she couldn't show up, she would call me and say
14  I can't make it there tonight, something's come
15  up, can you just go ahead and go in.
16     Q.    Earlier this morning you had stated
17  that you had been informed that Wendy and Lisa
18  had arranged to switch and Lisa was supposed to
19  cover for Wendy and then Lisa didn't show up?
20     A.    That was my understanding.
21     Q.    I'm just wondering, what's that
22  understanding based on?
23     A.    I don't know when we are talking
24  about.  You are asking me a question and I'm

**Page 45**

1  telling you that this went on a lot.  The
2  particular incident why they fired Wendy, I
3  don't know.  I don't know what the reasoning was
4  behind it.
5          It's upsetting for me because you
6  want me to say something that I can't say.  I'm
7  not happy with the company myself.  I know what
8  the company put me through.  I can't imagine
9  what they put a pregnant girl through.  To be
10  honest with you, you know, I'm trying to be
11  telling you how I feel and it's very
12  frustrating, you know, to sit here and testify
13  for a company that I have no respect for at all.
14  That's just how I feel.  You keep asking me this
15  particular incident, there's been several
16  incidents.  I don't know.
17         We used to switch all the time is
18  what I'm telling you.  I don't know this
19  particular incident caused Wendy to get fired.
20  I don't know.
21     Q.    I'm not trying to get you to say
22  anything you don't know and what I'm trying to
23  make sure is we know what the source of what
24  you're saying is.  I'm not trying to put any

# KATHLEEN D. RAYMOND
# January 24, 2007

13 (Pages 46 to 49)

## Page 46

1 words in your mouth. I want to make sure what
2 the source of what you are telling us is whether
3 you observed this firsthand?
4     A.    I haven't been told. I worked with
5 Wendy, I worked with Lisa, I worked with several
6 people on third shift. I'm telling you know
7 that this went on for a long time. We used to
8 switch, it was never a problem.
9         I know after Wendy had got fired,
10 we had to start signing this piece of paper
11 which had to be okayed by whoever the director
12 of nursing was and the scheduler. It had to be
13 signed by the scheduler and signed by the
14 director of nursing before we would actually
15 switch.
16        And I forgot what the time period
17 was you couldn't just do it just like that. You
18 had to give them so much notice. I can't
19 remember when it was. It could be different by
20 now. I don't know.
21     Q.    When was the last time you talked
22 to Wendy Gauthier?
23     A.    The last time I worked with her,
24 which is I don't know how many years ago.

## Page 47

1     Q.    You haven't talked to her since she
2 was terminated?
3     A.    No.
4     Q.    Since Wendy was terminated, have
5 you talked to anybody else about her employment,
6 the termination of her employment?
7     A.    To my attorney.
8     Q.    Anybody other than your attorney?
9     A.    Not that I'm aware of.
10     Q.    When you talked to your attorney,
11 was it just you and your attorney or were there
12 other people there?
13     A.    There was no other people there. I
14 remember going back to Sunbridge because I had
15 residents there that I cared very much for. And
16 when I was applying for a job, it was mentioned
17 to me about am I the one suing Sunbridge. So
18 apparently it must be the talk of the company.
19 I'll be honest with you and I go, no, I'm not
20 suing Sunbridge. And then they said it Wendy
21 Gauthier.
22        The facts and I don't know how
23 relevant this is, but I went back there for my
24 records, my personal records and the

## Page 48

1 recordkeeping there is atrocious. I can show
2 you documentation of an M2 testing that is good
3 until 2010, they are only good for a year or two
4 years. The documentation, I asked for all my
5 records, nobody seems to know where all the
6 records are. So I wouldn't put no importance on
7 anything to do with their recordkeeping. I know
8 from myself it was unacceptable. I had to call
9 New Mexico, Albuquerque, New Mexico because they
10 told me that I didn't have a legal right to my
11 records and I do.
12        I just want to put that in because
13 I'm not happy with the company itself. I know
14 how they handle paperwork. For me to keep my
15 CNA certification, I needed my inservices from
16 Sunbridge, they can't find any of them. Every
17 time we've ever done an inservice on third
18 shift, we get so many credits to keep our CNA
19 license. I can't do CNA work, but I needed
20 that credibility you have to have so many
21 credits to keep your CNA license. They don't
22 have them. I'm just letting you know this.
23        MR. WILLIAMS: Just note an
24 objection.

## Page 49

1     Q.    (By Mr. Williams) Have you,
2 yourself, ever been in trouble for violating the
3 no call, no show policy?
4     A.    Never.
5     Q.    You were aware of what the no call,
6 no show policy was?
7     A.    You don't show up for work, you get
8 terminated, I guess. I have always gone to work
9 every job I've ever been.
10     Q.    How many years had you worked for
11 at Sunbridge?
12     A.    I believe three years. I left one
13 time and then came back.
14     Q.    During that three-year period, were
15 there other CNAs besides Wendy Gauthier who were
16 pregnant while working there?
17     A.    Not that I'm aware of, no.
18     Q.    You, yourself, don't work there
19 anymore, correct?
20     A.    No.
21     Q.    You explained a little bit about
22 after you were injured -- why don't you just
23 state for the record how your employment ended
24 there, clean statement of that?

**KATHLEEN D. RAYMOND**
**January 24, 2007**

14 (Pages 50 to 53)

---

Page 50

1    A.    I worked that particular day until
2    3:20 in the afternoon.  My daughter used to help
3    in activities, I was answering the phone, giving
4    messages, writing messages down for people.  I
5    was called in by the administrator, Michael Rose
6    at the time, took me in the office and told me
7    that I needed to go home.  He didn't explain
8    why, nothing.  I didn't know.
9        So I went home and I calmed down a
10   little bit because I was devastated.  You got
11   three kids, a husband with a bad heart and they
12   tell you they no longer have a job for you.
13   Very upsetting.
14       Two weeks later, he called and said
15   I needed to come into the office.  Now, you just
16   fired me or terminated me, however you want to
17   put it, make me drive back to Sunbridge to tell
18   me I no longer have a job.  I figured that out
19   when I left at 3:20 in the afternoon.  Sent me a
20   letter a week later saying we cannot provide a
21   job for you more or less.
22       Q.    Was any other reason given for
23   ending your employment however you want to
24   describe it?

---

Page 51

1    A.    Because I reached my maximum
2    medical improvement, I'm not going to get
3    better.
4        Q.    You got an attorney who's
5    representing you currently in a case against
6    Sunbridge?
7        A.    Yes.
8        Q.    Briefly just describe the nature of
9    that case, what's the basic claim, the
10   underlying claim?
11       A.    What do you mean the basic claim?
12       Q.    What's the basic claim you are
13   bringing in that claim, what are you saying?
14       A.    You'll have to talk to my attorney.
15   I ain't getting into no legal thing.  Anything
16   to do with my worker's comp case, you'll have to
17   deal with my attorney.  That has nothing to do
18   with this part of it.  I'm not going to be on
19   record that's going to hurt myself.
20       Q.    It is a worker's comp claim?
21       A.    Yes, it is.
22       MR. WILLIAMS:  I think that's all I
23   have?
24       MR. SHEA:  I just have a couple

---

Page 52

1    quick questions.  I will be brief.
2
3
4        FURTHER EXAMINATION BY MR. SHEA:
5
6        Q.    You were injured and re-injured on
7    the job?
8        A.    Yes, I was.
9        Q.    In relation to your termination
10   date, do you recall approximately when you were
11   first injured on the job and then re-injured on
12   the job?
13       A.    I was what?
14       Q.    Do you recall the approximate time
15   frame when you first were injured in relation to
16   your termination, approximately how long?
17       A.    I'm not very good with dates.
18       Q.    If you had to approximate, would
19   you say six months?
20       A.    When I returned to work and then
21   when I got re-injured again, it was in January
22   of '05.
23       Q.    Was that the first injury?
24       A.    That's the second injury.

---

Page 53

1    Q.    When was the first prior to that?
2    A.    I believe it was June 29th or July
3    29th, I'm not absolutely, I'm not very good on
4    dates.
5    Q.    You were on light duty after the
6    second?
7    A.    Two months later, I was on light
8    duty.
9    Q.    After the second?
10   A.    September, yeah.
11   Q.    September of what?
12   A.    '05, or '04, I'm not very good with
13   dates.
14   Q.    Your end date was July of '05, your
15   termination date?
16   A.    Right.
17   Q.    So if we go back, you said you were
18   on light duty for about a year prior to your
19   termination?
20   A.    I believe so.
21   Q.    Is this helping you remember when
22   the first injury was?
23   A.    It was June 29th of '04.
24   Q.    And the second injury was January

---

# KATHLEEN D. RAYMOND
# January 24, 2007

15 (Pages 54 to 57)

Page 54

1  of '05?
2  A.  Right.
3  Q.  Were you on light duty after the
4  first injury?
5  A.  Yes.
6  Q.  Were you on light duty after the
7  second injury?
8  A.  Yes.
9  Q.  Up to the time of your termination,
10  were you on light duty?
11  A.  Yes.
12  Q.  During that whole time after that
13  first injury to the time of your termination,
14  you always had the position of CNA, the title?
15  A.  Yes.
16  Q.  You did handle some CNA
17  responsibilities, correct, as well as light duty
18  responsibilities during that time frame?
19  A.  Yes, right.
20  Q.  No one changed your position or
21  gave you a new job after your first or second
22  injury?
23  A.  No.
24  Q.  Up to the time of your termination?

Page 55

1  A.  Right.
2  Q.  Debbie Laranger, she was on light
3  duty?
4  A.  When I was on light duty, she
5  wasn't there, she was out on workmen's comp.
6  And when I left and I applied for the activities
7  assistant job, she was working light duty.
8  Q.  How long was she working light
9  duty?
10  A.  I have no idea. I mean, I had left
11  the company. I don't know if they took her
12  right back.
13  Q.  Where was she working light duty,
14  what responsibilities?
15  A.  I'm not sure exactly. She probably
16  was doing the same thing I do, helping the CNAs.
17  Q.  They didn't change her job title
18  as far as you know?
19  A.  As far as I know, no.
20  Q.  Did they ever give Wendy Gauthier
21  light duty at Sunbridge?
22  A.  Not that I'm aware of.
23  Q.  You are aware she was asking for
24  light duty, correct?

