## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**WENDY GAUTHIER,**                      )
                                         )
        **Plaintiff,**                   )
                                         )        **Civil Action No.**
        **v.**                           )        **05-40119-FDS**
                                         )
**SUNHEALTH SPECIALTY SERVICES,**        )
**INC., and SUNBRIDGE HEALTHCARE**       )
**CORPORATION,**                         )
                                         )
        **Defendants.**                  )
_____)

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action alleging unlawful employment discrimination on the basis of gender and

handicap, arising out of an employee's pregnancy and related complications. Jurisdiction is

based on diversity of citizenship. Plaintiff Wendy Gauthier is a former employee of defendants

Sunhealth Specialty Services, Inc., and Sunbridge Healthcare Corporation, which operate a

nursing home and rehabilitation facility in Oxford, Massachusetts, called Sandalwood. Gauthier

alleges that defendants discharged her from employment in violation of (1) Mass. Gen. Laws ch.

151B, § 4 (gender discrimination); (2) Mass. Gen. Laws ch. 151B, § 4(16) (handicap

discrimination); (3) Mass. Gen. Laws ch. 151B, § 4(4) (retaliation); and (4) Mass. Gen. Laws.

ch. 152, § 75B (workers' compensation retaliation). No federal claims are raised.

Defendants have moved for summary judgment on all counts. For the following reasons,

the motion will be granted in part and denied in part as to the claims of handicap discrimination;

granted as to the claim for workers' compensation retaliation; and denied as to the claims of

gender discrimination and retaliation.

## I.    Statement of Facts

The facts are stated in the light most favorable to the plaintiff unless otherwise noted.

Plaintiff Wendy Gauthier is a 34-year-old woman residing in Millbury, Massachusetts. Defendants Sunhealth and Sunbridge own and operate a nursing care and rehabilitation facility known as Sandalwood in Oxford, Massachusetts.[1]

Gauthier was employed by Sandalwood from December 22, 2003, through May 25, 2004, as a Certified Nursing Assistant ("CNA"). She was hired to work on the night shift, from 11:00 p.m. to 7:00 a.m.

During her interview for the position, Gauthier told Ann Kendall (her eventual supervisor and the director of nursing at Sandalwood) that she was twelve weeks pregnant.[2] Gauthier also told Kendall that she intended to take unpaid maternity leave after the birth of her child.

### A.    Plaintiff's Restrictions on Heavy Lifting

It is undisputed that lifting and supporting the weight of facility residents is an essential job function of a CNA. According to Gauthier, at the time her employment began, on December 22, she was able to perform all essential job functions of a CNA, including heavy lifting. At some point soon thereafter, however, her ability to lift became restricted.

On December 31, nine days after she began work, she was seen by Dr. Lester Mietkiewicz for a medical examination. Dr. Mietkiewicz's records indicate that Gauthier "was

---

[1] For present purposes, defendants have not sought to distinguish between Sunhealth and Sunbridge. For the sake of simplicity, plaintiff's employer will be referred to simply as "Sandalwood."

[2] The evidence as to the stage of plaintiff's pregnancy during the relevant time is inconsistent; the differences are not, however, material.

12 wks pregnant and no heavy lifting is suggested." (Pl. Ex. 7).

On January 12, 2004, Gauthier was examined by her obstetrician, Dr. John Farricy. Dr. Farricy gave her a note that stated in relevant part: "I am recommending that [Gauthier] be able to work and lift with the assistance of another co-worker." Her supervisor, Ann Kendall, requested the note to be sure that Gauthier was capable of doing her job.

According to Gauthier, she was injured on the job on January 24, 2004, when she was kicked in the abdomen by a Sandalwood patient. She drove herself to a hospital emergency room for treatment. She contends that she obtained a note from the hospital stating that she was not to engage in any lifting or bending. She gave this note to Kendall and requested "light duty." Gauthier was told by Kendall that "there is no light duty" and was not given any less strenuous work. According to Gauthier, Kendall also stated that she could not accept the note because it was not from Gauthier's obstetrician. The note is not in the record.[3]

Gauthier visited her obstetrician on January 26, who gave her a note to relay to Kendall. This note stated: "It is my recommendation that [Gauthier] be able to continue working and lifting with caution."

Defendants filed a workers' compensation claim on behalf of Gauthier for the abdominal injury; the record does not reveal when it was filed. According to Gauthier, she did not request that the company file the claim. She further contends that no one at Sandalwood asked her about workers' compensation, nor did she speak to anyone about the subject. Gauthier nonetheless

---

[3] Gauthier's recollections during her deposition concerning her injury were inconsistent. At one point, she stated that the abdominal injury occurred on April 28, 2004. She also asserted that she was never denied light duty in January, and that the first time she requested light duty was after April 28. Defendants also produced an "Incident Accident Record" that stated the injury occurred on April 28. The Court will credit the version that is most favorable to the plaintiff.

asserts that she was "aware" a claim had been filed on her behalf.