Page 56

1  A.  Yes.
2  Q.  There was an incident that you did
3  testify about earlier concerning Wendy Gauthier
4  and Lisa Franks in a scheduling issue?
5  A.  Yes.
6  Q.  I believe you said you were
7  questioned about it?
8  A.  Yes.
9  Q.  Were you questioned about one
10  particular incident?
11  A.  I can't remember. I believe it was
12  the director of nursing had questioned me about
13  it. And I had told her at that time that I was
14  there when they switched.
15  Q.  Who was the director of nursing?
16  A.  I think it was Anne Kendall.
17  Q.  It's just prior to Wendy Gauthier's
18  termination?
19  A.  Yes, she was the director of
20  nursing at the time.
21  Q.  She came to you and asked you about
22  an incident where there was some confusion?
23  A.  She had asked me if Wendy and Lisa
24  had switched. And I said they switched that

Page 57

1  particular night. I don't know about any other
2  night. I just know that night they had
3  switched.
4  Q.  Focusing on that night, how do you
5  know they switched?
6  A.  I was standing there when they were
7  switching.
8  Q.  Shortly thereafter Wendy Gauthier
9  was terminated, correct?
10  A.  I didn't do see Wendy, so I would
11  imagine she was terminated. Nobody had said
12  anything and I asked the nurse and she said she
13  was no longer working for the company.
14  Q.  How long would you say, just
15  approximate, I'm not asking for dates because I
16  don't remember dates too well myself, how long
17  after you being questioned by Anne Kendall and
18  Wendy Gauthier's termination, how long would you
19  say that time frame was, couple weeks, week?
20  A.  I believe it was, as far as I know,
21  it was like, I forget which day it was, but I
22  think it was the following week.
23  Q.  That she was terminated?
24  A.  I didn't know she was

# KATHLEEN D. RAYMOND
# January 24, 2007

16 (Pages 58 to 61)

## Page 58

1  terminated.
2    Q.    You just never saw her again?
3    A.    I just never saw her again. I had
4  asked, but they just told me that she no longer
5  works there.
6    Q.    Do you remember who told you that?
7    A.    The director of nursing.
8    Q.    Anne Kendall?
9    A.    Yes.
10   Q.    Shortly after the termination?
11   A.    Right.
12   Q.    You say it's about a week between
13 that incident and the termination?
14   A.    And I never seen her again, yes.
15   Q.    You never saw Wendy Gauthier commit
16 any kind of no call, no show, correct?
17   A.    Not that I'm aware of, no.
18       MR. SHEA: Thank you very much.
19       MR. WILLIAMS: I have just one
20 follow up.
21
22
23       FURTHER EXAMINATION BY MR. WILLIAMS:
24

## Page 59

1    Q.    Just on that last discussion you
2  were having where Anne Kendall had asked you
3  about whether or not there has been a switch, I
4  think you said that you were there when they had
5  made the switch?
6    A.    Yes.
7    Q.    Were you there when the two of them
8  agreed to switch, can you just tell me what you
9  mean by you were there?
10   A.    They needed to switch as far as I
11 knew. You know what I'm saying, they agreed to
12 switch.
13   Q.    You were there when they switched,
14 were you there?
15   A.    Well, the nurse was erasing their
16 names and switching to whatever day they were
17 switching to.
18   Q.    You were there to see the nurse
19 making the switch?
20   A.    Well, she was erasing it, I didn't
21 stand there and make sure she was writing
22 somebody's name. Like I was saying before, this
23 was a normal practice.
24       I remember a few times I had been

## Page 60

1  there when, not Wendy, but another employee was
2  supposed to show up, didn't show up from work
3  and I got, I don't know how many patients 40, 50
4  patients and they had to call the director of
5  nursing in to help me because I can't do all
6  them patients myself. But I had been there four
7  or five hours with nobody but myself and a nurse
8  to handle all these residents which makes it
9  tough.
10   Q.    There's a safety issue if you don't
11 have enough people there, correct?
12   A.    The place should have been shut
13 down sometimes, there's no way you can take care
14 of that many patients or residents with the
15 nurse and a CNA.
16   Q.    I just want to go back and make
17 sure I've got it clear. This will be the last
18 question.
19       You were there when the nurse was
20 making some changes, you didn't actually see,
21 but making some change in the scheduling book
22 for a switch between Lisa Franks and Wendy?
23   A.    Exactly.
24   Q.    That was sometime shortly before

## Page 61

1  she was terminated?
2    A.    Like I told you, we all switched
3  all the time. I couldn't tell you if that was a
4  particular. I know that one time before she got
5  fired, they were switching and then the next
6  thing you know, Wendy goes to the hospital, I no
7  longer see her ever again. I mean, you know, I
8  don't know if it was that particular time or
9  another time. I can't say exactly.
10       MR. WILLIAMS: That's all I have.
11       MR. SHEA: I'm sorry, I have a
12 couple more based on what he asked you.
13
14
15       FURTHER EXAMINATION BY MR. SHEA:
16
17   Q.    You do remember that the incident
18 that you were questioned about by Anne Kendall
19 related to the time that you saw the change
20 being made in front of you in the book, right?
21   A.    Right.
22       MR. WILLIAMS: Objection.
23   Q.    (By Mr. Shea) By the way, this
24 procedure that you've described that you had for

# KATHLEEN D. RAYMOND
# January 24, 2007

17 (Pages 62 to 65)

## Page 62

1  switching time and changing the schedule up
2  until the time that Wendy Gauthier was
3  terminated, that was verbally explained to you,
4  it wasn't in any kind of writing or handbook?
5      A.    I never seen anything in writing as
6  far as that procedure of switching days, it was
7  pretty lax around there for a while.
8          MR. SHEA: That's it. I'm all
9  set.
10         You have the right to read the
11  transcript that's going to be produced as a
12  result of this deposition for its accuracy.
13         THE WITNESS: Okay.
14         MR. SHEA: We can make arrangements
15  for you to do that, read and sign if you
16  want to or if you're confident that you
17  don't have any changes, you can waive the
18  reading and signing.
19         THE WITNESS: I would like it to
20  be sent to my attorney, if that's possible.
21         MR. SHEA: Okay. Just to be clear
22  for the record, you don't have an attorney
23  representing you regarding this matter as a
24  witness in this case?

## Page 63

1          THE WITNESS: No.
2          MR. SHEA: You mean Rickie Weiner,
3  your worker's compensation attorney?
4          THE WITNESS: Yes.
5          MR. SHEA: That's all I have.
6
7          (Deposition concluded at 10:58 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 64

1      I, ELISABETH ZAHARIADIS, a Notary Public
2  in and for the Commonwealth of Massachusetts, do
3  hereby certify that KATHLEEN D. RAYMOND appeared
4  before me, satisfactorily identified herself, on
5  the 24th day of January, 2007, at Worcester,
6  Massachusetts, and was by me duly sworn to
7  testify to the truth and nothing but the truth
8  as to her knowledge touching and concerning the
9  matters in controversy in this cause; that she
10  was thereupon examined upon her oath and said
11  examination reduced to writing by me; and that
12  the statement is a true record of the testimony
13  given by the witness, to the best of my
14  knowledge and ability.
15      I further certify that I am not a relative
16  or employee of counsel/attorney for any of the
17  parties, nor a relative or employee of such
18  parties, nor am I financially interested in the
19  outcome of the action.
20      WITNESS MY HAND this 6th day of February,
21  2007.
22
23  Elisabeth Zahariadis   My Commission expires:
24  Notary Public          October 5, 2012

## Page 65

1  Today's date:      February 6, 2007
2  To:          Rickie T. Weiner, Esq.
3  Copied to:      Michael O. Shea, Esq.
4              Michael Williams, Esq.
5  From:          Elisabeth Zahariadis
6  Deposition of:     Kathleen D. Raymond
7  Taken:          January 24, 2007
8  Action:        Gauthier V. Sunhealth
9
10      The above-described deposition has
11  been completed. Pursuant to the Rules of Civil
12  Procedure, Ms. Raymond has thirty days to sign
13  the deposition from today's date.
14      Please contact my office
15  immediately to schedule an appointment for Mr.
16  Raymond to come in and review the transcript and
17  sign the signature page within the next thirty
18  days. It will then be attached to the original
19  deposition transcript and a copy forwarded to
20  all parties with any addendum.
21      Thank you for your cooperation in
22  this matter.
23
24

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

# KATHLEEN D. RAYMOND
# January 24, 2007

18 (Pages 66 to 68)

|  | Page 66 |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF MASSACHUSETTS |
| 3 |  |
| 4 | ***************************** |
| 5 | WENDY GAUTHIER,        * |
| 6 |       Plaintiff   * |
| 7 | vs.            *No.: 05cv40119-FDS |
| 8 | SUNHEALTH SPECIALTY      * |
| 9 | SERVICES, INC. and SUNBRIDGE* |
| 10 | HEALTHCARE CORPORATION,   * |
| 11 |       Defendants   * |
| 12 | ***************************** |
| 13 |  |
| 14 |  |
| 15 |     I, KATHLEEN D. RAYMOND, do hereby certify, |
| 16 | under the pains and penalties of perjury, that |
| 17 | the foregoing testimony is true and accurate, to |
| 18 | the best of my knowledge and belief. |
| 19 |     WITNESS MY HAND, this   day of      , |
| 20 | 2007. |
| 21 |     _____ |
| 22 |       KATHLEEN D. RAYMOND |
| 23 | EZ |
| 24 |  |

|  | Page 67 |
|---|---|
| 1 | CORRECTION SHEET |
| 2 | DEPONENT: Kathleen D. Raymond |
| 3 | CASE: Gauthier V. Sunhealth Specialty Services |
| 4 | DATE TAKEN: January 24, 2007 |
| 5 | ********************************************* |
| 6 | PAGE/ LINE/ CHANGE OR CORRECTION AND REASON |
| 7 | ********************************************* |
| 8 | ___/ ___/ _____ |
| 9 | ___/ ___/ _____ |
| 10 | ___/ ___/ _____ |
| 11 | ___/ ___/ _____ |
| 12 | ___/ ___/ _____ |
| 13 | ___/ ___/ _____ |
| 14 | ___/ ___/ _____ |
| 15 | ___/ ___/ _____ |
| 16 | ___/ ___/ _____ |
| 17 | ___/ ___/ _____ |
| 18 | ___/ ___/ _____ |
| 19 | ___/ ___/ _____ |
| 20 | ___/ ___/ _____ |
| 21 | ___/ ___/ _____ |
| 22 | ___/ ___/ _____ |
| 23 | ___/ ___/ _____ |
| 24 | ___/ ___/ _____ |

|  | Page 68 |
|---|---|
| 1 |  |
| 2 |  |
| 3 |  |
| 4 |  |
| 5 |  |
| 6 |  |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