Gauthier requested light duty another four or five times between January and May 2004. Each time, Kendall denied her request. The administrator of Sandalwood, Stephen Copper, testified that there was light duty available on the day shift for CNAs, and that it was Sandalwood policy to put CNAs on light duty on the day shift "if there was a position available." This light duty consisted of various tasks such as filing, general office work, answering phones, and patient escorts. Because of more limited staffing, light duty was not available on the night shift. Gauthier contends that she was never offered a move to the day shift, but also concedes that she never requested one.

### B.    Plaintiff's Nausea

Beginning in about January 2004, Gauthier began to suffer from morning sickness. She vomited every day approximately twenty times a day. She was not given any medication or treatment for nausea, and was not given any restrictions as to her activities by her physician.

She testified as follows as to her request for accommodation for morning sickness:

Q:    And did you ask for time off for your morning sickness?

A:    I asked for time off on numerous occasions, through my time span working there while I was pregnant, yes; I was denied.

Q:    And did you ask for these accommodations that you just described on several occasions throughout the course of your employment?

A:    Yes, several times.

Q:    And were you denied?

A:    Correct. . . .

Q:    So, you're saying that you requested an accommodation to go to the bathroom for morning sickness, and you were denied?

A:     Yes. . . .

Q:     And what did you ask the supervisor?

A:     I had asked the supervisor, you know, 'I have to go to the bathroom,' you know, quite a few times.  And then Ann [Kendall] told me – the next day she told me – like I said – if I was unable to perform my job, then I can no longer work here anymore.

Q:     But I'm trying to understand what the specific accommodation was that you were requesting.  Did you ask if it was okay to go to the bathroom to vomit, and they said, 'No,' or this other supervisor said, 'No'?

A:     Yes, because they felt that it wasn't appropriate to do that and I had called out a numerous of times [*sic*] because of that, and I was written up for that. . . .

Q:     The accommodation you sought – and correct me if I'm wrong – was that you be allowed to go to the bathroom; was that correct?  . . .

A:     Yes. . . .

Q:     And how frequently did you ask that you be allowed to go to the bathroom?

A:     I couldn't.  Sometimes I just ran right in there.  I mean, there was like nothing I could do, you know, but they told me that that's not appropriate to come to work like that.

Q:     Who said it was inappropriate to come to work like that?

A:     One of the supervisors that was on 11 to 7.  . . .

Q:     Did you specify how frequently and for what duration your visits to the bathroom would be accommodated?

A:     No, because it changed all the time.

(Gauthier Dep. at II:71-75).[4]

---

[4]  Gauthier acknowledged in her deposition that she called in sick nine or ten times during her employment with Sandalwood and that she received a written warning regarding her attendance.  She maintains, however, that she had never been absent from a shift without calling before the shift occurred.

C.     **Plaintiff's Swollen Feet**

At some point, Gauthier also began suffering from swollen feet.  She testified as follows:

> There was numerous times I was at work, I needed my feet to be up because they
> were swollen so bad and I feel that I performed my job to my best abilities and
> I—I went above and beyond the call of duty at work.

(*Id.* at II:54).  The only evidence in the record that Gauthier may have communicated to her

supervisors that she had swollen feet, or that she asked for an accommodation, was the following

exchange at her deposition:

> Q:     What accommodations did you ask for, other than the ones that you
>        already testified about?
>
> A:     The no lifting, the swollen [*sic*] of the feet and using the bathroom more
>        frequently because I had morning sickness, . . . .

(Gauthier Dep. at II:71).

D.     **Plaintiff's Request for Time Off to Sleep**

Beginning in January 2004, Gauthier periodically asked for time off because she wanted

to sleep between the end of her shift and her doctor's appointments, which were in the morning.

She wished to use this extra time to sleep "because it was too hard for me to stay up all night and

stay up all day to go to . . . doctor's appointments."  (Gauthier Dep. at 38).[5]  Those requests were

repeatedly denied.[6]

---

[5] Plaintiff argues that she requested time off to *attend* doctor's appointments—which, by implication, were scheduled between 11:00 at night and 7:00 in the morning.  The only evidence cited in support of that argument, however, was the following testimony from her deposition:  "Q: Your testimony is that you asked Ann Kendall if you could take a shift off to go to a doctor's appointment *the following day* and were denied?  A: Yes."  (Gauther Dep. at I:39) (emphasis added).  This testimony does not state or suggest that plaintiff had an actual doctor's appointment in the middle of the night.

[6] Defendants repeatedly assert that Gauthier has admitted in her deposition that the *only* accommodation she requested for any of her alleged conditions was additional time off from work.  In her first day of deposition testimony, she did make a statement to that effect.  On her second day of testimony, however, she contended that she also asked to refrain from heavy lifting and to be allowed to use the bathroom more frequently due to morning

6

E.     **Plaintiff's Termination from Employment**

Gauthier's employment was terminated on May 25, 2004.  It is undisputed that the official explanation for Gauthier's discharge was that she had committed two "no call/no shows."  A "no call/no show" occurs when a Sandalwood employee does not show up for an assigned shift and does not notify anyone at the facility.  It is also undisputed that understaffing jeopardizes the health and safety of the residents of a skilled nursing facility.