# EXHIBIT 6

**LISA FRANKS**
**February 8, 2007**



Page 1

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3

4

5  *****************************

6  WENDY GAUTHIER,                    *

7              Plaintiff          *

8  vs.                       *No.: 05cv40119-FDS

9  SUNHEALTH SPECIALTY           *

10 SERVICES, INC. and SUNBRIDGE *

11 HEALTHCARE CORPORATION,       *

12            Defendants      *

13 *****************************

14

15    TELEPHONE DEPOSITION OF:  LISA FRANKS

16       CATUOGNO COURT REPORTING SERVICES

17              446 Main Street

18          Worcester, Massachusetts

19         February 8, 2007     4:21 p.m.

20

21

22

23            Elisabeth Zahariadis

24        Certified Shorthand Reporter

# LISA FRANKS
# February 8, 2007

2 (Pages 2 to 5)

---

Page 2

```
 1  APPEARANCES:
 2
 3  Representing the Plaintiff:
 4     LAW OFFICE OF MICHAEL O. SHEA, P.C.
 5     451 Main Street
 6     Wilbraham, MA  01095
 7     BY: MICHAEL O. SHEA, ESQ.
 8     (413) 596-8005 FAX 596-8095
 9
10  Representing the Defendant:
11     LAWSON & WEITZEN, LLP
12     88 Black Falcon Avenue
13     Boston, MA  02210
14     BY: K. SCOTT GRIGGS, ESQ.
15     (617) 439-4990 FAX 439-3987
16
17  In attendance: Wendy Gauthier
18
19
20
21
22
23
24
```

Page 4

```
 1        MR. SHEA: I appreciate you doing
 2  this. I've got Attorney Griggs for
 3  SunBridge here and I've got Wendy Gauthier
 4  and the stenographer.
 5        MR. GRIGGS: Hello, Lisa.
 6        THE WITNESS: Hi.
 7        MR. SHEA: We're going to swear you
 8  in and stipulate on the record that you are
 9  who you are between the lawyers anyway.
10
11     LISA FRANKS, Deponent, having first been
12  satisfactorily identified and duly sworn,
13  deposes and states as follows:
14
15
16     EXAMINATION BY MR. SHEA:
17
18     Q.   Are you feeling okay today to
19  answer some questions?
20     A.   Yeah, I'm feeling okay.  I have the
21  bug and stuff so.
22     Q.   You are not under the influence of
23  any medication or anything which would affect
24  your ability to answer questions?
```

---

Page 3

```
 1           I N D E X
 2
 3  WITNESS:     LISA FRANKS
 4
 5  EXAMINATION BY:            PAGE:
 6  Mr. Shea                4
 7  Mr. Griggs             24
 8
 9  EXHIBIT:             PAGE:
10  (none offered)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1     A.   No, I'm not.
 2     Q.   I'll try to be brief and I
 3  appreciate you being available.
 4           As I said, I represent Wendy
 5  Gauthier in a case involving SunBridge and I
 6  just want to ask you a few questions about your
 7  employment there.
 8     A.   Okay.
 9     Q.   You were employed there as a CNA?
10     A.   Yes, I was.
11     Q.   Do you remember when you started
12  your employment there?
13     A.   I believe I started there, I was on
14  again off again for a few years there.  I
15  originally started working there 1992.
16     Q.   Were you working there in 2003 and
17  2004?
18     A.   Yes, I was.
19     Q.   Are you still working there?
20     A.   No, I'm not.
21     Q.   Why did you leave there?
22     A.   I had an opportunity to further my
23  education and my knowledge and I went into
24  working at St. Vincent Hospital.
```

---

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# LISA FRANKS
# February 8, 2007

Page 6

1    Q.    Here in Worcester?
2    A.    Yes.
3    Q.    How old are you?
4    A.    37.
5    Q.    Where do you currently reside?
6    A.    19 Vine Street, Oxford,
7    Massachusetts.
8    Q.    How long have you lived there?
9    A.    I've been here 10 years now.
10    Q.    Over how many years were you
11    employed as a CNA at SunBridge?
12    A.    I was there from '92 to December of
13    '05 I believe it was.
14    Q.    You left there voluntarily you
15    said?
16    A.    Yes.
17    Q.    Did you ever receive a warning or
18    any kind of reprimand there?
19    A.    No, not that I recall.
20    Q.    Did SunBridge or Sandalwood have a
21    no call/no show policy of some kind?
22    A.    Yes, they did.
23    Q.    Can you tell me what you remember
24    about that policy?

Page 7

1    A.    I do know if you are scheduled to
2    work on a certain day or shift and you do not
3    show up there, I don't recall what their total
4    policy is what they do for the first offense,
5    but they do reprimand you.
6    Q.    Who was your supervisor in '03 and
7    '04? Ann Kendall?
8    A.    I can't remember right now. I know
9    Ann Kendall was one. I'm trying to think who
10    else was there. They switched over so often.
11    Ann Kendall was one I know.
12    Q.    If you remember the other one, can
13    you just let me know?
14    A.    His first name is Mike, but I don't
15    remember his last name.
16    Q.    As a CNA, did you have occasion to
17    change your schedule from time to time?
18    A.    Not that I recall.
19    Q.    Did you ever switch time with any
20    other CNAs?
21    A.    Yeah, I had.
22    Q.    Can you tell me how that process
23    was undertaken?
24    A.    Usually there was a form you fill

Page 8

1    out if you wanted to switch times, if you want
2    to work for somebody or somebody needed to work
3    for you, you needed to fill out a form of some
4    kind.
5    Q.    You said usually, are there
6    occasions when you notified the scheduler
7    verbally of a time swap?
8    A.    I don't recall.
9    Q.    Is there some policy that talked
10    about how to switch time with another CNA
11    between CNAs that you recall or no?
12    A.    I honestly don't recall right now.
13    This was a few years back. I don't recall all
14    the policies right now.
15    Q.    Did you ever switch time, change
16    your schedule and swap time with Wendy Gauthier?
17    A.    I honestly don't recall, but I may
18    have.
19    Q.    Do you know why she was terminated?
20    Do you know that she was terminated from
21    Sandalwood or SunBridge?
22    A.    Yes, I do. She was terminated and
23    I understand that during that time I guess she
24    was pregnant and she was having complications

Page 9

1    with her pregnancy and she had called in a few
2    times. I don't know. I don't recall how many
3    times, but I do know that she was having
4    problems with her pregnancy at the time.
5    Q.    Do you recall what those
6    complications were?
7    A.    I really don't know. I can't
8    recall what they were. She was having pressure
9    or what it was.
10    MR. GRIGGS: I'll object to the
11    form of the question. Insufficient basis
12    for her to make that observation.
13    Q.    (By Mr. Shea) Did she have swollen
14    feet and legs?
15    MR. GRIGGS: Same objection.
16    THE WITNESS: Honestly, I can't
17    recall if she did or not at this point.
18    I'm sorry.
19    Q.    (By Mr. Shea) That's okay. How
20    often did you work alongside Wendy Gauthier?
21    A.    I don't know. I'd say maybe two
22    times a week or so.
23    Q.    Full shifts?
24    A.    Yeah.

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# LISA FRANKS
# February 8, 2007

4 (Pages 10 to 13)

Page 10

1    Q.    Which shift did you work, did you
2  work a usual shift?
3    A.    Basically 11:00 at night until 7:00
4  in the morning.
5    Q.    Did you ever happen to commit a no
6  call/no show?
7    A.    No, I don't believe I did.
8    Q.    You said you don't recall any
9  employee that committed a no call/no show?
10    A.    Right.
11    Q.    Do you have a specific
12  recollection of swapping time with Wendy
13  Gauthier?
14    A.    I don't have a specific time, no.
15  I'm sorry.
16    Q.    Do you think you may have swapped
17  time with her or change your schedule where you
18  were covering for her or vice versa on more than
19  one occasion?
20    A.    I don't recall. If she asked me
21  and we fill out a form, then yeah, I probably
22  did. I honestly don't recall.
23    Q.    Do you recall whether you ever
24  swapped time with Wendy Gauthier where a form

Page 11

1  was not filled out and the request was made
2  verbally and noted by the scheduler?
3    A.    I don't recall that, honestly.
4    Q.    It could have happened, you just
5  may not recall right now?
6    MR. GRIGGS:  Asked and answered.
7  Objection.
8    Q.    (By Mr. Shea) Pardon me?
9    MR. GRIGGS:  I'll object to the
10  question. Asked and answered.
11    Q.    (By Mr. Shea) What was your
12  answer?
13    A.    I honestly don't recall, but may
14  have.
15    Q.    (By Mr. Shea) As far as you know,
16  was Wendy Gauthier a good employee at SunBridge?
17    MR. GRIGGS:  Objection.
18    THE WITNESS:  Yes, she was. She
19  was a good employee.
20    Q.    (By Mr. Shea) Did she have a good
21  working relationship with others as far as you
22  know?
23    MR. GRIGGS:  Same objection.
24    THE WITNESS:  I believe she has,

Page 12

1  yes.
2    Q.    (By Mr. Shea) She was a hard
3  worker?
4    A.    Yes.
5    Q.    Do you remember her getting injured
6  on the job?
7    A.    That, I honestly don't recall.
8    Q.    You do recall something about
9  pregnancy complications?
10    A.    Right.
11    Q.    A need to take time off for those
12  complications?
13    A.    Yes.
14    Q.    Do you know anything more about
15  that subject matter than what you may have
16  already said?
17    A.    No, not that I can recall.
18    MR. SHEA:  Can we leave you on the
19  phone for one minutes, Ms. Franks.
20    THE WITNESS:  Yes.
21    MR. SHEA:  I may be done, I just
22  want to step out of the room and talk to my
23  client real quick and then I'll be right
24  back in.