The second no call/no show purportedly occurred on some unspecified date in May 2004. It was this incident that caused Sandalwood to terminate Gauthier's employment.  Neither Kendall nor any other Sandalwood employee recalls specifically who made the decision to end Gauthier's employment.

Gauthier disputes that she ever committed even one "no call/no show."  She contends that on every occasion that she was absent, she arranged for another CNA to switch shifts with her in advance.  In particular, she contends that on the occasions of the alleged no call/no shows, she had already switched that shift with another CNA, Lisa Franks.  Gauthier verbally agreed to the change with Franks and then informed the shift supervisor.  Gauthier maintains that the shift supervisor was then "supposed to switch it in the book."  Another CNA working with both Gauthier and Franks at the time, Lisa Raymond, has stated that "[Gauthier] and Lisa Franks had switched days and Lisa didn't show up."

The exact disciplinary procedure at Sandalwood, and the number of absenteeism or lateness violations necessary to trigger a termination, are in dispute.  As discussed below, Gauthier contends that other Sandalwood employees in comparable positions have had more

---

sickness.  The Court will credit the version most favorable to the plaintiff.

than two no-call/no shows and have not been terminated.

## II.    Analysis

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990).

### A.    The Claim of Gender Discrimination

Plaintiff first contends that she was terminated because she was pregnant.  Discrimination on the basis of pregnancy is a form of gender discrimination prohibited by Mass. Gen. Laws ch. 151B, §4.  *Massachusetts Elec. Co. v. Massachusetts Comm'n Against Discrimination,* 375 Mass. 160, 167-169 (1978).

As a general matter, the law requires that pregnant women be treated equally with non-pregnant employees.  *Id*. at 167-168.  Thus, for example, an employer cannot discharge a female employee because she becomes pregnant, and pregnancy-related requests for sick days and other temporary leaves of absence must be treated the same as those made by non-pregnant employees. *See, e.g., Troy v. Bay State Computer Group, Inc.*, 141 F.3d 378, 381 (1st Cir. 1998). Nonetheless, the law does not require that employers tolerate poor performance or absenteeism in an employee simply because she is pregnant**.  *See id.* ("[T]he discrimination statutes are not medical leave acts, and [an employer] would not automatically be liable for gender

discrimination if it had discharged [a pregnant employee] for poor attendance under standards applied to other employees, even if the poor record was due to pregnancy complications").

To prevail on a claim of gender discrimination under ch. 151B, §4, plaintiff has the initial burden of demonstrating a *prima facie* case. To do so, she must show that (1) she was within a protected class; (2) she met her employer's legitimate performance expectations; (3) she was actually or constructively discharged; and (4) she was replaced by another employee with similar skills and qualifications. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Patrick v. Jansson Corp.*, 392 F. Supp. 2d 49, 53 (D. Mass. 2005) (applying standard to ch. 151B). Meeting that *prima facie* burden "is not onerous." *Santiago-Ramos v. Centennial P.R. Wireless*, 217 F.3d 46, 54 (1st Cir. 2000).[7]

If an employee makes this showing, an employer can rebut it by offering evidence of a legitimate, nondiscriminatory reason for the employment decision. *Santiago-Ramos,* 217 F.3d at 54. If the employer does so, the burden shifts to the plaintiff to show that the employer's articulated justification is a pretext. *Id.* at 55.

Plaintiff here has made a *prima facie* showing as to all four elements. She was pregnant at the time of her December 2003 hiring, and defendants knew this when they hired her. She was discharged from her employment in May 2004. Finally, defendants do not dispute that her duties continued to be performed after her discharge by other, comparably qualified employees.

Defendants' sole contention for summary judgment on this count rests on the second element of the *St. Mary's* test: they contend that plaintiff was not performing her job at an

---

[7] Massachusetts courts generally look to analogous federal precedent in interpreting ch. 151B, although those interpretations are not binding. *See Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 816 & n.5 (1997); *Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 440-441 (1995).

acceptable level.  Defendants contend that plaintiff was discharged because she committed two
"no call/no shows" during her employment.  Unacceptable absence is a legitimate,
nondiscriminatory reason to terminate an employee.  *See, e.g., Troy*, 141 F.3d at 381.[8]

Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find
that defendants' proffered explanation for plaintiff's dismissal was a mere pretext.  A plaintiff
can show pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate reasons" for the adverse employment
action.  *Santiago-Ramos,* 217 F.3d at 56.

First, according to plaintiff, she never missed a shift without calling or scheduling
coverage.  Plaintiff further contends that she had switched shifts with another CNA, Lisa Franks,
on the day of the alleged no call/no show that led to her termination of employment.