Page 13

1    THE WITNESS:  Okay.
2    MR. SHEA:  Thank you.
3
4    (A recess was taken)
5
6    MR. SHEA:  Back on the record.
7    Q.    (By Mr. Shea) Lisa, it's Mike
8  Shea again.
9    A.    Okay.
10    Q.    Did you have any conversation with
11  anyone about today's deposition?
12    A.    No, I haven't, just my husband.
13    Q.    What conversation did you have with
14  him?
15    A.    I just had told him that I was
16  supposed to go to a deposition about something
17  that had happened with a former coworker I used
18  to work with.
19    Q.    Did he know who she was?
20    A.    No, he has no clue. And I didn't
21  even say who the person was.
22    Q.    Was it fairly common practice to
23  swap time among CNAs?
24    A.    On occasion, yeah.

**LISA FRANKS**
**February 8, 2007**

5  (Pages 14 to 17)

---

Page 14

1    Q.    But it wasn't uncommon, correct?
2    A.    Right.
3    Q.    You could do that verbally as well
4  as in writing, correct?
5    A.    Well, they really wanted, they
6  expected you to fill out a form, but there were
7  instances I believe that may have happened.
8    Q.    Did anyone to your knowledge get
9  reprimanded if they asked for time off or time
10  swapped?
11    A.    Not that I recall.
12    Q.    Verbally?
13    A.    I don't recall.
14    Q.    Do you know why Wendy Gauthier was
15  terminated?
16    A.    I don't know.  I heard at that
17  time, I remember hearing different reasons why
18  because she was calling out too much and they
19  didn't think she was up to doing her job the way
20  she should have been doing it.
21    Q.    Was somebody telling you this?
22    A.    What?
23    Q.    Was someone telling you that she
24  wasn't up to doing her job?

---

Page 15

1    A.    I recall somebody telling me, but I
2  don't recall the person's name right now at this
3  point who had said it.
4    Q.    You said you worked alongside Wendy
5  Gauthier?
6    A.    Yes, I did.
7    Q.    Couple days a week on average?
8    A.    Yes, I never had a problem working
9  with her.
10    Q.    Did she ever have a problem working
11  up to their standards to your knowledge?
12    A.    Not that I know of, no.
13    Q.    Do you have an understanding, I
14  know I asked you this, but I'd like to delve
15  into your knowledge, if any, about the reasons
16  why Ms. Gauthier was told she was being
17  terminated.  Do you have an understanding of
18  that?
19        MR. GRIGGS:  Objection.  The
20    question is calling for state of mind of
21    someone else.
22        THE WITNESS:  Do I have an
23    understanding of that?
24    Q.    (By Mr. Shea)  Yes.

---

Page 16

1    A.    I really don't.
2    Q.    Did somebody tell you why she was
3  terminated?
4    A.    No, they just said that she was
5  calling out an awful lot.
6    Q.    Who said that, do you know?
7    A.    One of the nurses that I had worked
8  with.  I don't recall her name.  If it was
9  Debbie or if it was another nurse.
10    Q.    Do you know who terminated Wendy
11  Gauthier's employment?
12    A.    No, I don't recall that, I'm sorry.
13    Q.    Did you have any conversation with
14  anyone other than your husband about this case?
15    A.    No, I haven't.
16    Q.    No lawyers?
17    A.    No.
18    Q.    Okay.  Did you talk to anyone at
19  SunBridge because you were there after Wendy
20  Gauthier was gone, right?
21    A.    Yes, I was.
22    Q.    Did you talk to anyone after Wendy
23  Gauthier was terminated as to the reasons for
24  her termination?

---

Page 17

1    A.    I had just asked because I just
2  noticed she wasn't on the schedule anymore and I
3  was curious.  And they said, just one of the
4  nurses had stated that she thought she got
5  terminated because of her call outs.
6    Q.    No one ever told you she was
7  terminated for a no call/no show, is that fair
8  to say?
9    A.    No, not that I recall.
10    Q.    Do you know how early on in her
11  employment at SunBridge she began having
12  complications with her pregnancy?
13    A.    That, I don't recall.  I'm sorry.
14    Q.    Let me ask you about this form
15  that you are talking about where the CNA uses a
16  form that asks for time off or switch time with
17  another CNA.
18        Do you recall using that form
19  every time you switched time or no?
20    A.    I honestly don't recall if I signed
21  it every time.  I know I did sign it most of the
22  time.
23    Q.    Can you walk through the process,
24  where do you get this form from and what did it

---

**LISA FRANKS**
**February 8, 2007**

6 (Pages 18 to 21)

Page 18

1  say?
2     A.     They were like a collection basket
3  type that it had all the forms in there, it was
4  like in a cubby hole in the hallway and you
5  could go there and just take it and fill it out
6  and then it would have to be okayed by the
7  supervisor.
8     Q.     Who were the supervisors at the
9  time that you and Wendy Gauthier worked there?
10    A.     I'm not positively sure, but I
11  believe it may have been Ann Kendall at that
12  time.
13    Q.     Was there a supervisor Donna that
14  you remember or no?
15    A.     I do remember a Donna, but I don't
16  know exactly what time frame she was there at.
17  If it was during that time frame or a different
18  one.
19    Q.     What was her title, was she a
20  nurse?
21    A.     She was a nurse, but she was higher
22  up. I don't know if she was assistant director
23  of nursing or if she was.
24    Q.     Was she a scheduler?

Page 19

1     A.     Honestly, I don't recall that.
2     Q.     When you filled this form out, you
3  drop it in basket somewhere you said?
4     A.     Yes.
5     Q.     Who takes the form or what do they
6  do with it?
7     A.     Usually put it in the basket and
8  then the following day the supervisor would take
9  it or the scheduler and from that point on, they
10  would go through and approve it or the scheduler
11  would change the schedule if need be.
12    Q.     If the time change was approved,
13  would that be noted somewhere?
14    A.     Yes, I believe so.
15    Q.     By whom and on what document?
16    A.     It would be approved by the
17  supervisor or I believe the scheduler was in
18  charge of putting the difference in on the
19  schedule.
20    Q.     Did the scheduler have authority to
21  approve time swap such as this?
22    A.     I don't recall that.
23    Q.     Is that possible, you just don't
24  recall?

Page 20

1     A.     I honestly don't recall.
2     Q.     Is it fair to say that as long as
3  the CNA who's looking to get coverage and change
4  their schedule, as long as they get a commitment
5  from the other CNA who is going to take their
6  place, is that sufficient?
7        MR. GRIGGS: Objection to the form.
8        THE WITNESS: To me it would be.
9     Q.     (By Mr. Shea) Under the practices
10  at SunBridge, was that sufficient in your view?
11       MR. GRIGGS: Objection again.
12    Q.     (By Mr. Shea) You can answer.
13    A.     Yes, I guess so.
14    Q.     You followed their procedures at
15  SunBridge?
16    A.     Yes.
17    Q.     You were never given a warning or
18  spoken to about a no call/no show issue?
19    A.     I don't recall getting one, no.
20    Q.     Were you ever spoken to about
21  Wendy Gauthier committing a no call/no show?
22    A.     I honestly don't recall that. I'm
23  sorry.
24    Q.     Ann Kendall never came to you to

Page 21

1  your knowledge and asked you about switching
2  time with Wendy Gauthier, is that fair to say?
3     A.     Right.
4     Q.     Steve Copper never came to you
5  about switching time with Wendy Gauthier or a no
6  call/no show, correct?
7     A.     Correct.
8     Q.     To your knowledge, was there
9  anything in writing in terms of policies or
10  procedures concerning switching time with
11  another CNA?
12    A.     I'm sorry, can you repeat that
13  question?
14    Q.     Were there any written policies or
15  procedures at Sandalwood SunBridge relating to
16  switching time with another CNA as we have been
17  talking about?
18    A.     I believe there was. I just don't
19  recall the whole entire policy itself, but I
20  believe there was a policy for switching time.
21    Q.     Do you know what it said?
22    A.     I don't recall, honestly.
23    Q.     Were you ever given a copy of such
24  a policy or do you know?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**LISA FRANKS**
**February 8, 2007**

7 (Pages 22 to 25)

## Page 22

1    A.    It was a long time ago when I
2  stopped working there. I basically threw out
3  all the policies because I don't work there
4  anymore and I don't plan on going back there to
5  work.
6    Q.    Did you leave there on good terms?
7    A.    I believe I did.
8    Q.    When you say a long time ago, how
9  long ago was this policy that you saw concerning
10  switching time?
11    A.    It was back in '03 is when I
12  actually read it.
13    Q.    Where was that, where did you read
14  it?
15    A.    I had it at my house in the policy
16  handbook.
17    Q.    It's in the company handbook?
18    A.    I believe it is, yes.
19    Q.    Did you get a copy of the company
20  handbook?
21    A.    I did, but like I said, I no longer
22  have that handbook.
23    Q.    I understand. But at some point,
24  you did get a copy of the company handbook?

## Page 23

1    A.    Yes.
2    Q.    You think there's a policy and
3  procedure in there about switching time with
4  another CNA?
5    A.    I don't recall. Their handbooks
6  have probably changed since then.
7    Q.    I'm talking about back then?
8    A.    Back then, I believe there was.
9    Q.    You don't remember what it says?
10    A.    I honestly don't recall. No, I'm
11  sorry, that was a few years ago.
12    Q.    You don't recall whether it said
13  you had to switch time in writing or anything
14  like that, right?
15    A.    I don't recall it, no.
16    Q.    If fact, other CNAs would switch
17  time with their coworkers on a verbal request,
18  correct?
19    MR. GRIGGS: Objection. Calls for
20  speculation.
21    THE WITNESS: I honestly don't
22  recall, I'm sorry.
23    Q.    (By Mr. Shea) Did you ever switch
24  time on a verbal agreement with Wendy Gauthier?