Second, Sandalwood employees have given conflicting testimony as to the company's
shift-switching policy.  Copper testified that shift-switching could be based on a verbal
agreement between an employee and a supervisor.  However, Kendall, who was plaintiff's
immediate supervisor, maintained that shift-switching required both a written request signed by
both CNAs and the approval of the scheduler or Kendall herself.  According to Kendall, verbal
agreements to switch shifts were only permissible in "unusual circumstances," where there was
not time to put the agreement in writing.  If plaintiff was considered a "no show" because she
verbally informed a supervisor of her switch but did not fill out any paperwork, Kendall's

---

[8] There does not appear to be any issue concerning the amount of sick leave provided to plaintiff.  In
addition to whatever medical or family leave an employee may receive as a job benefit, federal law may also provide
a statutory right to a certain amount of family and medical leave.  *See* the Family and Medical Leave Act, 29 U.S.C.
§§ 2601 *et seq.* ("FMLA").  Plaintiff here does not argue that she was entitled to FMLA-protected leave, presumably
because she was employed by Sandalwood for less than one year.  *Id.* at § 2611.

purported adherence to a procedure not required by company policy could be considered evidence of pretext.[9]

Third, even assuming that plaintiff did in fact commit two no call/no shows, a reasonable jury could find that she was treated differently than non-pregnant employees who had committed similar offenses. Copper testified that at the time of plaintiff's employment, the company had a progressive discipline policy: employees who committed workplace infractions would receive a minimum of two verbal warnings before receiving written warnings, and generally two written warnings were required before any disciplinary action was taken. Any disciplinary action would depend upon "[a] review [of] the employee [and] the nature of the events." Suspensions, as an alternative to termination, might be used in cases of "alleged abuse" and "excessive absenteeism."

Plaintiff has submitted evidence tending to show that other CNAs employed by defendants were *not* terminated after committing two no call/no shows. "Employee No. 2" committed no call/no shows on June 14 and June 22, 2004, and was not terminated until October 13.[10] "Employee No. 6" committed no call/no shows on July 15 and September 4, 2005, and received her first written warning (without termination) on September 6. "Employee No. 13" was hired by defendants on April 9, 2004, committed no call/no shows on April 10 and April 17, and was not terminated until after an additional (notified) absence on April 23 and an incident of tardiness on May 4.

---

[9] Kendall could not recall whether plaintiff had ever committed a no call/no show at all, and could not remember why plaintiff was terminated. Copper recalls talking to Kendall about plaintiff's no call/no shows and eventual termination, but acknowledged that he never talked to plaintiff about her absenteeism, and never learned the circumstances of the second no call/no show.

[10] The evidence was submitted to the Court with the employee names redacted.

These other incidents, of course, may be factually distinct in ways that are not set forth in the record.  Defendants, however, have offered no such evidence or explanation.  Indeed, defendants have not produced a single employee who can remember the exact factual circumstances of *plaintiff's* second no call/no show.

The foregoing is sufficient evidence of pretext to survive a motion for summary judgment.  The issue at present, of course, is not whether Sandalwood actually discriminated against the plaintiff; it may well have terminated her for a perfectly valid reason.  Nonetheless, viewing the record in the light most favorable to plaintiff, there is a genuine issue of material fact as to whether her termination was motivated by gender discrimination.  Summary judgment as to that claim will therefore be denied.

**B.     The Claim of Handicap Discrimination**

Plaintiff next contends that defendants discharged her on the basis of handicap in violation of Mass. Gen. Laws ch. 151B §4(16).[11]  That statute makes it an unlawful discriminatory practice

> [f]or any employer, personally or through an agent, to dismiss from employment or . . . or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business.

*Id.*  To succeed on such a claim, the plaintiff must show that (1) she is handicapped within the

---

[11] The analogous federal statute, the Americans with Disabilities Act, 42 U.S.C. § 12112 *et. seq.* ("ADA"), uses the term "disability," whereas the Massachusetts statute uses the term "handicap."  There is little or no substantive difference between the two terms.  *See, e.g., Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11, 21 & n.5 (1st Cir. 2002) ("Although we write in terms of the ADA, our comments apply with equal force to the appellant's claim under its state-law counterpart, Mass. Gen. Laws ch. 151B, § 4.  That statute tracks the ADA in virtually all respects").

meaning of the statute; (2) she was nevertheless able to perform the essential functions of her job, either (a) without accommodation, or (b) with a reasonable accommodation provided by the employer, subject to the qualification that the accommodation not pose an undue hardship upon the employer; and (3) the handicap was the cause of the allegedly unlawful discriminatory action. *Cargill v. Harvard Univ.*, 60 Mass. App. Ct. 585, 586 (2004); *see New Bedford v. Massachusetts Comm'n Against Discrimination*, 440 Mass. 450, 461-462 (2003); *St. Laurent v. United Parcel Service, Inc.,* 416 F. Supp. 2d 212, 220 (D. Mass. 2006).