## Page 24

1    A.    I may have, but I don't honestly
2  recall.
3    MR. SHEA: I don't have anything
4  further.
5
6
7    EXAMINATION BY MR. GRIGGS:
8
9    Q.    Lisa, you know who I am
10  representing SunBridge, right? Are you still
11  there?
12    A.    Yes, I'm here, sorry.
13    Q.    Have you ever agreed verbally or in
14  writing to show up for somebody else's shift and
15  failed to show up?
16    MR. SHEA: Objection.
17    THE WITNESS: No.
18    Q.    (By Mr. Griggs) Have you ever
19  failed to show up for a shift for which you were
20  scheduled by any means?
21    MR. SHEA: Objection.
22    THE WITNESS: I don't recall, no.
23    Q.    (By Mr. Griggs) Before, you said
24  it was your understanding that there was a

## Page 25

1  policy that you had to fill out a form in
2  writing to request a shift swap; is that
3  correct?
4    A.    I believe so.
5    MR. GRIGGS: I think I have no
6  further questions.
7    MR. SHEA: Nothing further.
8
9    (Deposition concluded at 4:47 p.m.)

# LISA FRANKS
# February 8, 2007

8 (Pages 26 to 29)

|  | Page 26 |
|---|---|
| 1 | I, ELISABETH ZAHARIADIS, a Notary Public |
| 2 | in and for the Commonwealth of Massachusetts, do |
| 3 | hereby certify that LISA FRANKS satisfactorily |
| 4 | identified herself, on the 8th day of February, |
| 5 | 2007, at Worcester, Massachusetts, and was by me |
| 6 | duly sworn to testify to the truth and nothing |
| 7 | but the truth as to her knowledge touching and |
| 8 | concerning the matters in controversy in this |
| 9 | cause; that she was thereupon examined upon her |
| 10 | oath and said examination reduced to writing by |
| 11 | me; and that the statement is a true record of |
| 12 | the testimony given by the witness, to the best |
| 13 | of my knowledge and ability. |
| 14 | I further certify that I am not a relative |
| 15 | or employee of counsel/attorney for any of the |
| 16 | parties, nor a relative or employee of such |
| 17 | parties, nor am I financially interested in the |
| 18 | outcome of the action. |
| 19 | WITNESS MY HAND this 3rd day of March |
| 20 | 2007. |
| 21 | |
| 22 | |
| 23 | Elisabeth Zahariadis   My Commission expires: |
| 24 | Notary Public        October 5, 2012 |

|  | Page 28 |
|---|---|
| 1 | |
| 2 | UNITED STATES DISTRICT COURT |
| 3 | DISTRICT OF MASSACHUSETTS |
| 4 | |
| 5 | ****************************** |
| 6 | WENDY GAUTHIER,          * |
| 7 | Plaintiff   * |
| 8 | vs.          *No.: 05cv40119-FDS |
| 9 | SUNHEALTH SPECIALTY     * |
| 10 | SERVICES, INC. and SUNBRIDGE* |
| 11 | HEALTHCARE CORPORATION,   * |
| 12 | Defendants   * |
| 13 | ****************************** |
| 14 | |
| 15 | |
| 16 | I, LISA FRANKS, do hereby certify, |
| 17 | under the pains and penalties of perjury, that |
| 18 | the foregoing testimony is true and accurate, to |
| 19 | the best of my knowledge and belief. |
| 20 | WITNESS MY HAND, this   day of          , |
| 21 | 2007. |
| 22 | |
| 23 | _____ |
| 24 | EZ          LISA FRANKS |

|  | Page 27 |
|---|---|
| 1 | Today's date:        March 3, 2007 |
| 2 | To:          K. Scott Griggs, Esq. |
| 3 | Copied to:        Michael O. Shea, Esq. |
| 4 | From:          Elisabeth Zahariadis |
| 5 | Deposition of:        Lisa Franks |
| 6 | Taken:          February 8, 2007 |
| 7 | Action:          WENDY GAUTHIER |
| 8 | Vs. SUNHEALTH SPECIALTY |
| 9 | SERVICES, INC., ET AL. |
| 10 | |
| 11 | |
| 12 | Enclosed is a copy of Ms. Franks's |
| 13 | deposition. Pursuant to the Rules of Civil |
| 14 | Procedure, Ms. Franks has thirty days to sign |
| 15 | the deposition from today's date. |
| 16 | Please have Ms. Franks sign the enclosed |
| 17 | signature page. If there are any errors, please |
| 18 | have her mark the page, line and error on the |
| 19 | enclosed correction sheet. She should not mark |
| 20 | the transcript itself. This addendum should be |
| 21 | forwarded to all interested parties. |
| 22 | Thank you for your cooperation in this |
| 23 | matter. |
| 24 | |

|  | Page 29 |
|---|---|
| 1 | CORRECTION SHEET |
| 2 | DEPONENT: Lisa Franks |
| 3 | CASE: Gauthier V. Sunhealth Specialty Services |
| 4 | DATE TAKEN: February 8, 2007 |
| 5 | ************************************** |
| 6 | PAGE/ LINE/ CHANGE OR CORRECTION AND REASON |
| 7 | ************************************** |
| 8 | __/__/_____ |
| 9 | __/__/_____ |
| 10 | __/__/_____ |
| 11 | __/__/_____ |
| 12 | __/__/_____ |
| 13 | __/__/_____ |
| 14 | __/__/_____ |
| 15 | __/__/_____ |
| 16 | __/__/_____ |
| 17 | __/__/_____ |
| 18 | __/__/_____ |
| 19 | __/__/_____ |
| 20 | __/__/_____ |
| 21 | __/__/_____ |
| 22 | __/__/_____ |
| 23 | __/__/_____ |
| 24 | __/__/_____ |

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# EXHIBIT 7

Medical File



Primary Care
Physicians

Lester P. Mietkiewicz, M.D.
PRIMARY CARE PHYSICIANS
28 GRAFTON COMMON ● GRAFTON, MA 01519 ● (508) 839-5391

Date 12/31/05                For M Wendy Gauthier

Street _____ Town _____ State _____

DOB _____ Clinic M/R Number _____

Wendy was seen today for
an employment examination.
She is 13 weeks pregnant
and no heavy lifting
is suggested.

SIGNATURE _____

29-96,558

Repetur    NEW RX - STARTER SUPPLY ☐
NON  1 2 3 4 5 6 7 8 YEAR

DEA #

R.Ph.

12/22/03 - 5/25/04
was 11 wks
preg. at hire.

01/12/2004  16:41    5083636206    ....



## OBSTETRICS & GYNECOLOGY

John P. Farricy, M.D., F.A.C.O.G.          20 Worcester Center Blvd.
Susan L. Kraft, M.D., F.A.C.O.G.          Suite 587, 5th Floor, North
                                           Worcester, MA 01608

                                           Office (508) 363-6100
                                           Fax (508) 363-6206

                                           January 12, 2004

To Whom It May Concern,

Wendy Gauthier is a patient under my care for her

pregnancy.  I am recommending that she be able

to work and lift with the assistance of another co-

worker.  Any questions regarding this matter, please call

the office.  Thankyou

Sincerely,

Dr. John Farricy


Drs. Farricy & Kraft, LLP

01/26/2004  15:18  5083636285    DRS FARRICY KRAFT    PAGE  01



## OBSTETRICS & GYNECOLOGY

John P. Farricy, M.D., F.A.C.O.G.
Susan L. Kraft, M.D., F.A.C.O.G.

20 Worcester Center Blvd.
Suite 587, 5th Floor, North
Worcester, MA 01608

Office (508) 363-6100
Fax (508) 363-6206

*ATTN: Anne Kendall*

January 26, 2004

To Whom It May Concern,

Wendy Gauthier was seen in my office today.

It is my recommendation that she be able to

continue working and lifting with caution.

Any questions regarding this matter, please call the

office.  Thankyou

Sincerely,

Dr. John Farricy

Drs. Farricy & Kraft, LLP

FEB-22-2007  11:27      LAWSON & WEITZEN                    PAGE  28
02/22/2007  11:20    4135968095          SHEA LAW OFFICE

## OBSTETRICS & GYNECOLOGY

John P. Farricy, M.D., F.A.C.O.G.              28 Worcester Center Blvd.
Susan L. Kroft, M.D., F.A.C.O.G.              Suite 587, 5th Floor, North
                                                          Worcester, MA 01608

                                                       Office (508) 363-6100
                                                       Fax (508) 363-6___

COPY

May 6, 2004

CONFIDENTIAL

To Whom It May Concern,

Wendy Gauthier is a patient under my care and was

seen in the office today.  It is my recommendation

that she be able to perform her duties as

usual at work.  Any questions regarding this

matter, please call the office.  Thankyou

Sincerely,

Dr. John Farricy

Drs. Farricy & Kroft, LLP

# EXHIBIT 8

# PERFORMANCE IMPROVEMENT PLAN

Name ████████████████ Job Title ___ C N A ___ Facility Sandalwood

Nature of Concern:  ✓ Absenteeism  ___ Dress Code  ✓ Behavior  ___ Performance
  ✓ Tardiness  ___ Other (describe) _____

Date(s) of Prior Disciplinary Notices in File: _____

Date(s) of Occurrence: _____

Specific Description of Issue, Situation or Behavior (what, where, how): You have been
(1) late for work 37 X in 2 1/2 Months.
(2) Your Attitude toward your Job is
very Neg. You don't take any directives
from Charge Nurse or Supervisor without
Challenging them. Come back from breaks late

Immediate and Continued Change Needed for Success: Stop being late —
this affect the staff Morale as well as
Residents Care.