Under ch. 151B, an individual has a "handicap" if he or she (1) has a substantial impairment that substantially limits one or more major life activities; (2) has a record of such a physical or mental condition; or (3) is regarded by the employer as having such a condition. Mass. Gen. Laws ch. 151B, §§ 1(17); 1(20); and 4(16); *New Bedford*, 440 Mass. at 463. Determining whether a plaintiff is "handicapped" is a fact-intensive analysis and must be made on a case-by-case basis. *Calero-Cerezo v. U.S. Dept. of Justice,* 355 F.3d 6, 20 (1st Cir. 2004).

Pregnancy alone is not a handicap. *McDonnell v. Certified Engineering & Testing Co., Inc.,* 899 F. Supp. 739, 753 (D. Mass. 1995) ("while in some cases pregnancy may render a person disabled, this disability must be demonstrated; pregnancy is not, *per se*, a disability"). Pregnancy-related complications can, nonetheless, constitute a handicap. *See Darian v. University of Mass. Boston,* 980 F. Supp. 77, 85-87 (D. Mass. 1997); *see also McDonnell,* 899 F. Supp. at 753; *compare School Committee of Braintree v. Massachusetts Com'n Against Discrimination*, 377 Mass. 424, 432 (1979). The relevant issue is the nature of the purported disability, "regardless of its origin." *Darian,* 980 F. Supp. at 86.

In addition to establishing that she is handicapped, plaintiff must put forth evidence that

13

she was a "qualified handicapped person"—that is, that she was "capable of performing the essential functions of the position involved with reasonable accommodation." Mass. Gen. Laws ch. 151B, § 1(16); *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 646 (1st Cir. 2000).

An "essential function" is a "fundamental job duty of the employment position the individual with a disability holds or desires." *Ward v. Massachusetts Health Research Institute,* 209 F.3d 29, 34 (1st Cir. 2000). Defendants bear the burden of proving that a given job function is an essential function. *Ward,* 209 F.3d at 35.

The burden of showing that a reasonable accommodation was available is on the plaintiff. *Garcia-Ayala*, 212 F.3d at 648-49; *St. Laurent,* 416 F. Supp. 2d. at 222. The employer's burden of showing an inability to accommodate is triggered only "after a plaintiff produces sufficient evidence to make at least a facial showing that reasonable accommodation is possible." *Cargill*, 60 Mass. App. Ct. at 603; *Cox v. New England Tel. & Tel. Co.,* 414 Mass. 375, 386 n.3 (1993).

Here, plaintiff contends that she had four temporary disabilities arising out of her pregnancy that rendered her "handicapped" within the meaning of the law—an inability to do any heavy lifting, nausea, swollen feet, and a need to sleep before medical appointments.

## 1.    Plaintiff's Request to Refrain from Heavy Lifting

The first set of issues concerns plaintiff's ability to lift and support the weight of facility residents. A reasonable jury could find that plaintiff's temporary inability to do heavy lifting rendered her "handicapped" within the meaning of ch. 151B, § 4.[12] An inability to lift is a substantial limitation of a "major life activity." The Massachusetts Commission Against

---

[12]  The Court need not reach plaintiff's alternative contention that she was *regarded* as handicapped by the defendants.

Discrimination includes "lifting" in its list of major life activities.  *MCAD Guidelines,* § II.A.5.
The First Circuit has also held that lifting, under certain circumstances, can be a major life
activity.  *Gillen,* 283 F.3d at 22-23.

Plaintiff does not dispute that heavy lifting was an essential function of her position.  It is
her burden, in the first instance, to show that a reasonable accommodation was available.  The
*only* accommodation she requested, however, was a transfer to a "light duty" position.   Her
supervisor, however, denied her request and told her "there is no such thing as light duty."

Although the record does not reveal what plaintiff thought "light duty" actually was,
some light duty did exist at Sandalwood:  filing, answering phones, patient escorts, and other
miscellaneous office work.  According to the undisputed evidence, however, light duty only
existed on the day shift, because of the relatively small number of employees present on the
afternoon and night shifts.  Plaintiff never asked to switch from the night shift to the day shift.

It is clear that Sandalwood was not required to transfer plaintiff to a different position, or
to create a new position for her.  Massachusetts law does not require that an employer provide a
"reasonable accommodation" in the form of a reassignment to new or different position.  *Russell
v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 454 (2002); *see Lolos v. Solutia, Inc.,* 193 F.
Supp. 2d 364, 371-73 (D. Mass. 2002); *St. Laurent,* 416 F. Supp. 2d at 223.  Requiring the
employer to transfer plaintiff to light duty would involve "writing heavy lifting out of [her] job
description."  *Id.* at 223.