Action Taken  ✓ Documented Verbal Notice  ___ Suspension for ___ days to start on
  (1st) Written Notice  (Date) _____ and return to work on
  ___ Termination  (Date) _____

**Further performance problems of any kind may lead to further corrective action up to and including termination of employment.**

Employee Comments: _____

Grace Shifford yer    7/9/03
Supervisor's Signature    Date

W. Haddurke    7/28/03
Dept. Head/Administrator    Date

Employee's Signature    Date
☑ Employee Refused to Sign - Requires Witness Signature AM

Maureen Perry RN    7/9/03
Witness Signature    Date

Copy to Personnel File (**White**)    Employee (**Canary**)    Supervisor (**Pink**)

FSH-714 (10/97)  BRIGGS, Des Moines, IA 50306  (800) 247-2343  PRINTED IN U.S.A.

HR 407A

# SANDALWOOD

## RECORD OF COUNSELING

Date: _3 · 1 - 04_

Employee Name: ███████        Employee #: _____

Department: _R S g_        Location: _____

☐ **Verbal**   ☒ **Written**   ☐ **Final Written Warning**   ☐ **Termination**

Dates and types of prior disciplinary actions or counseling:
(1st Prior) _____

(1st Prior) _____

(1st Prior) _____

Description of current specific behavior/performance requiring counseling: _____

Misconduct #: _____        Gross Misconduct #: _____ *(If applicable)*

Corrective action to be taken by employee: _Excessive. Absentisim_

_Emp will not Be Absent next 90 Days._

Description of current specific behavior/performance requiring termination: _____

_____

_____

Failure to correct and sustain the performance and/or behavior required by the date(s) indicated above will result in appropriate disciplinary action up to and including termination of employment.

Employee remarks: _____

_____

_____

*My signature indicates that the above issue(s) was/were discussed with me, not that I necessarily agree with the contents of this Record of Counseling.*

███████ _3 /01 /04_ _A. Kennell 3/01/04_
Employee                Date        Supervisor            Date

_____        _____
Next Level Management    Date        Witness            Date

| HUMAN RESOURCES POLICY AND PROCEDURE MANUAL – HR 407 | | |
|---|---|---|
| Sun Healthcare Group, June 2002 | **Section - Forms** | Page 1 of 1 |





## ABSENCE REPORT

Name _____

Department _____    Date 6-22-04    Time _____

### WAS ABSENT FROM WORK TODAY

☐ Illness    ☐ Vacation    ☐ Unknown

☐ Injury    ☐ Approved Leave    ☐

Remarks: No call / No show

called wrist 7:40pm - thinks she

resigned to her previous title

quitting + time

Supervisor's Signature _____

Form 819    BRIGGS, Des Moines, IA 50306  (800) 247-2343
PRINTED IN U.S.A.

ABSENCE REPORT

# EXHIBIT 9



HR 407A

# SunBridge Sandalwood

## RECORD OF COUNSELING

Employee Name: ██████████████████     Date: _9-6-05_

Employee #: ██████████     Position: _C N A_

Department: _Nursing_     Location: _____

Dates of prior disciplinary actions of counseling within the last 12 months:

Verbal counseling: _____    First written warning: X ___    Final written warning: ✓

> Type* and description of current specific behavior/performance/conduct requiring counseling (including actions and completion dates agreed upon to correct problem(s); indicate employee reactions, commitments, etc.):
>
> _excessive absenteism_
>
> _(see attached)_
>
> _3 absence occurrences in a 90 day period._
>
> * Type of current disciplinary action taken (e.g. Misconduct, rule #18)

Type of current disciplinary action taken:

X First Written Warning    _____ Final Written Warning    _____ Discharge

_____ Investigative Suspension    _Spoke c ████ reviewed_

Employee Comments: _policy, per next call out will be immediate termination_

Any further violations of company policy, or continued performance problems either related or unrelated to the above will result in further disciplinary action up to, and including, discharge. Violations of different rules are cumulative.

*My signature indicates that I have received this written warning and the above issues were discussed with me, but does not indicate that I am in agreement with the above statement(s).*

██████████████    _____    _Gina Lamura R DNS_ 9/6/
Employee    Date    Supervisor    Date

_____    _____    _____    _____
Next Level Management    Date    Witness    Date

| DATE | CALLED OUT | TARDY | VACATION | OTHER |
|---|---|---|---|---|
| 7/27/2005 | Illness for Family | | | |
| 8/8/2005 | | | | Babysitter called in |
| 8/23/2005 | | | | No Call No Show |
| 8/25/2005 | Illness for Family | | | |
| 9/4/2005 | Called Out | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

5 call outs since date of hire 7/15/05

| DATE | CALLED OUT | TARDY | VACATION | OTHER |
|---|---|---|---|---|
| 7/27/2005 | Illness for Family | | | |
| 8/8/2005 | | | | Babysitter called in |
| 8/23/2005 | | | | No Call No Show |
| 8/25/2005 | Illness for Family | | | |
| 9/5/2005 | Illness for Self | | | |
| 9/6/2005 | | 1/2 Hour | | |
| 9/13/2005 | | | | No Call No Show |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

# EXHIBIT 10

# PERFORMANCE IMPROVEMENT PLAN

Name: ▮▮▮▮▮▮    Job Title: CNA    Facility: Sudonwood

Nature of Concern: ___ Absenteeism  ___ Dress Code  ___ Behavior  ___ Performance
___ Tardiness  ___ Other (describe) _____

Date(s) of Prior Disciplinary Notices in File: _____

Date(s) of Occurrence: _____

Specific Description of Issue, Situation or Behavior (what, where, how): _____

irradict behavior — lying in bed w/pt — "consoling pt"
strong smell of alcohol on breath — eyes very
glossy — Joe Petone RN Employee Refused alcohol testing
+ offer of employee assistance. Employee chose to leave of
her own accord.

Immediate and Continued Change Needed for Success: _____

This is a repeat Behavior of Nov. 21 — Behavior
inappropriate + strong odor of Alcohol — Unsteady on her feet
+ while giving Breakfast Cart. Crooked into wall + then walked
away.

Action Taken
___ Documented Verbal Notice    _✓_ Suspension for _1_ days to start on
___ Written Notice    (Date) 12/1/03 and return to work on
___ Termination    (Date) _____

**_Further performance problems of any kind may lead to further corrective action up to and including termination of employment._**

Employee Comments: _____

Supervisor's Signature _____  Date 12-1-03

Employee's Signature _____  Date
☒ Employee Refused to Sign - Requires Witness Signature

Dept. Head/Administrator _____  Date    Witness Signature _____  Date

Copy to Personnel File **(White)**    Employee **(Canary)**    Supervisor **(Pink)**

# PERFORMANCE IMPROVEMENT PLAN

Name [redacted] Job Title ___ C N A ___ Facility Sandalwood.

Nature of Concern:   ✓ Absenteeism   ____ Dress Code   ____ Behavior   ____ Performance
                     ✓ Tardiness      ____ Other (describe) _____

Date(s) of Prior Disciplinary Notices in File: _____

Date(s) of Occurrence: 5/3/03 ——— 6/25/03 _____

Specific Description of Issue, Situation or Behavior (what, where, how): Within a period of 2 1/2 Months your Attendance is poor. 11 Xs. you have been late. From your Scheduled time.

Immediate and Continued Change Needed for Success: (1) Stop being late. (2) stop calling out. (3). Report to work Promptly after your break — to ensure the residents care getting Quality Care.

Action Taken   ✓ Documented Verbal Notice   ____ Suspension for ____ days to start on
               ____ Written Notice           (Date) _____ and return to work on
               ____ Termination              (Date) _____

**Further performance problems of any kind may lead to further corrective action up to and including termination of employment.**

Employee Comments: _____
_____
_____
_____

Gnesh/Bond ye   7/10/03
Supervisor's Signature          Date

[redacted]
Employee's Signature            Date
☐ Employee Refused to Sign - Requires Witness Signature

W.H. Ceddall Vn   7/28/03
Dept. Head/Administrator        Date

Marilyn Mason LPN
Witness Signature               Date

Copy to Personnel File **(White)**   Employee **(Canary)**   Supervisor **(Pink)**

FSH-714 (10/97) BRIGGS, Des Moines, IA 50306 (800) 247-2343 PRINTED IN U.S.A.

# EMPLOYEE COUNSELING FORM

DATE: 8/20/96

EMPLOYEE: ███████████████

**PROBLEM:**
████ came in late & then became upset when she wasn't allowed to stop rounds & start her assignment right away but was asked to do residents that needed to be done before breakfast ████ became upset & angry & co worker verbal comments made back & forth ████ upset & thinks her assignment is too heavy but she had 4 completed, 4 set ups + 1 shower although yesterday the aide did one of them for her

**STATEMENT BY EMPLOYEE:**
(error)
Counseled Refused to sign & denied all
Marcm LM

**RESOLUTION OF PROBLEM OR ACTION TAKEN:**
Getting to work on time + working as a team
(or suspension) possible

_Marilyn MacMillen_            8/24/96
Signature of Staff Member          Date                    ████████████████        Signature of Employee        Date

# EMPLOYEE COUNSELING FORM

DATE: _8/20/96_

EMPLOYEE: _Thompson LPN_

**PROBLEM:** _has been late 4 days in the past week_
_Wed. 8/14    7⁰⁵ A_
_Thurs 8/15    7⁰⁵ A_
_Friday 8/16    7⁰⁵ A_
_Tues. 9/20    7⁰⁵ A_

**STATEMENT BY EMPLOYEE:**

**RESOLUTION OF PROBLEM OR ACTION TAKEN:**

_If action continues, possible suspension_

_Marilyn Thompson LPN_  _8/21/96_
Signature of Staff Member    Date

Signature of Employee    Date

# EMPLOYEE COUNSELING FORM

# EMPLOYEE COUNSELING FORM

DATE: _September 21, 1997_

EMPLOYEE: _███████████████_

PROBLEM: _unprofessionalism - patient safety_
_Came on duty very argumentative, upset about not_
_having a partner, yelling & arguing at yourself, & others_
_stating you were going to quit - an argument between_
_you & another aide took place in a hallway, upsetting to_
_residents, attempts to stop argument failed, you continue_
_to be upset most of day - language became foul & offensive_

STATEMENT BY EMPLOYEE:
_____
_____
_____
_____
_____
_____

RESOLUTION OF PROBLEM OR ACTION TAKEN:
_attempts to tell you to calm down failed - staffing would_
_be complete - failed ████ you were way out fcontrol,_
_your voice loud, scaring people. This time you spent_
_arguing, someone could have choked or fallen - you forgot your_
_responsibilities. We could solve this by coming to me first_
_if it happens again - I would have to send you home to cool -_

_Debra-Ann Ricci RN_    _9/22/97_
Signature of Staff Member       Date              Signature of Employee        Date

# EMPLOYEE COUNSELING FORM

DATE: _11-20-98_

EMPLOYEE ███████████████

**PROBLEM:**
resident behavior -
while working ō power residents who are behavior
problems. be aware. Even though you had no warning
of this behavior, in future watch for facial expression
rigidity of body, yelling out.