There is no evidence that plaintiff suggested any alternative accommodation to enable her
to lift and support facility residents.  *Compare Cargill*, 60 Mass. App. Ct. at 604 (denying
summary judgment because librarian plaintiff who suffered from rheumatoid arthritis produced

15

sufficient evidence to make a facial showing that utilization of student workers, part-time

workers, and shelving carts could reasonably accommodate her inability to perform essential

library-related manual labor). Certainly Sandalwood was not required to hire an additional

person who could do the job for her. *See Marzano v. Universal Studio, Inc.*, 2003 WL 21696213

(D. Mass. 2003).

Nonetheless, it is far from clear that Sandalwood complied with its statutory duties in

terms of accommodation. In general, an employee's initial request for an accommodation

triggers an obligation on the part of the employer to engage in an "interactive process" to

determine whether an appropriate accommodation is available. *Russell*, 437 Mass. at 443. In

some cases, a failure to engage in the interactive process may constitute a failure to provide a

reasonable accommodation. *Kvorjak v. Maine*, 259 F.3d 48, 52-53 (1st Cir. 2001); *Jacques v.

Clean-Up Group, Inc.*, 96 F.3d 506, 515 (1st Cir. 1996). That omission may, however, be

harmless where it is clear that the employee cannot perform the essential duties of the job under

any circumstances. *Kvorjak*, 259 F.3d at 53; *Soto-Ocasio v. Federal Express Corp.*, 150 F.3d 14,

19 (1st Cir. 1998).

Here, it appears that Sandalwood rejected the possibility of "light duty" out of hand,

without discussion of alternatives. It is difficult to ascertain from the record whether an

interactive process might have yielded anything useful. As noted, plaintiff herself has suggested

no alternatives, and it is not the role of this Court to try to imagine possible accommodations.

On the other hand, the disability was temporary, and it is at least possible that a short-term

accommodation might have been reasonable where a long-term one was not. Furthermore, and

in any event, the employer had a legal duty to consider and discuss possible alternatives, even if

only to reject them as unreasonable.

Under the circumstances, and giving the benefit of every inference to the plaintiff, it is not possible to conclude with confidence that the interactive process would necessarily have been futile. Although plaintiff's request for "light duty" on the night shift was not a request for a reasonable accommodation within the meaning of ch. 151B, Sandalwood's apparent failure to engage in the interactive process in response to that request requires the denial of summary judgment as to the claim based on a temporary inability to perform heavy lifting.

### 2.     Plaintiff's Request for Time Off for Nausea

The second set of issues concerns plaintiff's morning sickness. Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could conclude that she vomited every day approximately twenty times a day; that, to accommodate her nausea, she asked her supervisor both for "time off" and to be able to use the bathroom; that her supervisors denied her requests; that she was told that it was "not appropriate to come to work like that" and if she were "unable to perform [her] job," that she could no longer work there; and that sometimes she simply ran into the bathroom without permission when she was nauseous.

Plaintiff's testimony raises a host of questions. It is unclear, for example, whether she was actually denied the ability to use the bathroom, as she does not contend that she was forced to vomit at her work station. It is also unclear whether her supervisors felt she used the bathroom too frequently or stayed too long, or simply felt that she should not have come to work at all when she felt ill. It is also unclear what precise accommodation plaintiff was requesting, and whether it was reasonable; there is a vast gulf between being able to use the bathroom more frequently and not coming to work at all. While the former could be reasonably accommodated

17

in most employment settings, the latter would be dramatically more burdensome on the employer.  Being present at work is an essential job function of most employment positions.  *See Ward,* 209 F.3d at 35 (citing *Tyndall v. Nation Educ. Centers, Inc., of California,* 31 F.3d 209, 213 (4th Cir. 1994)).

In any event, temporary nausea resulting in frequent vomiting is plainly a substantial limitation on a number of major life activities, and a reasonable jury could therefore conclude that it constituted a "handicap."  As noted, it then becomes plaintiff's burden to show that she was able to perform the essential functions of the position, with or without reasonable accommodation.  *Garcia-Ayala,* 212 F.3d at 646.  While the state of the evidence leaves much to be desired, the Court concludes that plaintiff has narrowly met her burden here.  She has produced sufficient evidence from which a reasonable jury could conclude that her handicap (nausea) could have been reasonably accommodated by her employer (for example, by permitting more trips to the bathroom).  Because the employer has submitted no countervailing evidence, summary judgment must be denied.

### 3.    <u>Plaintiff's Request to Raise Her Feet</u>

The third set of issues concerns plaintiff's swollen feet.  Temporary swollen feet resulting in an inability to stand or sit normally is a substantial limitation of a major life activity.  *See, e.g., Darian,* 980 F. Supp. at 85-87.  The entirety of the evidence concerning her request for accommodations for that condition consists of the following deposition testimony:

Q:    What accommodations did you ask for, other than the ones that you already testified about?