**STATEMENT BY EMPLOYEE:** The nurse and I talked this
over and I will take more notice.

**RESOLUTION OF PROBLEM OR ACTION TAKEN:**
█████████ I have gone over what to do with certain
behavior problems & how to read a persons
expression, + how to save yourself from being
hurt by resident.

_un-Ann Reeder_     _11/20/98_     ███████████████
Signature of Staff Member     Date     Signature of Employee     Date

# PERFORMANCE IMPROVEMENT PLAN

Name _____    Job Title __CNA.__    Facility __Sandalwood__

Nature of Concern: _____ Absenteeism _____ Dress Code ✓ Behavior _____ Performance
_____ Tardiness ✓ Other (describe) _inappropiate conduct._

Date(s) of Prior Disciplinary Notices in File: _____

Date(s) of Occurrence: _November 28, 1998._ _____

Specific Description of Issue, Situation or Behavior (what, where, how): _In searching out cloth in laundry dept. began using vulgar language becoming upset and losing control). Behavior can't upstand in hallway in hearing distance) of residents). this behavior influences + effected mood of other employees)._

Immediate and Continued Change Needed for Success: _Spoke to employee, cautioned think about what she is going to say, + express) it in more appropiate way). More calmer behavior needed._

Action Taken        _____ Documented Verbal Notice        _____ Suspension for _____ days to start on
                    ✓ Written Notice                      (Date) _____ and return to work
                    _____ Termination                     (Date) _____

**_Further performance problems of any kind may lead to further corrective action up to and including termination of employment._**

Employee Comments: _____

_____

Supervisor's Signature: Debra - Ann Rice LPN    Date 11/3/98

Dept. Head/Administrator    Date 12/3/98

Employee's Signature    Date 12/3
☑ Employee Refused to Sign - Requires Witness Signat
Comment

Witness Signature    D

Copy to Personnel File **(White)**        Employee **(Canary)**        Supervisor **(Pink)**

FSH-714 (10/97) BRIGGS, Des Moines, IA 50306 (800) 247-2343 PRINTED IN U.S.A.

# PERFORMANCE IMPROVEMENT PLAN

Name **████████**    Job Title _CNA_    Facility _Sandalwood_

Nature of Concern:    ____ Absenteeism    ____ Dress Code    ____ Behavior    ____ Performance
                      ____ Tardiness      ✓ Other (describe) _following policy._

Date(s) of Prior Disciplinary Notices in File: _____

Date(s) of Occurrence: _12/4/98_

Specific Description of Issue, Situation or Behavior (what, where, how): _____

_If any injury occurs at work you need to report it to your_
_Charge nurse immediately to ensure that you_
_receive the proper tx._

Immediate and Continued Change Needed for Success: _Not following policy re: employee_
_injury could lead to delay in tx a delay in healing time_
_& could lead to disciplinary actions._
_- Need to attend an inservice on body mechanics a SDC_

Action Taken    ____ Documented Verbal Notice    ____ Suspension for ____ days to start on
                ✓ Written Notice    (Date) _____ and return to work
                ____ Termination    (Date) _____

***Further performance problems of any kind may lead to further corrective action up to and including termination of employment.***

Employee Comments: _Sorry, but I don't know if it_
_happen at work or not. So that is why_
_I didn't report it._

_Jai Fierne RN_    _12-8-98_
Supervisor's Signature    Date    Employee's signature    D

☐ Employee Refused to Sign - Requires Witness Signa

Dept. Head/Administrator    Date    Witness Signature    D

Copy to Personnel File **(White)**    Employee **(Canary)**    Supervisor **(Pink)**

EXHIBIT 11



HR 407A

# SANDALWOOD

## RECORD OF COUNSELING

Employee Name: ███████████████████    Date: 12/10/04

Employee #: _____    Position: _____ CNA _____

Department: Nursing    Location: 1403 _____

Dates of prior disciplinary actions of counseling within the last 12 months:

Verbal counseling: ___X___    First written warning: _____    Final written warning: _____

---

Type* and description of current specific behavior/performance/conduct requiring counseling (including actions and completion dates agreed upon to correct problem(s); indicate employee reactions, commitments, etc.):

Excessive sick calls

During 90 day probationary period employee had 3 call outs for designated shifts.




\* Type of current disciplinary action taken (e.g. Misconduct, rule #18)

---

Type of current disciplinary action taken:
___X___ First Written Warning    _____ Final Written Warning    _____ Discharge

Employee Comments: _____

_____

_____

---

Any further violations of company policy, or continued performance problems either related or unrelated to the above will result in further disciplinary action up to, and including, discharge. Violations of different rules are cumulative.

*My signature indicates that I have received this written warning and the above issues were discussed with me, but does not indicate that I am in agreement with the above statement(s).*

| | | Kalih D Showkunll L DON 12/10/04 |
|---|---|---|
| Employee | Date | Supervisor                      Date |

| | | |
|---|---|---|
| Next Level Management | Date | Witness                          Date |

---

HR 408A

# SANDALWOOD

## MANAGEMENT PERFORMANCE IMPROVEMENT PLAN

Employee Name: ███████████           Employee #: _____

Performance areas/issues requiring improvement and/or correction: _____
_____ excessive Absenteeism _____
_____

Expected action(s): Employee will have Ø sick calls x 90days _____
_____
_____

Results to be achieved by: __3|10|05_____ (date)

Employee's remarks: _____
_____
_____

*Failure to correct and meet performance expectations required by the dates indicated above will result in further disciplinary action up to and including employment termination.*

_____          _____
Employee Signature                        Date

*Kellen A Hankins 4ADON*
Supervisor Signature

__12/10/04
Date

*(Attach additional documentation)*

HR 407A

# SUNBRIDGE SANDALWOOD

### RECORD OF COUNSELING

Employee Name: ███████████    Date: _5/16/05_

Employee #: _____ ·    Position: _CNA_

Department: _Nursing_    Location: _Sandalwood_

Dates of prior disciplinary actions of counseling within the last 12 months:

Verbal counseling: _✓_    First written warning: _✓_    Final written warning: _✓ (5/16)_

Type* and description of current specific behavior/performance/conduct requiring counseling (including actions and completion dates agreed upon to correct problem(s); indicate employee reactions, commitments, etc.):

5/13/05 / Friday  Call out
4/22/05 Friday  Call out. 9:45p
3/15/05 Tuesday  left early (6 hours complete)
3/8/05 Tuesday  left early (7 hours complete)
2/22/05 Tuesday  call out
1/05/05 Wednesday  call out

*per diem status*
*multiple call outs*
*available less*
*than 50%*

*Counseled in*
*December placed*
*on 30d Hip plan*
*for no call outs.*

\* Type of current disciplinary action taken (e.g. Misconduct, rule #18)

Type of current disciplinary action taken:
_____ First Written Warning    _____ Final Written Warning    _✓_ Discharge

Employee Comments:

_____

_____

_____

Any further violations of company policy, or continued performance problems either related or unrelated to the above will result in further disciplinary action up to, and including, discharge. Violations of different rules are cumulative.

*My signature indicates that I have received this written warning and the above issues were discussed with me, but does not indicate that I am in agreement with the above statement(s).*

_____    5/16/05
Employee          Date      Supervisor          Date

_____
Next Level Management    3/16/05    Witness          Date

| HUMAN RESOURCES POLICY AND PROCEDURE MANUAL – HR 407 | | |
|---|---|---|
| Sun Healthcare Group. October 2003 | Section - Forms | Page 1 of 1 |

# EXHIBIT 12

## PERSONNEL ACTION NOTICE

**SunBridge Healthcare**

☐ NEW HIRE
☐ REHIRE
☑ CHANGE

☐ BIO DATA   ☐ JOB   ☐ PAY   ☐ TRANSFER   ☐ LEAVE OF ABSENCE   ☑ TERMINATION

**BIO DATA**

Last Name _____   First Name _____   M. _____   FAC # 1403   Employee # _____

Address _____   Street/P.O. Box   City/Town   State   Zip

S.S.N. _____   Sex _____   Race _____   Birthdate _____   Phone _____

Emergency Contact Person: Name (& Relationship) _____   Phone (Home) _____   (Work) _____

Dept. Nsg   Job C.N.A.   Base Pay Rate $ _____   PIB Pay Rate $ _____   Hourly/Salaried _____   Hours Hired For _____

**TAX**   FEDERAL   STATE   LOCAL
Marital Status
Exemptions   T.J.T.C. ☐ Yes ☐ No   Review Date _____
Add'l Withholding

**PAY CHANGE**   ☐ Orientation Review   ☐ Annual Review   ☐ Other _____

New Base Rate $ _____   New PIB Rate $ _____   Hourly/Salaried _____   % Change _____   Effective Date _____   ☐ Other Earnings (List above)

**TRANSFER**

Old Facility # /Job Classification _____   New Facility # /Job Classification _____ (former facility)

Comments _____

**LEAVE OF ABSENCE**   ☐ Disability   ☐ Military   ☐ Jury Duty   ☐ Personal   ☐ Workers Compensation   ☐ Family & Medical

Benefit Hours to be Paid _____   Expected Return Date _____   ☐ Owes Insurance Premiums

**TERMINATION**

Reason for Separation NC/NS - Attendance   Eligible for Rehire ☐ Yes ☑ No   ☐ Exit Interview   ☐ COBRA

COMMENTS New Hire on 04/09/04 and since has had 2 N/C N/S
on 04/16 and 04/17. Employee also c/o for a shift 15 min
prior to end of shift on 04/18/04. Employee also c/o ill for 04/23/04 and
Tardy on 05/04/04

_____   Dept. Head _____   Date _____

_____   Administrator Stephen Cooper   Date 5/18/04

_____   Regional _____   Date _____

EXHIBIT 13



HR 407A

# SUNBRIDGE SANDALWOOD

### RECORD OF COUNSELING

Employee Name: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ _____  Date: 8/14/04 _____

Employee #: _____  Position: *C N A* _____

Department: *NSG* _____  Location: *NSG #1403* _____

Dates of prior disciplinary actions of counseling within the last 12 months:

Verbal counseling: _____  First written warning: ✓  Final written warning: ✓

> Type* and description of current specific behavior/performance/conduct requiring counseling (including actions and completion dates agreed upon to correct problem(s); indicate employee reactions, commitments, etc.):
> *Booked double shift 8/13/04 employee did not call or show for work, employee did not answer phone until 10³⁰ AM, employee suspended for one day*
>
> * Type of current disciplinary action taken (e.g. Misconduct, rule #18)

Type of current disciplinary action taken:
_____ First Written Warning   ✓ Final Written Warning   ~~Every 15~~ ✓ Discharge

Employee Comments:

_____

_____

_____

Any further violations of company policy, or continued performance problems either related or unrelated to the above will result in further disciplinary action up to, and including, discharge. Violations of different rules are cumulative.