A:    The no lifting, the swollen [*sic*] of the feet and using the bathroom more frequently because I had morning sickness,"

(Gauthier Dep. at II:71);

> There was numerous times I was at work, I needed my feet to be up because they were swollen so bad and I feel that I performed my job to my best abilities and I—I went above and beyond the call of duty at work.

(Gauthier Dep. at II:54).

An employer cannot be held liable for failing to accommodate the limitations flowing from a disability where the employer is not aware of the disability.  *See Estades-Negroni v. Associates Corp. of North America*, 377 F.3d 58, 64 (1st Cir. 2004); *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 649 n.21 (2004).  It is "the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one."  *Ocean Spray*, 441 Mass. at 644 (citing *Russell*, 437 Mass. at 457).  "Specifically, the request must let the employer know that the employee is a qualified handicapped person, and that the employee is currently unable either to perform the essential functions of his job or to enjoy equal terms, conditions, and benefits of employment."  *Ocean Spray*, 441 Mass. at 649 n.21; *accord Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 260-61 (1st Cir. 2001).

There is no evidence that plaintiff told her employer that she had swollen feet, and likewise no evidence that she made a "direct and specific" request for an accommodation.  *Reed*, 244 F.3d at 261 (1st Cir. 2001) (ADA); *see also Ocean Spray*, 441 Mass. at 649 & n.21 (2004) ("Employers cannot be required to accommodate needs they do not know exist").  Accordingly, plaintiff's claim of handicap discrimination as to her swollen feet cannot survive summary judgment.

### 4.      Plaintiff's Desire for More Sleep before Medical Appointments

The fourth set of issues concerns plaintiff's request for more sleep before attending doctor's appointments. Of course, pregnancy may be accompanied by fatigue, and excessive fatigue could, under some circumstances, constitute a "handicap" under the law.

Here, however, plaintiff does *not* contend that she suffered pregnancy-related fatigue, or fatigue triggered by any other condition or illness. Instead, she simply asserts that she needed more sleep before her doctor's appointments. There is no evidence that her medical appointments were for any purpose other than the routine monitoring of her pregnancy. There is no evidence that plaintiff was unable to obtain medical appointments during normal office hours. There is no evidence that any physician ever advised her to obtain more sleep before her appointments. Indeed, there is no evidence that her desire to sleep longer was anything other than a subjective preference. In fact, her pregnancy is only connected to her claimed "handicap" through a strained exercise in but-for causation—the reason the doctor's appointments were made in the first place is because plaintiff was pregnant.

Under the circumstances, plaintiff's desire for additional sleep before her medical appointments is not an actionable "handicap" under the law. Her request for time off to sleep was a matter of preference or convenience, not necessity. Accordingly, summary judgment will be granted as to this aspect of her claim for handicap discrimination.

*     *     *

In summary, plaintiff's claims based on her inability to lift patients and her morning sickness are sufficient to withstand summary judgment. Her swollen feet qualified as a "handicap," but there is no evidence that she ever communicated her condition or her requested accommodation to her employer. Her claim that she needed additional sleep before her doctors'

20

appointments does not qualify as a "handicap" within the meaning of the law.  Summary judgment as to the claim of handicap discrimination will therefore be granted in part and denied in part.

### C.     The Claim of Retaliation Based on Request for Accommodation

Section 4(4) of Chapter 151B makes it unlawful "[for] any person [or] employer . . . to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under [Chapter 151B]."  To state a *prima facie* case for retaliation, the plaintiff must establish that (1) she engaged in conduct protected under Chapter 151B; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.  *McMillan* v. *Massachusetts Soc. for the Prev. of Cruelty to Animals*, 140 F.3d 288, 309 (1st Cir. 1998); *Mole v. University of Massachusetts*, 442 Mass. 582, 591-92 (2004).[13]

For purposes of a claim under ch. 151B, § 4(4), a plaintiff engages in protected activity if "she has opposed any practices forbidden under this chapter or . . . has filed a complaint, testified or assisted in any proceeding under Mass. Gen. Laws ch. 151B, § 5."  Defendants' sole argument for summary judgment on this count is that plaintiff never told her employer that she had suffered discrimination, and therefore "there could not have been retaliation for making a report of discrimination."

As discussed, while plaintiff's pregnancy did not constitute a handicap *per se*, some of the complications that resulted were sufficient to render plaintiff "handicapped" within the

---

[13]  If the plaintiff makes this preliminary showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision.  If the defendant does so, the plaintiff must produce evidence to show that the proffered reason is a pretext for retaliation.  *McMillan*, 140 F.3d at 309; *Colburn v. Parker Hannifin/Nichols Portland Division,* 429 F.3d 325, 335-36 (1st Cir. 2005).

21

meaning of ch. 151B.  It is undisputed that plaintiff requested accommodation in the form of "light duty" and more bathroom breaks because of limitations arising from her pregnancy.