*My signature indicates that I have received this written warning and the above issues were discussed with me, but does not indicate that I am in agreement with the above statement(s).*

| Employee | Date | Supervisor | Date |
|---|---|---|---|
| *[signature]* | 8/14/04 | *Karen A. [signature]* | 8/14/04 |
| Next Level Management | Date | Witness | Date |



HR 407A

# SUNBRIDGE SANDALWOOD

## RECORD OF COUNSELING

Employee Name: ▮▮▮▮▮▮▮▮▮▮▮▮    Date: _8/13/04_

Employee #: _____    Position: _CNA_

Department: _NSb_    Location: _NSb_

Dates of prior disciplinary actions of counseling within the last 12 months:

Verbal counseling: _✓_    First written warning: _____    Final written warning: _____

---

Type* and description of current specific behavior/performance/conduct requiring counseling (including actions and completion dates agreed upon to correct problem(s); indicate employee reactions, commitments, etc.): _excessive absence, Booked 7-2-04 double shift Called out, Booked 7/16/04 was No Call No show until also was booked a double shift left early at Called out 7/20/04 and 7/21/04 medical reasons_

\* Type of current disciplinary action taken (e.g. Misconduct, rule #18)

---

Type of current disciplinary action taken:

_✓_ First Written Warning    _____ Final Written Warning    _____ Discharge

Employee Comments:

_____

_____

_____

Any further violations of company policy, or continued performance problems either related or unrelated to the above will result in further disciplinary action up to, and including, discharge. Violations of different rules are cumulative.

*My signature indicates that I have received this written warning and the above issues were discussed with me, but does not indicate that I am in agreement with the above statement(s).*

| Employee | Date | Supervisor | Date |
|---|---|---|---|
| | _8/14/04_ | | _8/14/04_ |
| Next Level Management | Date | Witness | Date |

EXHIBIT 14

Commonwealth of Massachusetts

Massachusetts Commission Against Discrimination

|                                              |     |                                              |
|----------------------------------------------|-----|----------------------------------------------|
|                                              | )   | MCAD Docket No. 04SEM02262                   |
| Wendy Gauthier,                              | )   | EEOC Case No.    16CA402362                   |
|                                              | )   |                                              |
|     Complainant,          | )   |                                              |
|                                              | )   |                                              |
|     v.                     | )   |                                              |
|                                              | )   |                                              |
| SunHealth Specialty Services, Inc. *et al.*; | )   |                                              |
|                                              | )   |                                              |
|     Respondents           | )   |                                              |
|                                              | )   |                                              |

### Position Paper of Respondents SunHealth Specialty Services, Inc. and SunBridge Healthcare Corporation

### I.  INTRODUCTION

This position paper is submitted on behalf of the respondents, SunHealth Specialty Services, Inc., A New Mexico corporation ("SunHealth") and SunBridge Healthcare Corporation, a New Mexico corporation ("SunBridge") (together, "Respondents"). SunHealth and SunBridge are co-employers of Complainant, Wendy Gauthier. SunBridge operates the facility known as SunBridge Care & Rehabilitation for Sandalwood ("Sandalwood") located in Oxford, Massachusetts. This Position Paper is submitted in response to the discrimination claims filed by the Complainant alleging gender, disability and pregnancy discrimination and retaliatory discharge under Massachusetts General Laws, chapter 152, Section 75B, the Americans with Disabilities Act and Title VII of the Civil Rights Act.

### II.    DISCRIMINATORY ALLEGATIONS

**Count One** alleges failure to file and failure to accommodate a workers' compensation injury;

**Count Two**, additionally, or in the alternative, alleges a failure to accommodate a pregnancy related complication; and

**Count Three** alleges retaliatory discharge based upon Counts One and Two.

A.    **COUNT ONE.**

Respondents' answer to Count One.

1.    Allegations. Complainant states that she was employed full time at Sandalwood as a Certified Nursing Assistant from December, 2003 through the date of her termination. Complainant alleges that she strained a muscle while moving a patient, but no workers' compensation claim was filed on her behalf. In addition, following the injury Complainant alleges that she was denied light duty although other employees were granted such duty.

2.    Response. Complainant was hired on December 22, 2003 as a Per Diem employee anticipated to work 24 hours per pay period on the 11 P.M. to 7 AM shift. Per Diem employees have no regularly scheduled hours but instead work on an as needed basis. Complainant was not a full time employee. See Exhibit 1.

Complainant, like all employees, is responsible for notifying the employer that a workers' compensation injury has occurred. Workers' Compensation Claim Number 9000541087 was opened for Complainant for an injury dated January 24, 2004. Respondents have no further information concerning the disposition of the claim at this time, but have requested a report from the workers' compensation insurance carrier. Complainant's personnel file contains no evidence of any kind that Complainant requested light duty following her injury.

B.    **COUNT TWO**

1.    Allegations. Complainant alleges that she informed Respondents that she was suffering from pregnancy related complications. Complainant further alleges that she requested, but was denied, accommodation for her pregnancy complications.

2.    Response. It is not clear that Complainant informed Respondents of her pregnancy, other than providing the following:

2.1    A Progress note from Saint Vincent Hospital dated April 28, 2004, indicating that she was examined on that date in the labor and delivery department, but was released to return to work her regular duties. Exhibit 2.

2.2    a written statement, dated May 6, 2004, from her physician,

2

who practices obstetrics and gynecology, that states as follows:

"To Whom It May Concern:

Wendy Gauthier is a patient under my care and was seen in the office today. It is my recommendation that she be able to perform her duties as usual at work. Any questions regarding this matter, please call the office. Thank you." Exhibit 3.

Neither statement identifies the reason for Complainant's visit, but each clearly states that she is able to perform her duties as usual.

## C.   COUNT THREE.

1.  <u>Allegations</u>.   Complainant alleges that she was fired because she was injured on the job and because she requested accommodation for her injury and/or her pregnancy complications.

2.  <u>Response.</u>   There is ample evidence that Complainant was fired because of excessive absences from work despite numerous warnings. There is no evidence that Complainant was unable to perform the usual duties of her job or that she requested accommodation for any reason.

Sandalwood is a skilled nursing facility regulated by the state of Massachusetts and the federal Centers for Medicare and Medicaid. Consistent work attendance  is a critical part of Complainant's position for both  operational and regulatory reasons.
Sandalwood has an Attendance and Punctuality Standards Policy whose purpose is to assure the operation of the facility with as little disruption as possible (as mandated by regulatory requirements). A true and correct copy of this policy is attached as Exhibit 4.   The Policy is contained in Sandalwood's employee handbook. Complainant acknowledged in writing her receipt of the handbook. Exhibit 5.  From January 1, 2004 through May15, 2004, Complainant had 16 absences.  None of these absences was reported to be caused by either her work injury or pregnancy complications. Complainant's pattern of absences began with her failure to show up for her scheduled work orientation on January 1, 2004, and continued throughout the course of her employment.  Exhibit 6.

The Attendance Policy states as follows:

"4.    No Call/No Show: Failure to call and failure to show up for work for

3

one scheduled shift or more is considered a voluntary resignation." (see Exhibit 4, page 2); and

"Supervisors shall provide verbal counseling to employees with absences and tardiness that are not yet at the level of severity of a formal written warning as outlined below. Written warnings will be issued for:
...(b.) Three absence occurrences with proper notice within any 90-day period." *(see* Exhibit 4, page 3).

Despite the provisions of the Attendance Policy, Respondents permitted Complainant to continue working following a No Call/No Show on January 27, 2004. Complainant first received verbal counseling concerning her frequent absences, as well as written counseling on April 8, 2004. Exhibit 7. Pursuant to the written warning on April 8, 2004, Complainant agreed to have no further absences for the next ninety (90) days. Nevertheless, Complainant was absent for an additional five days between April 8 and May 17, 2004, including a No Call/No Show on May 16th, when Complainant failed to respond to 4 messages left by her supervisor. Exhibit 8.

## V.     CONCLUSION

These claims against Respondents should be dismissed. Respondents adhere to and enforce vigorously all applicable federal and state laws against discrimination in employment. Respondents likewise enforce the attendance and punctuality policy, as required by state and federal regulations. Complainant was terminated for excessive absenteeism and no other reason.

Respondents are not represented by outside counsel with respect to this matter. The undersigned is authorized to execute any and all documents on behalf of Respondents. I declare under the pains and penalties of perjury that the foregoing is true and correct. Dated this 5th day of October, 2004.

SUNHEALTH SPECIALTY SERVICES, INC.,
A NEW MEXICO CORPORATION

By: *Peta L Hallisey*
Peta L. Hallisey, corporate counsel

SUNBRIDGE HEALTHCARE CORPORATION,
A NEW MEXICO CORPORATION

By: *Peta L. Hallisey*
Peta L. Hallisey, corporate counsel

4