The fact that plaintiff may have never reported any discrimination to anyone is not controlling.  In a disability-based retaliatory discharge claim, requesting workplace accommodations because of a disability constitutes "protected activity" whether or not a formal complaint or charge was ever made.  *See Wright v. CompUSA, Inc.,* 352 F.3d 472, 477-478 (1st Cir. 2003) (Americans with Disabilities Act); *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 177 (1st Cir. 2003) (same); *Miller v. Verizon Communications,* 474 F. Supp. 2d 187, 201 (D. Mass. 2007) (ADA and ch. 151B, § 4(4)).

Plaintiff did, therefore, engage in protected conduct under Massachusetts law when she requested accommodations.  The fact that some of the requested accommodations may have been unreasonable does not automatically foreclose a retaliation claim springing from those requests. *Wright*, 352 F.3d at 477; *Mesnick v. General Elec. Co.,* 950 F.2d 816, 827 (1st Cir. 1991) ("The fact that a plaintiff eventually proves unable to establish that his employer violated [the statute] in the first instance is not fatal to his prima facie case of retaliation").

Because defendants do not dispute that plaintiff suffered an adverse employment action, and do not argue that a reasonable jury could not find there was a causal connection between the requests for accommodation and plaintiff's discharge, summary judgment will be denied.[14]

### D.    The Claim of Retaliation Based on Workers' Compensation Filing

---

[14]  While plaintiff has met her *prima facie* burden, neither party has specifically discussed (in the retaliatory discharge context) defendants' subsequent obligation to articulate a legitimate, nondiscriminatory reason for the discharge and plaintiff's consequent responsibility to produce evidence showing pretext.  As previously stated, plaintiff was terminated for allegedly committing two "no call/no shows."  The Court deems defendants to have met their burden of articulating a non-discriminatory reason, and deems plaintiff to have met her responsive burden, based on the evidence of pretext discussed above.

Plaintiff further contends that she was retaliated against for making a claim for workers' compensation in violation of Mass. Gen. Laws ch. 152, § 75B. The statute states in relevant part:

> No employer or duly authorized agent of an employer shall discharge, refuse to hire or in any other manner discriminate against an employee because the employee has exercised a right afforded by [the Workers' Compensation Act], or who has testified or in any manner cooperated with an inquiry or proceeding pursuant to this [Act], unless the employee knowingly participated in a fraudulent proceeding.

*Id.* In order to assert a claim of retaliation under the Massachusetts Workers' Compensation Act, an employee must demonstrate that (1) the employee engaged in an activity protected by the Act; (2) the employer was aware of the protected activity; (3) the employer thereafter engaged in an adverse employment action; and (4) but for the employee's engagement in the protected activity, the employer would not have taken the adverse employment action against the employee. *Benoit,* 331 F.3d at 177 n.5.

A workers' compensation claim was filed by Sandalwood on plaintiff's behalf for the January 2004 abdominal injury. It is undisputed that plaintiff did not ask anyone about workers' compensation after her injury, and that she never spoke to any Sandalwood officers or employees about the subject. Plaintiff asserts only that at some unspecified point she became "aware" that a workers' compensation claim had been filed on her behalf. Because she never heard back from her employer or any state agency about any claim for benefits, she began to doubt if a workmen's compensation claim had been filed or not.

Plaintiff's complete lack of involvement in—indeed, general unawareness of—her own claim mandates the conclusion that she did not suffer from unlawful retaliation under the Workers' Compensation Act. Proof of retaliation requires, among other things, proof that the

employee "exercised a right afforded [by the act]."  Mass. Gen. Laws ch. 152, § 75B.  Plaintiff did not exercise any such right here.  By her own undisputed admission, she simply had no involvement in the process at all.  While there might be scenarios where an employer filed a claim on behalf of an employee, but nonetheless later retaliated against that employee for the exercise of that right, surely some bare minimum of action by the plaintiff is required.[15]  Here, plaintiff did nothing at all to assert her rights, and lacked even remote involvement in the process.  Plaintiff therefore did not engage in a "protected activity" within the meaning of the law.  Summary judgment will accordingly be granted as to that claim.

## III.     Conclusion

For the foregoing reasons, the motion of defendants Sunhealth Specialty Services, Inc., and Sunbridge Healthcare Corporation for summary judgment is

1.    GRANTED in part and DENIED in part as to Count I (discrimination on the basis of handicap);

2.    GRANTED as to Count IV (retaliation for making a claim under the Workers' Compensation Act); and

3.    DENIED as to Counts II (discrimination on the basis of gender) and III (retaliation for making a claim of handicap discrimination).

**So Ordered.**

      /s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

---

[15]   The sole case plaintiff cites in support of her § 75B claim is *Gilman v. C & S Wholesale Grocers, Inc.*, 170 F. Supp. 2d 77 (D. Mass. 2001).  *Gilman*, however, simply states that a reasonable jury may conclude that an employee was discriminated against when that employee *asserts* his or her workers' compensation rights.  *Gilman*, 170 F. Supp. 2d at 87.

Dated: March 27, 2008